**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | NORTHERN DISTRICT OF |
| | ) | GEORGIA, GAINESVILLE |
| CROWN ASSETS, LLC, | ) | DIVISION, CASE NO. 20-21451 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| SAHIB ARORA; VINEET SINGH; | ) | Removed Case: |
| KING GROUP MGMT, LLC; | ) | |
| MAHARAJA INVESTMENTS, LLC; and | ) | FULTON COUNTY |
| ZILLIONAIRE ASSETS, LLC, | ) | SUPERIOR COURT, |
| | ) | CASE NO. 2020CV339119 |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adversary Proceeding No. |
| CHARANJEEV SINGH; KARAN S. AHUJA; | ) | |
| JARNAIL SINGH; JONIKA ARORA; | ) | _____ |
| CROWN ASSETS, LLC; 2551 E PINETREE | ) | |
| BLVD MGMT LLC; 2551 EAST PINETREE | ) | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | ) | |
| 140 W DYKES STREET LLC; 1604 E | ) | |
| OGLETHORPE BLVD LLC; KING ASSETS, | ) | |
| LLC; and 2505 S MAIN STREET, LLC, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

<u>**NOTICE OF REMOVAL**</u>

Crown Assets, LLC (the "**Debtor**"), as Respondent in Case Number 2020CV339119 (the "**Removed Case**"), which has been pending in Fulton County, Georgia Superior Court (the "**State Court**"), hereby removes the Removed Case, in its entirety, to the United States Bankruptcy Court for the Northern District of Georgia (the "**Bankruptcy Court**").

The Removed Case was originally commenced in the State Court when Shaib Arora, Vineet Singh, King Group Mgmt, LLC, Maharaja Investments, LLC, and Zillionaire Assets,

LLC (collectively, the "**Petitioners**") filed a petition (and later an first amended and restated petition) (collectively, the "**Petition**") seeking relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, to quiet title, for an injunction, for rescission, for other equitable relief, for declaratory judgment, and for damages for various torts (the "**Claims**") allegedly committed by the Debtor and the other respondents in the Removed Case (collectively, the "**Respondents**").

The Debtor owns, manages, and sells real estate.  Real estate investment is the sole purpose of the Debtor.  The Debtor is wholly owned by Karan Ahuja, one of the Respondents in the Removed Case.  The individual Petitioners and Respondents are family members that grew up and lived in India for decades prior to the Removed Case being filed.  In 2014, family members from each side decided to invest in real estate located in the United States and created a company called King Group Mgmt, LLC ("**King Group**").

Virtually all of the Claims are centered around an allegation that the Petitioners were under duress and being extorted when they executed certain documents and consummated certain transactions between August 2019 and February 2020.  The duress and extortion is premised on an allegation that the Respondents threatened to release "false and defamatory" information about the Petitioners' sister to her groom's family prior to her scheduled wedding taking place in India, and that in turn the Respondents "coerced" or "forced" the Petitioners to complete the above-referenced transactions.[1]  In reality, however, there never was any "coercion" because the Respondents never threatened the Petitioners or their side of the family.  Instead, the above-referenced transactions were voluntarily entered into by the Petitioners and Respondents in order

---

[1] The Petitioners and their family members have started making even more ridiculous allegations since filing the Petition, including that some of the Respondents were going to send "a hundred thugs," to the wedding.

to settle on-going familial disputes and debts.  The August 2019 transactions and subsequent transactions were the result of months' worth of negotiations which took place between each side of the family.  Virtually all of the documents executed to effectuate the transactions were prepared by Petitioners' counsel – Joel Haber in Conyers, Georgia.

Unhappy and unsatisfied with the deals reached, the Petitioners started defaming the Respondents.  The defamation consisted of communications to the Debtor's and other Respondents' lenders.  The Petitioners, through the assistance of their counsel, filed false affidavits in the real estate records.  The Petitioners also reported false information to police concerning some of the Respondents.  Then, on August 7, 2020, the Petitioners took the egregious step of filing the Petition in the Removed Case.  In connection with the Petition and in order to apply even more leverage against the Respondents, the Petitioners' and their counsel filed *Notices of Lis Pendens* against virtually all of the properties owned by the Debtor and other Respondents, as shown in the below chart, with the Debtor's interest(s) in each property highlighted in bold font:

| Property Address | Owner(s) on Title | Ownership | Loan Obligor(s) or Guarantor(s) |
| --- | --- | --- | --- |
| 7530 St. Marlo Country Club Parkway, Duluth, GA 30097 | Charanjeev Singh | Individual | Charanjeev Singh |
| 90 Hunters Chase, McDonough, GA 30253 | Zillionaire Assets LLC | LLC | **Debtor**; Karan Ahuja; and Zillionaire Assets LLC |
| 325 Crooked Stick Drive, Milton, GA 30004 | **Debtor** | LLC | **Debtor** and Karan Ahuja |
| 1604 E Oglethorpe Boulevard, Albany, GA | **Debtor** and 1604 E Oglethorpe Blvd LLC | Tenants in Common | **Debtor**; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |

| 140 W Dykes Street, Cochran, GA | 140 W Dykes LLC | LLC | **Debtor**; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |
|---|---|---|---|
| 2505 S Main Street, Moultrie, GA | 2505 S Main Street LLC | LLC | Debtor; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |
| 4319 Covington Highway, Decatur, GA | Debtor and 4319 Covington Hwy LLC | Tenants in Common | **Debtor**; Billionaires Funding Group, LLC; 4319 Covington Hwy LLC; Karan Ahuja; Shaneel Lalani |
| 106 Commerce Street, Fayetteville, GA | **Debtor** and King Group Mgmt, LLC | Fifty Percent (50%) Interest Each | |
| 3811 Flat Shoals Parkway, College Park, GA | **Debtor** and King Group Mgmt, LLC | Fifty Percent (50%) Interest Each | |
| 2723 Roosevelt Highway, College Park, GA | **Debtor** and King Group Mgmt, LLC | Fifty Percent (50%) Interest Each | |
| 2318 Old Cornelia Highway, Gainesville, GA | King Group Mgmt, LLC and Golden Epoch Investments LLC | Fifty Six Percent (56%) and Forty Four Percent (44%) Interest Each | **Debtor**; King Group Mgmt, LLC; and Golden Epoch Investments LLC |
| 2551 E Pinetree Boulevard, Thomasville, GA | 2551 E Pinetree Blvd LLC | LLC | **Debtor**; Karan Ahuja, Shaneel Lalani; 2551 E Pinetree Blvd LLC; Billionaires Funding Group, LLC |

In the Removed Case, the Debtor and other Respondents filed an Emergency Motion to Cancel Lis Pendens (the "**Emergency Motion**"), arguing, *inter alia*, that the *Notices of Lis Pendens* were not authorized to be filed and record under Georgia law, and that they were causing significant harm to the Debtor and other Respondents as they could not sell or refinance the properties and the same was causing issues with their lenders.  At the end of September, the Judge in the Removed Case denied the Emergency Motion (the "**Emergency Motion Order**"). The Emergency Motion Order was not a directly appealable order and therefore the *Notices of Lis Pendens* would presumably remain on the Debtor's and other Respondents' properties until resolution of the claims in the Petition.  A resolution in the State Court is not forthcoming any time soon, as discovery has not commenced and due to the COVID-19 pandemic, the operations of Georgia state courts are somewhat limited at this time.

Unable to sell or refinance its properties, and with maturity obligations to its lenders looming in 2021, the Debtor was forced by the Petitioners to file for bankruptcy relief.  On October 25, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Georgia, Gainesville Division (the "**Gainesville Bankruptcy Court**"), thereby commencing case no. 20-21451 (the "**Bankruptcy Case**").

The Petitioners will no doubt file a proof of claim in the Bankruptcy Case claiming millions of dollars of damages based on the ridiculous allegations contained in their Petition, as well as any additional damages the Petitioners may conjure up during the pendency of the Bankruptcy Case.

Accordingly, the Removed Case is based on allegations that will likely comprise a claim that the Petitioners will assert against the Debtor in the Bankruptcy Case.  The allowance or

disallowance of the Petitioners' to be filed proof of claim will necessarily need to be resolved by the Gainesville Bankruptcy Court.

Therefore, the Removed Case is inextricably intertwined with the Bankruptcy Case and the claims that the Petitioners will no doubt assert therein. Without question, if a judgment or other relief were to be entered in the Removed Case, that judgment or other relief would simply be a small piece of the Petitioners' imminent claim in the Bankruptcy Case. The Petitioners' only option to collect on any such judgment or other relief against the Debtor would be to file a proof of claim in the Bankruptcy Case and seek a distribution as an unsecured creditor holding a prepetition claim against the Debtor.

Given that the Petitioners' claims asserted in the Petition are potential obligations of the Debtor, the Removed Case is related to the Bankruptcy Case. As such, the District Court has jurisdiction of the Removed Case pursuant to 28 U.S.C. § 1334(b).

Pursuant to 28 U.S.C. § 157, the United States District Court for the Northern District of Georgia (the "**District Court**") may refer the Removed Case to the bankruptcy judges for the district. The District Court has in fact referred to the bankruptcy judges for this district all cases under the Bankruptcy Code and all proceedings under Bankruptcy Code or arising in or related to a case under Bankruptcy Code. Accordingly, the Removed Case is automatically referred to the Bankruptcy Court.

As permitted by Bankruptcy Rule 9027(a)(2), this Notice of Removal is being filed within 90 days after the order for relief on the Bankruptcy Case.

**Core/Non-Core Status of Removed Case.**

The Removed Case is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Pursuant to 28 U.S.C. § 157(c)(2), the Debtor and the other Respondents consent to the District

Court's referral of the Removed Case to the Bankruptcy Court to hear and determine and to enter appropriate orders and judgments, subject to review under 28 U.S.C. § 158. Pursuant to Bankruptcy Rule 9027(a)(1), the Debtor consents to the entry of final orders or judgments by the bankruptcy judge.

**Process and Pleadings.**

This notice is accompanied by copies of all process and pleadings (as narrowly defined by Federal Rule of Civil Procedure Rule 7(a)), including:

1.    The Petitioners' Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, rescission and Other Equitable Relief, Declaratory Judgment and Damages and First Amended and Restated Petition, collectively attached hereto as Exhibit A;

2.    Respondents Charanjeev Singh, Karan S. Ahuja, Crown Assets, LLC, 4319 Covington Hwy LLC, 140 W Dykes Street LLC, 1604 E Oglethorpe Blvd LLC, King Assets LLC, and 2505 S Main Street, LLC's Emergency Motion to Cancel Lis Pendens, attached hereto as Exhibit B;

3.    The Petitioners' Response in Opposition to Respondents' Emergency Motion to Cancel Lis Pendens, attached hereto as Exhibit C;

4.    The Petitioners' Motion for Attorney's Fees Under O.C.G.A. § 9-15-14, attached hereto as Exhibit D;

5.    The Petitioners' Motion to Strike Affidavits, attached hereto as Exhibit E;

6.    The transcript of the hearing on the Emergency Motion, attached hereto as Exhibit F;

7.      The Petitioners' Motion for Interlocutory Injunctive Relief and Memorandum of Law in Support Thereof, attached hereto as Exhibit G; and

8.      Respondents Charanjeev Singh, Karan S. Ahuja, Crown Assets, LLC, 4319 Covington Hwy LLC, 140 W Dykes Street LLC, 1604 E Oglethorpe Blvd LLC, King Assets LLC, and 2505 S Main Street, LLC's Response to Petitioners' Motion for Interlocutory Injunctive Relief, attached hereto as Exhibit H;

**Filing in State Court.**

Pursuant to Federal Rule of Bankruptcy Procedure 9027(c), promptly after the filing hereof, the undersigned shall file a copy of this notice with the State Court.

WHEREFORE, the Debtor removes the Removed Case in its entirety from the State Court.

This 25th day of October, 2020.

**ROUNTREE LEITMAN & KLEIN, LLC**

/s/ David S. Klein
William A. Rountree
Georgia Bar No. 616503
David S. Klein
Georgia Bar No. 183389
Benjamin R. Keck
Georgia Bar No. 943504
Counsel for the Debtor Crown Assets, LLC

Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, Georgia 30329
(404) 584-1238
wrountree@rlklawfirm.com
dklein@rlklawfirm.com
bkeck@rlklawfirm.com

# EXHIBIT A

Debtor Crown Assets, LLC's Notice of Removal
*Sahib Arora et al. v. Charanjeev Singh et al.*
Previously Pending in the Superior Court of Fulton County, Case No. 2020CV339119

Fulton County Superior Court
***EFILED***BR
Date: 8/7/2020 1:20 AM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. ___2020CV339119___ |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

---

**PETITION FOR RELIEF UNDER THE GEORGIA RACKETEER
INFLUENCED AND CORRUPT ORGANIZATIONS ACT, QUIET
TITLE, INJUNCTION, RESCISSION AND OTHER EQUITABLE
RELIEF, DECLARATORY JUDGMENT AND DAMAGES**

---

**COME NOW** SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

LLC, Petitioners in the above-styled action, and file this, their **Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages** against Respondents CHARANJEEV SINGH, KARAN S. AHUJA, JARNAIL SINGH, JONIKA ARORA, CROWN ASSETS, LLC, 2551 E PINETREE BLVD MGMT, LLC, 2551 EAST PINETREE BLVD, LLC, 4319 COVINGTON HWY, LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE BLVD, LLC; 2505 S MAIN STREET, LLC and KING ASSETS, LLC respectfully showing as follows:

## INTRODUCTION

1.

Petitioners file this action for relief under the general civil law of the State of Georgia and the **Georgia Racketeer Influenced and Corrupt Organizations Act** (O.C.G.A. § 16-14-1 *et seq*.; hereinafter the "Georgia RICO Act") to recover the interests in real property and the Membership Interests in Petitioners Maharaja and Zillionaire, and other property and money, which Respondents **Charanjeev Singh**, **Karan S. Ahuja**, **Jarnail Singh**, **Jonika Arora**, **Crown Assets, LLC**, **2551 E Pinetree Blvd, LLC, 2551 E Pinetree Blvd Mgmt, LLC**, **4319 Covington Hwy, LLC**, **140 W Dykes Street LLC**, **1604 W. Oglethorpe Blvd, LLC**, **2505 S. Main**

Street LLC and King Assets, LLC obtained from them through a pattern of racketeering activity consisting of the following acts: **Theft by Extortion** (*see* O.C.G.A. § 16-8-16), **Theft by Deception** [*see* O.C.G.A. § 16-8-3(b)(4)], **Theft by Conversion** [*see* O.C.G.A. § 16-8-4(a)], **Forgery in the First Degree** [*see* O.C.G.A. § 16-9-1(b)], **Forgery in the Third Degree** [*see* O.C.G.A. § 16-9-1(d)(1)], **False Swearing** [*see* O.C.G.A. § 16-10-71(a)], **Illegal Use of Financial Cards** (*see* O.C.G.A. §§ 16-9-31 – 34) and **Identity Fraud** (*see* O.C.G.A. § 16-9-121), and to impose sanctions upon said Respondents as provided in the Georgia RICO Act and the general civil law.

## THE PARTIES, JURISDICTION AND VENUE

### Petitioners

2.

**Sahib Arora** ("Dr. Arora") and **Vineet Singh** ("Vineet") are individuals residing in Gwinnett County, Georgia.

3.

**King Group MGMT LLC** ("King Group"), **Maharaja Investments, LLC** ("Maharaja") and **Zillionaire Assets, LLC** ("Zillionaire") are active limited liability companies organized and existing under the laws of the State of Georgia.

## Respondents

4.

**Charanjeev Singh** ("Charanjeev"), **Karan S. Ahuja** ("Ahuja"), **Jarnail Singh** ("Jarnail") and **Jonika Arora** ("Jonika") are individuals residing in Fulton County, Georgia, and are subject to the jurisdiction and venue of this Court.  They may be served at their residence address located at 325 Crooked Stick Drive, City of Milton, Fulton County, Georgia.

5.

**Crown Assets, LLC** ("Crown LLC") is a limited liability company organized and existing under the laws of the State of Georgia. According to the records of the Georgia Secretary of State, Respondent Crown LLC's registered office is located at 7530 St Marlo Country Club Parkway, Duluth, Forsyth County, Georgia.  However, the registered agent, Respondent Ahuja, no longer maintains an office at the registered address.   Respondent Crown LLC's principal office address is 200 Glenridge Point Parkway, Suite 100, City of Atlanta, Fulton County, Georgia. Crown LLC is therefore subject to the jurisdiction and venue of this Court and may be served with process upon its registered agent, Respondent Ahuja, at its principal office address or at his home address.

6.

**2551 E Pinetree Blvd Mgmt, LLC** ("Pinetree Mgmt LLC") is a limited

liability company organized and existing under the laws of the State of Georgia having a registered office located at 200 Glenridge Point Parkway, Suite 100, City of Atlanta, Fulton County, Georgia. Pinetree Mgmt LLC is therefore subject to the jurisdiction and venue of this Court.

7.

**2551 East Pinetree Blvd, LLC** ("Pinetree LLC") is a limited liability company organized and existing under the laws of the State of Georgia having a registered office in Gwinnett County, Georgia. Pinetree LLC is subject to the jurisdiction and venue of this Court upon the grounds that substantial equitable relief is requested against resident Co-Respondents Charanjeev, Ahuja, Jarnail, Jonika, Crown LLC, Pinetree Mgmt LLC and King Assets LLC. *See* O.C.G.A. § 9-10-30. Pinetree LLC is subject to the jurisdiction and venue of this Court upon the further grounds that it is a joint obligor, joint tort-feasor, joint promisor, copartner, or joint trespasser with the said resident Co-Respondents. *See* O.C.G.A. § 9-10-31.

8.

**4319 Covington Hwy, LLC** ("Covington LLC") is a limited liability company organized and existing under the laws of the State of Georgia having a registered office located at 5675 Jimmy Carter Boulevard, Suite 109, City of Norcross, Gwinnett County, Georgia. 4319 Covington LLC is subject to the jurisdiction and venue of this Court upon the grounds that substantial equitable relief

is requested against resident Co-Respondents Charanjeev, Ahuja, Jarnail, Jonika, Crown LLC, Pinetree Mgmt LLC and King Assets LLC. *See* O.C.G.A. § 9-10-30. Covington LLC is subject to the jurisdiction and venue of this Court upon the further grounds that it is a joint obligor, joint tort-feasor, joint promisor, copartner, or joint trespasser with the said resident Co-Respondents. *See* O.C.G.A. § 9-10-31.

9.

**140 W Dykes Street LLC** ("Dykes LLC") is a limited liability company organized and existing under the laws of the State of Georgia having a registered office located at 410 Nora Drive, City of Fayetteville, Fayette County, Georgia. Dykes LLC is subject to the jurisdiction and venue of this Court upon the grounds that substantial equitable relief is requested against resident Co-Respondents Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Mgmt LLC and King Assets LLC. *See* O.C.G.A. § 9-10-30.  Dykes LLC is subject to the jurisdiction and venue of this Court upon the further grounds that it is a joint obligor, joint tort-feasor, joint promisor, copartner, or joint trespasser with the said resident Co-Respondents. *See* O.C.G.A. § 9-10-31.

10.

**1604 E Oglethorpe Blvd, LLC** ("Oglethorpe LLC") is a limited liability company organized and existing under the laws of the State of Georgia having a registered office located at 410 Nora Drive, City of Fayetteville, Fayette County,

Georgia. 1604 E. Oglethorpe is subject to the jurisdiction and venue of this Court upon the grounds that substantial equitable relief is requested against resident Co-Respondents Charanjeev, Ahuja, Jarnail, Jonika, Crown LLC and Pinetree Mgmt LLC. *See* O.C.G.A. § 9-10-30.  Oglethorpe LLC is subject to the jurisdiction and venue of this Court upon the further grounds that it is a joint obligor, joint tort-feasor, joint promisor, copartner, or joint trespasser with the said resident Co-Respondents. *See* O.C.G.A. § 9-10-31.

11.

**King Assets LLC** ("King Assets LLC") is a limited liability company organized and existing under the laws of the State of Georgia having a registered office located at 200 Glenridge Point Parkway, Suite 100, City of Atlanta, Fulton County, Georgia. King Assets LLC is therefore subject to the jurisdiction and venue of this Court.

12.

**2505 S Main Street, LLC** ("Main LLC") is a limited liability company organized and existing under the laws of the State of Georgia having a registered office located at 410 Nora Drive, City of Fayetteville, Fayette County, Georgia. 2505 S. Main is subject to the jurisdiction and venue of this Court upon the grounds that substantial equitable relief is requested against resident Co-Respondents Charanjeev, Ahuja, Jarnail, Jonika, Crown LLC, Pinetree Mgmt LLC and King

Assets LLC. *See* O.C.G.A. § 9-10-30.  Main LLC is subject to the jurisdiction and

venue of this Court upon the further grounds that it is a joint obligor, joint tort-feasor,

joint promisor, copartner, or joint trespasser with the said resident Co-Respondents.

*See* O.C.G.A. § 9-10-31.

## FACTUAL BACKGROUND

### 13.

Dr. Arora and Vineet are siblings. Their sister is Harsimran Arora.

Respondents Charanjeev and Ahuja are siblings and first cousins of Dr. Arora and

Vineet.  Respondent Jarnail is Charanjeev's and Ahuja's father and Respondent

Jonika their mother, and they are Dr. Arora's and Vineet's aunt and uncle.  Their

national origin is the Republic of India.  They are members of the Sikh community.

### 14.

Dr. Arora attended high school and college in this country and medical school

in India.  Upon returning to the United States in 2013, he decided to pursue his

interests in real estate investment rather than the medical profession and in 2014

formed King Group.

### 15.

Dr. Arora sought to include his extended family members, including

Respondents Charanjeev, Ahuja, Jarnail and Jonika in his King Group's real estate

investment business to a limited extent, for the welfare and benefit of the entire family, and to that end gifted an 11% interest in King Group to each of them.

16.

During the first two years or so of King Group's existence, Dr. Arora was only moderately successful, and most of the family members lost interest. King Group bought back all the Membership Interests within that time, except for the 11% interest owned by Respondent Ahuja.

17.

However, in subsequent years, Dr. Arora became much more successful in his real estate investment endeavors, acquiring a handsome portfolio of income-producing commercial properties located throughout the State of Georgia, namely retail stores such as shopping centers but also daycare centers and other types of commercial properties.

18.

Respondent Charanjeev came to the United States in 2018 and obtained a Georgia real estate license that year—at Dr. Arora's expense—and is currently a licensed real estate salesperson operating as an independent licensee of Realty First Atlanta LLC.

19.

When Charanjeev obtained his real estate license, Dr. Arora sought to help

him build up his resume, allowing him to work at King Group as a trainee to gain experience in leasing, managing and selling commercial properties.

20.

Respondent Jarnail came to live in the United States in 2018, and Jonika and Ahuja only last year.

21.

After they had realized the success that Dr. Arora had achieved since they made their decision to withdraw from King Group, Charanjeev, Jarnail and Jonika began to regret their decision and suggested that they should be entitled to a 50% ownership interest in all of Dr. Arora's real estate endeavors. However, they offered nothing in requital.

22.

After Dr. Arora advised that he would respectfully decline their offer to relieve him of half of his property and income, a spirit of envy and resentment began to manifest in Respondents' collective temper and disposition of mind.

23.

In January of 2019, Dr. Arora's and Vineet's sister, Mrs. Harsimran Arora, had become engaged to be married. The marriage was set to take place on November 9, 2019 in the Republic of India, in accordance with Sikh custom and tradition.

24.

Having ingratiated themselves to the family of her fiancé in India and discerning that any disruption in her marriage plans would cause Harsimran great emotional and mental suffering, and knowing that Dr. Arora and Vineet loved their sister and would go to any length to protect her from harm, Charanjeev, Ahuja, Jarnail and Jonika, or one of their party, spied an opportunity they could exploit that they believed—rightly—would make it very difficult for Dr. Arora to continue saying "no" to their demands.  Thus, Respondents hatched the plan that was to become the "pattern of racketeering activity" set forth in this Petition

25.

In or around July of 2019, Respondents Jarnail and Jonika began to communicate threats to Dr. Arora and Vineet directed against Harsimran.  They threatened that, if Dr. Arora and Vineet did not reconsider their refusal allow their sons, Charanjeev and Ahuja, to become equal partners in their businesses and properties,  they (Jonika and Jarnail) would ruin Harsimran's marriage plans by contacting the family of her fiancé and providing them with false and defamatory information about her and her family, so as to cause the fiancé's family to withdraw the offer of marriage.  These were the "acts of racketeering activity" that kicked off Respondents' racketeering scheme.

26.

Respondents had the knowledge, information, means, opportunity and amoral character needed to carry out their threats against Harsimran, which made them entirely credible.

27.

Respondents Jarnail and Jonika repeated their threats on numerous occasions in the period from late July and early August of 2019, making sure that Dr. Arora and Vineet were on board with making sons Charanjeev and Ahuja their 50% partners. Meanwhile, Respondents Charanjeev and Ahuja were tasked with working out the details of the transaction. Having become familiar with King Group's portfolio of properties and business operations during the months he worked for Dr. Arora, Charanjeev was the obvious choice as the group's "point man" in hammering out the various agreements and deeds of conveyance necessary to complete the theft. And he filled that role without compunction.

28.

To protect their sister from Respondents' vile and scurrilous threats, and for that reason alone, Dr. Arora and Vineet were forced to accede to Respondents' demands. On August 14, 2019, they signed a series of corporate amendments and deeds to real property conveying 50% of Petitioners' business and properties including the (1) Agreement between King Group, Crown and Zillionaire (by which

Respondent Crown LLC purportedly obtained half of King Group's 56% ownership interest in the property located at 2318 Old Cornelia Highway, Gainesville, Hall County, and a half interest in Zillionaire's property located at 5754 Attucks Boulevard, Morrow, Clayton County (the "**Coerced King Group Agreement**"); (2) **Bill of Sale** (by which Respondent Ahuja surrendered his 11% membership interest in King Group); (3) Amended and Restated Operating Agreement of Maharaja Investments, LLC (by which Respondents Ahuja and Charanjeev purportedly obtained a 25% membership interest each in Maharaja) ("**Coerced Maharaja Amendment**"); (3) Limited Warranty Deed by which Respondent Crown LLC purportedly obtained a one-half undivided interest in King Group's property located at 106 Commerce Street, Fayette County ("**Coerced Commerce Street Deed**"); (4) Limited Warranty Deed by which Respondent Crown LLC purportedly obtained a one-half undivided interest in King Group's property located 3811 Flat Shoals Parkway, DeKalb County ("**Coerced Flat Shoals Deed**"); (5) Limited Warranty Deed by which Respondent Crown LLC purportedly obtained a one-half undivided interest in King Group's property located on Roosevelt Highway, Fulton County ("**Coerced Roosevelt Hwy Deed**"); (6) Limited Warranty Deed by which Respondent Crown LLC purportedly obtained a one-half undivided interest in King Group's property located of 5341 Snapfinger Drive, DeKalb County ("**Coerced Snapfinger Deed**") (collectively the "**Coerced Transactions**").

29.

On August 14, 2019, Vineet and Jonika were both in India, and Dr. Arora was in the United States as were Respondents Jarnail, Ahuja and Charanjeev.  Early that day, before the documents relative to the Coerced Transactions had been signed, Jonika confronted Vineet face-to-face and repeated her intent to carry out the threats against Harsimran that very day, if Dr. Arora did not complete the paperwork.

30.

"Racketeering activity" means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving: Theft in violation of Article 1 of Chapter 8 of Title 16. *See* Georgia RICO Act, O.C.G.A. § 16-14-3(5)(A)(xii).  A person commits the offense of **Theft by Extortion** when he unlawfully obtains property of or from another person by threatening to: Disseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute. O.C.G.A. § 16-8-16(a)(3).  In attempting to unlawfully gain possession and control over Petitioners' property by making and repeating threats to slander and defame their sister, Respondents committed the crime of **Theft by Extortion** and **multiple acts of racketeering activity**.

31.

In acceding to Respondents' demands, Dr. Arora and Vineet consoled

themselves with the fact they had done what they had to do to protect their sister from Respondents and their belief that the matter was concluded.  But they were mistaken.

### 32.

Just four days later, on August 19, 2019, Respondents Charanjeev and Ahuja, in collusion with Respondents Jarnail and Jonika, Pinetree LLC and Pinetree Mgmt LLC, recorded a fraudulent Quitclaim Deed in the real property records of Thomas County, which purported to evidence the conveyances of Maharaja's unencumbered one-half undivided interest in the property known as the **Pinetree Plaza Shopping Center** located at 2551 E. Pinetree Boulevard, Thomasville, Thomas County, Georgia ("**Pinetree Plaza**") to Respondent Crown LLC.

### 33.

In the following month, September of 2019, when both Jarnail and Vineet were in India, Jarnail confronted Vineet face-to-face with the fact of Respondents' fraudulent conveyance of Pinetree Plaza to Respondent Crown LLC and repeated the threat to ruin Harsimran' s marriage by slandering and defaming her to her fiancé's family, if he and Dr. Arora were to take any action against Respondents to recover the property.  Vineet assured Jarnail that they would do nothing to put their sister's marriage and happiness in jeopardy.

34.

To the "stick" of extortion by which Respondents had forced Dr. Arora and Vineet to enter into the Coerced Transactions of August 14th and the "stick" of fraud by which they had fraudulently conveyed Maharaja's 50% ownership interest in Pinetree Plaza to themselves, Respondents added a "carrot," repeatedly assuring Dr. Arora and Vineet that they had every intention of re-conveying Pinetree Plaza back to Maharaja "when the dust settled," so to speak.

35.

As part of their efforts to shield Harsimran from Respondents' despicable threats against her, Dr. Arora and Vineet insisted that the date of her wedding be moved up without Respondents' knowledge. This turned out to be a very savvy move.

36.

Harsimran's marriage, which had been set for November 9, 2019, took place on October 25, 2019.

37.

Jarnail was in India at that time, having arrived earlier in October for the purpose of either attending or ruining the wedding but, unaware that the date had been moved up, missed the opportunity to do either. Respondents Jonika, Ahuja and Charanjeev had airline tickets to travel to India during the first week of November

for the same purpose but learning from Jarnail that the marriage had already taken place, cancelled their reservations.

<div align="center">38.</div>

The wedding removed the danger that Respondents posed to Harsimran and with it the duress that their threats against her caused to Dr. Arora and Vineet. However, Respondents discerned the need to somehow to "keep the pressure up." They needed more time to consolidate their position and, unbeknownst to Dr. Arora and Vineet, to continue their predation.  Most immediately, they needed Dr. Arora's cooperation to "cash out" on two of the properties they had extorted: 5754 Attucks Boulevard (as per the Coerced King Group Agreement) and 5341 Snapfinger Drive (as per the Coerced Snapfinger Deed), which were both under contract.  Respondents stood to profit handsomely.

<div align="center">39.</div>

They accomplished this by shifting tactics and pulling out a new extortion "stick," for the first time threatening to vigorously defend their fraudulent claim of title to Pinetree Plaza and fight any effort to recover the property if Dr. Arora and Vineet did not cooperate with them in the sales of Attucks Boulevard and Snapfinger Drive and allow them to walk away with half of the sales proceeds as per the coerced agreements, and attaching to it a new but similar "carrot,"  continuing their promises to re-convey the Pinetree Plaza property if he did.  This was the state of affairs during

the months of November and December of 2019 and into February of this year.

<div align="center">40.</div>

Respondents' "stick" was a big stick.  Their fraudulent conveyance of Pinetree Plaza to Respondent Crown LLC is a devastating loss to Petitioners.  Maharaja had purchased the property just weeks before, paying $700,000 *in cash*.  The property was unencumbered.  The $700,000 was the product of years of hard work and represented practically all of Dr. Arora's and Vineet's savings.  The loss of the money *and* the unencumbered 50% interest has deprived them of working capital and the readily-available cash necessary to take advantage of investment opportunities as they present themselves, causing a "rippling effect" and further financial losses from missed business opportunities.  A lease had just been signed with a major new tenant, Ollie's Bargain Outlet, greatly increasing the income that the property would produce.  But Petitioners were receiving and are still receiving none of it.  Their financial losses were mounting in every month that Respondents withheld title and possession of the property, and they continue to mount.  .

<div align="center">41.</div>

Petitioners' greatest financial loss due to Respondents' thievery is loss of the increase in the equity in Pinetree Plaza, which rose dramatically lease just after Maharaja's purchase, due to the Ollie's Bargain Outlet.  Petitioners are informed that in connection with Respondent's fraudulent conveyance to TC Federal for the line

of credit,  Pinetree Plaza was appraised at **$4,650,000**, an increase of **$3,250,000** and triple the amount that Petitioner and Respondent Pinetree LLC had paid for it just six months before.

<div align="center">42.</div>

Dr. Arora's and Vineet's efforts to appease Respondents were motivated by the uncertainties they faced were Respondents to "hunker down" in maintaining their fraudulent claim of title and possession of Pinetree Plaza.  Respondents had gone to great lengths to make the fraudulent conveyance from Maharaja to Crown LLC *appear* legitimate, and they could not be certain that, if forced to contest the validity of the conveyances in court, they would be successful.  For these reasons, Petitioners tried to be patient and hope that at some point, Respondents would be satisfied with what they had already stolen from them.  But that day never came.

<div align="center">43.</div>

Under duress from Respondents' threat to retain and defend their fraudulent claim to Pinetree Plaza if Petitioners gave them any trouble in their continued predations and lured on by their promise to re-convey the property if they went along, Dr. Arora and Vineet acceded to the sale of 5754 Attucks Boulevard, which took place on November 27, 2019, and allowed Respondents to walk away with 50% of the proceeds in keeping with the terms of the Coerced King Group Agreement, in the sum of $341,408.22, and they acceded to the sale of 5341 Snapfinger Drive,

which took place on February 25, 2020, allowing Respondents to walk away 50% of the proceeds in keeping with the <u>Coerced Snapfinger Deed</u>, in the sum of $541,756.27 rather than 11% in keeping the Membership Interest owned by Ahuja in King Group prior to the coerced deed.

<div align="center">44.</div>

But for Respondents' extortion and fraud, King Group would have been entitled to retain all of the sales proceeds from Attucks Boulevard and Snapfinger Drive except the 11% which would have gone Respondent Ahuja.  Therefore, King Group lost $266,298.42 on the Attucks sale and $422,669.90 on the Snapfinger Drive sale due to Respondents' extortion and fraud, totaling **$688,968.32**.

<div align="center">45.</div>

Since he was being forced to participate in the sale of 5754 Attucks Boulevard, Dr. Arora sought to mitigate his losses by using the proceeds for a 1031 exchange, and  Respondent Ahuja expressed his desire to do the same with Respondent Crown LLC's share of the proceeds.  But that would require Dr. Arora's agreement to make Respondent Crown LLC a member of Zillionaire.

<div align="center">46.</div>

Under the same conditions of duress ("stick") and fraudulent inducement ("carrot"), Dr. Arora agreed to enter into the <u>Amended and Restated Operating Agreement of Zillionaire Assets, LLC</u> dated November 20, 2019, providing for the

transfer of a 50% Membership Interest in Zillionaire to Respondent Crown LLC, for purpose of the 1031 exchange ("**Coerced Zillionaire Amendment**").

47.

In keeping with the <u>Coerced Zillionaire Amendment</u>, being beaten by the same "stick" and chasing the "carrot", Dr. Arora agreed on behalf of King Group and Zillionaire to enter into an <u>Agreement</u> with Respondent Crown LLC dated December 21, 2019, specifying *inter alia* that the "replacement" properties to be acquired by King Group and Respondent Crown LLC with the sale proceeds from 5754 Attucks Boulevard would be initially titled in the name of Zillionaire to comply with Section 1031 and subsequently conveyed to the parties.

48.

The December 21st Agreement provided *inter alia* that, while the "replacement" properties were still titled in the name of Zillionaire, the parties would cooperate with each other in obtaining financing for the properties.

49.

King Group purchased the property at 3180 Atlanta Highway, Clarke County, as its "replacement" property for the 1031 exchange, and Respondent Crown LLC purchased 90 Hunters Chase, City of McDonough, Henry County, as its "replacement" property. Both properties are still titled in the name of Zillionaire,

which is owned 50% by King Group and 50% by Respondent Crown LLC under the Coerced Zillionaire Amendment.

50.

King Group had obtained a high interest "hard money" loan for the purchase of 3180 Atlanta Highway, planning to refinance with a conventional loan as soon as possible.  King Group applied for and received approval for a conventional loan and was approved.   However, contrary to the terms of the Coerced Zillionaire Amendment and any conception of fairness and good faith—that is, for absolutely no reason at all other than to maliciously inflict further financial losses on Petitioners—Respondent Ahuja refused to cooperate in executing the document required by the lender, causing the loan to fall through and causing King Group to lose several thousand dollars in various fees and costs.  Respondent Ahuja has continued his bad faith refusal to cooperate with Petitioners, hobbling their ability to re-finance the high interest "hard money" loan and causing them to suffer continuing losses.

51.

In contrast, Respondent Ahuja did not experience any difficulties at all refinancing 90 Hunters Chase, Respondent Crown LLC's "replacement" property. He somehow managed to issue a security deed on the property—which is still titled in Zillionaire as stated above—without Dr. Arora's knowledge or consent, again,

contrary to the terms of the <u>Coerced Zillionaire Amendment</u>, which requires the consent of 51% of the Membership Interests in Zillionaire to convey the company's properties.

52.

Dr. Arora and Vineet did not learn until April of this year, after all these events had transpired, that Respondents never had any intention of re-conveying Pinetree Plaza back to Maharaja but that their true intention all along was to deceive them into forbearing legal action to recover Pinetree Plaza and cooperating in the pending sales of Attucks Boulevard and Snapfinger Drive.

53.

In April of this year, Dr. Arora and Vineet learned that on January 16, 2020, Respondent Crown LLC had fraudulently conveyed Maharaja's 50% undivided interest in Pinetree Plaza to Respondent Pinetree LLC and that Respondent Pinetree LLC had on the same day issued a fraudulent Security Deed purporting to convey the entire fee interest in the property to TC Federal to secure a $3,075,884.00 line of credit.

54.

On July 21, 2020, TC Federal filed suit in the Superior Court of Thomas County, being Civil Action SUCV2020000354, seeking relief including Quiet Title, Declaratory Relief, Establishment of an Equitable Lien and Damages against

Petitioners Dr. Arora, Vineet and Maharaja, and Respondents Charanjeev, Ahuja, Crown LLC, Pinetree LLC, Pinetree Mgmt LLC,  and Sameer Lalani and Shaneel Lalani, co-owners with Respondent Ahuja of Respondents Pinetree LLC, Pinetree Mgmt LLC, Covington LLC, Dyke LLC, Oglethorpe, LLC, and Main LLC several other parties, seeking to establish the validity of Pinetree LLC's security deed as a conveyance of the entire fee interest in Pinetree Plaza or to establish an equitable lien against the entirety of the property, including Maharaja's 50% undivided TC Federal has also recorded a Notice of Lis Pendens.  Dr. Arora, Vineet and Maharaja were served with process on August 3, 2020, and it appears they will be required to assert their claims against TC Federal to remove the Security Deed as a cloud on its title by way of counterclaim in that case, at least initially.

<div align="center">55.</div>

As the result of Respondents' racketeering scheme:

(a)   Respondents Ahuja and Pinetree LLC claim that they own **Maharaja's 50% interest in Pinetree Plaza** and the income from the property (First Fraudulent Deed and Second Fraudulent Deed *infra*)

(b)   Respondent Ahuja claims **25% Membership Interest** in **Maharaja** (Coerced Maharaja Amendment)

(c)   Respondent Charanjeev claims **25% Membership** Interest in

**Maharaja** (Coerced Maharaja Amendment)

(d)     Respondent Crown LLC claims a **50% interest** in **Zillionaire** (Coerced Zillionaire Amendment)

(e)     Respondent Crown LLC claims a **50% interest** in King Group's property located at **106 Commerce Street**, Fayette County (Coerced Commerce Street Deed)

(f)     Respondent Crown LLC claims **a 50% interest** in King Group's property located on **Roosevelt Highway**, Fulton County (Coerced Roosevelt Hwy Deed)

(g)     Respondent Crown LLC claims a **50% interest** in King Group's property located at **3811 Flat Shoals Parkway**, DeKalb County (Coerced Flat Shoals Deed)

(h)     Respondent Crown LLC claims a **50% interest** in King Group's **56% interest** (**28% of the fee**) in property located at **2318 Old Cornelia Highway,** Gainesville, Hall County, as well as the retail liquor store owned and operated By Petitioners at that location (Coerced King Group Agreement)

(i)     Respondent Crown LLC received half of the proceeds from the sale of 5754 Attucks Boulevard in the sum of $341,408.22, whereas Respondent Ahuja would have been entitled to only

11% of the proceeds in the amount of $75,109.80 as the owner of an 11% Membership Interest in King Group prior to the Coerced King Group Agreement—representing a realized financial loss to Petitioners of **$266,298.42**;

(j)   Respondent Crown LLC received half of the proceeds from the sale of 5341 Snapfinger Drive in the sum of $541,756.27, whereas Ahuja would have been entitled to only 11% of the proceeds in the amount of $119,186.37 as the owner of an 11% Membership Interest in King Group prior to the Coerced Snapfinger Deed—representing a realized financial loss to Petitioners of **$422,669.90**, and

(k)   Petitioner King Group is suffering continuing monetary damage as the result of Respondent Ahuja's obstinate and bad faith refusal to sign documents required by its prospective lender to re-finance its "replacement" property at 3180 Atlanta Highway, and its ability to sell the property, as it intends to do in the very near future, is uncertain due to Ahuja's malicious refusal to cooperate in completing the 1031 exchange transaction.

56.

The only legal benefit that Petitioners received in consideration for the

Coerced Transactions and Coerced Zillionaire Amendment—that is, the only benefit other than protecting Harsimran from Respondents' threats to harm her—was the return of Ahuja's 11% Membership Interest in King Group as evidenced by the Bill of Sale.  Respondents provided no other consideration.

<p style="text-align:center">57.</p>

In connection with their pre-litigation demand for rescission of the Coerced Transactions and Coerced Zillionaire Amendment, Petitioners offered to tender the 11% Membership Interest in King Group back to Respondent Ahuja.  Their offer of tender is a continuing one.

<p style="text-align:center">58.</p>

In seeking rescission of the subject agreements and conveyances, Petitioners request that the parties be restored to their prior positions as much as possible, as provided by law.

<h2 style="text-align:center">COUNT I—CLAIMS UNDER THE<br>GEORGIA RICO ACT</h2>

<p style="text-align:center">59.</p>

Petitioners re-allege and incorporate herein the preceding and subsequent Paragraphs by reference.

<p style="text-align:center">60.</p>

The acts of racketeering activity committed by Respondents include **Theft by**

**Extortion** as defined in O.C.G.A. § 16-8-16 (Respondents' threats to harm Petitioners' sister by defaming her as alleged in Paragraphs 24-28, 30, 33-39, 134-138; **Theft by Deception** as defined in O.C.G.A. § 16-8-3(b)(4) (Respondents' fraudulent conveyance of Maharaja's 50% ownership interest in Pinetree Plaza to Respondent Crown LLC, Respondent Crown LLC's fraudulent conveyance of Maharaja's 50% ownership interest to Respondent Pinetree LLC's and Pinetree LLC's fraudulent conveyance of a security deed to TC Federal as security for a $3,075,884.00 line of credit as alleged in Paragraphs 69-110); **Theft by Conversion** as defined in O.C.G.A. § 16-8-4(a) (Respondents' wrongful appropriation of the rental income from Pinetree Plaza that rightfully belongs to Maharaja as 50% owner of the property as alleged in Paragraphs 114-117); **Forgery in the First Degree** as defined in O.C.G.A. § 16-9-1(b) (Respondents' use of the Fraudulent Certification as evidence of Charanjeev's authority to execute the First Fraudulent Deed as "Authorized Signer" for Maharaja as alleged in Paragraphs 84-89); **Forgery in the Third Degree** as defined in O.C.G.A. § 16-9-1(d)(1) (Respondents' forgery of Vineet's name on checks drawn on the bank account of Maharaja and Vineet's personal account as alleged in Paragraphs 162-168); **False Swearing** as defined in O.C.G.A. § 16-10-71(a) (Respondent Ahuja's execution of the Fraudulent Affidavit as alleged in Paragraphs 104-110); **Illegal Use of Financial Cards** as defined in O.C.G.A. §§ 16-9-31 – 34 (Respondents' actions in using the credit card accounts

of Petitioners' sister without authorization as alleged in Paragraphs 173-177), and **Identity Fraud** as defined in O.C.G.A. § 16-9-121 (Respondents' actions in using confidential identifying information of Petitioners' sister to apply for credit in her name as alleged in Paragraphs 170-172).

<div align="center">61.</div>

In committing the unlawful acts alleged herein, Respondents acted as a criminal "enterprise." *See* O.C.G.A. § 16-14-3(3).

<div align="center">62.</div>

The unlawful acts committed by Respondents as alleged herein constitute a "pattern of racketeering activity" in that they consist of more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. *See* O.C.G.A. § 16-14-3(4)(A).

<div align="center">63.</div>

Respondents have acquired and maintain interests in and control of real property, personal and intangible property belonging to Petitioners through a pattern of racketeering activity or proceeds derived therefrom, in violation of O.C.G.A. § 16-14-4(a).

64.

Petitioners have suffered grievous losses of property and property rights as the result of Respondents' racketeering activities and are entitled to compensation and the imposition of sanctions against Respondents under the Georgia RICO Act pursuant to O.C.G.A. §§ 16-14-2(b) and 16-14-6.

**Injunction**

65.

Petitioners show that they are in "immediate danger of significant loss or damage" due to Respondents' continuing racketeering activity and are entitled to "appropriate orders and judgments" to enjoin such activity pending conclusion of the case as set forth in Count III (Injunctive Relief) pursuant to O.C.G.A. § 16-14-6(a)(2)-(b).

**Divestment**

66.

Alternatively, or in addition to the relief requested in Count I (Quiet Title), Count VII (Declaratory Judgment), Counts IV – VI (Rescission), Count XIII (Imposition of Equitable Lien), Count XIV (Imposition of a Constructive Trust), Count XV (Disgorgement) or other relief requested in this Petition, Petitioners seek and are entitled to the entry of the "appropriate orders and judgments" requiring that Respondents divest themselves of their purported interests Petitioners' property set

forth in Paragraph 55 as provided in O.C.G.A. § 16-14-6(a)(1).

## Treble Damages

### 67.

Petitioners are entitled to three times the actual damages they have sustained as the result of Respondents' racketeering activity, punitive damages and attorney's fees pursuant to O.C.G.A. § 16-14-6(c).

## COUNT II—QUIET TITLE

### 68.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 69.

On July 15, 2019, Maharaja purchased a one-half (50%) undivided interest in Pinetree Plaza, as evidenced by the Limited Warranty Deed from 2551 East Pinetree Boulevard Holdings, LLC, a Maryland limited liability company, as Grantor, to Maharaja and Respondent Pinetree LLC, as Grantees and tenants in common, recorded on July 19, 2019 in the Thomas County, Georgia, real property records ("**Vesting Deed**"), paying $700,000 of the $1,400,000  purchase price as half owner, in cash.

70.

Therefore, as of July 15, 2019, Maharaja was the owner of an undivided 50% interest in Pinetree Plaza, and Respondent Pinetree LLC was the owner of an undivided 50% interest.  They held the property as tenants in common.

71.

At the time of the purchase, Vineet was the Sole Member and Manager of Maharaja.

72.

Vineet was in India at the time of the closing and before his departure, signed a Certified Resolution and Incumbency Certificate of Maharaja Investments, LLC prepared and presented to him by Charanjeev, authorizing Charanjeev to sign any necessary closing documents on behalf of Maharaja in connection with the purchase ("**Authentic Certification**").

73.

Vineet provided the signed Authentic Certification to Charanjeev before he departed for India.

74.

The Authentic Certification was on a form that Petitioner King Group's attorney, Joel Haber, Esq., had prepared in 2018 in connection with a previous, unrelated transaction.

75.

On August 20, 2019, Respondents Charanjeev and Ahuja, in collusion with Respondents Pinetree LLC, Pinetree Mgmt LLC, Jarnail and Jonika, caused a Quitclaim Deed dated August 19, 2019 to be recorded in the real property records of Thomas County, Georgia, which purports to evidence the conveyance of Maharaja's 50% undivided interest in Pinetree Plaza to Respondent Crown LLC ("**First Fraudulent Deed**").

76.

The Intangibles Tax stamp indicates that the consideration paid was $0.00, and the exemption from intangibles tax claimed in the accompanying PT-61 form was "Corporation to Corporation" transfer.

77.

The First Fraudulent Deed is signed by "Charanjeev Singh, Authorized Signer".

78.

Charanjeev was not an "Authorized Signer" for Maharaja.

79.

Rather, Charanjeev executed the First Fraudulent Deed without Vineet's or Dr. Arora's knowledge or consent, in collusion with the other Respondents.

80.

Charanjeev had no legal right or authority whatsoever, either express or implied or apparent, to execute the <u>Fraudulent Deed</u> as "Authorized Signer" for Maharaja.

81.

Crown LLC was not and could not have been a *bona fide* purchaser for value, as it paid no consideration as indicated by the PT-61, and its Sole Member was Respondent Karan Ahuja, a co-conspirator and blood relative of Charanjeev and the other Respondents and owner of a one-half Membership Interest in the grantee, Pinetree LLC.

82.

The PT-61 accompanying the <u>First Fraudulent Deed</u> indicates the conveyance was a "Corporation to Corporation" transfer from Maharaja to Respondent Crown LLC for which no monetary consideration was given.

83.

A "Corporation to Corporation" transfer from Maharaja to Crown is incredible on its face, as the <u>Fraudulent Certification</u> recorded with the First Fraudulent Deed states that Vineet was **the Sole Member of Maharaja**, and Ahuja was **the Sole Member of Respondent Crown LLC** as shown by the <u>Second Fraudulent Deed</u> itself.

84.

Appended to the First Fraudulent Deed and recorded with it is a document captioned Certified Resolution and Incumbency Certificate of Maharaja Investments, LLC, which, among other things, purports to evidence Vineet's certification of Charanjeev's authority to act on the Maharaja's behalf in the conveyance of its interest in Pinetree Plaza to Respondent Crown LLC ("**Fraudulent Certification**").

85.

Vineet did not sign the Fraudulent Certification, nor did he or Dr. Arora have any knowledge its creation and use by Charanjeev and Ahuja in connection with the First Fraudulent Deed.

86.

Rather, the first page of the Fraudulent Certification is an *altered* version of the first page of the Authentic Certification in which Respondents Charanjeev and Ahuja substituted the word "*sale*" for the word "*purchase*" in several places.

87.

The second page of the Fraudulent Certification containing Vineet's purported signature is an *unaltered* copy of the second page of the Authentic Certification, which Respondents Charanjeev and Ahuja appended to the *altered* first page so as to create a false and fraudulent document purporting to evidence Charanjeev's

authority to sign the First Fraudulent Deed on behalf of Maharaja.

<p style="text-align:center">88.</p>

That the First Fraudulent Deed is indeed fraudulent is further shown by the fact that the Fraudulent Certification is contrary to the terms of the Coerced Maharaja Amendment that Respondent Ahuja had signed just four days before, which specified that he, Dr. Arora, Vineet and Charanjeev were each a 25% Member in Maharaja and that Dr. Arora was the Managing Member having sole legal authority to act on behalf of Maharaja as its authorized agent in the conveyancing of real property.

<p style="text-align:center">89.</p>

"Racketeering activity" means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving: Forgery in any degree in violation of Code Section 16-9-1. *See* Georgia RICO Act, O.C.G.A. § 16-14-3(5)(A)(xvi).  A person commits the offense of **Forgery in the First Degree** when with the intent to defraud he or she knowingly makes, alters, or possesses any writing, other than a check, in a fictitious name or in such manner that the writing as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority and utters or delivers such writing. *See* O.C.G.A. § 16-9-1(b).   In executing the False

<p style="text-align:center">-36-</p>

<u>Certification</u>, Respondents committed the crime of Forgery in the First Degree and **an act of racketeering activity**.

90.

Neither Respondents Charanjeev, Ahuja, Crown LLC nor Pinetree LLC nor any other Respondent paid any consideration to Maharaja, Dr. Arora or Vineet or any other person or entity for the property interest conveyed by the <u>First Fraudulent Deed</u>.

91.

The <u>First Fraudulent Deed</u> was ineffective as a conveyance of Maharaja's ownership interest in Pinetree Plaza to Respondent Crown LLC.  Rather, it is the product of the fraud Respondents Charanjeev and Ahuja with Respondent Pinetree LLC.

92.

By recording the <u>First Fraudulent Deed</u> showing Respondents Crown LLC and Pinetree LLC as equal co-owners of Pinetree Plaza, Respondents Charanjeev and Ahuja, in collusion with Respondents Pinetree LLC, Jarnail and Jonika, created a false chain of title in the deed records of Thomas County.

93.

The <u>First Fraudulent Deed</u> is an iniquitous instrument and cloud upon Maharaja's title, and Petitioners are entitled to an equitable order setting it aside and

cancelling it in equity pursuant to O.C.G.A. § 23-3-40 *et seq*.

94.

Respondents Charanjeev and Ahuja, in collusion with Respondents Pinetree LLC, Jarnail and Jonika, caused a Limited Warranty Deed dated January 16, 2020 to be recorded in the real property records of Thomas County, Georgia, which purports to evidence Respondent Crown LLC's conveyance of a 50% undivided interest in Pinetree Plaza to Respondent Pinetree LLC, for a purchase price of $700,000 ("**Second Fraudulent Deed**").

95.

The Second Fraudulent Deed is signed by "Karan Ahuja, Sole Member" of Respondent Crown LLC.

96.

Respondent Pinetree LLC was not a *bona fide* purchaser for value, as Respondent Ahuja is one of its three Members, the other two being Sameer Lalani and Shaneel Lalani.

97.

Even if Pinetree LLC were a *bona fide* purchaser for value, it purchased no ownership interest in Pinetree Plaza from Crown LLC, as Crown LLC had no such interest to convey.

98.

The $700,000 purchase price allegedly paid to Respondent Crown LLC by Respondent Pinetree LLC is not evidence of a legitimate, arm's length transaction but an effort to cover for the collusion between Respondents Charanjeev and Ahuja with Pinetree LLC and its principals, Sameer Lalani and Shaneel Lalani, as they went on to use loan proceeds to engage in other joint real estate purchases for their mutual advantage.

99.

The Second Fraudulent Deed was ineffective as a conveyance of Maharaja's ownership interest in Pinetree Plaza to Respondent Pinetree LLC.

100.

By recording the Second Fraudulent Deed showing Respondent Pinetree LLC as sole owner of Pinetree Plaza, Respondents Charanjeev and Ahuja, in collusion with Respondents Pinetree LLC, Jarnail and Jonika, continued the false chain of title in the Thomas County deed records that they started by recording the First Fraudulent Deed.

101.

The Second Fraudulent Deed is an iniquitous instrument and cloud upon Maharaja's title, and Petitioners are entitled to an equitable order setting it aside and cancelled it in equity pursuant to O.C.G.A. § 23-3-40 *et seq*.

102.

The Second Fraudulent Deed was executed and recorded in connection with a further aspect of Respondents' racketeering scheme, which was the fraudulent conveyance of legal title to the entire fee interest in Pinetree Plaza to TC Federal as security for a $3,075,884.00 line of credit, as evidenced by the Security Deed dated January 16, 2020 and recorded in the real property records of Thomas County, Georgia (the "**Security Deed**").

103.

"Racketeering activity" means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving: Theft in violation of Article 1 of Chapter 8 of this Title 16. *See* Georgia RICO Act, O.C.G.A. § 16-14-3(5)(A)(xii). A person commits the offense of **Theft by Deception** when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property. *See* O.C.G.A. § 16-8-3(a).  A person deceives if he intentionally: Sells or otherwise transfers or encumbers property intentionally failing to disclose a substantial and valid known lien, adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not a matter of official record.  O.C.G.A.  §  16-8-3(b)(4).    Respondents'  fraudulent  conveyance  of Maharaja's 50% interest in Pinetree Plaza to Respondent Crown LLC as evidenced

by the <u>First Fraudulent Deed</u>, their fraudulent conveyance of Maharaja's said property to Respondent Pinetree LLC evidenced by the <u>Second Fraudulent Deed</u> and their fraudulent conveyance of the property to TC Federal as security for a line of credit as evidenced by the <u>Security Deed</u>, Respondents committed the crime Theft by Deception and **three separate acts of racketeering activity**.

<center>104.</center>

At the time he executed the <u>Second Fraudulent Deed</u> to Pinetree LLC as Sole Member of Respondent Crown LLC, Respondent Ahuja personally executed an <u>Affidavit of Possession</u>, under oath, which was recorded together with the <u>Second Fraudulent Deed</u> ("**Fraudulent Affidavit**").

<center>105.</center>

The <u>Fraudulent Affidavit</u> was also executed, under oath, by Sameer Lalani and Shaneel Lalani, the other two Members of Respondent Pinetree LLC.

<center>106.</center>

In executing the <u>Fraudulent Affidavit</u>, Respondent Ahuja affirmed the ruth of the following statement: "**CROWN ASSETS, LLC, a Georgia limited liability company, received title to a 50% undivided interest in [Pinetree Plaza] on August 19, 2019 by virtue of the deed of conveyance referenced in Item 1 above [being the First Fraudulent Deed]**."

107.

The statement was false, and Respondent Ahuja knew it was false when he made it.

108.

In executing the Fraudulent Affidavit, Respondent Ahuja affirmed that: "**This Affidavit is given to place these facts on record with regard to [Pinetree Plaza]; and Affiants understand that the law firm of SILVIS, AMBROSE, LINDQUIST & COCH, P.C.; lender TC FEDERAL BANK ISAOA ATIMA; and FIRST AMERICAN TITLE INSURANCE COMPANY; and others interested in the title to [Pinetree Plaza] will rely on the truth of the statements contained herein**."

109.

The false statements made by Respondent Ahuja, under oath, were intended to induce Respondent TC Federal to issue the said line of credit in the amount of $3,075,884.00, and TC Federal relied on the false statements in issuing the line of credit.

110.

"Racketeering activity" means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving: Perjury and other related offenses

in violation of Article 4 of Chapter 10 of Title 16. *See* Georgia RICO Act, O.C.G.A.

§ 16-14-3(5)(A)(xxv).   A person to whom a lawful oath or affirmation has been

administered or who executes a document knowing that it purports to be an

acknowledgment of a lawful oath or affirmation commits the offense of **False**

**Swearing** when, in any matter or thing other than a judicial proceeding, he

knowingly and willfully makes a false statement. *See* O.C.G.A. § 16-10-71(a).   In

executing the <u>False Affidavit</u>, Respondents committed the crime False Swearing and

**an act of racketeering activity**.


## COUNT III—INJUNCTIVE RELIEF

### 111.

Petitioners re-allege and incorporate herein the preceding Paragraphs by

reference.

### 112.

Petitioners are in **immediate danger of significant loss or damage** as the

result of Respondents' fraudulent conveyances of Maharaja's 50% ownership

interest in Pinetree Plaza to themselves as evidenced by the <u>First Fraudulent Deed</u>,

the <u>Second Fraudulent Deed</u>, the <u>Fraudulent Certification</u> and the <u>Fraudulent</u>

<u>Affidavit</u> and their false claim of title to Maharaja's 50% ownership based on the

fraudulent deeds. *See* O.C.G.A. § 16-14-6(b).

113.

Petitioners are in **immediate danger of significant loss or damage** as the result of Respondents' disregard of Maharaja's rights as a 50% owner of Pinetree Plaza and tenant in common with Respondent Pinetree LLC, including the right to receive timely information concerning the management and financial performance of the property and to participate in its management.

114.

Petitioners are in **immediate danger of significant loss or damage** as the result of Respondent Pinetree LLC's fraudulent conveyance of Maharaja's 50% ownership interest in Pinetree Plaza to TC Federal as security for the $3,075,884.00 line of credit and TC Federal's pending lawsuit seeking to subject Maharaja's 50% in Pinetree Plaza to the Security Deed or an Equitable Lien.

115.

Petitioners are in "**immediate danger of significant loss or damage**" as the result of Respondents' on-going conversion of Maharaja's share of the rental income received from Pinetree Plaza and their failure and refusal to account for the funds.

116.

Petitioners are in "**immediate danger of significant loss or damage**" as the result of Respondents' on-going conversion of the proceeds of the line of credit

which they fraudulently purported to secure with Maharaja's 50% interest   in Pinetree Plaza.

117.

Respondents' actions in excluding Maharaja from possession and control of the Pinetree Plaza property and participate in its management constitute a continuing trespass and a wrongful appropriation of Maharaja's rights as 50% owner and tenant in common with Pinetree LLC.

118.

Respondents' unauthorized possession and control of all of the rental income received from Pinetree Plaza constitutes an on-going conversion of funds belonging to Maharaja.

119.

Respondents' possession and control of the loan proceeds they obtained from TC Federal after fraudulently conveying Maharaja's 50% interest in the Pinetree Plaza as security constitutes an on-going conversion of funds belonging to Maharaja.

120.

There is a substantial likelihood that Petitioners will prevail on the merits at trial, as the unlawful conduct being perpetrating by Respondents is plain and palpable.

121.

A balancing of the equities in this case weighs heavily in Petitioners' favor. All of Petitioners' rights and interests involved in this action are valuable property rights acquired through lawful means and are clearly entitled to the protection of a court of equity. Conversely, all of Respondents' claimed rights and interests are valuable property rights belonging to Petitioners which they obtained from through extortion, fraud and conversion and are *not* entitled to the protection of a court of equity.  The  $700,000 that Maharaja paid to purchase the 50% interest in Pinetree Plaza, free and clear, came out of Dr. Arora's and Vineet's pockets and was the product of years of hard work and prudent action.  Respondents paid nothing for their claimed interest.   Dr. Arora and Vineet are innocent parties drawn into Respondents' racketeering scheme against their will, who have lost property worth millions including its equity in Pinetree Plaza to their predations.   Respondents, on the other hand, are guilty parties, who obtained the property that Petitioners lost, without paying for it, working for it or having any rightful claim to it at all, but through employing tactics that are criminal and civilly actionable under the Georgia RICO Act.

<div align="center">122.</div>

An injunction against such egregious and plainly unlawful conduct is in the public interest.

123.

Irreparable harm is not a requirement of injunctive relief under the Georgia RICO Act. *See* O.C.G.A. § 16-14-6(b).  Nonetheless, there exists a substantial threat that Petitioners will suffer irreparable injury if the injunction is not granted.  A money judgment could not provide complete relief.

124.

Respondents are entitled a Temporary Restraining Order and Interlocutory Inunction as this case involves racketeering, fraud, on-going tortious conduct, title to real property, tenants in common, complicated and intricate accounts and dissipation of assets.

125.

Petitioners have no adequate remedy at law.   They can be made whole only through the recovery of Pinetree Plaza and the establishment of an **Imposition of an Equitable Lien** on all properties that Respondents purchased with funds obtained from them through racketeering, including the properties or interests in the properties located at 325 Crooked Stick Drive, 4319 Covington Highway, 140 W. Dykes Street, 1604 E. Oglethorpe Boulevard, and 2411-2505 S. Main Street, and the rental income from those properties, and the **Imposition of a Constructive Trust** on the properties that Petitioners were coerced into transferring to Respondents directly, including the 50% interests in 106 Commerce Street, 2318 Old Cornelia

Highway, 3811 Flat Shoals Parkway and the vacant land on Roosevelt Highway. King Group owns the other 50% interest in these properties.

126.

However, Petitioners will have no viable claims for Imposition of an Equitable Lien or Constructive Trust unless Respondents are enjoined from taking any action that might impair King Group's interest in the properties and/or its claim for imposition of a Equitable Lien prevent the dissipation of the assets to which those claims will attach.

127.

Similarly, Petitioners would have no viable claim for recovery of the title to Pinetree Plaza if that property is lost to TC Federal.  Accordingly, Petitioners are entitled to appropriate orders and judgments requiring that Respondents post a bond or provide other security in an amount sufficient to satisfy TC Federal's claims against Maharaja's 50% interest in the Pinetree Plaza property.

128.

Petitioners are entitled to appropriate orders and judgments enjoining Respondents from continuing their conversion of Maharaja's share of the rental income from Pinetree Plaza during the pendency of this case. *See* O.C.G.A. § 16-14-6(a).

129.

Having fraudulently conveyed Maharaja's 50% in Pinetree Plaza to TC Federal as security for the line of credit, Petitioners are entitled to appropriate orders and judgments restraining and enjoining them from continuing their conversion of the proceeds of the loan without first providing adequate security for payment of TC Federal's claims against Maharaja's interest in Pinetree Plaza.

130.

Petitioners are also entitled to appropriate orders and judgments compelling Respondent Ahuja to show cause as to his refusal to cooperate in the re-financing of King Group's "replacement" property on Atlanta Highway and compelling him to do so in the absence of good cause.

131.

Petitioners are entitled to the immediate entry of a Temporary Restraining Order and an Interlocutory Injunction within 30 days restraining and enjoining Respondents from taking any actions or requiring them to take such actions during the pendency of the case as necessary to preserve the *status quo*.

By way of illustration, Respondents should be enjoined from:

(a) Selling, transferring or encumbering any interest in the Pinetree Plaza property or taking any other action or permitting any action to be taken which may impair its good and marketable title
(b) Transferring any funds from any bank accounts used in the operation of Pinetree Plaza to any person except in the ordinary course of business of Pinetree Plaza to pay regularly recurring business expenses

(c) Disbursing any funds representing rental income received from Pinetree Plaza from any bank account to any person for any reason

(d) Disbursing any funds representing proceeds from the line of credit with TC Federal from any bank account to any person for any reason

(e) Altering, manipulating, destroying, or removing any financial records and/or other documents and/or other documents, books and records, including electronically-stored data, pertaining to the purchase and on-going operations of Pinetree Plaza including but not limited to the documents pertaining to the line of credit from TC Federal

(f) Selling, transferring or encumbering the properties or any interest in the properties located at 106 Commerce Street, 2318 Old Cornelia Highway, 3811 Flat Shoals Parkway, the vacant land on Roosevelt Highway, 325 Crooked Stick Drive, 4319 Covington Highway, 140 W. Dykes Street, 2411-2505 S. Main Street, 7530 St. Marlo Country Club Parkway, and 90 Hunters Chase, or taking any other action or permitting any action to be taken which may impair the good and marketable title;

(g) Disbursing any funds representing rental income received from the properties located at 106 Commerce Street, 2318 Old Cornelia Highway, 3811 Flat Shoals Parkway, the vacant land on Roosevelt Highway, 325 Crooked Stick Drive, 4319 Covington Highway, 140 W. Dykes Street, 2411-2505 S. Main Street, 7530 St. Marlo Country Club Parkway, and 90 Hunters Chase, to any person for any reason to any person except in the ordinary course of business to pay regularly recurring business expenses of the property that generating the income

(h) Altering, manipulating, destroying, or removing any financial records and/or other documents and/or other documents, books and records, including electronically-stored data, pertaining to the purchase and on-going operations of 106 Commerce Street, 2318 Old Cornelia Highway, 3811 Flat Shoals Parkway, the vacant land on Roosevelt Highway, 325 Crooked Stick Drive, 4319 Covington Highway, 140 W. Dykes Street, 2411-2505 S. Main Street, 7530 St. Marlo Country Club Parkway, and 90 Hunters Chase

(i) Altering, manipulating, destroying, or removing any financial records and/or other documents and/or other documents, books and records, including electronically-stored data, of any Respondent

(j) Selling, transferring or encumbering any Membership Interest in any of the Respondent limited liability companies to any person who is not a party to this action

By way of illustration, Respondents should be required to allow Petitioners and or their counsel to:

> (i) Inspect and make copies of the records identified above as they pertain to Pinetree Plaza, any financial records and/or other documents and/or other documents, books and records, including electronically-stored data, pertaining to the purchase and on-going operations of Pinetree Plaza including but not limited to the documents pertaining to the line of credit from TC Federal.

### 132.

Petitioners are entitled to such other orders in the exercise of the Court's discretion as are reasonable and necessary to assure the orderly management and preservation of the properties until the parties' rights can be determined.

## COUNT IV—RESCISSION ON THE
## GROUND OF DURESS

### 133.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 134.

In entering into the <u>Coerced Transactions</u> on August 14, 2019, Dr. Arora and Vineet were under the duress caused by Respondents' threat to slander and defame Harsimran to her fiancé's family to interfere with her marriage plans, if they did not do so.

135.

In entering into the <u>Coerced Zillionaire Amendment</u>, Dr. Arora and Vineet were under the duress caused by the devastating financial losses they were suffering as the result of Respondents' fraudulent conveyance of Maharaja's 50% ownership interest in Pinetree Plaza.

136.

Dr. Arora and Vineet did not enter into the said transactions and conveyances of their own free will and accord but were compelled to do so by Respondents' threats to harm their loved one.

137.

Since the free assent of the parties is essential to a valid contract, duress, either by imprisonment, threats, or other acts, by which the free will of the party is restrained and his consent induced, renders the contract voidable at the election of the injured party.  OCGA § 13-5-6.

138.

Petitioners are entitled to an order rescinding the <u>Coerced Transactions</u> and the <u>Coerced Zillionaire Amendment</u> on the ground of duress.

## COUNT V—RESCISSION ON THE GROUND OF
## FRAUDULENT INDUCEMENT

### 139.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 140.

Respondents represented to Dr. Arora and Vineet that if they agreed to the Coerced Transactions of August 14, 2019, Respondents would not take any action to harm their sister as they had threatened.

### 141.

Respondents represented to Dr. Arora and Vineet that if they agreed to the Coerced Zillionaire Amendment and cooperated in the sales of the Attucks Boulevard and Snapfinger Drive properties, Respondents would reconvey Maharaja's 50% ownership interest in Pinetree Plaza.

### 142.

Dr. Arora and Vineet entered into the Coerced Transactions and Coerced Zillionaire Amendment in reliance on Respondents' representations.

### 143.

Respondents' representations were false, and they know they were false when they made them.

144.

Respondents never had any intention of withdrawing their threats against Harsimran or reconveying Pinetree Plaza back to Maharaja  but made the false representations to induce Dr. Arora and Vineet to enter into the <u>Coerced Transactions</u> and <u>Coerced Zillionaire Amendment</u> and cooperate in the sales of the Attucks Boulevard and Snapfinger Drive properties as shown by their subsequent conduct, namely, their fraudulent conveyance of Maharaja's 50% interest in Pinetree Plaza to Respondent Crown LLC just four days after the <u>Coerced Transactions</u>, their continued  threats to ruin Harsimran's marriage, their fraudulent conveyance of Maharaja's property from Crown LLC to Pinetree LLC and their fraudulent security deed conveyance from Pinetree LLC  to TC Federal.

145.

Having been fraudulently induced by Respondents' false statements to enter into the <u>Coerced Transactions</u> and the <u>Coerced Zillionaire Amendment</u>, Petitioners are entitled to an order rescinding the transactions upon that ground.

## COUNT VI—RESCISSION ON GROUND OF ILLEGALITY

146.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

147.

Apart from the return of Respondent Ahuja's 11% interest in King Group, which Petitioners tender back to him, the only consideration Petitioners received in entering into the Coerced Transactions and the Coerced Zillionaire Amendment was the protection of their sister from Respondents' threats.

148.

Consideration to do *or not do* an immoral or illegal cannot support an enforceable contract.  Such a contract is void pursuant to OCGA § 13-8-1.

149.

Petitioners seek and are entitled to an order rescinding the Coerced Transactions and Coerced Zillionaire Amendment on the ground of illegality.

**COUNT VII—DECLARATORY JUDGMENT**

150.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

151.

Under the circumstances, an actual controversy exists between Petitioners and Respondents concerning the validity of the Coerced Transactions and Coerced

<u>Zillionaire Amendment</u>.

<div align="center">152.</div>

Under the circumstances, an actual controversy exists between Petitioners and Respondents concerning the validity of the <u>First Fraudulent Deed</u> and the <u>Second Fraudulent Deed</u> as conveyances of Maharaja's 50% ownership interest in Pinetree Plaza.

<div align="center">153.</div>

In addition, or alternatively to the relief requested elsewhere in this Petition, Petitioners are entitled to a judgment pursuant to OCGA § 9-4-1 *et seq*. declaring that the <u>Coerced Transactions</u>, the <u>Coerced Zillionaire Amendment</u>, the <u>First Fraudulent Deed</u>, and the <u>Second Fraudulent Deed</u> are the products of Respondents' unlawful acts and are invalid, ineffective and unenforceable.

<div align="center">**COUNT VIII—CONVERSION OF PINETREE
PLAZA INCOME**</div>

<div align="center">154.</div>

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

<div align="center">155.</div>

Maharaja purchased its 50% interest in Pinetree Plaza in July of 2019 and since its acquisition has been entitled to receive 50% of the net income.

156.

Yet, neither Maharaja, nor Dr. Arora nor Vineet has ever received *any* of the

substantial rental income paid by the tenants of the property.

157.

Respondents have retained *all* the rental income from Pinetree Plaza and have

refused to account for the receipt and use of such funds.

158.

Respondents have exercised the right of ownership over Maharaja's share of

the income received from Pinetree Plaza without authorization and in hostility to its

rights.

159.

Petitioners are entitled to a money judgment against Respondents for

conversion of the rental income it should have received since purchasing Pinetree

Plaza, as shown by the evidence.

160.

 "Racketeering activity" means to commit, to attempt to commit, or to solicit,

coerce, or intimidate another person to commit any crime which is chargeable by

indictment under the laws of this state involving: Theft in violation of Article 1 of

Chapter 8 of Title 16. *See* Georgia RICO Act, O.C.G.A. § 16-14-3(5)(A)(xii).  A

person commits the offense of **Theft by Conversion** when, having lawfully obtained

funds or other property of another including, but not limited to, leased or rented personal property, under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, he knowingly converts the funds or property to his own use in violation of the agreement or legal obligation. O.C.G.A. § 16-8-4(a). In converting rental income from Pinetree Plaza that Respondents were legally obligated to pay to Maharaja, Respondents committed the crime of Theft of Conversion and **multiple acts of racketeering activity**.

## COUNT IX—CONVERSION OF BANK FUNDS

### 161.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 162.

On or about July 30, 2019, Respondent Charanjeev forged an authorized signature on a check in the amount of $15,000.00 drawn on Maharaja's bank account maintained at Bank of America.

### 163.

On or about August 2, 2019, Respondent Charanjeev forged an authorized signature on a check in the amount of $10,000.00 drawn on Maharaja's bank account

maintained at Bank of America.

<center>164.</center>

On or about August 12, 2019, Respondent Ahuja forged an authorized signature on a check in the amount of $5,300 drawn on Vineet's personal bank account maintained at Associated Credit Union.

<center>165.</center>

By way of such forgeries, Respondents exercised the right of ownership over Maharaja's and Vineet's bank funds, without authorization and in hostility to their rights.

<center>166.</center>

Maharaja is entitled to a money judgment against Respondents for conversion in the amount of $25,000.00.

<center>167.</center>

Vineet is entitled to a money judgment against Respondents for conversion in the amount of $5,300.00.

<center>168.</center>

"Racketeering activity" means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving: Forgery in any degree in violation of Code Section 16-9-1. *See* Georgia RICO Act, O.C.G.A. § 16-14-3(5)(A)(xvi(d)

A person commits the offense of **Forgery in the Third Degree** when with the intent to defraud he or she knowingly: Makes, alters, possesses, utters, or delivers any check written in the amount of $1,500.00 or more in a fictitious name or in such manner that the check as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority.  In unlawfully obtaining funds from Maharaja's and Vineet's bank accounts by forging authorized signatures on checks drawn on their accounts, Respondents committed the crime of Forgery in the Third Degree and **three acts of racketeering activity**.

## COUNT X—CONVERSION THROUGH IDENTITY AND FINANCIAL TRANSACTION CARD FRAUD

### 169.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 170.

In August of 2019, Respondents took possession of personal identifying information belonging to Vineet and his sister, Harsimran, including their driver's licenses, other ID cards, Social Security cards, credit cards and confidential information pertaining to financial cards and accounts issued in their names.

171.

"Racketeering activity" means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving: Identity fraud in violation of Article 8 of Chapter 9 of Title 16. *See* Georgia RICO Act, O.C.G.A. § 16-14-3(5)(A) (xx). A person commits the offense of **Identity Fraud** when he or she willfully and fraudulently: Without authorization or consent, uses or possesses with intent to fraudulently use identifying information concerning a person. O.C.G.A. § 16-9-121(a). In taking possession of Vineet's and Harsimran's personal identifying information without their knowledge or authorization with the intent to use it to further their fraudulent scheme, Respondents committed the crime of Identity Fraud and **at least two acts of racketeering activity**.

172.

Without Harsimran's knowledge or authorization, Respondents used her confidential and identifying information to commit various acts of identity fraud and financial transaction card fraud, including applying for credit in her name and transferring their credit card balances to the fraudulent account, transferring their credit card account balances to her existing credit card accounts and charging the costs of goods and services to her credit card accounts.

173.

Harsimran confronted Respondent Charanjeev when she learned of the fraud, whereupon Charanjeev promised to pay the fraudulent charges. However, he did not keep that promise.

174.

Respondents converted approximately $35,000 from Harsimran's deposit and credit card accounts but Respondent Charanjeev paid some charges, totaling about $6,000, directly to one or more of the credit card issuers. The remaining balance of unpaid fraudulent charges was $29,514.54.

175.

To save their sister's credit standing, Petitioners paid the fraudulent charges for her from an account maintained by Zillionaire, and she has assigned to Zillionaire her claims against Respondents arising from the fraud including the right to re-payment of the bogus charges.

176.

Zillionaire is entitled to a money judgment against Respondents for conversion in the amount of $29,514.54.

177.

"Racketeering activity" means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by

indictment under the laws of this state involving: **Illegal Use of Financial Transaction Cards** in violation of Code Sections 16-9-31, 16-9-32, 16-9-33, and 16-9-34. *See* Georgia RICO Act, O.C.G.A. § 16-14-3(5)(A) (xvii).   A person commits the offense of financial transaction card theft when:  He takes, obtains, or withholds a financial transaction card from the person, possession, custody, or control of another without the cardholder's consent; or who, with knowledge that it has been so taken, obtained, or withheld, receives the financial transaction card with intent to use it or to sell it or to transfer it to a person other than the issuer or the cardholder. O.C.G.A. § 16-9-31(a)(1). A person commits the offense of financial transaction card fraud when, with intent to defraud the issuer; a person or organization providing money, goods, services, or anything else of value; or any other person; or cardholder, such person: Uses for the purpose of obtaining money, goods, services, or anything else of value: A financial transaction card obtained or retained or which was received with knowledge that it was obtained or retained in violation of Code Section 16-9-31 or 16-9-32. O.C.G.A. § 16-9-33(a)(1)(A).  In taking possession of Harsimran's credit cards without her knowledge or authorization and using them transfer their unpaid credit card account balances, Respondents committed the crimes of financial transaction card theft and financial transaction card fraud and **multiple acts of racketeering activity**.

## COUNT XI—BREACH OF FIDUCIARY DUTY

### 178.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 179.

Maharaja and Respondent Pinetree LLC purchased Pinetree Plaza at the same time from a common grantor and hold the property as tenants in common, and a fiduciary relationship exists between them in all matters concerning the Pinetree Plaza property.

### 180.

Respondent Pinetree LLC breached its fiduciary duty to Maharaja by knowingly participating with the other Respondents in the conversion of Maharaja's share of the income received from the Pinetree Plaza property.

### 181.

Respondent Pinetree LLC breached its fiduciary duty to Maharaja by knowingly participating with the other Respondents in the fraudulent conveyance of Maharaja's 50% ownership interest in Pinetree Plaza to Respondent Crown LLC as evidenced by First Fraudulent Deed, Respondent Crown LLC's fraudulent conveyance of Maharaja's Interest in Pinetree Plaza to Respondent Pinetree LLC as evidenced by the Second Fraudulent Deed and in its fraudulent security deed

conveyance of Maharaja's property interest to TC Federal as security for a line of credit as evidenced by the <u>Security Deed</u>.

<div align="center">182.</div>

Maharaja is entitled to damages against Pinetree LLC for the value of all property interests and funds it obtained through the breach of its fiduciary duty including the converted rental income and all other damages that Maharaja has sustained as the result of its breach of fiduciary duty, and if the Court in the pending Thomas County action rules that the Security Deed is a valid conveyance of Maharaja's 50% interest in Pinetree Plaza or that its interest is subject to an equitable lien, Maharaja will be entitled to damages in the amount of all sums it is required to pay to preserve its title.

<div align="center">

**COUNT XII—FRAUD**

183.
</div>

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

<div align="center">184.</div>

Respondents obtained possession and control of Petitioners' valuable property interests and funds through fraud, fraudulent inducement and deception as alleged in this Petition.

185.

Petitioners are entitled to recover money damages against Respondents for the value of all property interests and funds obtained by them through fraud and all other damages sustained as the result of Respondents' unlawful conduct.

## COUNT XIII—IMPOSITION OF AN EQUITABLE LIEN

186.

Petitioners incorporate the previous allegations herein by reference.

187.

Respondents used some or all of the proceeds that they have obtained from Petitioners through the unlawful acts forth in this Petition to purchase interests in the following properties: **325 Crooked Stick Drive**, City of Milton, Fulton County, titled in Respondent Crown LLC; **4319 Covington Highway**, City of Decatur, DeKalb County, titled in Respondents Covington LLC and Crown LLC; **140 W. Dykes Street**, City of Cochran, Bleckley County, titled in Respondent Dykes LLC; **1604 E. Oglethorpe Boulevard**, City of Albany, Dougherty County, titled in Respondents Oglethorpe LLC and Crown LLC; **2411-2505 S. Main Street**, City of Moultrie, Colquitt County, titled in Respondent Main LLC; **7530 St. Marlo Country Club Parkway**, City of Duluth, Forsyth County, titled in the name of Respondent King Assets LLC and **90 Hunters Chase**, City of McDonough, titled in

the name of Fidelity Bank c/o Zillionaire for the benefit of Respondent Crown LLC.

188.

Respondents Dykes LLC, Oglethorpe LLC and Main LLC are jointly owned and managed by Respondent Ahuja and the other two principals of Pinetree LLC, Sameer Lalani and Shaneel Lalani.

189.

An equitable lien on specific property may be decreed whenever under the rules of equity, the circumstances require this remedy.

190.

It is against equity that Respondents should retain title to 325 Crooked Stick Drive; 4319 Covington Highway; 140 W. Dykes Street; 1604 E. Oglethorpe Avenue; 2411-2505 S. Main Street; 7530 St. Marlo Country Club Parkway or 90 Hunters Chase, or the income received therefrom, or any other property purchased, improved or maintained with funds obtained from Petitioners through the unlawful acts forth in this Petition, without restoring such funds to Petitioners.

191.

In addition or alternatively to any other relief requested in this Petition, Petitioners seek and are entitled to the imposition of an equitable lien upon Respondents' interests in 325 Crooked Stick Drive; 4319 Covington Highway; 140 W. Dykes Street; 1604 E. Oglethorpe Avenue; 2411-2505 S. Main Street; 7530 St.

Marlo Country Club Parkway and 90 Hunters Chase, and the income received therefrom, and against any other property purchased, improved or maintained with funds obtained from Petitioners through the unlawful acts forth in this Petition without restoring such funds to Petitioners.

## COUNT XIV– IMPOSITION OF A CONSTRUCTIVE TRUST

### 192.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 193.

A constructive trust arises with respect to the title to property which was acquired by fraud or other unlawful means.

### 194.

Respondent Crown LLC claims title to a 50% interest in the properties located at 106 Commerce Street, 2318 Old Cornelia Highway, 3811 Flat Shoals Parkway and the vacant land Roosevelt Highway based upon the Coerced Commerce Street Deed, the Coerced King Group Agreement, the Coerced Flat Shoals Deed, and the Coerced Roosevelt Hwy Deed.  The 50% claimed in 2318 Old Cornelia Highway is 50% of King Group's 56% ownership interest, 28% of the total fee.

195.

Respondent Crown LLC obtained its purported 50% interests in 106 Commerce Street, 2318 Old Cornelia Highway, 3811 Flat Shoals Parkway, and Roosevelt Highway from Petitioners through the unlawful acts forth in this Petition.

196.

In addition or alternatively to any other relief requested in this Petition, Petitioners seek and are entitled to the imposition of a constructive trust upon Respondents' claimed 50% interests in 106 Commerce Street, 3811 Flat Shoals Parkway, and Roosevelt Highway and the income received therefrom and upon any other property that Respondents obtained from Petitioners through the unlawful acts set forth in this Petition.

## COUNT XV—DISGORGEMENT

197.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

198.

Respondents have profited from Pinetree LLC's breach of the fiduciary duty it owes to Maharaja as tenant in common with respect to the Pinetree Plaza property.

199.

Petitioners are entitled to the remedy of disgorgement against Respondents in the amount of the gross revenues received by them either directly or indirectly as the result of Pinetree LLC's breach of fiduciary duty.

## COUNT XVI—REQUEST FOR
## EQUITABLE ACCOUNTING

200.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

201.

Maharaja is a tenant in common with Respondent Pinetree LLC with respect to their joint ownership of Pinetree Plaza.

202.

A fiduciary relationship exists between Maharaja and Pinetree LLC as tenants in common with respect to their joint ownership of Pinetree Plaza.

203.

Respondent Crown LLC and its principal, Respondent Ahuja, claim title to Maharaja's 50% interest in Pinetree Plaza based upon the First Fraudulent Deed and Second Fraudulent Deed.

204.

Respondents Crown LLC, Pinetree LLC and Pinetree Mgmt LLC have assumed possession and control of Pinetree Plaza and have received all of the rental income generated by the property and presumably have paid the expenses but have remitted none of the profits to Maharaja.

205.

In January of this year, the said Respondents purported to convey the entire fee interest in Pinetree Plaza to TC Federal Bank as security for a $3,075,884.00 line of credit but have paid none of the loan proceeds to Maharaja.

206.

On July 21, 2020, TC Federal filed suit in the Superior Court of Thomas County against Maharaja and Respondents Crown LLC, Pinetree LLC, and their principals, for Quiet Title, Declaratory Relief, Establishment of an Equitable Lien, seeking among other things to establish the security deed issued by Respondents as a valid conveyance of Maharaja's 50% interest in Pinetree Plaza or alternatively to subject it to an equitable lien.

207.

The said Respondents have failed and refused to provide any information to Maharaja concerning the income and expenses of Pinetree Plaza nor have they provided any information concerning the use of the loan proceeds from TC Federal.

208.

Respondent Crown LLC claims that it is a tenant in common with King Group with respect to 106 Commerce Street, 2318 Old Cornelia Highway, 3811 Flat Shoals Parkway and the vacant land on Roosevelt Highway, based upon the <u>Coerced Commerce Street Deed</u>, the <u>Coerced King Group Agreement</u>, the <u>Coerced Flat Shoals Deed</u>, and the <u>Coerced Roosevelt Hwy Deed.</u>

209.

Although Petitioners deny Respondent Crown LLC's claims to an ownership interest in the said properties, Respondent Charanjeev assumed management and control over them, and he has failed to account to Petitioners for the rental income and expenditures for the maintenance, repair and up-keep of the properties.

210.

Petitioners seek the Imposition of a Equitable Lien on Respondents' properties located at 325 Crooked Stick Drive, Milton, Fulton County, 4319 Covington Highway, Decatur, DeKalb County, 140 W. Dykes Street, Cochran, Bleckley County and 1604 E. Oglethorpe Boulevard, Albany, Dougherty County, and all revenues generated by the properties, on the grounds that Respondents purchased them with funds obtained from Petitioners through unlawful means, and they seek the Imposition of a Constructive Trust on all revenues generated by 106 Commerce Street, 2318 Old Cornelia Highway, 3811 Flat Shoals Parkway and the

vacant land on Roosevelt Highway and the remedy of Disgorgement with respect to the gross profits, or alternatively the net profits, earned by Respondents from the use of funds obtained from Petitioners through Pinetree LLC's breach of fiduciary duty.

211.

To establish these claims, Petitioners must determine the amount of money that Respondents obtained from them through unlawful means and the uses to which they put those funds, most importantly, to identify all properties purchased or improved with such funds and determine the gross and net profits earned from those properties.

212.

The financial evidence required to establish Petitioners' claims is complicated and intricate.

213.

Much of the financial information that Petitioners require concerns accounts between tenants in common.

214.

Petitioners have no adequate remedy at law.

215.

The facts alleged in this Petition show that on an accounting, Petitioners will likely be entitled to recover judgment for some amount.

216.

Accordingly, Petitioners are entitled to an Equitable Accounting from Respondents pursuant O.C.G.A. § 23-2-70.

## COUNT XVII—CONSPIRACY

217.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

218.

In committing the various tortious and unlawful acts alleged herein, Respondents acted in concert and in furtherance of a common plan or scheme in which they all participated, having the goal of obtaining possession and control of Petitioners' property through unlawful means.

219.

Liability for the unlawful conduct of any one of the said Respondents in furtherance of the conspiracy should therefore be imputed to all the others, and judgment should be entered jointly and severally against them for all damages sustained by Petitioners as the result of the wrongdoing committed by any one of them.

## COUNT XVIII– PUNITIVE DAMAGES

### 220.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 221.

Respondents' conduct as set forth herein shows willful misconduct, wantonness, and that entire want of care which raises the presumption of a conscious indifference to the consequences of its actions, thereby entitling Petitioners to recover punitive damages pursuant to O.C.G.A. § 51-12-5.1.

## COUNT XIX– ATTORNEY'S FEES

### 222.

Petitioners re-allege and incorporate herein the preceding Paragraphs by reference.

### 223.

Respondents have acted in bad faith, been stubbornly litigious, and have caused Petitioners unnecessary trouble and expense, thereby entitling them to recover their attorney's fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE** Petitioners respectfully pray:

(a)     For an Order granting relief under the Georgia RICO Act, including appropriate orders and judgments divesting Respondents of property unlawfully obtained from Petitioners, injunctive relief and treble damages, as requested in Count I

(b)     For an Order of Quiet Title removing and cancelling the <u>First Fraudulent Deed</u> and the <u>Second Fraudulent Deed</u> as clouds upon Maharaja's title to the Pinetree Plaza property, as requested in Count II

(c)     For a Temporary Restraining Order and Interlocutory Injunction to preserve the *status quo* pending the conclusion of this case, as requested in Count III

(d)     For an Order rescinding the <u>Coerced Transactions</u> and the <u>Coerced Zillionaire Amendment</u> on the ground of Duress, as requested in Count IV, or on the ground of Fraudulent Inducement as requested in Count V, or on the ground of Illegality as requested in Count VI

(e)     For a Declaratory Judgment, as requested in Count VIII

(f)     For a money judgment against Respondents for conversion of the rental income from Pinetree Plaza, as requested in Count VIII

(g)     For a money judgment against Respondents for conversion of bank

funds in the amount of $30,300.00, as requested in Count IX

(h)    For a money judgment against Respondents for conversion through identity fraud and financial transaction card fraud in the amount of $29,514.54, as requested in Count X

(i)    For a money judgment against Respondents for Pinetree LLC's breach of fiduciary duty in an amount to be established at trial, as requested in Count XI

(j)    For a money judgment against Respondents for fraud, as requested in Count XII

(k)    For the Imposition of an Equitable Lien as requested in Count XIII

(l)    For the imposition of a Constructive Trust as requested in Count XIV

(m)    For an Order requiring Disgorgement of the gross or net profits earned by Respondents from property obtained from Petitioners through unlawful means in an amount to be established at trial, as requested in Count XV

(n)    For an Order requiring Respondents to render an equitable accounting, as requested in Count XVI

(o)    For punitive damages against Respondents, as requested in Count XVIII

(p)    For attorney's fees and expenses of litigation, as requested in Count

XIX, and

(q)    For such other and further relief as may be just and proper.

Respectfully Submitted,

_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net

## IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC<br><br>Petitioners,<br><br>v.<br><br>CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC<br><br>Respondents. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION<br><br>FILE NO. _____ |

## PETITION FOR RELIEF UNDER THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, QUIET TITLE, INJUNCTION, RESCISSION AND OTHER EQUITABLE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

**COME NOW** SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

<u>Other Equitable Relief, Declaratory Judgment and Damages</u> and that the facts stated therein are true and correct.

This 5th day of August, 2020.

_____
Sahib Arora

Sworn to and subscribed before me:

This ___ day of ___August___, 2020

_____
[NOTARY PUBLIC]

# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH;<br>KING GROUP MGMT LLC;<br>MAHARAJA INVESTMENTS, LLC<br>and ZILLIONAIRE ASSETS, LLC | §<br>§<br>§<br>§<br>§ | |
| Petitioners, | §<br>§ | CIVIL ACTION |
| v. | §<br>§<br>§ | FILE NO. _____ |
| CHARANJEEV SINGH; KARAN S.<br>AHUJA; JARNAIL SINGH; JONIKA<br>ARORA; CROWN ASSETS, LLC;<br>2551 E PINETREE BLVD<br>MGMT LLC; 2551 EAST PINETREE<br>BLVD LLC; 4319 COVINGTON<br>HWY, LLC; 140 W. DYKES<br>STREET, LLC; 1604 E.<br>OGLETHORPE BLVD, LLC;<br>KING ASSETS, LLC and<br>2505 S. MAIN STREET, LLC | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Respondents. | | |

## VERIFICATION

Personally appeared before me, the undersigned officer, duly authorized to administer oaths, **Vineet Singh**, who being duly sworn, upon his oath deposes and says that he has read the foregoing Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and

<u>Other Equitable Relief, Declaratory Judgment and Damages</u> and that the facts stated therein are true and correct.

This 5th day of August, 2020.

_____
Vineet Singh

Sworn to and subscribed before me:

This __5__ day of ___Aug_____, 2020

_____
[NOTARY PUBLIC]



# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC | § § § § § | |
| Petitioners, | § § | CIVIL ACTION |
| v. | § § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC | § § § § § § § § § § § § § | |
| Respondents. | | |

---

## EXHIBITS TO THE PETITION

---

Petitioners Sahib Arora, Vineet Singh, King Group MGMT LLC, Maharaja Investments, LLC and Zillionaire Assets, LLC file the documents referred to in the **Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable**

**Relief, Declaratory Judgment and Damages** filed in this action on August 7, 2020

as listed below, true and correct copies of which are attached hereto.

1.  Exhibit "A":    "Coerced King Group Agreement", *Petition
        at pp. 12-13, ¶ 28*

2.  Exhibit "B":    "Bill of Sale," *Id.*

3.  Exhibit "C":    "Coerced Maharaja Amendment," *Id.*

4.  Exhibit "D":    "Coerced Commerce Street Deed," *Id.*

5.  Exhibit "E":    "Coerced Flat Shoals Deed," *Id.*

6.  Exhibit "F":    "Coerced Roosevelt Hwy Deed," *Id.*

7.  Exhibit "G":    "Coerced Snapfinger Deed," *Id.*

8.  Exhibit "H":    "Coerced Zillionaire Amendment," *Petition at pp. 20-21,
        ¶ 46*

9.  Exhibit "I":    TC Federal Bank Complaint filed July 21, 2020 in the
        Superior Court of Thomas County, Civil Action
        SUCV2020000354, *Petition at pp. 23-24, ¶ 54*

10. Exhibit "J":    "Vesting Deed," *Petition, at p. 31, ¶ 69*

11. Exhibit "K":    "Authentic Certification," *Petition at p. 32, ¶ 72*

12. Exhibit "L":    "First Fraudulent Deed," *Petition at p. 33, ¶ 75* and
        attached "Fraudulent Certification"

13. Exhibit "M":    "Second Fraudulent Deed," *Petition at p. 38 ¶ 94*

14. Exhibit "N":    "Fraudulent Affidavit," *Petition at p. 41, ¶ 104*

[Continued on Following Page]

2

15. Exhibit "O":   "Security Deed," *Petition at p. 40, ¶ 102.*


This ___24th___ day of August, 2020.


Respectfully submitted,

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners


The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net



SAVE
THE
DATE

*for the wedding ceremony of*

## Anhad Singh And Harsimran Kaur

## November 9th, 2019



## AGREEMENT

THIS AGREEMENT made and entered into this 14th day of August, 2019 by and between KING GROUP MGMT, LLC, a Georgia limited liability company (hereinafter referred to as "King"), CROWN ASSETS, LLC, a Georgia limited liability company (hereinafter referred to as "Crown") and ZILLIONAIRE ASSETS, LLC, a Georgia limited liability company (hereinafter referred to as "Zillionaire").

### W I T N E S S E T H :

WHEREAS, King is the owner of an undivided fifty-six percent interest in real property and the improvements located at 2318 SE Old Cornelia Highway, Gainesville GA 30507 (the "Gainesville Property"); and the remaining forty-four percent interest of the Gainesville Property is owned by Golden Epoch Investments, LLC ("Golden Epoch"); and

WHEREAS, the Gainesville Property is subject to a loan in favor of Fidelity Bank in the original $616,000.00 (the "Gainesville Loan") and King and Golden Epoch are unconditionally liable for the repayment of the Gainesville Loan; and

WHEREAS, Zillionaire is the owner of the real property and the improvements located at 5754 Attucks Boulevard, Morrow GA 30260 (the "Morrow Property") and the sole member of Zillionaire is King; and

WHEREAS, the Morrow Property is subject to a loan in favor of Silver Hill Funding, LLC in the original $1,040,000.00 (the "Morrow Loan") and King is unconditionally liable for the repayment of the Morrow Loan; and

WHEREAS, Zillionaire desires to convey an undivided fifty percent interest in the Morrow Property to Crown and King desires to convey fifty percent of its interest in the Gainesville Property to Crown so that King and Crown shall each own an undivided twenty-eight (28) percent interest in the Gainesville Property; and

WHEREAS, based on the conveyance by Zillionaire and King, King and Crown will each be unconditionally liable for fifty percent of the indebtedness on the Morrow Property and King and Crown will each be unconditionally liable for twenty-five percent of the indebtedness on the Gainesville Property.

NOW THEREFORE, in consideration of the premises and of good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.   Zillionaire does hereby convey an undivided fifty percent interest in the Morrow Property to Crown and Crown shall be unconditionally liable for one-half of the indebtedness to Silver Hill Funding, LLC.

**Exhibit "A"**        KA

2.       King does hereby convey twenty-five percent of its interest in the Gainesville Property to Crown so that King and Crown shall each own an undivided 28% interest in the Gainesville Property and King and Crown are each twenty-five percent liable for the indebtedness to Fidelity National Bank.

3.       <u>Successors and Assigns</u>.  This Agreement shall apply to, inure to the benefit of, and be binding upon and enforceable against the parties hereto and their respective heirs, legal representative, successors, and assigns, to the same extent as if specified at length through out this Agreement.

4.       <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which counterparts together shall constitute one and the same instrument.

5.       <u>Time of the Essence</u>.  Time is of the essence of this Agreement. Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any public or legal holiday, the party having such privilege or duty shall have until 5:00 p.m. on the next succeeding business day to exercise such privilege or to discharge such duty.

6.       <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

7.       <u>Judicial Interpretation</u>.  Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that the agents of all parties have participated in the preparation hereof.

8.       <u>Authority to Execute Agreement</u>.  All parties signing this Agreement on hereby individually warrant that they are authorized to execute this Agreement on behalf of and to bind King, Crown and Zillionaire, respectively.

        IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed and its seal to be affixed thereto as of the day and year first above written.

KA

<u>ZILLIONAIRE:</u>

Zillionaire Assets, LLC
a Georgia limited liability company

By: _____
Sahib Singh Arora, Manager


<u>KING:</u>

King Group Mgmt, LLC
a Georgia limited liability company

By: _____
Sahib Singh Arora, Manager


<u>CROWN:</u>

Crown Assets, LLC
a Georgia limited liability company

By: _____
Karan Singh Ahuja, Manager

STATE OF GEORGIA

COUNTY OF FULTON

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that KARAN SINGH AHUJA ("Maker"), for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable considerations paid by SAHIB ARORA ("Purchaser") to the Maker, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, transfer and deliver unto Purchaser, the following described property, to-wit:

### HIS UNDIVIDED 11% MEMBERSHIP INTEREST IN
### KING GROUP MGMT, LLC

Maker warrants that he is the lawful owner in every respect of all the herein described property and that it is free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

Maker warrants and defends the title to all the herein described property unto the Purchaser, his heirs successors, and assigns, forever against every person whomsoever lawfully claiming or to claim such herein described property or any part thereof.

TO HAVE AND TO HOLD the same unto the said Purchaser, his heirs, successors, and assigns, forever, to their only proper use, benefit and behoof forever.

IN WITNESS WHEREOF, Maker has executed and delivered this Bill of Sale, effective this 14th day of August, 2019.

_Karan Ahuja_
Karan Singh Ahuja

**Exhibit "B"**

# AMENDED AND RESTATED
## OPERATING AGREEMENT
### OF
## MAHARAJA INVESTMENT, LLC

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE GEORGIA UNIFORM SECURITIES ACT OF 2008, AS AMENDED, IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 10-5-11(14) OF SUCH ACT. IN ADDITION, THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION FROM SUCH REGISTRATION SET FORTH IN THE SECURITIES ACT OF 1933 PROVIDED BY SECTION 4(2) THEREOF, NOR HAVE THEY BEEN REGISTERED WITH THE SECURITIES COMMISSION OF CERTAIN STATES IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS.

THIS AMENDED AND RESTATED OPERATING AGREEMENT OF **MAHARAJA INVESTMENT, LLC** (hereinafter referred to as the "Operating Agreement") is made and entered into this 14th day of August, 2019, by and between **VINEET SINGH, KARAN SINGH AHUJA, SAHIB ARORA AND CHARANJEEV SINGH** (hereinafter referred to as the "Members and individually as a "Member") whose respective addresses are set forth in ARTICLE 4 of this Operating Agreement. All of the aforementioned parties and any additional persons who may be admitted as Members as herein provided are sometimes hereinafter collectively referred to as the "Members" or hereinafter sometimes individually referred to as a "Member."

## W I T N E S S E T H:

WHEREAS, **MAHARAJA INVESTMENT, LLC,** a limited liability company (hereinafter referred to as the "Company") was formed pursuant to the laws of the State of Georgia, the purpose of which shall be engaged in the purchase, ownership, operation, sale and financing of real estate.

**The Members** hereto desire to amend and restate (i) the contributions to the capital of the Company by the Members; (ii) the division of the profits and losses derived from the ownership, maintenance and operation thereof of the Company; (iii) the restrictions on disposition of Membership Interests; (iv) Management of the Company; and (iv) address various other matters relating to the rights and obligations of the Members;

**NOW, THEREFORE**, the undersigned in consideration of the premises, the mutual promises contained in this Operating Agreement and for the other good and valuable consideration, the Members agree as follows.

Exhibit "C"

**NOW, THEREFORE**, the undersigned in consideration of the premises, the mutual promises contained in this Operating Agreement and for the other good and valuable consideration, the Members agree as follows.

<div align="center">

### ARTICLE 1

### DEFINITIONS

</div>

The following terms used in this Operating Agreement shall have the following meaning (unless otherwise expressly provided herein:

"Additional Capital Contributions." With respect to each Member, all additional Capital Contributions made by such Member pursuant to Section 8.02 of this Agreement.

"Additional Capital Contributions Account." An account maintained for each Member equal to (i) the aggregate Additional Capital Contributions to the Company made by such Member, less (ii) the aggregate distributions to such Member pursuant to Section 9.01.

"Articles of Organization." The Articles of Organization of    MAHARAJA INVESTMENT, LLC, as filed with the Secretary of State of Georgia as the same may be amended from time to time.

"Affiliate." (i) in the case of an individual, any relative of such Person, (ii) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of voting securities of any equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"Arbitrable Dispute." Any of the disputes so designated in Section 17.01 hereof.

"Available Cash" means all cash of the Company on hand as of any given time after the payment of all then due debts and liabilities of the Company and after any prepayments of any debts and liabilities of the Company that the Members deem appropriate to cause the Company to make, less any Reserves deemed necessary by the Members, consistent with the provisions of this Agreement, for (a) the repayment of any debts or liabilities of the Company, (b) the working capital or other requirements of the Company, and (c) any contingent or unforeseen liabilities of the Company.

"Business" means:

    a) All aspects of the purchase, lease, ownership, financing, development and sale of real property;

<div align="center">2</div>

b) All actions necessary to or reasonable connected with the Company's foregoing business which may be legally exercised by limited liability companies under the Georgia Act; and

c) All activities necessary, customary, convenient, or incident to any of the foregoing.

"Capital Account" of a Member means a capital account established, maintained, and adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Consistent therewith, each Member's Capital Account will be adjusted from time to time pursuant to Section 8.06 hereof, the purpose of which is to set forth certain operating rules for the allocation of book items of income, gain, loss and deduction for Capital Account purposes. The provisions of Article 8 hereof shall be construed in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv). The Capital Accounts shall not be adjusted for items as they are computed and allocated to the Members for federal income tax purposes. Upon the transfer hereunder of all or part of a Membership Interest, other than a Transfer that terminates the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Capital Account of the transferor Member that is attributable to the transferred Membership Interest will carry over to the transferee Member. In the event of a Transfer of all or part of a Member's Membership Interest that causes a termination of the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Members' Capital Accounts will be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(1).

"Capital Contribution." Any contribution to the capital of the Company in cash, promissory notes or the agreed value of property by a Member whenever made.

"Code." The Internal Revenue Code of 1986, as amended from time to time.

"Company." MAHARAJA INVESTMENT, LLC.

"Economic Interest" Refers to a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Georgia Act but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

"Economic Interest Owner." The owner of an Economic Interest who is not a Member.

"Entity." Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Fiscal Year." The Company's fiscal year, which shall be the calendar year.

"Georgia Act." The Georgia Limited Liability Company Act at O.C.G.A Section 14-11- 100, et seq.

"Initial Capital Contribution." The initial contribution to the capital of the Company made by a Member pursuant to Section 8.01 of this Operating Agreement.

"Majority Interest." Membership Interests of Members which, taken together, exceed fifty-one percent *(51%)* of the aggregate of all Membership Interests.

"Majority Vote." Membership Interests of Members which, taken together, exceed fifty-one percent *(51%)* of the aggregate of all Membership Interests.

"Manager." One or more Members designated pursuant to this Operating Agreement as a Manager from time to time pursuant to Section 5.02 hereof.

"Member." Each of the parties who executes a counterpart of this Operating Agreement as a member and each of the parties who may hereafter become members. To the extent a Manager has purchased a Membership Interest in the Company, the Manager will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent such Member has purchased said Membership Interest in the Company.

"Membership Interest." A Member's entire interest in the Company including (i) the right to participate in the management of the business and affairs of the Company, and the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Georgia Act, and (ii) the percentage ownership share of each Member in the capital, assets and properties of the Company. The Membership Interests of the Members as of the date of this agreement are as follows:

| Member's Name | Membership Interest |
|---|---|
| Vineet Singh | 25% |
| Karan Singh Ahuja | 25% |
| Sahib Arora | 25% |
| Charanjeev Singh | 25% |

For purposes of the provisions hereof relating to action taken or approval by Members, including voting, written consents or other approval, only Membership Interests held by Members shall be taken into account.

"Net Cash Flow." All cash received by the Company resulting from management and operation of the lodging facilities including proceeds from mortgages or refinancing, plus any other items of income received in cash by the Company, less all payments of debts and expenses, including capital expenditures and principal and interest payments on mortgages and debts, paid in the operation of the Company, and less any Reserves for working capital and capital expenditures which the Members deem reasonably necessary for the operation of the Company or

are so specified in any approved budget.

"Net Profits" or "Net Losses." The Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss) with the following adjustments: (i) such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B)) and 705(a)(2)(B) were included in the computation of taxable income or loss; (ii) that any items specially allocated pursuant to Article 10 hereof shall not be taken into account in computing Net Profits or Net Losses; (iii) if any Member contributes property to the Company with an initial book value to the Company different from its adjusted basis for federal income tax purposes to the Company, or if Company property is revalued in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or as otherwise required by the Regulations, Net Profits and Net Loses will be computed as if the initial adjusted basis for federal income tax purposes to the Company of such contributed or revalued property equaled its initial book value to the Company as of the date of contribution or revaluation; and (iv) credits or debits to Capital Accounts due to a revaluation of Company assets in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f), or due to a distribution of noncash assets as provided in Section 16.04 hereof, will be take into account as gain or loss from the disposition of such assets for purposes of computing Net Profits and Net Losses.

"Operating Agreement." This Operating Agreement as originally executed and as amended from time to time.

"Person." Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Reserves." With respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the affirmative vote of Members holding at least fifty-one (51%) percent of the Membership Interests for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transferring Member." A Member who sells, assigns, pledges hypothecates or otherwise transfers for consideration or gratuitously all or any portion of his Membership Interest.

"Treasury Regulations" or "Regulations." The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 2

## FORMATION OF COMPANY

   **2.01    Formation.** The Company was formed on June 9, 2019, as a Georgia limited liability company by causing Articles of Organization to be delivered to the Secretary of State of

Georgia in accordance with the provisions of the Georgia Act. The Company shall be taxed as a partnership for federal income tax purposes.

**2.02**   **Name**. The name of the MAHARAJA INVESTMENT, LLC

**2.03**   **Principal Place of Business**. The principal place of business of the Company within the State of Georgia is located at 660 Belgrave Lane, Tucker GA 30084.   The Company may locate its places of business and registered office at any other place or places as the Manager or Managers may from time to time deem advisable.

**2.04**   **Registered Office and Registered Agent**. The Company's registered office shall be at the office of its registered agent at 660 Belgrave Lane, Tucker, GA, 30084 and the name of its registered agent at such address is Vineet Singh.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Georgia Act and the applicable rules promulgated thereunder.

**2.05**   **Term**. The term of the Company shall commence at the date the Articles of Organization were filed with Secretary of State of Georgia and shall continue until the Company is dissolved, terminated and its affairs wound up in accordance with the provisions of this Operating Agreement or the Georgia Act.

## ARTICLE 3

## BUSINESS OF COMPANY

**3.01**   **Permitted Businesses**. The Company shall engage in the Business and may engage in any other Business or activities as approved by the Majority Interest of the Members.

## ARTICLE 4

## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members as of the date of this Agreement are as follows:

| NAME | ADDRESS |
| --- | --- |
| Vineet Singh | 660 Belgrave Lane<br>Tucker GA 30084 |
| Karan Singh Ahuja | 660 Belgrave Lane<br>Tucker GA 30084 |
| Sahib Arora | 660 Belgrave Lane<br>Tucker GA 30084 |

Charanjeev Singh                          660 Belgrave Lane
                                          Tucker GA 30084

Any party may change its address by giving notice of such address change to the other parties pursuant to the notice provisions set forth in Section 17.14.

## ARTICLE 5

## MANAGEMENT

**5.01** **Management of Business**. Subject to approval by the Members by Majority Vote as to Major Decisions as provided below, the business and affairs of the Company shall be managed by its Manager(s). Each Manager shall have full authority, power and discretion to delegate the management or control of the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. The Members shall determine from time to time by Majority Vote which persons shall be the Manager(s), responsible for administering the day to-day activities of the Company. Each Manager may carry out the business of the Company directly or delegate or assign by contractual agreement any of their responsibilities. The delegation or assignment by contractual agreement of duties under this Agreement shall not release or reduce the liability and responsibility of the Manager(s) and the Manager(s) shall exercise due care in selecting agents, assignees and designees.

Notwithstanding the foregoing, the Manager(s) shall not have the authority to undertake any of the following matters ("Major Decision") without first having obtained the affirmative vote of the Members holding at least fifty-one (51%) percent of the Membership Interests:

(a)   the purchase, lease or sale or other disposition of real or personal property;

(b)   the borrowing or refinancing of any funds for or by the Company (whether secured or unsecured), or the prepayment of any such borrowing;

(c)   the approval of projected annual Company budgets, or expenditures of funds in excess of 110% of the amounts specified in any such approved budgets;

(d)   the approval of amounts distributed to the Members pursuant to Section 9.01 hereof;

(e)   any contracts or agreements between the Company and the Members or any of their respective Affiliates;

(f)the consummation of any major transactions or series of related transactions, which are not in the ordinary course of the Company's business, including, but not limited to making any expenditure or commitment, other than the lease or rental of space on behalf of the Company in the ordinary course;

(g)   the amendment of the Articles of Organization or this Operating Agreement;

(h)   the merger of the Company with or into any other business entity;

(i)   the filing of any bankruptcy petition or commencement of any insolvency proceeding for the Company.

(j)   Additional capital contributions by Members.

**5.02    Election of Manager**. The Manager(s) shall be SAHIB ARORA.  He shall serve in such capacity until the first to occur of his death, disability, resignation or removal by a Majority Vote.

**5.03    Tax Matters Member**. The Members hereby appoint SAHIB ARORA as the Company's "Tax Matters Partner", as that term is defined in Section 623 l(a)(7) of the Code, and further appoint the Tax Matters Partner to receive notice of the beginning of any administrative proceeding at the Company level with respect to any Company item or items, as well as to receive notice of any final administrative adjustment resulting from any such proceeding, in each case within the meaning information to the Internal Revenue Service as may be necessary to enable to Internal Revenue Service to provide the Members with such notices as are required under the Code. The Company's Tax Matters Partner shall also keep each Member informed of any administrative or judicial proceedings relative to any adjustment or proposed adjustment at the Company level of Company items. The Tax Matters Partner shall have the authority to (a) enter into any settlement agreement with the Internal Revenue Service, (b) file a petition as contemplated by Sections 6226(a) or 6228 of the Code, (c) intervene in any action as contemplated by Section 6226(b) of the Code, (d) file any request as contemplated by Section 6227(b) of the Code or (e) enter into an agreement extending the period of limitation as contemplated by Section 6229(1)(B) of the Code.

**5.04    Managers Have No Exclusive Duty to Company**. The Manager(s) shall not be required to manage the Company as their sole and exclusive function and he (or any Manager) may have other business interests and may engage in other activities in addition to those relating to the Company.   Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or to any of the Members as a result of any other business or venture.

**5.05    Bank Accounts**. The Manager(s) may from time to time open bank accounts in the name of the Company, and the Manager(s) shall be the sole signatories on such accounts unless the Members or Manager(s) determine otherwise.

**5.06    Indemnity of the Manager(s), and Employees.** To the fullest extent permitted under O.C.G.A Section 14-11-306, the Company shall indemnify the Manager(s) and its employees and make advances for reasonable and necessary expenses to them with respect to such matters to the maximum extent permitted under applicable law.

## ARTICLE 6

## RIGHTS, OBLIGATIONS, REPRESENTATIONS
## AND WARRANTIES OF MEMBERS

**6.01    Limitation on Liability** Each Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

**6.02    No Liability for Company Obligations**. No Member will have any personal liability for any debts or losses of the Company beyond such Member's Capital Contributions, except as provided by law.

**6.03    Priority and Return of Capital**. No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Income or Net Loss or distributions except as set forth herein. This Section shall not apply to any loans (as distinguished from Capital Contributions) which a Member has made to the Company.

**6.04    Restrictions on Competitive Activity.** Except as otherwise provided in this Operating Agreement, or in any Covenant Not to Compete, a Confidentiality Agreement, a Noninterference Agreement or any other agreement between the Members, the Members and their respective Affiliates may conduct any other business or activity whatsoever not related to the Company's business, without any accountability to the Company or any Member.

**6.05    Validity of Agreement**. Each Member warrants that this Operating Agreement and each and every other agreement, document and instrument provided for herein and to which such Member is or shall be a party, when executed and delivered, will constitute the valid and binding obligation of such Member, enforceable against him in accordance with its terms, except as enforceability may be limited by (a) bankruptcy or similar laws from time to time in effect affecting the enforcement of creditor's rights generally or (b) the availability of equitable remedies generally.

**6.06    No Violation of Material Instruments**. Each Member represents and warrants that the execution and delivery of this Operating Agreement by such Member does not, and the consummation of the transactions contemplated hereby will not:

      (a)    violate or constitute an occurrence of default (which violation or default either singularly or in the aggregate would be considered material) under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any material agreement, instrument, order, judgment, decree or other arrangement to which such Member or any of its Affiliates is a party or by which any of them is bound or its respective assets affected;

      (b)    require any consent, approval, filing or notice under any provision of law, or violate any judgment, ruling, order, writ, injunction, decree, statute, role or regulation applicable to such Member or any of the Member's Affiliates.

## ARTICLE 7

## MEETINGS OF MEMBERS

**7.01    Yearly Meeting**. The yearly meeting of the Members may be held in the month of December or at such other time as shall be determined by unanimous agreement of the Members.

**7.02    Special Meetings**. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Manager or by a Member or Members holding at least a thirty-three percent (33%) Membership Interest.

**7.03    Place of Meetings.** The Members may designate any place, either within or outside the State of Georgia, as the place of meetings for any meeting of the Members. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Company in the State of Georgia.

**7.04    Notice of Meetings**. Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at his address as it appears on the books of the Company, with postage thereon prepaid.

**7.05    Meeting of all Members**. If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice and at such meeting any lawful action may be taken.

**7.06    Record Date**. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which Notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**7.07    Quorum**. Members holding fifty-one (51%) percent of the Membership Interests represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if at the adjournment of the meeting a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting. At such adjourned meeting at which quorum shall be present or

represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Membership Interests whose absence would cause less than a quorum to be present.

**7.08    Manner of Acting.** If a quorum is present, the affirmative vote of Members holding fifty-one (51%) percent of the Membership Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Georgia Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise provided herein or required under applicable law, Members who have an interest (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Membership Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

**7.09    Proxies.** At all meetings of members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney in fact. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

**7.10    Action by Members Without a Meeting.** Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by all the necessary Members entitled to vote and required to approve such action and delivered to the Manager for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when the Members required to approve such action have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

**7.11    Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

<div align="center">

**ARTICLE 8**

**CONTRIBUTIONS TO COMPANY AND CAPITAL ACCOUNTS**

</div>

**8.01    Member's Capital Contributions.** Each Member shall contribute the amount of cash, set forth next to such Member's name on Exhibit "A" hereto as the Member's Initial Capital Contribution.

**8.02    Additional Capital Contributions.**

In the event that the Members by Majority Vote determine that Additional Capital Contributions are needed by the Company, the Members shall contribute their share of such Additional Capital Contributions (determined by reference to their Membership Interests in the Company) within fifteen (15) days thereafter (or, if later, such time as is set forth in the notice

from the Company).    In the event that a Member fails to make such Additional Capital Contributions (the "Defaulting Member"), and the remaining Members (the "Non-Defaulting Members") contribute such Defaulting Members' Additional Capital Contribution (the "Disproportionate Contribution"), then the Defaulting Member's Interest in the Company shall be reduced using the following formula:

$$\frac{A}{A + C} \times I \times 2 =$$ Interest in membership interest of the Company to be forfeited by the breaching Member.

where: $A =$ Breaching Member's share of Additional Capital Contributions required by this Section 8.02;

$C =$ Total capital previously contributed by Breaching Member; and

$I =$ Breaching Member's membership interest of the Company prior to their failure to make the required Additional Capital Contributions.

It is the intent of the parties hereto that the membership interest of the Company forfeited by the Defaulting Member shall be allocated pro rata among the Non-Defaulting Members who contributed the Defaulting Member's share of the Additional Capital Contribution required by this Section 8.02 in the same proportions as such Additional Capital Contributions are made by the Non-Defaulting Members.

**8.03    Optional Loans**.    In addition to or in lieu of making a capital call pursuant to Section 8.02, in the event that the Members by Majority Vote determine that the Company needs additional capital, the Manager may ask each Member to make a loan to the Company in an amount determined by the Manager.  The Manager shall fix, and notify the Members of a date by which the Members must respond to any such request, and the Members shall, before such date, determine whether to make the requested loans (which may be made directly or through Affiliates) and notify the Manager of such decision, but no Member shall be required to make any such loan.  Any loan made pursuant to this Section 8.03 shall bear simple interest at the rate of two percent (2%) per annum in excess of the "prime rate" of SunTrust Bank, Atlanta, Georgia, or its successor entity, in effect from time to time during the periods such loans are outstanding, and shall be payable pursuant to the provision of Sections 9.01 and Section 16.01 hereof.  The Members by Majority Vote shall have complete discretion regarding whether to request a loan from Members pursuant to this Section 8.03 or requesting that the Members make an Additional Capital Contribution pursuant to Section 8.02.

**8.04    No Interest on Contributions**.    No Member shall be entitled to receive interest on his or her Capital Contribution.

**8.05    Loan Guarantees**.    The Members of the Company agree that they shall all, but not less than all, upon request by the Manager, execute unconditional guarantees of repayment of

loans, financings, borrowings, rentals or other obligations of the Company. In addition, the Members of the Company agree to execute any and all documents necessary or required by any lending institution or any third party to make loans to the Company. The Manager may require that said guarantees be executed on behalf of the Company.

### 8.06   Capital Accounts

(a) An individual Capital Account shall be established and maintained for each Member, and shall be credited with the Capital Contribution of such Member, any Additional Capital Contributions and that portion of Net Income allocable to such Member and shall be debited with that portion of any Net Loss allocable to such Member and all distributions made by the Company to such Member.

(b) No interest shall be payable to any Member on any positive balance in such Member's Capital Account.

(c) No Member shall have the right to withdraw from his or her Capital Account or to otherwise receive any Company funds or property, except as provided by this Operating Agreement.

(d) No Member shall be required to eliminate in any fashion any deficit balance which may arise in his or her Capital Account at the time the Company is dissolved or at any other time.

### 8.07   Withdrawal or Reduction of Members' Contributions to Capital

(a) A Member shall not receive out of the Company's property any part of such member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid, or their remains property of the Company sufficient to pay them.

(b) A Member, irrespective of the nature of such Member's Capital Contributions, has only the right to demand and receive cash in return for such Capital Contribution.

## ARTICLE 9

## DISTRIBUTIONS TO MEMBERS

**9.01   Distributions**. Except as otherwise provided in this Operating Agreement, Net Cash Flow shall be distributed to the Members ratably in proportion to their Membership Interests. Such Net Cash Flow shall be distributed at such times as the Members holding fifty-one (51%) percent of the Membership Interest shall determine from time to time, but in no event less frequently than once per year. Should the Members holding fifty-one (51%) percent of the

Membership Interest determine that the Net Cash Flow for a particular quarter will be more appropriately reinvested into the Company, they may in their discretion, reduce the distribution amounts to an amount necessary to cover the income tax assessment caused by the Net Profits of the Company, not yet distributed.

**9.02** **Distributions In Cash.** A Member, irrespective of the nature of such Member's Capital Contributions or his share of the Net Cash Flow, has only the right to demand and receive cash for the satisfaction of his share of the Net Cash Flow, should the Net Cash Flow be distributed as determined under Section 9.01.

**9.03** **Limitation Upon Distributions**. No distribution shall be made to Members if prohibited by O.C.G.A Section 14-11-407.

**9.04** **Distributions After the Fiscal Year End**. The Manager may, to the extent consistent with this Article 9, elect to have distributions made after the end of a Fiscal Year relate back to such Fiscal Year, provided, however, that any such distribution must be made within thirty (30) days after the end of such Fiscal Year.

**9.05** **Withholding**. The Manager may cause the Company to withhold income or other taxes as may be required by, and otherwise comply with and take actions necessary as the result of, the provisions of the code of any state or local tax law requiring withholding. Any amounts of the Company's Available Cash withheld pursuant to this Operating Agreement shall be deemed to have been paid to the members as distributions of the Company's Available Cash in the amounts so withheld pursuant to this Article 9.

**9.06** **Tax Distributions.** Unless prevented by applicable law, the Company shall distribute to each Member, with respect to each fiscal year, either during such fiscal year or within sixty (60) days thereafter, to the extent of Available Cash, an amount equal to (i) the amount of the Company's federal taxable income allocated to such Member for such fiscal year, multiplied by (ii) the highest combined federal and state income tax rate to which any Member is subject with respect to such fiscal year (the "Tax Distribution"). All distributions pursuant to this section shall be distributed ratably in proportion to the relative Membership Interests of the Members and shall be credited as a distribution pursuant to Section 9.01.

## ARTICLE 10

## ADJUSTMENT OF CAPITAL ACCOUNTS AND PROFITS AND LOSSES

**10.01** **General Tax Allocations.** As of the end of each Fiscal Year, and after giving effect to the special tax allocations set forth in Section 10.2, Net Profits and Net Losses shall be allocated among the Members for Capital Account, as well as for federal income tax purposes, ratably in accordance with their respective Membership Interests.

**10.02** **Special Allocations**. At the end of each Fiscal Year and notwithstanding any provision of Section 10.01, the following special allocations shall be made for both Capital Account and for federal income tax purposes unless otherwise provided:

(a)     In accordance with the ordering rules of Treasury Regulation Section 1.704-2(j), items of gross income and realized gain first shall be allocated in an amount and in a manner that complies with the "chargeback" requirement of Treasury Regulation Section 1.704-2(i)(4), the "qualified income offset" requirement of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and the "minimum gain chargeback" requirement of Treasury Regulation Section 1.704-2(f). Further, any "partner nonrecourse deductions" within the meaning of Treasury Regulation Section 1.704-2(i)(2) attributable to "partner nonrecourse debt" shall be allocated to the Member who bears the "economic risk of loss" for such debt in accordance with Treasury Regulation Section 1.704-2(i). Any losses in excess of the losses allowable to the Members pursuant to the Treasury Regulations promulgated under Code Section 704(b) shall first be allocated to the extent allowable hereunder to Members who are not precluded from receiving such allocations by the preceding provisions of this subparagraph (a), if any, and shall thereafter be allocated as provided in Section 10.01.

(b)     If a taxing authority ignores the characterization of any amounts paid to a Member (or an Affiliate thereof) as salaries, management fees, commissions, interest  or other compensation for services ("Compensation"), and refuses to treat such payments as either guaranteed payments within the meaning of Code Section 707(c) or payments made to such Member other than in such Member's capacity as a "partner" within the meaning of Code Section 707(a), and such taxing authority ultimately treats such amounts paid to a Member (or an Affiliate) thereto as a distribution to such Member for federal income tax purposes which reduces such Member's Capital Account, then the Compensation shall be treated as an allocation of an item of income or gain of the Company to the recipient Member so that, consistent with the intent of the Members, the Compensation shall not be treated as a distribution which reduces the recipient Member's Capital Account.  Accordingly, such Member shall be allocated the first available items of Company income and gain (including in a succeeding year) in an amount equal to the Compensation.

(c)     If the Company owns (x) any property contributed by a Member that had a fair market value different from its adjusted basis for federal income tax purposes on the date of the contribution, or (y) any property that has been revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), then for federal income tax purposes only and not for Capital Account purposes, any income, gain, loss or deduction with respect to such property shall be allocated among the Members in accordance with Code Section 704(c) and the Treasury Regulations thereunder.

**10.03  Tax Items.**  Except as otherwise provided herein, any allocation to a Member of a portion of the Net Profits or Net Losses for a Fiscal Year (or other relevant period) will be deemed to be an allocation to that Member of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Company for federal income tax purposes.

**10.04  Partial Year Allocations**.  In the event that a Member is admitted to the Company during the Company's Fiscal Year, or all or a portion of a Member's Membership Interest is transferred during the Company's Fiscal Year, Net Profits and Net Losses shall be allocated to the admitted or transferee Member in any manner permitted by Code Section 706 or the Treasury

Regulations thereunder, as the Manager shall determine in his discretion. Allocations made in this Article X shall be made to each holder of a Membership Interest whether or not the holder is a substituted Member.

  **10.05 Allocations and Distributions Upon Dissolution.** When the Company is dissolved and wound-up pursuant to Article 16 hereof, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Members pursuant to this Article 10. It is the intent of the parties hereto that after the allocations described in the previous sentence are made and the final cash distribution referred to in Section 16.04 hereof is made, that such actions will result in the Capital Account balances of the Members equaling zero following the dissolution of the Company. The allocation and distribution provisions of Articles 9 and 10, as well as the provisions of Article 14 hereof, shall be construed in such a way in order to achieve this result. Notwithstanding anything in this Agreement to the contrary, no Member shall be obligated to restore any negative balance in his Capital Account upon the dissolution of the Company, the Transfer of all of any portion of his Membership Interest, or otherwise.

## ARTICLE 11

## LIMITATION ON LIABILITY AND INDEMNIFICATION

  **11.01 Limitation on Liability of the Members.** No Member, Company officer, or Manager shall be liable to the Company for any loss or damage sustained by any of them, except loss or damage resulting from intentional misconduct or a knowing violation of law or a transaction for which such Person received a personal benefit in violation or breach of any provision of this Agreement.

  **11.02 Indemnification.** The Company shall indemnify and hold harmless the Members, and Manager(s), from and against any and all claims and demands whatsoever arising in connection with the Company to the fullest extent provided by Section 14-11-306 of the Act and applicable law.

## ARTICLE 12

## COMPENSATION AND REIMBURSEMENTS

  **12.01 Compensation.** Except as otherwise provided herein or approved by an affirmative vote members holding fifty-one (51%) percent of the Membership Interests in the Company, none of the Members, Manager(s), if any, or their Affiliates shall be entitled to compensation in connection with rendering their services to the Company.

  **12.02 Reimbursement of Members.** The Company shall reimburse the Members and Manager(s) for all reasonable and direct out of pocket expenses and costs incurred in connection with rendering services to the Company; provided, however, that any such expenses must be documented in the manner required by the Internal Revenue Service as necessary to allow the deduct ability of such expenses as business expenses of the Company.

## ARTICLE 13

## ACCOUNTING, BOOKS AND RECORDS

**13.01  Accounting Method.** The Company will maintain its books and records on such basis of accounting as the Manager shall determine.

**13.02  Books and Records.** The Company shall keep, at Company expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts and such other matters as are required by the Code. Such books of account will be the property of the Company, will be kept in accordance with generally accepted accounting principles and procedures consistently applied and will be open to the reasonable inspection and examination by the Members and their duly authorized representatives. Such books of account will be maintained at the principal office of the Company, or at such other place as the Manager determines.

**13.03  Financial Statements.** Within sixty (60) days following the end of each quarter of the Company, and within ninety (90) days following the end of each Fiscal Year of the Company, the Manager shall cause to be prepared and delivered to each Member unaudited financial statements of the Company for such quarter and Fiscal Year.

**13.04  Tax Returns.** The Manager shall cause the Company's tax returns and other governmental returns and reports to be prepared and timely filed. The Manager shall deliver copies of Schedule K-1 of Form 1065 (or a comparable schedule), federal and state tax returns and other necessary tax information for each Fiscal Year to each Member no later than sixty (60) days after the end of each Fiscal Year, or such later date as may be otherwise agreed to by the Members.

## ARTICLE 14

## TRANSFERABILITY AND ADDITIONAL MEMBERS

**14.01  General.** Except as otherwise specifically provided herein, no Member shall have the right to:

    (a)    sell, assign, pledge, hypothecate transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or

    (b)    gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy), all or any part of his Membership Interest, except that Members have a right to transfer all or a portion of a Membership Interest to the parents, spouses or lineal descendants of the current owners of such interest or into trust established for the benefit of any of the foregoing, for bona-fide estate planning or tax planning purposes.

**14.02  Additional Members.** Without vote or assent of Members holding at least fifty one (51%) percent of the Membership Interests, no Person or Entity may become a Member of this Company either by the issuance by the Company of a Membership Interest, or as a transferee of a Member's Membership Interest or any portion thereof.  No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Members may by an affirmative vote of fifty-one (51%) percent of the Membership Interests at the time a Member is admitted elect to close the Company books (as though the Company's tax year had ended) or to make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of 706(d) of the Code and Treasury Regulations promulgated thereunder.

### 14.03  Sale. Assignment or Other Transfer of Member Interests.

(a) No Member shall sell, assign or otherwise transfer all or any part of his Membership Interest, without first obtaining the affirmative vote or assent of Members holding fifty-one (51%) percent of the Membership Interests in the Company held by all Members excluding the transferring Member, (the "Remaining Members.")  The restrictions contained in this Section shall not apply to restrict in any way transfer by any Member of assets which such Member holds other than such Member's Membership interest in the Company.

(b) As a condition to any transfer, the transferee shall agree to be bound by all of the terms and provisions of this Operating Agreement to the same extent and in the same capacity as the transferor would have been with respect to the transferred Membership Interest had the transferor continued to own such transferred Membership Interest. However, in the event that (i) a Member who has transferred his Membership Interest to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a Membership Interest in the Company, (ii) the spouse of a Member is awarded or becomes entitled to some or all of such Member's Membership Interest pursuant to a divorce decree or settlement agreement, or (iii) an owner of a Member has transferred a portion or all of his membership interest in such owner to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a membership interest in a Member or (iv) the spouse of an owner of a Member is awarded or becomes entitled to some or all of such Member's membership interest in a Member pursuant to a divorce decree or settlement agreement, then, in either such event, an Event of Default, as defined in Section 15.02 herein shall have occurred and the Membership Interest held by such spouse (or the membership interest in the Member that is held by such spouse) shall be subject to the provisions of  Section 14.03 herein. In addition, the Transferee Member or spouse shall become a holder of an Economic Interest only, with no voting rights, unless the remaining original Members, excluding the Member who transferred such Membership Interest, determine otherwise by majority vote of such Members.

(c) In exercising discretion to consent to any sale, assignment or transfer covered by the provisions of subparagraph (a) of this Section 14.03, the Members shall require such vendee, assignee or other transferee or counsel for any such person to demonstrate to the Members (i) the vendee, assignee or other transferee is a financially responsible person who understands the nature of an investment in the Company and (ii) such person intends to take and hold the interest

transferred for investment for his own account and not for resale to others. No Member shall consent to a sale, assignment or other transfer of less than all of the Membership Interest to the Member, unless in the opinion of the Members, such Member's Membership Interest is large enough to be divided. In addition no such sale, assignment or other transfer shall be effective to bind the Company until and unless the Remaining Members shall receive an opinion of counsel for the vendor, assignor or other transferor in form and substance satisfactory to counsel for the Company that the sale, assignment or other transfer may lawfully be made under all applicable law, including any and all applicable securities laws, and that such sale, assignment or other transfer, together with all other sales or transfers or interests in the Company sold, assigned or transferred within the preceding twelve (12) months and will not result in a termination of the Company pursuant to Code Section 708.

(d) The transferee of any Member (if a transfer is permitted pursuant to the terms of this Agreement) shall be subject to and bound by all of the terms and conditions of this Agreement.

**14.04   Deadlock and Triggering of Put/Call Procedure.**

(a) If (i) at any time the Members are unable to reach a resolution as to any Major Decision under this Operating Agreement; and (ii) a Member determines that such matter or decision is not resolvable without resort to the following procedure, such Member may send a notice (a "Declaration of Deadlock") to all Members of the Company declaring the existence of a deadlock (a "Deadlock").

(b) Within three (3) calendar days after delivery of a Declaration of Deadlock (the "Delivery Period"), each Member shall provide to the other Member a written report detailing the facts that such Member deems to be relevant to the creation and resolution of the Deadlock, plus any supporting information and a summary of any discussion relevant to the subject matter of the Deadlock. For a period of thirty (30) calendar days after expiration of the Delivery Period (the "Discussion Period"), the Members shall meet in person and/or communicate telephonically or electronically as frequently as necessary to negotiate in good faith to resolve the Deadlock. If the Members are able to resolve the Deadlock they shall, within the Discussion Period, execute a written acknowledgement (the "Resolution Acknowledgement") setting forth in reasonable details the resolution of the Deadlock. Pending resolution of the Deadlock, all Members, Managers and the Company shall continue to perform their respective obligations under this Operating Agreement without regard to whether the Deadlock has been resolved, unless and until such obligations are terminated or expire in accordance with the provisions hereof or are rendered incapable of performance by reason of the Deadlock. In the event that the Members are unable to resolve the Deadlock within the Discussion Period, either Member may institute the procedures set forth in this section.

(c) Manner of Offer. At any time after the expiration of the Discussion Period, if the Deadlock has not been resolved, any Member may at any time offer to the other Members (individually and collectively, the "Electing Members") both to sell all of the offeror's Membership Interest to the Electing Members and to buy all of the Electing Members' Membership Interests (such offeror is hereinafter referred to as the "Initiating Member"). Such

offer must be in writing and must contain the following: (1) a statement of intention to make an offer in accordance with this Section; (2) a statement of the Initiating Member's determination of the Stated Amount (as defined below); (3) a statement that a condition to any purchase pursuant to the offer shall be the absolute and unconditional indemnity by the purchasing Member of the Initiating Member against any loss, claim or damage that the Initiating Member may suffer arising out of any guarantee by the Initiating Member of any debt of the Company for borrowed money; (4) a statement that the purchase price of the Membership Interest subject to the offer shall be payable not less than twenty five percent (25%) cash at Closing with the balance, if any, represented by a promissory note of the purchasing Member secured by the acquired Membership Interest and personally guaranteed by the owner of the purchasing Member and payable in equal monthly installments over thirty six consecutive months with interest at the prime rate plus 2% announced by SunTrust Bank, Atlanta, Georgia or successors ("Applicable Rate"); and (5) a statement that such offer is both an offer to sell all the Membership Interest owned by the Initiating Member and an offer to purchase all the Membership Interest owned by the Electing Members (the "Put-Call Offer") on such terms and conditions. The "Stated Amount" means the fair market value of the subject Membership Interest, as determined by a qualified independent appraiser under the procedure outlined in Section 15.03 (c) below; provided however, that the Stated Amount shall not be less than the aggregate of all indebtedness owed by the Company, including any loans to the Company from Members.

The purchase price ("Put-Call Purchase Price") for any Member's Membership Interest in the Company acquired pursuant to this Section shall be that amount which would be distributed to such Member pursuant to Section 9.01 hereof (after giving effect to all applicable provisions of this Operating Agreement, but after liquidating all Reserves then existing and without establishing any additional Reserves), if (i) all of the assets then held by the Company were sold for cash on the date of the Closing (as defined in this section) for a gross sales price equal to Stated Amount and (ii) the Company's liabilities were paid in full. Any loans by a Member to the Company owing to a Member shall be added to the purchase price payable to such Member.

The Put-Call Offer shall be irrevocable for ninety (90) days, and the Electing Members may, on or before such ninetieth (90th) day, accept in writing either the offer to sell or the offer to buy, and upon acceptance, the Initiating Member and the Electing Members shall be required to sell or to buy, as the case may be. If the Electing Members fail to accept either offer within the ninety (90) day period, the Electing Members shall be deemed to have accepted the offer to sell the Membership Interests of the Electing Members to the Initiating Member.

Any two or more Members may jointly execute a Put-Call Offer and specify in the Put-Call Offer that they are to be treated as one Initiating Member for purposes of this Section. For purposes of the remainder of this Section unless the context indicates otherwise, references to "Member," "Initiating Member" or "Electing Member" include, where appropriate, the plural as well as the singular.

(d) Differing Elections. If the Electing Members consists of more than one Member, three possible response combinations may result: (i) all Electing Members elect to purchase the Membership Interest of the Initiating Member, (ii) all Electing Members elect to sell their Membership Interests to the Initiating Member, or (iii) one or more Electing Members elect

to purchase the Initiating Membership Member's Interest and one or more Electing Members elect to sell their Membership Interest to the Initiating Member. In the event of a split of elections as described in (iii), an Electing Member's election to sell his Membership Interest shall be ineffective and the election of an Electing Member to purchase the Membership Interest of the Initiating Member shall be the only effective election, and those Electing Member(s) electing to purchase the Initiating Member's Interest shall purchase all of the Initiating Member's Membership Interest.

If there is more than one Electing Member electing to purchase the Initiating Member's Membership Interest, each such Electing Member in the purchasing group shall be entitled to purchase such portion of the Initiating Member's Membership Interest as all such Electing Members shall agree among themselves. In the event all Electing Members in the purchasing group cannot agree on the portion of the Initiating Member's Membership Interest that each of them shall purchase, then each such Electing Member in the purchasing group shall be entitled to purchase a portion of the Initiating Member's Membership Interest, such portion to be determined by dividing each Electing Member's Ownership Percentage by the total Ownership Percentages of all Electing Members in the purchasing group.

**14.05**    **Closing.** The closing of such purchase and sale (the "Closing") shall be held at the offices of the Company and on the date specified by the purchaser by written notice to the seller, which date shall be on or before the thirtieth (30) day after such option to purchase or sell has been exercised. At Closing, the purchaser shall pay the Put-Call Purchase Price by wire transfer of immediately available funds.

(a) It shall be a condition to the Closing that the purchasing Member(s) shall either (i) repay all Company indebtedness for borrowed monies under which the selling Member has personal liability or (ii) cause the selling Member to be released from such personal liability by written instrument duly signed by the holder of such indebtedness. The purchasing Member(s) agrees to indemnify in writing the selling Member and hold the selling Member harmless from and against any damage, loss or liability as a result of the purchasing Member's failure to repay such indebtedness at the closing in accordance with the provisions hereof or to obtain the release of the selling Member. The selling Member, may, in his sole and absolute discretion, and without prejudice to any other legal or equitable remedies he may have, refuse to proceed with the Closing unless simultaneously therewith all such indebtedness is so repaid or such releases delivered. In addition, at any Closing held pursuant to this Section, the purchasing Member shall by a legally enforceable agreement assume the payment of, and indemnify the selling Member against all obligations of the Company accruing after Closing other than those obligations owing out of or related to an act or omission of the selling Member which constitutes gross negligence or willful misconduct.

(b) At the Closing, an assignment and, if requested by the Purchasing Member or, a bill of sale from the selling Member to the purchasing Member of the selling Member's Membership Interest together with such other instruments and documents as may be reasonably necessary or desirable to effectuate the sale and transfer to the purchasing Member shall be delivered upon payment of the purchase price. The purchasing Member shall have the right, within his sole and absolute discretion, to cause his nominee or designee to acquire the selling Member's

Membership Interest at the Closing but nothing herein shall relieve the purchasing Member of his other obligations hereunder. Any such designee shall, upon Closing, become a Member only if expressly approved and consented to by the purchasing Member.

## ARTICLE 15

### PROHIBITED TRANSACTIONS AND DEFAULTS

**15.01  Prohibited Transactions.** Neither any Member shall, without the consent of all of the other Members, do any one of the following nor shall any Member permit any of such Member's respective Affiliates to do any of the following:

(a)  Use the name of the Company (or any substantially similar name) or any trademark or trade name adopted by the Company except in the ordinary course of the Company's business;

(b)  Disclose to any nonmember any of the Company business practices, trade secrets, or any other information not generally known to the business community:

(c)  Do any other act or deed with the intention of harming the business operations of the company;

(d)  Do any act contrary to this Operating Agreement except with the prior written approval of all Members;

(e)  Do any act which would make it impossible to carry on the intended or ordinary business of the Company;

(f)  Confess a judgment against the Company;

(g)  Wrongfully transfer or dispose of Company property, real or personal;

(h)  Admit another Person or Entity as a Member except as provided herein;

(i)  Pledge their Membership Interest without the consent of the Manager.

The Members shall not use, directly or indirectly, the assets of this Company for any purpose other than carrying on the business of this Company, for the full and exclusive benefit of all its Members.

**15.02  Events of Default.** The following events shall be deemed to be events of default by a Member.

(a)  Any attempted transfer of an interest in the Company by the Member without complying with the provisions of Article 14 of this Operating

Agreement.

(b)     The making of an assignment for benefit of creditors or the filing of the Member of a petition under any section or chapter of the National Bankruptcy Act, as amended, or under similar law or statute of the Untied States, or any State thereof, by the Member

(c)     Adjudication of the Member as bankrupt or insolvent in proceedings filed against the Member under any section or chapter of the National Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof, without further possibility of appeal or review.

(d)     The appointment or a receiver for all or substantially all of the assets of a Member and the failure to have such receiver discharged with in thirty (30) days after appointment.

(e)     The attempted transfer, whether voluntary or involuntary, of an interest in the Company to the creditor(s) of a Member in partial or complete satisfactory of any judgment or lien held by such creditor(s) against such Member.

(f)     Failure to make the Member's required Initial Capital Contribution or Additional Capital Contribution in accordance with Section 8.01 or Section 8.02 of this Agreement.

**15.03   Effect of Default.**

(a)     On the occurrence of an event of default by a Member, the Non-defaulting Members shall have the right, at their election, to purchase the Membership Interest of the Defaulting Member at a Purchase Price determined in accordance with Section 15.03(c) or to receive an increase in the Membership Interest pursuant to Paragraph 8.02 of this Agreement. Said election may be made at any time within ninety (90) days from the date of such default, upon giving the Defaulting Member ten (10) days written notice of such election, provided such default is continuing on the date such notice is given.

(b)     If the Non-defaulting Member(s) (the "Purchasing Members") exercises his option to purchase then the Defaulting Member and the Purchasing Members shall meet within thirty (30) days after the date the Purchase Price has been determined, at the time and place designated by the Purchasing Member (the "Closing").   At the Closing, the Defaulting Member shall execute all documents that may be necessary or desirable, in the opinion of counsel for the Purchasing Member to convey the Defaulting Member's entire Membership Interest to the Purchasing Member free and clear of all

liens and encumbrance. At the Closing, the Purchasing Member shall pay the Purchase Price in cash. The total cash proceeds from such sale shall be applied as follows.

(1)     First to the costs and expenses incurred in determining the Purchase Price (including but not limited to appraisal costs);

(2)     Next to the payment of all loans, including all interest thereon, from the Purchasing Member to the Defaulting Member; and

(3)     The remaining cash shall be paid to the Defaulting Member.

(c)     Purchase Price for Membership Interest. For purposes of this Section 15.03, the Purchase Price for a Membership Interest shall be equal to the amount agreed upon between the Defaulting Member and the Purchasing Member; or if the Defaulting Member and the Purchasing Member cannot agree upon such a Purchase Price within thirty (30) days after the date of the event triggering the right to effectuate such purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership Interest. The fair market value of the Defaulting Member's Membership Interest shall be as determined by a qualified independent appraiser mutually agreed upon of the Defaulting Member and the Purchasing Member. If the Defaulting Member and the Purchasing Member cannot agree upon an appraiser within ninety (90) days after the date of the event triggering the purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership interest determined as follows: The Defaulting Member shall appoint one (1) qualified appraiser, the Purchasing Member shall appoint one (1) qualified appraiser , and a third appraiser shall be appointed by the two appraisers so appointed. If the two appraisers appointed by the Defaulting Member and the Purchasing Member are unable to agree upon the selection of a third appraiser, the third appraiser shall be selected in accordance with the rules of the American Arbitration Association.

Each of the three (3) appraisers selected in accordance with the above procedure shall separately and independently determine the fair market value of the Defaulting Member's Membership Interest in the Company. When completed, each such appraisal shall be placed in a sealed envelope and delivered to the attorney for the Company to hold until all three appraisals have been received. No appraisal shall be opened or disclosed until all three have been received. After receiving all three appraisals, the attorney for the Company shall open the appraisals and the fair market value shall be the average of the two appraisals that are closest to each other. If, however, the middle appraisal is equal to the average of the high and low appraisals, then the fair market value shall be equal to the middle appraisal. In either case, such determination shall be final and binding upon the parties. The cost of all appraisals made in accordance with this Section 15.03 and shall be deducted from the purchase price proceeds otherwise payable to the Defaulting Member.

**15.04.** **Additional Effects on Default.** Pursuit to any of the foregoing remedies shall not preclude pursuit of any of the other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or wavier of any amount due to the remaining Members hereunder or of any damages accruing to them by reason of the violation of any of the terms, provisions and covenants herein contained. No waiver by the remaining Member of any violation or breach shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions, and covenants herein contained, and forbearance by them to enforce one or more of the remedies herein provided on an event of default shall not be deemed or construed to constitute a waiver of such default.

## ARTICLE 16

## DISSOLUTION AND TERMINATION

**16.01** **Dissolution.** The Company shall be dissolved only upon the occurrence of any of the events set forth in O.C.G.A. Section 14-11-602(b) .

If the Company is continued after the occurrence of an Event of Dissociation of a Member pursuant to this Section, any successor in interest of the Member as to whom the Event of Dissociation occurred shall become an Economic Interest Owner, but shall not be admitted as a Member, except in accordance with Articles 14 hereof.

**16.02** **Withdrawing Member.** Unless otherwise approved by Members holding a Majority Interest, a Member who suffers or incurs an Event of Dissociation, or whose status as a Member is otherwise terminated (a "Withdrawing Member"), regardless of whether such termination was the result of a voluntary act by such Withdrawing Member, shall not be entitled to receive outright the fair value of his Membership Interest, and such Withdrawing Member shall become an Economic Interest Owner.

**16.03** **Effect of Dissolution.** Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Georgia Act. Upon dissolution, the Managers shall file a statement of commencement of winding up and publish the notice permitted by the Georgia Act.

**16.04** **Winding-Up Liquidation and Distribution of Assets.**

    (a)    Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations from the date of the last previous accounting until the date of dissolution. The Manager(s), or if none, the Persons or Persons selected by Majority Vote of the Members (the "Liquidators") shall immediately proceed to wind up the affairs of the Company.

    (b)    If the Company is dissolved and its affairs are to be wound up, the

Liquidators shall:

(1)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Liquidators may determine to distribute any assets to the Members in kind);

(2)    Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article 9 hereof;

(3)    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company;

(4)    Distribute the remaining assets to the Members, either in cash or in kind, as determined by the Managers in accordance with the provisions of Section 9.01, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1 (b)(2) (ii)(b)(2) of the Treasury Regulations in accordance with the positive balance (if any) in each Member's Capital Account (as determined after taking into an account all Capital Account adjustments for the Company's Fiscal Year during which the liquidation occurs), with any balance in excess thereof being distributed in proportion to the Members' respective Membership Interests. Any such distribution in respect to Capital Accounts shall, to the extent practicable, be made in accordance with the time requirements set forth in Section 1.704- 1 (b)(2)(ii)(b)(2) of the Treasury Regulations; and

(5)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

(c)    Notwithstanding anything to the contrary in this Operating Agreement upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocation and other Capital Account adjustments for all taxable years ,including the year during which

such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital account.

(d)      Upon completion of the winding-up, liquidation and distribution of the assets, the Company shall be deemed terminated.

**16.05   Certificate of Termination.** When all debts, liabilities, and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A Section 14-11-610.

**16.06   Return of Contribution Nonrecourse to Other Members**. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his Capital Contribution. If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE 17.

## MISCELLANEOUS PROVISIONS

**17.01   Arbitration.** Any dispute arising in connection with this Operating Agreement shall be an Arbitrable Dispute and shall be finally settled by arbitration under the then applicable Commercial Arbitration rules of the American Arbitration Association, by one or more arbitrators agreed upon by the parties or, in the absence of such an agreement, appointed in accordance with such Rules. The arbitration proceedings shall be held in Atlanta, Georgia. Judgment upon the award rendered may be entered in any court having jurisdiction and application may be made to such court for judicial acceptance of such award and an order of enforcement as the case may be. The parties hereby agree that the rendering of an award by the arbitrator or arbitrators shall be a condition precedent to the initiation of any legal proceedings with respect to any Arbitrable Dispute.  The Members agree and understand that this paragraph in no way shall prevent any Member or Members from pursuing civil or criminal remedies for any breach of legal duty or fraudulent or intentional action by any Member, Members or agents, designees' or assignees thereof. The arbitration hearing shall have the following procedures:

(a)      WITHIN THIRTY (30) DAYS AFTER THE SERVICE OF A WRITTEN REQUEST FOR PRODUCTION OF DOCUMENTS, THE RECEIVING PARTY SHALL PROVIDE THE REQUESTING PARTY WITH COPIES OF THE REQUESTED DOCUMENTS THAT ARE RELEVANT TO THE CLAIMS, COUNTERCLAIMS, AND DEFENSES ASSERTED IN THE ARBITRATION, AND THAT ARE NOT PRIVILEGED.   ANY OBJECTION TO A REQUEST FOR PRODUCTION OF DOCUMENTS THAT CANNOT BE RESOLVED BETWEEN THE PARTIES TO THE ARBITRATION SHALL BE DETERMINED

BY THE ARBITRATOR(S), WHICH DETERMINATION SHALL BE CONCLUSIVE. THIS PROCEDURE RELATED TO THE PRODUCTION OF DOCUMENTS SHALL BE THE SOLE FORM OF WRITTEN DISCOVERY PERMITTED IN THE ARBITRATION.

(b)    EACH PARTY TO THE ARBITRATION SHALL BE PERMITTED TO TAKE A MAXIMUM OF THREE (3) DEPOSITIONS OF FACT WITNESSES. TO THE EXTENT THAT A PARTY TO THE ARBITRATION DESIRES TO TAKE MORE THAN THREE (3) FACT WITNESS DEPOSITIONS, THE PARTY SHALL REQUEST PERMISSION FROM THE ARBITRATOR(S) TO TAKE THE ADDITIONAL DEPOSITION(S). THE ARBITRATOR(S) SHALL PERMIT ADDITIONAL FACT WITNESS DEPOSITION(S) UPON GOOD CAUSE SHOWN OR THE AGREEMENT OF THE PARTIES. NO FACT WITNESS DEPOSITION SHALL LAST LONGER THAN FOUR (4) HOURS OF DEPOSITION TIME.   ALL OBJECTIONS TO QUESTIONS POSED IN THE DEPOSITION(S) SHALL BE RESERVED FOR THE ARBITRATION HEARING EXCEPT FOR OBJECTIONS BASED UPON PRIVILEGE.

(c)    TO THE EXTENT THAT EITHER PARTY TO THE ARBITRATION INTENDS TO RELY UPON THE TESTIMONY OF AN EXPERT WITNESS(ES) DURING THE ARBITRATION HEARING, THE OTHER PARTY SHALL BE ENTITLED TO DEPOSE THE EXPERT WITNESS(ES) FOR A MAXIMUM OF SEVEN (7) HOURS OF DEPOSITION TIME. THE EXPERT WITNESS(ES) SHALL PRODUCE A REPORT OR STATEMENT WHICH SETS OUT THEIR EXPERT OPINION AND THE FACTUAL AND LEGAL BASIS THEREOF AT LEAST FOURTEEN (14) DAYS PRIOR TO THE SCHEDULED DEPOSITION, AND AT LEAST THIRTY (30) DAYS PRIOR TO THE DATE OF THE ARBITRATION HEARING. ALL OBJECTIONS TO QUESTIONS POSED IN THE DEPOSITION(S) SHALL BE RESERVED FOR THE ARBITRATION HEARING.

(d)    THE ARBITRATION AWARD SHALL BE MADE WITHIN ONE HUNDRED TWENTY (120) DAYS AFTER THE APPOINTMENT OF THE ARBITRATOR(S), AND THE ARBITRATOR(S) SHALL AGREE TO COMPLY WITH THIS SCHEDULE BEFORE ACCEPTING APPOINTMENT.

(e)    THE PARTIES SHALL BEAR AN EQUAL SHARE OF THE ARBITRATORS AND ADMINISTRATIVE FEES.

(f)    NOTWITHSTANDING ANY LEGAL AUTHORITY TO THE CONTRARY, "MANIFEST DISREGARD OF THE LAW" ON THE PART OF THE ARBITRATOR(S) IN RENDERING AN AWARD SHALL CONSTITUTE A VALID GROUND TO VACATE.

**17.02  Books of Account and Records.** Proper and complete records and books of account shall be kept or shall be caused to be kept by the Manager in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. The books and records shall be at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, or their duly authorized representatives during reasonable business hours.

**17.03  Application of Georgia Law.** This Operating Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Georgia Act.

**17.04  No Action for Partition.** No Member has any right to maintain any action for partition with respect to any property of the Company.

**17.05  Construction.** Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**17.06  Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**17.07  Waivers.** The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**17.08  Rights and Remedies Cumulative.** The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all of the remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**17.09  Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**17.10  Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**17.11  Counterparts.** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**17.12  Investment Representations.** Any securities created under this Agreement have not been registered under the Georgia Uniform Securities Act of 2008, as amended, in reliance upon the exemption from registration set forth in Section 10-5-11(14) of such act. In addition, these securities have not been registered with the United States Securities and Exchange Commission in reliance upon an exemption from such registration set forth in the Securities Act of 1933 provided by Section 4(2) thereof, nor have they been registered with the Securities Commission of certain states in reliance upon certain exemptions from registration. These securities have been acquired for investment purposes only and may not be offered for sale,

pledged, hypothecated, sold or transferred except in compliance with the terms and conditions of this Agreement and in a transaction which is either exempt from registration under such acts or pursuant to an effective registration statement under such acts.

**17.13   Certification of Non-Foreign Status**. In order to comply with Code Section 1445 and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each member shall provide to the Company, an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as that term is defined in the Code and Treasury Regulations. Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Manager to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

**17.14   Notices**. Any and all notices, offers, demands, or elections required or permitted to be made under this Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand delivered (either in person by the party giving such notice, or by its designated agent, (ii) or by a nationally known overnight delivery service courier, next business day delivery or (iii) on the third (3rd) business day  (when making regular deliveries of mail on all of its regularly appointed week day rounds in Atlanta, Georgia) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage prepaid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth below or at such other address as the other party may hereafter designate by Notice.

**17.15   Amendments**. Any amendment to this Operating Agreement shall be made in writing and signed and consented by the affirmative vote of not less than fifty-one (51%) percent of the Membership Interests.

**17.16   Invalidity**. The invalidity or unenforceability or any particular provision of this Agreement shall not affect the other provisions hereof, and of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted. If any particular provision herein is construed to be in conflict with the provisions of the Georgia Act, then the Georgia Act shall control and such invalid or unenforceable provisions shall not affect or invalidate the other provisions hereof, and this Agreement shall be construed in all respects as if such conflicting provision were omitted.

**17.17   Further Assurances**. The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

**17.18   Time**. Time is of the essence of this Agreement, and to any payments, allocations and distributions specified under this Agreement.

**SIGNATURE PAGE ATTACHED**

**IN WITNESS WHEREOF,** the parties hereto have executed this Operating Agreement as of the date first above written.

_____(SEAL)
VINEET SINGH

_____(SEAL)
KARAN SINGH AHUJA

_____(SEAL)
SAHIB ARORA

_____(SEAL)
CHARANJEEV SINGH

EXHIBIT "A"

| **MEMBER** | **CONTRIBUTION** |
| --- | --- |
| VINEET SINGH | $100.00 in cash |
| KARAN SINGH AHUJA | $100.00 in cash |
| SAHIB ARORA | $100.00 in cash |
| CHARANJEEV SINGH | $100.00 in cash |

```
Doc ID: 010705110002 Type: WD
Recorded: 08/19/2019 at 09:40:00 AM
Fee Amt: $15.00 Page 1 of 2
Transfer Tax: $0.00
Fayette, Ga. Clerk Superior Court
Sheila Studdard Clerk of Court
BK 4912 PG 272-273
```

STATE OF GEORGIA

COUNTY OF ROCKDALE

RETURN TO:
JOEL M. HABER
2365 WALL ST.
SUITE 120
CONYERS, GA 30013

## LIMITED WARRANTY DEED

This Indenture made this 14th day of August, 2019 and between

### KING GROUP MGMT, LLC
**a Georgia limited liability company**

**party or parties of the first part, hereinafter referred to as "Grantor", and**

### CROWN ASSETS, LLC
**a Georgia limited liability company**

party or parties of the second part hereinafter referred to as "Grantee", the words "Grantor" and "Grantee" to include the neuter, masculine and feminine genders, the singular and plural.

## W I T N E S S E T H:

FOR AND IN CONSIDERATION of the sum of Ten Dollars in hand paid and other good and valuable consideration delivered to Grantor by Grantee at and before the execution, sealing and delivery hereof, the receipt and sufficiency of which is hereby acknowledged, Grantor, has and hereby does grant bargain, sell and convey unto Grantee and the heirs, legal representatives, successors and assigns of Grantee an undivided one-half (1/2) interest in and to the following described property, to-wit:

**Exhibit "D"**

ALL THAT TRACT or parcel of land lying and being in Land Lot 199, of the 13th District of Fayette County, Georgia, being shown on a Survey for Jack Y. Grizzell, as per plat recorded in Plat Book 7, page 85, Fayette County records, which plat is hereby referred to and made a part of this description; being improved property known as 106 Commerce Street a/k/a 3010 Highway 138, according to the present system of numbering houses in Fayette County, Georgia records.

The above described property is conveyed subject to all easements, covenant, restrictions and other matters of record.

TO HAVE AND TO HOLD said tract or parcel of land, together with any and all of the rights, members and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit and behoof of the Grantee and the heirs, legal representatives, successors and assigns of Grantee, forever, in fee simple.

GRANTOR SHALL WARRANT and forever defend the right and title to said tract or parcel of land unto the Grantee and the heirs, legal representatives, successors and assigns of Grantee, against the claims of any persons owning, holding or claiming by, through or under Grantor but not otherwise.

IN WITNESS WHEREOF, the Grantor has signed and sealed this deed, the day and year first above written.

Signed, sealed and delivered
in the presence of:

KING GROUP MGMT, LLC
a Georgia limited liability company


_____
UNOFFICIAL WITNESS

By: _____ (seal)
Sahib Singh Arora, Manager

_____
NOTARY SEAL
My commission expires

_____

2019121218 DEED BOOK 27736 Pg 80
Filed and Recorded: 8/16/2019 3:58:00 PM
Recording Fee: $14.00
Prepared By:
2100834758

**MAP PARCEL #15-089-01-003**

STATE OF GEORGIA

COUNTY OF ROCKDALE

RETURN TO:
JOEL M. HABER
2365 WALL ST.
SUITE 120
CONYERS, GA 30013

### LIMITED WARRANTY DEED

This Indenture made this 14th day of August, 2019 and between

### KING GROUP MGMT, LLC
### a Georgia limited liability company

party or parties of the first part, hereinafter referred to as "Grantor", and

### CROWN ASSETS, LLC
### a Georgia limited liability company

party or parties of the second part hereinafter referred to as "Grantee", the words "Grantor" and "Grantee" to include the neuter, masculine and feminine genders, the singular and plural.

### W I T N E S S E T H:

FOR AND IN CONSIDERATION of the sum of Ten Dollars in hand paid and other good and valuable consideration delivered to Grantor by Grantee at and before the execution, sealing and delivery hereof, the receipt and sufficiency of which is hereby acknowledged, Grantor, has and hereby does grant bargain, sell and convey unto Grantee and the heirs, legal representatives, successors and assigns of Grantee an undivided one-half (1/2) interest in and to the following described property, to-wit:

**Exhibit "E"**

All that tract or parcel of land lying and being in Land Lot 89 of the 15th District of DeKalb County, Georgia, and being more particularly described in Exhibit "A" attached hereto and made a part hereof by reference and being known as 3811 Flat Shoals Parkway, according to the present system of numbering in DeKalb County, Georgia.

The above described property is conveyed subject to all easements, covenant, restrictions and other matters of record.

TO HAVE AND TO HOLD said tract or parcel of land, together with any and all of the rights, members and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit and behoof of the Grantee and the heirs, legal representatives, successors and assigns of Grantee, forever, in fee simple.

GRANTOR SHALL WARRANT and forever defend the right and title to said tract or parcel of land unto the Grantee and the heirs, legal representatives, successors and assigns of Grantee, against the claims of any persons owning, holding or claiming by, through or under Grantor but not otherwise.

IN WITNESS WHEREOF, the Grantor has signed and sealed this deed, the day and year first above written.

Signed, sealed and delivered          KING GROUP MGMT, LLC
in the presence of:                   a Georgia limited liability company


UNOFFICIAL WITNESS                    By: _____(seal)
                                      Sahib Singh Arora, Manager

NOTARY SEAL
My commission expires:
3-9-2020

Exhibit "A"

All that tract or parcel of land lying and being in Land Lot 89 of the 15th District of DeKalb County, Georgia, and being more particularly described as follows:

Beginning at a point on the West side of Flat Shoals Road, located Five Hundred Thirty-nine and Four Tenths (539.4) feet Northwesterly from the intersection of the East line of said Land Lot with Southwesterly side of Flat Shoals Road and running thence West, Three Hundred Forty and Five Tenths (340.5) feet to an iron pin; thence North One Hundred (100) feet to an iron pin; thence running East, Three Hundred (300) feet, more or less, to the Westerly side of said Flat Shoals Road; thence Southwesterly along the West side of Flat Shoals Road, One Hundred Ten (110) feet to the Point of Beginning.

Being a part of Tract Four (4) as shown on the Plat of T.C. Jackson, C.S., 1937.

Less and except that certain property described in Condemnation in favor of The State Highway Department of Georgia, dated June 29, 1962, recorded in Deed Book 1679, Page 356, DeKalb County, Georgia Records.

Further Less and Except that certain property described in Affidavit of Condemnation, being Civil Action File No. 14CV1767-5 in the Superior Court of DeKalb County, dated June 27, 2014, filed for record July 1, 2014 at 4:07 p.m., recorded in Deed Book 24451, Page 264, DeKalb County, Georgia Records.

15 089 01 003

Deed Book 60423 Pg 174
Filed and Recorded Aug-19-2019 09:00am
2019-0304303
Real Estate Transfer Tax $0.00
CATHELENE ROBINSON
Clerk of Superior Court
Fulton County, Georgia

TAX PARCEL # 13 003500060352

STATE OF GEORGIA

COUNTY OF ROCKDALE

RETURN TO:
JOEL M. HABER
2365 WALL ST.
SUITE 120
CONYERS, GA 30013

## LIMITED WARRANTY DEED

This Indenture made this 14th day of August, 2019 and between

### KING GROUP MGMT, LLC
**a Georgia limited liability company**

**party or parties of the first part, hereinafter referred to as "Grantor", and**

### CROWN ASSETS, LLC
**a Georgia limited liability company**

party or parties of the second part hereinafter referred to as "Grantee", the words "Grantor" and "Grantee" to include the neuter, masculine and feminine genders, the singular and plural.

## W I T N E S S E T H:

FOR AND IN CONSIDERATION of the sum of Ten Dollars in hand paid and other good and valuable consideration delivered to Grantor by Grantee at and before the execution, sealing and delivery hereof, the receipt and sufficiency of which is hereby acknowledged, Grantor, has and hereby does grant bargain, sell and convey unto Grantee and the heirs, legal representatives, successors and assigns of Grantee an undivided one-half (1/2) interest in and to the following described property, to-wit:

**Exhibit "F"**

Deed Book 60423 Pg 174A
CATHELENE ROBINSON
Clerk of Superior Court
Fulton County, Georgia

ALL THAT TRACT or parcel of land lying and being in Land Lots 35 and 62 of the 13th District of Fulton County, Georgia, and being more particularly described as follows:

Beginning at an iron pin located at the corner formed by the intersection of the northwesterly right of way line of Roosevelt Highway (U.S. Highway #29) and the east line of Land Lot 62; running thence southwesterly along the northwesterly right of way line of Roosevelt Highway (U.S. Highway #29), 475.5 feet to an iron pin; running thence northerly and forming an interior angle of 67 degrees 22 minutes with the course last run, 432.2 feet to an iron pin; running thence easterly and forming an interior angle of 90 degrees with the course last run, 439.3 feet to an iron pin on the east line of Land Lot 35; thence South along the east line of Land Lots 35 and 62, 244.3 feet to the northwesterly right of way line of Roosevelt Highway (U.S. Highway #29) at the POINT OF BEGINNING.

The above described property is conveyed subject to all easements, covenant, restrictions and other matters of record.

TO HAVE AND TO HOLD said tract or parcel of land, together with any and all of the rights, members and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit and behoof of the Grantee and the heirs, legal representatives, successors and assigns of Grantee, forever, in fee simple.

GRANTOR SHALL WARRANT and forever defend the right and title to said tract or parcel of land unto the Grantee and the heirs, legal representatives, successors and assigns of Grantee, against the claims of any persons owning, holding or claiming by, through or under Grantor but not otherwise.

IN WITNESS WHEREOF, the Grantor has signed and sealed this deed, the day and year first above written.

Signed, sealed and delivered
in the presence of:

KING GROUP MGMT, LLC
a Georgia limited liability company

UNOFFICIAL WITNESS

By: _____ (seal)
Sahib Singh Arora, Manager

NOTARY SEAL
My commission expires

JOEL M HABER
DEKALB COUNTY, GEORGIA
NOTARY PUBLIC
MY COMMISSION EXPIRES
MARCH 9, 2020

2019121231 DEED BOOK 27736 Pg 127
Filed and Recorded: 8/16/2019 3:59:00 PM
Recording Fee: $14.00
Prepared By:
2100834758

**MAP PARCEL #16-041-03-013**

STATE OF GEORGIA

COUNTY OF ROCKDALE

RETURN TO:
JOEL M. HABER
2365 WALL ST.
SUITE 120
CONYERS, GA 30013

## LIMITED WARRANTY DEED

This Indenture made this 14th day of August, 2019 and between

**KING GROUP MGMT, LLC**
**a Georgia limited liability company**

party or parties of the first part, hereinafter referred to as "Grantor", and

**CROWN ASSETS, LLC**
**a Georgia limited liability company**

party or parties of the second part hereinafter referred to as "Grantee", the words "Grantor" and "Grantee" to include the neuter, masculine and feminine genders, the singular and plural.

## W I T N E S S E T H :

FOR AND IN CONSIDERATION of the sum of Ten Dollars in hand paid and other good and valuable consideration delivered to Grantor by Grantee at and before the execution, sealing and delivery hereof, the receipt and sufficiency of which is hereby acknowledged, Grantor, has and hereby does grant bargain, sell and convey unto Grantee and the heirs, legal representatives, successors and assigns of Grantee an undivided one-half (1/2) interest in and to the following described property, to-wit:

**Exhibit "G"**

All that tract or parcel of land lying and being in Land Lot 41 of the 16th District, DeKalb County, Georgia, and being more particularly described in Exhibit "Λ" attached hereto and made a part hereof by reference and being known as 5341 Snapfinger Park Drive, according to the present system of numbering in DeKalb County, Georgia.

The above described property is conveyed subject to all easements, covenant, restrictions and other matters of record.

TO HAVE AND TO HOLD said tract or parcel of land, together with any and all of the rights, members and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit and behoof of the Grantee and the heirs, legal representatives, successors and assigns of Grantee, forever, in fee simple.

GRANTOR SHALL WARRANT and forever defend the right and title to said tract or parcel of land unto the Grantee and the heirs, legal representatives, successors and assigns of Grantee, against the claims of any persons owning, holding or claiming by, through or under Grantor but not otherwise.

IN WITNESS WHEREOF, the Grantor has signed and sealed this deed, the day and year first above written.

Signed, sealed and delivered              KING GROUP MGMT, LLC
in the presence of:                       a Georgia limited liability company


_____                 By: _____ (seal)
UNOFFICIAL WITNESS                        Sahib Singh Arora, Manager


NOTARY SEAL
My commission expires:
3-9-2020

Exhibit "A"

All that tract or parcel of land lying and being in Land Lot 41 of the 16th District, DeKalb County, Georgia, and being more particularly described as follows:

Beginning at the iron pin found on the southwesterly right of way of Snapfinger Park Drive (a 60 foot right of way 313.21 feet northwesterly, as measured along the southwesterly right of way line of Snapfinger Park Drive, from the corner formed by the intersection of the southwesterly right of way line of Snapfinger Drive with the westerly right of way line of Panola Road, thence leaving the southwesterly right of way line of Snapfinger Park Drive and running South 12 degrees 36 minutes 40 seconds West a distance of 211.13 feet to an iron pin found on the northeasterly line of property now or formerly owned by United Central Bank (Deed Book 23966, page 77, DeKalb County, Georgia records); running thence North 77 degrees 23 minutes 20 seconds West along the northeasterly line of said United Central Bank property, 252.00 feet to an iron pin set on the southeasterly line of property now or formerly owned by State Farm Mutual Automobile Insurance Company (Deed Book 5491, page 339, aforesaid records); running thence North 12 degrees 36 minutes 40 seconds East along the southeasterly line of said State Farm Mutual Automobile Insurance Company property 213.60 feet to an iron pin set on the southwesterly right of way line of Snapfinger Park Drive; running southeasterly along the southwesterly right of way line of Snapfinger Drive, and following the curvature thereof, the following courses and distances; along the arc of a curve to the right (said arc having a radius of 542.96 feet and being subtended by a chord bearing South 79 degrees 58 minutes 39 seconds East a distance of 96.83 feet), and an arc distance of 96.96 feet to a point; and South 74 degrees 51 minutes 43 seconds East, 155.42 feet to the iron pin found which marks the POINT OF BEGINNING, being a tract or parcel of land containing 1.247 acres and having a building thereon located at and known as No. 5341 Snapfinger Park Drive, according to the present system of numbering buildings in unincorporated DeKalb County, Georgia; and being more particularly shown on and described in accordance with a plat of survey prepared for Bridge Pointe Christian Daycare Academy Incorporation, Branch Banking and Trust Company and First American Title Insurance Company, dated April 8, 2014 and revised April 10, 2014/

As a matter of information only, the tax parcel identification number is 16-041-03-013.

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**ZILLIONAIRE ASSETS LLC**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE GEORGIA
UNIFORM SECURITIES ACT OF 2008, AS AMENDED, IN RELIANCE UPON THE
EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 10-5-11(14) OF SUCH
ACT. IN ADDITION, THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE
UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON
AN EXEMPTION FROM SUCH REGISTRATION SET FORTH IN THE SECURITIES ACT
OF 1933 PROVIDED BY SECTION 4(2) THEREOF, NOR HAVE THEY BEEN
REGISTERED WITH THE SECURITIES COMMISSION OF CERTAIN STATES IN
RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION. THESE
SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND
MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR
TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF
THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM
REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE
REGISTRATION STATEMENT UNDER SUCH ACTS.

THIS AMENDED AND RESTATED OPERATING AGREEMENT OF
**ZILLIONAIRE ASSETS LLC** (hereinafter referred to as the "Operating Agreement") is
effective this 20th day of November, 2019, by **KING GROUP MGMT LLC AND CROWN
ASSETS, LLC** (hereinafter referred to as the "Members" and individually as a "Member") whose
respective addresses are set forth in ARTICLE 4 of this Operating Agreement. All of the
aforementioned parties and any additional persons who may be admitted as Members as herein
provided are sometimes hereinafter collectively referred to as the "Members" or hereinafter
sometimes individually referred to as a "Member."

## W I T N E S S E T H :

**WHEREAS**, **ZILLIONAIRE ASSETS LLC,** a limited liability company (hereinafter
referred to as the "Company") was formed pursuant to the laws of the State of Georgia, the
purpose of which shall be all aspects of the purchase, ownership, operation and financing of a
commercial building located at 5754 Attucks Boulevard, Morrow, GA 30260.

**The Members** hereto desire to amend and restate (i) the contributions to the capital of
the Company by the Members; (ii) the division of the profits and losses derived from the
ownership, maintenance and operation thereof of the Company; (iii) the restrictions on
disposition of Membership Interests; (iv) Management of the Company; and (iv) address various
other matters relating to the rights and obligations of the Members;

**NOW, THEREFORE**, the undersigned in consideration of the premises, the mutual
promises contained in this Operating Agreement and for the other good and valuable
consideration, the Members agree as follows.

**Exhibit "H"**

# ARTICLE 1

## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meaning (unless otherwise expressly provided herein):

"Additional Capital Contributions." With respect to each Member, all additional Capital Contributions made by such Member pursuant to Section 8.02 of this Agreement.

"Additional Capital Contributions Account." An account maintained for each Member equal to (i) the aggregate Additional Capital Contributions to the Company made by such Member, less (ii) the aggregate distributions to such Member pursuant to Section 9.01.

"Articles of Organization." The Articles of Organization of ZILLIONAIRE ASSETS LLC, as filed with the Secretary of State of Georgia as the same may be amended from time to time.

"Affiliate." (i) in the case of an individual, any relative of such Person, (ii) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of voting securities of any equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"Arbitrable Dispute." Any of the disputes so designated in Section 17.01 hereof.

"Available Cash" means all cash of the Company on hand as of any given time after the payment of all then due debts and liabilities of the Company and after any prepayments of any debts and liabilities of the Company that the Members deem appropriate to cause the Company to make, less any Reserves deemed necessary by the Members, consistent with the provisions of this Agreement, for (a) the repayment of any debts or liabilities of the Company, (b) the working capital or other requirements of the Company, and (c) any contingent or unforeseen liabilities of the Company.

"Business" means:

a)    All aspects of the purchase, ownership, operation and financing of a commercial building located at 5754 Attucks Boulevard, Morrow, GA 30260.

(b)    All actions necessary to or reasonably connected with the Company's foregoing business which may be legally exercised by limited liability companies under the Georgia Act; and

(c)     All activities necessary, customary, convenient, or incident to any of the foregoing.

"Capital Account" of a Member means a capital account established, maintained, and adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Consistent therewith, each Member's Capital Account will be adjusted from time to time pursuant to Section 8.06 hereof, the purpose of which is to set forth certain operating rules for the allocation of book items of income, gain, loss and deduction for Capital Account purposes. The provisions of Article 8 hereof shall be construed in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv). The Capital Accounts shall not be adjusted for items as they are computed and allocated to the Members for federal income tax purposes. Upon the transfer hereunder of all or part of a Membership Interest, other than a Transfer that terminates the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Capital Account of the transferor Member that is attributable to the transferred Membership Interest will carry over to the transferee Member. In the event of a Transfer of all or part of a Member's Membership Interest that causes a termination of the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Members' Capital Accounts will be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(1).

"Capital Contribution." Any contribution to the capital of the Company in cash, promissory notes or the agreed value of property by a Member whenever made.

"Code." The Internal Revenue Code of 1986, as amended from time to time.

"Company." ZILLIONAIRE ASSETS LLC

"Economic Interest" Refers to a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Georgia Act but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

"Economic Interest Owner." The owner of an Economic Interest who is not a Member.

"Entity." Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Fiscal Year." The Company's fiscal year, which shall be the calendar year.

"Georgia Act." The Georgia Limited Liability Company Act at O.C.G.A Section 14-11-100, et seq.

"Initial Capital Contribution." The initial contribution to the capital of the Company made by a Member pursuant to Section 8.01 of this Operating Agreement.

"Majority Vote." Membership Interests of Members which, taken together, exceed fifty-one percent *(51%)* of the aggregate of all Membership Interests.

"Manager." One or more Members designated pursuant to this Operating Agreement as a Manager from time to time pursuant to Section 5.02 hereof.

"Member." Each of the parties who executes a counterpart of this Operating Agreement as a member and each of the parties who may hereafter become members. To the extent a Manager has purchased a Membership Interest in the Company, the Manager will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent such Member has purchased said Membership Interest in the Company.

"Membership Interest." A Member's entire interest in the Company including (i) the right to participate in the management of the business and affairs of the Company, and the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Georgia Act, and (ii) the percentage ownership share of each Member in the capital, assets and properties of the Company. The Membership Interests of the Members as of the date of this agreement are as follows:

| Member's Name | Membership Interest |
|---|---|
| KING GROUP MGMT LLC | 50% |
| CROWN ASSETS, LLC | 50% |

For purposes of the provisions hereof relating to action taken or approval by Members, including voting, written consents or other approval, only Membership Interests held by Members shall be taken into account.

"Net Cash Flow." All cash received by the Company resulting from management and operation of the lodging facilities including proceeds from mortgages or refinancing, plus any other items of income received in cash by the Company, less all payments of debts and expenses, including capital expenditures and principal and interest payments on mortgages and debts, paid in the operation of the Company, and less any Reserves for working capital and capital expenditures which the Members deem reasonably necessary for the operation of the Company or are so specified in any approved budget.

"Net Profits" or "Net Losses." The Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss) with the following adjustments: (i) such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B)) and 705(a)(2)(B) were included in the computation of taxable income or loss; (ii) that any items specially allocated pursuant to Article 10 hereof shall not be taken into account in computing Net Profits or Net Losses; (iii) if

any Member contributes property to the Company with an initial book value to the Company different from its adjusted basis for federal income tax purposes to the Company, or if Company property is revalued in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or as otherwise required by the Regulations, Net Profits and Net Loses will be computed as if the initial adjusted basis for federal income tax purposes to the Company of such contributed or revalued property equaled its initial book value to the Company as of the date of contribution or revaluation; and (iv) credits or debits to Capital Accounts due to a revaluation of Company assets in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f), or due to a distribution of noncash assets as provided in Section 16.04 hereof, will be take into account as gain or loss from the disposition of such assets for purposes of computing Net Profits and Net Losses.

"Operating Agreement." This Operating Agreement as originally executed and as amended from time to time.

"Person." Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Reserves." With respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the affirmative vote of Members holding at least fifty-one (51%) percent of the Membership Interests for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transferring Member." A Member who sells, assigns, pledges hypothecates or otherwise transfers for consideration or gratuitously all or any portion of his Membership Interest.

"Treasury Regulations" or "Regulations." The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 2

## FORMATION OF COMPANY

**2.01   Formation**.  The Company was formed on December 18, 2018 as a Georgia limited liability company by causing Articles of Organization to be delivered to the Secretary of State of Georgia in accordance with the provisions of the Georgia Act. The Company shall be taxed as a partnership for federal income tax purposes.

**2.02   Name**. The name of the Company is ZILLIONAIRE ASSETS LLC.

**2.03   Principal Place of Business**. The principal place of business of the Company within the State of Georgia is located at 660 Belgrave Lane, Tucker, GA 30084.  The Company may locate its places of business and registered office at any other place or places as the Manager or Managers may from time to time deem advisable.

**2.04**   <u>Registered Office and Registered Agent</u>. The Company's registered office shall be at the office of its registered agent at 1150 Faith Ave, SE, Atlanta, GA 30316 and the name of its registered agent at such address is Gobind Madan. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Georgia Act and the applicable rules promulgated thereunder.

**2.05**   <u>Term</u>. The term of the Company shall commence at the date the Articles of Organization were filed with Secretary of State of Georgia and shall continue until the Company is dissolved, terminated and its affairs wound up in accordance with the provisions of this Operating Agreement or the Georgia Act.

## ARTICLE 3

### BUSINESS OF COMPANY

**3.01**   <u>Permitted Businesses</u>. The Company shall engage in the Business and may engage in any other Business or activities as approved by the Majority Vote of the Members.

## ARTICLE 4

### NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members as of the date of this Agreement are as follows:

| <u>NAME</u> | <u>ADDRESS</u> |
|---|---|
| KING GROUP MGMT LLC | 660 Belgrave Lane<br>Tucker, GA 30084 |
| CROWN ASSETS, LLC | 1150 Faith Avenue<br>Atlanta GA 30316 |

Any party may change its address by giving notice of such address change to the other parties pursuant to the notice provisions set forth in Section 17.14.

## ARTICLE 5

### MANAGEMENT

**5.01** <u>Management of Business</u>. Subject to approval by the Members by Majority Vote as to Major Decisions as provided below, the business and affairs of the Company shall be managed by its Manager(s). Each Manager shall have full authority, power and discretion to delegate the management or control of the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or

incident to the management of the Company's business. The Members shall determine from time to time by Majority Vote which persons shall be the Manager(s), responsible for administering the day-to-day activities of the Company. Each Manager may carry out the business of the Company directly or delegate or assign by contractual agreement any of their responsibilities. The delegation or assignment by contractual agreement of duties under this Agreement shall not release or reduce the liability and responsibility of the Manager(s) and the Manager(s) shall exercise due care in selecting agents, assignees and designees.

Notwithstanding the foregoing, the Manager(s) shall not have the authority to undertake any of the following matters ("Major Decision") without first having obtained the affirmative vote of the Members holding at least fifty-one (51%) percent of the Membership Interests:

(a)    the purchase, lease or sale or other disposition of real or personal property;

(b)    the borrowing or refinancing of any funds for or by the Company (whether secured or unsecured), or the prepayment of any such borrowing;

(c)    the approval of projected annual Company budgets, or expenditures of funds in excess of 110% of the amounts specified in any such approved budgets;

(d)    the approval of amounts distributed to the Members pursuant to Section 9.01 hereof;

(e)    any contracts or agreements between the Company and the Members or any of their respective Affiliates;

(f)    the consummation of any major transactions or series of related transactions, which are not in the ordinary course of the Company's business, including, but not limited to making any expenditure or commitment, other than the lease or rental of space on behalf of the Company in the ordinary course;

(g)    the amendment of the Articles of Organization or this Operating Agreement;

(h)    the merger of the Company with or into any other business entity;

(i)    the filing of any bankruptcy petition or commencement of any insolvency proceeding for the Company.

(j)    Additional capital contributions by Members.

**5.02**    **Election of Manager**. The Manager shall be KING GROUP MGMT, LLC. He shall serve in such capacity until the first to occur of his death, disability, resignation or removal

by a Majority Vote.

**5.03**   **Tax Matters Member**. The Members hereby appoint SAHIB SINGH ARORA as the Company's "Tax Matters Partner", as that term is defined in Section 623 l(a)(7) of the Code, and further appoint the Tax Matters Partner to receive notice of the beginning of any administrative proceeding at the Company level with respect to any Company item or items, as well as to receive notice of any final administrative adjustment resulting from any such proceeding, in each case within the meaning information to the Internal Revenue Service as may be necessary to enable to Internal Revenue Service to provide the Members with such notices as are required under the Code. The Company's Tax Matters Partner shall also keep each Member informed of any administrative or judicial proceedings relative to any adjustment or proposed adjustment at the Company level of Company items. The Tax Matters Partner shall have the authority to (a) enter into any settlement agreement with the Internal Revenue Service, (b) file a petition as contemplated by Sections 6226(a) or 6228 of the Code, (c) intervene in any action as contemplated by Section 6226(b) of the Code, (d) file any request as contemplated by Section 6227(b) of the Code or (e) enter into an agreement extending the period of limitation as contemplated by Section 6229(1)(B) of the Code.

**5.04**   **Managers Have No Exclusive Duty to Company**. The Manager(s) shall not be required to manage the Company as their sole and exclusive function and he (or any Manager) may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or to any of the Members as a result of any other business or venture.

**5.05**   **Bank Accounts**. The Manager(s) may from time to time open bank accounts in the name of the Company, and the Manager(s) shall be the sole signatories on such accounts unless the Members or Manager(s) determine otherwise.

**5.06**   **Indemnity of the Manager(s), and Employees.** To the fullest extent permitted under O.C.G.A Section 14-11-306, the Company shall indemnify the Manager(s) and its employees and make advances for reasonable and necessary expenses to them with respect to such matters to the maximum extent permitted under applicable law.

## ARTICLE 6
### RIGHTS, OBLIGATIONS, REPRESENTATIONS
### AND WARRANTIES OF MEMBERS

**6.01**   **Limitation on Liability** Each Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

**6.02**   **No Liability for Company Obligations**. No Member will have any personal liability for any debts or losses of the Company beyond such Member's Capital Contributions, except as provided by law.

**6.03    Priority and Return of Capital**. No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Income or Net Loss or distributions except as set forth herein. This Section shall not apply to any loans (as distinguished from Capital Contributions) which a Member has made to the Company.

**6.04    Restrictions on Competitive Activity.** Except as otherwise provided in this Operating Agreement, or in any Covenant Not to Compete, a Confidentiality Agreement, a Noninterference Agreement or any other agreement between the Members, the Members and their respective Affiliates may conduct any other business or activity whatsoever not related to the Company's business, without any accountability to the Company or any Member.

**6.05    Validity of Agreement**. Each Member warrants that this Operating Agreement and each and every other agreement, document and instrument provided for herein and to which such Member is or shall be a party, when executed and delivered, will constitute the valid and binding obligation of such Member, enforceable against him in accordance with its terms, except as enforceability may be limited by (a) bankruptcy or similar laws from time to time in effect affecting the enforcement of creditor's rights generally or (b) the availability of equitable remedies generally.

**6.06    No Violation of Material Instruments**. Each Member represents and warrants that the execution and delivery of this Operating Agreement by such Member does not, and the consummation of the transactions contemplated hereby will not:

        (a)    violate or constitute an occurrence of default (which violation or default either singularly or in the aggregate would be considered material) under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any material agreement, instrument, order, judgment, decree or other arrangement to which such Member or any of its Affiliates is a party or by which any of them is bound or its respective assets affected;

        (b)    require any consent, approval, filing or notice under any provision of law, or violate any judgment, ruling, order, writ, injunction, decree, statute, role or regulation applicable to such Member or any of the Member's Affiliates.

## ARTICLE 7
## MEETINGS OF MEMBERS

**7.01    Yearly Meeting**. The yearly meeting of the Members may be held in the month of December or at such other time as shall be determined by unanimous agreement of the Members.

**7.02    Special Meetings**. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Manager or by a Member

or Members holding at least a thirty-three percent (33%) Membership Interest.

**7.03**    **Place of Meetings.** The Members may designate any place, either within or outside the State of Georgia, as the place of meetings for any meeting of the Members. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Company in the State of Georgia.

**7.04**    **Notice of Meetings.** Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at his address as it appears on the books of the Company, with postage thereon prepaid.

**7.05**    **Meeting of all Members.** If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice and at such meeting any lawful action may be taken.

**7.06**    **Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which Notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**7.07**    **Quorum.** Members holding fifty-one (51%) percent of the Membership Interests represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if at the adjournment of the meeting a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting. At such adjourned meeting at which quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Membership Interests whose absence would cause less than a quorum to be present.

**7.08**    **Manner of Acting.** If a quorum is present, the affirmative vote of Members holding fifty-one (51%) percent of the Membership Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Georgia Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise provided herein or required under applicable law, Members who have an interest (economic or otherwise)

in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Membership Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

**7.09** **Proxies**. At all meetings of members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney in fact. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

**7.10** **Action by Members Without a Meeting**. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by all the necessary Members entitled to vote and required to approve such action and delivered to the Manager for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when the Members required to approve such action have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

**7.11** **Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

## ARTICLE 8
## CONTRIBUTIONS TO COMPANY AND CAPITAL ACCOUNTS

**8.01** **Member's Capital Contributions**. Each Member shall contribute the amount of cash, set forth next to such Member's name on Exhibit "A" hereto as the Member's Initial Capital Contribution.

**8.02** **Additional Capital Contributions**.

In the event that the Members by Majority Vote determine that Additional Capital Contributions are needed by the Company, the Members shall contribute their share of such Additional Capital Contributions (determined by reference to their Membership Interests in the Company) within fifteen (15) days thereafter (or, if later, such time as is set forth in the notice from the Company). In the event that a Member fails to make such Additional Capital Contributions (the "Defaulting Member"), and the remaining Members (the "Non-Defaulting Members") contribute such Defaulting Members' Additional Capital Contribution (the "Disproportionate Contribution"), then the Defaulting Member's Interest in the Company shall be reduced using the following formula:

$$\frac{A}{be \quad A \; + \; C} \quad x \quad I \, x \, 2 \quad = \quad$$ Interest in membership interest of the Company to be forfeited by the breaching Member.

where:   A=   Breaching Member's share of Additional Capital
Contributions required by this Section 8.02;

C=   Total capital previously contributed by Breaching
Member; and

I=   Breaching Member's membership interest of the
Company prior to their failure to make the required
Additional Capital Contributions.

It is the intent of the parties hereto that the membership interest of the Company forfeited by the Defaulting Member shall be allocated pro rata among the Non-Defaulting Members who contributed the Defaulting Member's share of the Additional Capital Contribution required by this Section 8.02 in the same proportions as such Additional Capital Contributions are made by the Non-Defaulting Members.

**8.03     Optional Loans**.  In addition to or in lieu of making a capital call pursuant to Section 8.02, in the event that the Members by Majority Vote determine that the Company needs additional capital, the Manager may ask each Member to make a loan to the Company in an amount determined by the Manager.  The Manager shall fix, and notify the Members of a date by which the Members must respond to any such request, and the Members shall, before such date, determine whether to make the requested loans (which may be made directly or through Affiliates) and notify the Manager of such decision, but no Member shall be required to make any such loan.  Any loan made pursuant to this Section 8.03 shall bear simple interest at the rate of two percent (2%) per annum in excess of the "prime rate" of SunTrust Bank, Atlanta, Georgia, or its successor entity, in effect from time to time during the periods such loans are outstanding, and shall be payable pursuant to the provision of Sections 9.01 and Section 16.01 hereof.  The Members by Majority Vote shall have complete discretion regarding whether to request a loan from Members pursuant to this Section 8.03 or requesting that the Members make an Additional Capital Contribution pursuant to Section 8.02.

**8.04     No Interest on Contributions**.  No Member shall be entitled to receive interest on his or her Capital Contribution.

**8.05     Loan Guarantees**.  The Members of the Company agree that they shall all, but not less than all, upon request by the Manager, execute unconditional guarantees of repayment of loans, financings, borrowings, rentals or other obligations of the Company.  In addition, the Members of the Company agree to execute any and all documents necessary or required by any lending institution or any third party to make loans to the Company.  The Manager may require that said guarantees be executed on behalf of the Company.

**8.06     Capital Accounts**

(a)   An individual Capital Account shall be established and maintained for each Member, and shall be credited with the Capital Contribution of such Member, any Additional Capital Contributions and that portion of Net Income allocable to such Member and shall be debited with that portion of

any Net Loss allocable to such Member and all distributions made by the Company to such Member.

(b)    No interest shall be payable to any Member on any positive balance in such Member's Capital Account.

(c)    No Member shall have the right to withdraw from his or her Capital Account or to otherwise receive any Company funds or property, except as provided by this Operating Agreement.

(d)    No Member shall be required to eliminate in any fashion any deficit balance which may arise in his or her Capital Account at the time the Company is dissolved or at any other time.

### 8.07    Withdrawal or Reduction of Members' Contributions to Capital

(a)    A Member shall not receive out of the Company's property any part of such member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid, or their remains property of the Company sufficient to pay them.

(b)    A Member, irrespective of the nature of such Member's Capital Contributions, has only the right to demand and receive cash in return for such Capital Contribution.

## ARTICLE 9
## DISTRIBUTIONS TO MEMBERS

**9.01**    **Distributions**. Except as otherwise provided in this Operating Agreement, Net Cash Flow shall be distributed to the Members ratably in proportion to their Membership Interests. Such Net Cash Flow shall be distributed at such times as the Members holding fifty-one(51%) percent of the Membership Interest shall determine from time to time, but in no event less frequently than once per year. Should the Members holding fifty-one (51%) percent of the Membership Interest determine that the Net Cash Flow for a particular quarter will be more appropriately reinvested into the Company, they may in their discretion, reduce the distribution amounts to an amount necessary to cover the income tax assessment caused by the Net Profits of the Company, not yet distributed.

**9.02**    **Distributions In Cash.** A Member, irrespective of the nature of such Member's Capital Contributions or his share of the Net Cash Flow, has only the right to demand and receive cash for the satisfaction of his share of the Net Cash Flow, should the Net Cash Flow be distributed as determined under Section 9.01.

**9.03**    **Limitation Upon Distributions**. No distribution shall be made to Members if prohibited by O.C.G.A Section 14-11-407.

**9.04    Distributions After the Fiscal Year End.**  The Manager may, to the extent consistent with this Article 9, elect to have distributions made after the end of a Fiscal Year relate back to such Fiscal Year, provided, however, that any such distribution must be made within thirty (30) days after the end of such Fiscal Year.

**9.05    Withholding.**  The Manager may cause the Company to withhold income or other taxes as may be required by, and otherwise comply with and take actions necessary as the result of, the provisions of the code of any state or local tax law requiring withholding.  Any amounts of the Company's Available Cash withheld pursuant to this Operating Agreement shall be deemed to have been paid to the members as distributions of the Company's Available Cash in the amounts so withheld pursuant to this Article 9.

**9.06    Tax Distributions.**  Unless prevented by applicable law, the Company shall distribute to each Member, with respect to each fiscal year, either during such fiscal year or within sixty (60) days thereafter, to the extent of Available Cash, an amount equal to (i) the amount of the Company's federal taxable income allocated to such Member for such fiscal year, multiplied by (ii) the highest combined federal and state income tax rate to which any Member is subject with respect to such fiscal year (the "Tax Distribution"). All distributions pursuant to this section shall be distributed ratably in proportion to the relative Membership Interests of the Members and shall be credited as a distribution pursuant to Section 9.01.

## ARTICLE 10
## ADJUSTMENT OF CAPITAL ACCOUNTS AND PROFITS AND LOSSES

**10.01    General Tax Allocations.**  As of the end of each Fiscal Year, and after giving effect to the special tax allocations set forth in Section 10.2, Net Profits and Net Losses shall be allocated among the Members for Capital Account, as well as for federal income tax purposes, ratably in accordance with their respective Membership Interests.

**10.02    Special Allocations.**  At the end of each Fiscal Year and notwithstanding any provision of Section 10.01, the following special allocations shall be made for both Capital Account and for federal income tax purposes unless otherwise provided:

(a)    In accordance with the ordering rules of Treasury Regulation Section 1.704-2(j), items of gross income and realized gain first shall be allocated in an amount and in a manner that complies with the "chargeback" requirement of Treasury Regulation Section 1.704-2(i)(4), the "qualified income offset" requirement of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and the "minimum gain chargeback" requirement of Treasury Regulation Section 1.704-2(f).  Further, any "partner nonrecourse deductions" within the meaning of Treasury Regulation Section 1.704-2(i)(2) attributable to "partner nonrecourse debt" shall be allocated to the Member who bears the "economic risk of loss" for such debt in accordance with Treasury Regulation Section 1.704-2(i).  Any losses in excess of the losses allowable to the Members pursuant to the Treasury Regulations promulgated under Code Section 704(b) shall first be allocated to the extent allowable hereunder to Members who are not precluded from receiving such allocations by the preceding provisions of this subparagraph (a), if any, and shall thereafter

be allocated as provided in Section 10.01.

        (b)     If a taxing authority ignores the characterization of any amounts paid to a Member (or an Affiliate thereof) as salaries, management fees, commissions, interest or other compensation for services ("Compensation"), and refuses to treat such payments as either guaranteed payments within the meaning of Code Section 707(c) or payments made to such Member other than in such Member's capacity as a "partner" within the meaning of Code Section 707(a), and such taxing authority ultimately treats such amounts paid to a Member (or an Affiliate) thereto as a distribution to such Member for federal income tax purposes which reduces such Member's Capital Account, then the Compensation shall be treated as an allocation of an item of income or gain of the Company to the recipient Member so that, consistent with the intent of the Members, the Compensation shall not be treated as a distribution which reduces the recipient Member's Capital Account. Accordingly, such Member shall be allocated the first available items of Company income and gain (including in a succeeding year) in an amount equal to the Compensation.

        (c)     If the Company owns (x) any property contributed by a Member that had a fair market value different from its adjusted basis for federal income tax purposes on the date of the contribution, or (y) any property that has been revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), then for federal income tax purposes only and not for Capital Account purposes, any income, gain, loss or deduction with respect to such property shall be allocated among the Members in accordance with Code Section 704(c) and the Treasury Regulations thereunder.

        **10.03**  <u>**Tax Items.**</u>  Except as otherwise provided herein, any allocation to a Member of a portion of the Net Profits or Net Losses for a Fiscal Year (or other relevant period) will be deemed to be an allocation to that Member of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Company for federal income tax purposes.

        **10.04**  <u>**Partial Year Allocations.**</u>  In the event that a Member is admitted to the Company during the Company's Fiscal Year, or all or a portion of a Member's Membership Interest is transferred during the Company's Fiscal Year, Net Profits and Net Losses shall be allocated to the admitted or transferee Member in any manner permitted by Code Section 706 or the Treasury Regulations thereunder, as the Manager shall determine in his discretion. Allocations made in this Article X shall be made to each holder of a Membership Interest whether or not the holder is a substituted Member.

        **10.05**  <u>**Allocations and Distributions Upon Dissolution.**</u>  When the Company is dissolved and wound-up pursuant to Article 16 hereof, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Members pursuant to this Article 10. It is the intent of the parties hereto that after the allocations described in the previous sentence are made and the final cash distribution referred to in Section 16.04 hereof is made, that such actions will result in the Capital Account balances of the Members equaling zero following the dissolution of the Company. The allocation and distribution provisions of Articles 9 and 10, as well as the provisions of Article 14 hereof, shall be construed in such a way in order to achieve

this result. Notwithstanding anything in this Agreement to the contrary, no Member shall be obligated to restore any negative balance in his Capital Account upon the dissolution of the Company, the Transfer of all of any portion of his Membership Interest, or otherwise.

## ARTICLE 11
## LIMITATION ON LIABILITY AND INDEMNIFICATION

**11.01  Limitation on Liability of the Members.**   No Member, Company officer, or Manager shall be liable to the Company for any loss or damage sustained by any of them, except loss or damage resulting from intentional misconduct or a knowing violation of law or a transaction for which such Person received a personal benefit in violation or breach of any provision of this Agreement.

**11.02  Indemnification.**   The Company shall indemnify and hold harmless the Members, and Manager(s), from and against any and all claims and demands whatsoever arising in connection with the Company to the fullest extent provided by Section 14-11-306 of the Act and applicable law.

## ARTICLE 12

## COMPENSATION AND REIMBURSEMENTS

**12.01  Compensation.**   Except as otherwise provided herein or approved by an affirmative vote members holding fifty-one (51%) percent of the Membership Interests in the Company, none of the Members, Manager(s), if any, or their Affiliates shall be entitled to compensation in connection with rendering their services to the Company.

**12.02  Reimbursement of Members.** The Company shall reimburse the Members and Manager(s) for all reasonable and direct out of pocket expenses and costs incurred in connection with rendering services to the Company; provided, however, that any such expenses must be documented in the manner required by the Internal Revenue Service as necessary to allow the deduct ability of such expenses as business expenses of the Company.

## ARTICLE 13

## ACCOUNTING, BOOKS AND RECORDS

**13.01  Accounting Method.**  The Company will maintain its books and records on such basis of accounting as the Manager shall determine.

**13.02  Books and Records.**   The Company shall keep, at Company expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts and such other matters as are required by the Code.  Such books of account will be the property of the Company, will be kept in accordance with generally accepted accounting principles and procedures consistently applied and will be open to the reasonable inspection and examination by the Members and their duly authorized representatives.  Such

books of account will be maintained at the principal office of the Company, or at such other place as the Manager determines.

**13.03** **Financial Statements.** Within sixty (60) days following the end of each quarter of the Company, and within ninety (90) days following the end of each Fiscal Year of the Company, the Manager shall cause to be prepared and delivered to each Member unaudited financial statements of the Company for such quarter and Fiscal Year.

**13.04** **Tax Returns.** The Manager shall cause the Company's tax returns and other governmental returns and reports to be prepared and timely filed. The Manager shall deliver copies of Schedule K-1 of Form 1065 (or a comparable schedule), federal and state tax returns and other necessary tax information for each Fiscal Year to each Member no later than sixty (60) days after the end of each Fiscal Year, or such later date as may be otherwise agreed to by the Members.

## ARTICLE 14

## TRANSFERABILITY AND ADDITIONAL MEMBERS

**14.01** **General.** Except as otherwise specifically provided herein, no Member shall have the right to:

    (a)    sell, assign, pledge, hypothecate transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or

    (b)    gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy), all or any part of his Membership Interest, except that Members have a right to transfer all or a portion of a Membership Interest to the parents, spouses or lineal descendants of the current owners of such interest or into trust established for the benefit of any of the foregoing, for bona-fide estate planning or tax planning purposes.

**14.02** **Additional Members.** Without vote or assent of Members holding at least fifty one (51%) percent of the Membership Interests, no Person or Entity may become a Member of this Company either by the issuance by the Company of a Membership Interest, or as a transferee of a Member's Membership Interest or any portion thereof. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Members may by an affirmative vote of fifty-one (51%) percent of the Membership Interests at the time a Member is admitted elect to close the Company books (as though the Company's tax year had ended) or to make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of 706(d) of the Code and Treasury Regulations promulgated thereunder.

### 14.03  Sale. Assignment or Other Transfer of Member Interests.

(a) No Member shall sell, assign or otherwise transfer all or any part of his Membership Interest, without first obtaining the affirmative vote or assent of Members holding fifty-one (51%) percent of the Membership Interests in the Company held by all Members excluding the transferring Member, (the "Remaining Members.")  The restrictions contained in this Section shall not apply to restrict in any way transfer by any Member of assets which such Member holds other than such Member's Membership interest in the Company.

(b) As a condition to any transfer, the transferee shall agree to be bound by all of the terms and provisions of this Operating Agreement to the same extent and in the same capacity as the transferor would have been with respect to the transferred Membership Interest had the transferor continued to own such transferred Membership Interest. However, in the event that (i) a Member who has transferred his Membership Interest to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a Membership Interest in the Company, (ii) the spouse of a Member is awarded or becomes entitled to some or all of such Member's Membership Interest pursuant to a divorce decree or settlement agreement, or (iii) an owner of a Member has transferred a portion or all of his membership interest in such owner to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a membership interest in a Member or (iv) the spouse of an owner of a Member is awarded or becomes entitled to some or all of such Member's membership interest in a Member pursuant to a divorce decree or settlement agreement, then, in either such event, an Event of Default, as defined in Section 15.02 herein shall have occurred and the Membership Interest held by such spouse (or the membership interest in the Member that is held by such spouse) shall be subject to the provisions of Section 14.03 herein. In addition, the Transferee Member or spouse shall become a holder of an Economic Interest only, with no voting rights, unless the remaining original Members, excluding the Member who transferred such Membership Interest, determine otherwise by majority vote of such Members.

(c) In exercising discretion to consent to any sale, assignment or transfer covered by the provisions of subparagraph (a) of this Section 14.03, the Members shall require such vendee, assignee or other transferee or counsel for any such person to demonstrate to the Members (i) the vendee, assignee or other transferee is a financially responsible person who understands the nature of an investment in the Company and (ii) such person intends to take and hold the interest transferred for investment for his own account and not for resale to others. No Member shall consent to a sale, assignment or other transfer of less than all of the Membership Interest to the Member, unless in the opinion of the Members, such Member's Membership Interest is large enough to be divided.  In addition no such sale, assignment or other transfer shall be effective to bind the Company until and unless the Remaining Members shall receive an opinion of counsel for the vendor, assignor or other transferor in form and substance satisfactory to counsel for the Company that the sale, assignment or other transfer may lawfully be made under all applicable law, including any and all applicable securities laws, and that such sale, assignment or other transfer, together with all other sales or transfers or interests in the Company sold, assigned or transferred within the preceding twelve (12) months and will not result in a termination of the Company pursuant to Code Section 708.

(d) The transferee of any Member (if a transfer is permitted pursuant to the terms of this Agreement) shall be subject to and bound by all of the terms and conditions of this Agreement.

**14.04   Deadlock and Triggering of Put/Call Procedure.**

(a) If (i) at any time the Members are unable to reach a resolution as to any Major Decision under this Operating Agreement; and (ii) a Member determines that such matter or decision is not resolvable without resort to the following procedure, such Member may send a notice (a "Declaration of Deadlock") to all Members of the Company declaring the existence of a deadlock (a "Deadlock").

(b) Within three (3) calendar days after delivery of a Declaration of Deadlock (the "Delivery Period"), each Member shall provide to the other Member a written report detailing the facts that such Member deems to be relevant to the creation and resolution of the Deadlock, plus any supporting information and a summary of any discussion relevant to the subject matter of the Deadlock. For a period of thirty (30) calendar days after expiration of the Delivery Period (the "Discussion Period"), the Members shall meet in person and/or communicate telephonically or electronically as frequently as necessary to negotiate in good faith to resolve the Deadlock. If the Members are able to resolve the Deadlock they shall, within the Discussion Period, execute a written acknowledgement (the "Resolution Acknowledgement") setting forth in reasonable details the resolution of the Deadlock. Pending resolution of the Deadlock, all Members, Managers and the Company shall continue to perform their respective obligations under this Operating Agreement without regard to whether the Deadlock has been resolved, unless and until such obligations are terminated or expire in accordance with the provisions hereof or are rendered incapable of performance by reason of the Deadlock. In the event that the Members are unable to resolve the Deadlock within the Discussion Period, either Member may institute the procedures set forth in this section.

(c) Manner of Offer. At any time after the expiration of the Discussion Period, if the Deadlock has not been resolved, any Member may at any time offer to the other Members (individually and collectively, the "Electing Members") both to sell all of the offeror's Membership Interest to the Electing Members and to buy all of the Electing Members' Membership Interests (such offeror is hereinafter referred to as the "Initiating Member"). Such offer must be in writing and must contain the following: (1) a statement of intention to make an offer in accordance with this Section; (2) a statement of the Initiating Member's determination of the Stated Amount (as defined below); (3) a statement that a condition to any purchase pursuant to the offer shall be the absolute and unconditional indemnity by the purchasing Member of the Initiating Member against any loss, claim or damage that the Initiating Member may suffer arising out of any guarantee by the Initiating Member of any debt of the Company for borrowed money; (4) a statement that the purchase price of the Membership Interest subject to the offer shall be payable not less than twenty five percent (25%) cash at Closing with the balance, if any, represented by a promissory note of the purchasing Member secured by the acquired Membership Interest and personally guaranteed by the owner of the purchasing Member and payable in equal monthly installments over thirty six consecutive months with interest at the

prime rate plus 2% announced by SunTrust Bank, Atlanta, Georgia or successors ("Applicable Rate"); and (5) a statement that such offer is both an offer to sell all the Membership Interest owned by the Initiating Member and an offer to purchase all the Membership Interest owned by the Electing Members (the "Put-Call Offer") on such terms and conditions. The "Stated Amount" means the fair market value of the subject Membership Interest, as determined by a qualified independent appraiser under the procedure outlined in Section 15.03 (c) below; provided however, that the Stated Amount shall not be less than the aggregate of all indebtedness owed by the Company, including any loans to the Company from Members.

The purchase price ("Put-Call Purchase Price") for any Member's Membership Interest in the Company acquired pursuant to this Section shall be that amount which would be distributed to such Member pursuant to Section 9.01 hereof (after giving effect to all applicable provisions of this Operating Agreement, but after liquidating all Reserves then existing and without establishing any additional Reserves), if (i) all of the assets then held by the Company were sold for cash on the date of the Closing (as defined in this section) for a gross sales price equal to Stated Amount and (ii) the Company's liabilities were paid in full. Any loans by a Member to the Company owing to a Member shall be added to the purchase price payable to such Member.

The Put-Call Offer shall be irrevocable for ninety (90) days, and the Electing Members may, on or before such ninetieth (90th) day, accept in writing either the offer to sell or the offer to buy, and upon acceptance, the Initiating Member and the Electing Members shall be required to sell or to buy, as the case may be. If the Electing Members fail to accept either offer within the ninety (90) day period, the Electing Members shall be deemed to have accepted the offer to sell the Membership Interests of the Electing Members to the Initiating Member.

Any two or more Members may jointly execute a Put-Call Offer and specify in the Put-Call Offer that they are to be treated as one Initiating Member for purposes of this Section. For purposes of the remainder of this Section unless the context indicates otherwise, references to "Member," "Initiating Member" or "Electing Member" include, where appropriate, the plural as well as the singular.

(d) Differing Elections. If the Electing Members consists of more than one Member, three possible response combinations may result: (i) all Electing Members elect to purchase the Membership Interest of the Initiating Member, (ii) all Electing Members elect to sell their Membership Interests to the Initiating Member, or (iii) one or more Electing Members elect to purchase the Initiating Membership Member's Interest and one or more Electing Members elect to sell their Membership Interest to the Initiating Member. In the event of a split of elections as described in (iii), an Electing Member's election to sell his Membership Interest shall be ineffective and the election of an Electing Member to purchase the Membership Interest of the Initiating Member shall be the only effective election, and those Electing Member(s) electing to purchase the Initiating Member's Interest shall purchase all of the Initiating Member's Membership Interest.

If there is more than one Electing Member electing to purchase the Initiating Member's Membership Interest, each such Electing Member in the purchasing group shall be entitled to purchase such portion of the Initiating Member's Membership Interest as all such Electing

Members shall agree among themselves. In the event all Electing Members in the purchasing group cannot agree on the portion of the Initiating Member's Membership Interest that each of them shall purchase, then each such Electing Member in the purchasing group shall be entitled to purchase a portion of the Initiating Member's Membership Interest, such portion to be determined by dividing each Electing Member's Ownership Percentage by the total Ownership Percentages of all Electing Members in the purchasing group.

**14.05 Closing.** The closing of such purchase and sale (the "Closing") shall be held at the offices of the Company and on the date specified by the purchaser by written notice to the seller, which date shall be on or before the thirtieth (30) day after such option to purchase or sell has been exercised. At Closing, the purchaser shall pay the Put-Call Purchase Price by wire transfer of immediately available funds.

(a) It shall be a condition to the Closing that the purchasing Member(s) shall either (i) repay all Company indebtedness for borrowed monies under which the selling Member has personal liability or (ii) cause the selling Member to be released from such personal liability by written instrument duly signed by the holder of such indebtedness. The purchasing Member(s) agrees to indemnify in writing the selling Member and hold the selling Member harmless from and against any damage, loss or liability as a result of the purchasing Member's failure to repay such indebtedness at the closing in accordance with the provisions hereof or to obtain the release of the selling Member. The selling Member, may, in his sole and absolute discretion, and without prejudice to any other legal or equitable remedies he may have, refuse to proceed with the Closing unless simultaneously therewith all such indebtedness is so repaid or such releases delivered. In addition, at any Closing held pursuant to this Section, the purchasing Member shall by a legally enforceable agreement assume the payment of, and indemnify the selling Member against all obligations of the Company accruing after Closing other than those obligations owing out of or related to an act or omission of the selling Member which constitutes gross negligence or willful misconduct.

(b) At the Closing, an assignment and, if requested by the Purchasing Member or, a bill of sale from the selling Member to the purchasing Member of the selling Member's Membership Interest together with such other instruments and documents as may be reasonably necessary or desirable to effectuate the sale and transfer to the purchasing Member shall be delivered upon payment of the purchase price. The purchasing Member shall have the right, within his sole and absolute discretion, to cause his nominee or designee to acquire the selling Member's Membership Interest at the Closing but nothing herein shall relieve the purchasing Member of his other obligations hereunder. Any such designee shall, upon Closing, become a Member only if expressly approved and consented to by the purchasing Member.

## ARTICLE 15

## PROHIBITED TRANSACTIONS AND DEFAULTS

**15.01 Prohibited Transactions.** Neither any Member shall, without the consent of all of the other Members, do any one of the following nor shall any Member permit any of such Member's respective Affiliates to do any of the following:

(a)  Use the name of the Company (or any substantially similar name) or any trademark or trade name adopted by the Company except in the ordinary course of the Company's business;

(b)  Disclose to any nonmember any of the Company business practices, trade secrets, or any other information not generally known to the business community;

(c)  Do any other act or deed with the intention of harming the business operations of the company;

(d)  Do any act contrary to this Operating Agreement except with the prior written approval of all Members;

(e)  Do any act which would make it impossible to carry on the intended or ordinary business of the Company;

(f)  Confess a judgment against the Company.

(g)  Wrongfully transfer or dispose of Company property, real or personal;

(h)  Admit another Person or Entity as a Member except as provided herein.

(i)  Pledge by a Member of any of their Membership Interests without the consent of the Manager.

The Members shall not use, directly or indirectly, the assets of this Company for any purpose other than carrying on the business of this Company, for the full and exclusive benefit of all its Members.

**15.02  Events of Default.** The following events shall be deemed to be events of default by a Member.

(a)  Any attempted transfer of an interest in the Company by the Member without complying with the provisions of Article 14 of this Operating Agreement.

(b)  The making of an assignment for benefit of creditors or the filing of the Member of a petition under any section or chapter of the National Bankruptcy Act, as amended, or under similar law or statute of the Untied States, or any State thereof, by the Member

(c)  Adjudication of the Member as bankrupt or insolvent in proceedings filed against the Member under any section or chapter of the National

Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof, without further possibility of appeal or review.

(d)     The appointment or a receiver for all or substantially all of the assets of a Member and the failure to have such receiver discharged with in thirty (30) days after appointment.

(e)     The attempted transfer, whether voluntary or involuntary, of an interest in the Company to the creditor(s) of a Member in partial or complete satisfactory of any judgment or lien held by such creditor(s) against such Member.

(f)     Failure to make the Member's required Initial Capital Contribution or Additional Capital Contribution in accordance with Section 8.01 or Section 8.02 of this Agreement.

**15.03  Effect of Default.**

(a)     On the occurrence of an event of default by a Member, the Non-defaulting Members shall have the right, at their election, to purchase the Membership Interest of the Defaulting Member at a Purchase Price determined in accordance with Section 15.03(c) or to receive an increase in the Membership Interest pursuant to Paragraph 8.02 of this Agreement. Said election may be made at any time within ninety (90) days from the date of such default, upon giving the Defaulting Member ten (10) days written notice of such election, provided such default is continuing on the date such notice is given.

(b)     If the Non-defaulting Member(s) (the "Purchasing Members") exercises his option to purchase then the Defaulting Member and the Purchasing Members shall meet within thirty (30) days after the date the Purchase Price has been determined, at the time and place designated by the Purchasing Member (the "Closing").   At the Closing, the Defaulting Member shall execute all documents that may be necessary or desirable, in the opinion of counsel for the Purchasing Member to convey the Defaulting Member's entire Membership Interest to the Purchasing Member free and clear of all liens and encumbrance. At the Closing, the Purchasing Member shall pay the Purchase Price in cash. The total cash proceeds from such sale shall be applied as follows.

(1)     First to the costs and expenses incurred in determining the Purchase Price (including but not limited to appraisal costs);

(2)     Next to the payment of all loans, including all interest thereon, from the Purchasing Member to the Defaulting Member; and

(3)     The remaining cash shall be paid to the Defaulting Member.

(c)     <u>Purchase Price for Membership Interest</u>. For purposes of this Section 15.03, the Purchase Price for a Membership Interest shall be equal to the amount agreed upon between the Defaulting Member and the Purchasing Member; or if the Defaulting Member and the Purchasing Member cannot agree upon such a Purchase Price within thirty (30) days after the date of the event triggering the right to effectuate such purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership Interest. The fair market value of the Defaulting Member's Membership Interest shall be as determined by a qualified independent appraiser mutually agreed upon of the Defaulting Member and the Purchasing Member. If the Defaulting Member and the Purchasing Member cannot agree upon an appraiser within ninety (90) days after the date of the event triggering the purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership interest determined as follows: The Defaulting Member shall appoint one (1) qualified appraiser, the Purchasing Member shall appoint one (1) qualified appraiser, and a third appraiser shall be appointed by the two appraisers so appointed. If the two appraisers appointed by the Defaulting Member and the Purchasing Member are unable to agree upon the selection of a third appraiser, the third appraiser shall be selected in accordance with the rules of the American Arbitration Association.

Each of the three (3) appraisers selected in accordance with the above procedure shall separately and independently determine the fair market value of the Defaulting Member's Membership Interest in the Company. When completed, each such appraisal shall be placed in a sealed envelope and delivered to the attorney for the Company to hold until all three appraisals have been received. No appraisal shall be opened or disclosed until all three have been received. After receiving all three appraisals, the attorney for the Company shall open the appraisals and the fair market value shall be the average of the two appraisals that are closest to each other. If, however, the middle appraisal is equal to the average of the high and low appraisals, then the fair market value shall be equal to the middle appraisal. In either case, such determination shall be final and binding upon the parties. The cost of all appraisals made in accordance with this Section 15.03 and shall be deducted from the purchase price proceeds otherwise payable to the Defaulting Member.

**15.04. Additional Effects on Default.** Pursuit to any of the foregoing remedies shall not preclude pursuit of any of the other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any amount due to the remaining Members hereunder or of any damages accruing to them by reason of the violation of any of the terms, provisions and covenants herein contained. No waiver by the remaining Member of any violation or breach shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions, and covenants herein contained, and forbearance by them to enforce one or more of the remedies herein provided on an event of default shall not be deemed or

construed to constitute a waiver of such default.

## ARTICLE 16
## DISSOLUTION AND TERMINATION

**16.01  Dissolution.**  The Company shall be dissolved only upon the occurrence of any of the  events set forth in O.C.G.A. Section 14-11-602(b).

If the Company is continued after the occurrence of an Event of Dissociation of a Member pursuant to this Section, any successor in interest of the Member as to whom the Event of Dissociation occurred shall become an Economic Interest Owner, but shall not be admitted as a Member, except in accordance with Articles 14 hereof.

**16.02  Withdrawing Member.**  Unless otherwise approved by Members holding a Majority Interest, a Member who suffers or incurs an Event of Dissociation, or whose status as a Member is otherwise terminated (a "Withdrawing Member"), regardless of whether such termination was the result of a voluntary act by such Withdrawing Member, shall not be entitled to receive outright the fair value of his Membership Interest, and such Withdrawing Member shall become an Economic Interest Owner.

**16.03  Effect of Dissolution.**  Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Georgia Act. Upon dissolution, the Managers shall file a statement of commencement of winding up and publish the notice permitted by the Georgia Act.

### 16.04 Winding-Up Liquidation and Distribution of Assets.

(a)    Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations from the date of the last previous accounting until the date of dissolution. The Manager(s), or if none, the Persons or Persons selected by Majority Vote of the Members (the "Liquidators") shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Liquidators shall:

(1)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Liquidators may determine to distribute any assets to the Members in kind);

(2)    Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article 9 hereof;

(3)    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the

extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company;

(4)    Distribute the remaining assets to the Members, either in cash or in kind, as determined by the Managers in accordance with the provisions of Section 9.01, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1 (b)(2) (ii)(b)(2) of the Treasury Regulations in accordance with the positive balance (if any) in each Member's Capital Account (as determined after taking into an account all Capital Account adjustments for the Company's Fiscal Year during which the liquidation occurs), with any balance in excess thereof being distributed in proportion to the Members' respective Membership Interests. Any such distribution in respect to Capital Accounts shall, to the extent practicable, be made in accordance with the time requirements set forth in Section 1.704- 1 (b)(2)(ii)(b)(2) of the Treasury Regulations; and

(5)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

(c)    Notwithstanding anything to the contrary in this Operating Agreement upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocation and other Capital Account adjustments for all taxable years ,including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital account.

(d)    Upon completion of the winding-up, liquidation and distribution of the assets, the Company shall be deemed terminated.

    **16.05  Certificate of Termination.** When all debts, liabilities, and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining

property and assets have been distributed to the Members, a Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A Section 14-11-610.

    **16.06  Return of Contribution Nonrecourse to Other Members.** Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his Capital Contribution. If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE 17

## MISCELLANEOUS PROVISIONS

    **17.01  Arbitration.** Any dispute arising in connection with this Operating Agreement shall be an Arbitrable Dispute and shall be finally settled by arbitration under the then applicable Commercial Arbitration rules of the American Arbitration Association, by one or more arbitrators agreed upon by the parties or, in the absence of such an agreement, appointed in accordance with such Rules. The arbitration proceedings shall be held in Atlanta, Georgia. Judgment upon the award rendered may be entered in any court having jurisdiction and application may be made to such court for judicial acceptance of such award and an order of enforcement as the case may be. The parties hereby agree that the rendering of an award by the arbitrator or arbitrators shall be a condition precedent to the initiation of any legal proceedings with respect to any Arbitrable Dispute. The Members agree and understand that this paragraph in no way shall prevent any Member or Members from pursuing civil or criminal remedies for any breach of legal duty or fraudulent or intentional action by any Member, Members or agents, designees' or assignees thereof. The arbitration hearing shall have the following procedures:

    (a)    WITHIN THIRTY (30) DAYS AFTER THE SERVICE OF A WRITTEN REQUEST FOR PRODUCTION OF DOCUMENTS, THE RECEIVING PARTY SHALL PROVIDE THE REQUESTING PARTY WITH COPIES OF THE REQUESTED DOCUMENTS THAT ARE RELEVANT TO THE CLAIMS, COUNTERCLAIMS, AND DEFENSES ASSERTED IN THE ARBITRATION, AND THAT ARE NOT PRIVILEGED. ANY OBJECTION TO A REQUEST FOR PRODUCTION OF DOCUMENTS THAT CANNOT BE RESOLVED BETWEEN THE PARTIES TO THE ARBITRATION SHALL BE DETERMINED BY THE ARBITRATOR(S), WHICH DETERMINATION SHALL BE CONCLUSIVE. THIS PROCEDURE RELATED TO THE PRODUCTION OF DOCUMENTS SHALL BE THE SOLE FORM OF WRITTEN DISCOVERY PERMITTED IN THE ARBITRATION.

    (b)    EACH PARTY TO THE ARBITRATION SHALL BE PERMITTED TO TAKE A MAXIMUM OF THREE (3) DEPOSITIONS OF FACT WITNESSES.  TO THE EXTENT THAT A PARTY TO THE ARBITRATION DESIRES TO TAKE MORE THAN THREE (3) FACT WITNESS DEPOSITIONS, THE PARTY SHALL REQUEST PERMISSION FROM THE ARBITRATOR(S) TO TAKE THE ADDITIONAL DEPOSITION(S).    THE

ARBITRATOR(S) SHALL PERMIT ADDITIONAL FACT WITNESS DEPOSITION(S) UPON GOOD CAUSE SHOWN OR THE AGREEMENT OF THE PARTIES. NO FACT WITNESS DEPOSITION SHALL LAST LONGER THAN FOUR (4) HOURS OF DEPOSITION TIME. ALL OBJECTIONS TO QUESTIONS POSED IN THE DEPOSITION(S) SHALL BE RESERVED FOR THE ARBITRATION HEARING EXCEPT FOR OBJECTIONS BASED UPON PRIVILEGE.

(c)     TO THE EXTENT THAT EITHER PARTY TO THE ARBITRATION INTENDS TO RELY UPON THE TESTIMONY OF AN EXPERT WITNESS(ES) DURING THE ARBITRATION HEARING, THE OTHER PARTY SHALL BE ENTITLED TO DEPOSE THE EXPERT WITNESS(ES) FOR A MAXIMUM OF SEVEN (7) HOURS OF DEPOSITION TIME. THE EXPERT WITNESS(ES) SHALL PRODUCE A REPORT OR STATEMENT WHICH SETS OUT THEIR EXPERT OPINION AND THE FACTUAL AND LEGAL BASIS THEREOF AT LEAST FOURTEEN (14) DAYS PRIOR TO THE SCHEDULED DEPOSITION, AND AT LEAST THIRTY (30) DAYS PRIOR TO THE DATE OF THE ARBITRATION HEARING. ALL OBJECTIONS TO QUESTIONS POSED IN THE DEPOSITION(S) SHALL BE RESERVED FOR THE ARBITRATION HEARING.

(d)     THE ARBITRATION AWARD SHALL BE MADE WITHIN ONE HUNDRED TWENTY (120) DAYS AFTER THE APPOINTMENT OF THE ARBITRATOR(S), AND THE ARBITRATOR(S) SHALL AGREE TO COMPLY WITH THIS SCHEDULE BEFORE ACCEPTING APPOINTMENT.

(e)     THE PARTIES SHALL BEAR AN EQUAL SHARE OF THE ARBITRATORS AND ADMINISTRATIVE FEES.

(f)     NOTWITHSTANDING ANY LEGAL AUTHORITY TO THE CONTRARY, "MANIFEST DISREGARD OF THE LAW" ON THE PART OF THE ARBITRATOR(S) IN RENDERING AN AWARD SHALL CONSTITUTE A VALID GROUND TO VACATE.

**17.02  Books of Account and Records.** Proper and complete records and books of account shall be kept or shall be caused to be kept by the Manager in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. The books and records shall be at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, or their duly authorized representatives during reasonable business hours.

**17.03  Application of Georgia Law.** This Operating Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Georgia Act.

**17.04  No Action for Partition.** No Member has any right to maintain any action for partition with respect to any property of the Company.

**17.05     Construction.** Whenever the singular number is used in this Operating

Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**17.06 Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**17.07 Waivers.** The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**17.08 Rights and Remedies Cumulative.** The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all of the remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**17.09 Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**17.10 Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**17.11 Counterparts.** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**17.12 Investment Representations.** Any securities created under this Agreement have not been registered under the Georgia Uniform Securities Act of 2008, as amended, in reliance upon the exemption from registration set forth in Section 10-5-11(14) of such act. In addition, these securities have not been registered with the United States Securities and Exchange Commission in reliance upon an exemption from such registration set forth in the Securities Act of 1933 provided by Section 4(2) thereof, nor have they been registered with the Securities Commission of certain states in reliance upon certain exemptions from registration. These securities have been acquired for investment purposes only and may not be offered for sale, pledged, hypothecated, sold or transferred except in compliance with the terms and conditions of this Agreement and in a transaction which is either exempt from registration under such acts or pursuant to an effective registration statement under such acts.

**17.13 Certification of Non-Foreign Status.** In order to comply with Code Section 1445 and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each member shall provide to the Company, an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that

the Member is not a foreign person as that term is defined in the Code and Treasury Regulations. Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Manager to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

**17.14  Notices**. Any and all notices, offers, demands, or elections required or permitted to be made under this Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand delivered either in person by the party giving such notice, or by its designated agent, or (ii) the next business day after delivery to a nationally known overnight delivery service courier or (iii) on the third (3rd) business day (when making regular deliveries of mail on all of its regularly appointed week day rounds in Atlanta, Georgia) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage prepaid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth below or at such other address as the other party may hereafter designate by Notice.

**17.15  Amendments**. Any amendment to this Operating Agreement shall be made in writing and signed and consented by the affirmative vote of not less than fifty-one (51%) percent of the Membership Interests.

**17.16  Invalidity**. The invalidity or unenforceability or any particular provision of this Agreement shall not affect the other provisions hereof, and of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted. If any particular provision herein is construed to be in conflict with the provisions of the Georgia Act, then the Georgia Act shall control and such invalid or unenforceable provisions shall not affect or invalidate the other provisions hereof, and this Agreement shall be construed in all respects as if such conflicting provision were omitted.

**17.17  Further Assurances**. The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

**17.18  Time**. Time is of the essence of this Agreement, and to any payments, allocations and distributions specified under this Agreement.

<div align="center">SIGNATURE PAGE ATTACHED</div>

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended and Restated Operating Agreement as of the date first above written.

KING GROUP MGMT LLC
a Georgia limtied liability company

By: _____
Sahib Singh Arora, Manager

CROWN ASSETS, LLC
a Georgia limited liability company

By: _____
Karan Singh Ahuja, Manager

ZILLIONAIRE ASSETS LLC OA.18

EXHIBIT "A"

| MEMBER | CONTRIBUTION |
|---|---|
| KING GROUP MGMT LLC | $100.00 |
| CROWN ASSETS, LLC | $100.00 |

## SUPERIOR COURT OF THOMAS COUNTY
## STATE OF GEORGIA

<div align="center">

**SUMMONS**

</div>

TO: ARORA, SAHIB

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Ian Macdonald**
**Clark Partington**
**106 E. College Avenue**
**Suite 600**
**Tallahassee, Florida 32301**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 21st day of July, 2020.**

Clerk of Superior Court

Randa D. Wharton, Clerk
Thomas County, Georgia

<div align="center">

**Exhibit "I"**

</div>

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
THOMAS COUNTY, GEORGIA

**SUCV202000035**

JUL 21, 2020 10:59 AM

Randa D. Wharton, Clerk
Thomas County, Georgia

## IN THE SUPERIOR COURT OF THOMAS COUNTY
## STATE OF GEORGIA

|  |  |  |
|---|---|---|
| TC FEDERAL BANK | ( | |
| | ( | |
| | ( | |
| Plaintiff, | ( | |
| | ( | |
| v. | ( | Civil Action File No.: _____ |
| | ( | |
| 2551 EAST PINETREE BLVD, LLC, a | ( | |
| Georgia limited liability company; | ( | |
| MAHARAJA INVESTMENTS, LLC, a | ( | |
| Georgia limited liability company; | ( | |
| CROWN ASSETS, LLC, a Georgia | ( | |
| limited liability company; KARAN | ( | |
| AHUJA; SHANEEL LALANI; SAMEER | ( | |
| LALANI; CHARANJEEV SINGH; | ( | |
| VINEET SINGH and SAHIB ARORA | ( | |
| | ( | |
| | ( | |
| | ( | |
| Defendants. | | |

## COMPLAINT

Plaintiff, TC FEDERAL BANK ("TC Federal Bank" or "Plaintiff"), by and through its

undersigned counsel, sues Defendants, 2551 EAST PINETREE BLVD, LLC, a Georgia limited

liability company; MAHARAJA INVESTMENTS LLC, a Georgia limited liability company;

CROWN ASSETS LLC, a Georgia limited liability company; KARAN AHUJA; SHANEEL

LALANI; SAMEER LALANI; CHARANJEEV SINGH; VINEET SINGH and SAHIB

ARORA, and allege(s):

## PARTIES, JURISDICTION, AND VENUE

1.      This Court has subject matter jurisdiction over this matter. *See* GA. CONST. 1983,

Art. VI, § IV, ¶ I and O.C.G.A. § 9-4-2.

2.      Plaintiff, TC Federal Bank, is a foreign banking corporation authorized to do business in the State of Georgia.

3.      The below named defendants are subject to the jurisdiction of this Court because they are Georgia residents and owned, purported to own or exercised control of the Subject Property, defined below, and have otherwise caused damages to Plaintiff by virtue of their control or purported control over the Subject Property.

4.      Defendant, 2551 East Pinetree Blvd, LLC, ("Borrower") is a Georgia limited liability company, transacting business in Thomas County, Georgia, authorized to transact business in Georgia by the Secretary of State, and is subject to the jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91.

5.      Service can be made on 2551 East Pinetree Blvd, LLC by serving its registered agent, Sameer Lalani, who has been designated as such with the Georgia Secretary of State, at 1040 Indian Trail Rd., Suite B1, Lilburn, GA 30047.

6.      Defendant, Maharaja Investments LLC ("Maharaja"), is a Georgia limited liability company, transacting business in Thomas County, Georgia, authorized to transact business in Georgia by the Secretary of State, and is subject to the jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91.

7.      Service can be made on Maharaja by serving its registered agent, Sahib Arora, who has been designated as such with the Georgia Secretary of State, at 660 Belgrave Lane, Tucker, GA 30084.

8.      Defendant, Crown Assets LLC ("Crown Assets"), is a Georgia limited liability company, transacting business in Thomas County, Georgia, authorized to transact business in

2

Georgia by the Secretary of State, and is subject to the jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91.

9.      Service can be made on Crown by serving its registered agent, Karan S. Ahuja, who has been designated as such with the Georgia Secretary of State, at 7530 St. Marlo Country Club Pkwy., Duluth, GA 30097.

10.     Defendant, Karan Ahuja, is a resident of Fulton  County, Georgia, and is subject to the jurisdiction of this Court.

11.     Service can be made on Karan Ahuja at, upon information and belief, 325 Crooked Stick Drive, Milton, Georgia 30004.

12.     Defendant, Shaneel Lalani, is a resident of DeKalb County, Georgia, and is subject to the jurisdiction of this Court.

13.     Service can be made on Shaneel Lalani at, upon information and belief, 104 Birch St., Decatur, GA 30030.

14.     Defendant, Sameer Lalani, is a resident of DeKalb County, Georgia, and is subject to the jurisdiction of this Court.

15.     Service can be made on Sameer Lalani at, upon information and belief, 2000 Embassy Walk Lane, Lilburn, GA 30047.

16.     Defendant, Charanjeev Singh, is a resident of Fulton County, Georgia, and is subject to the jurisdiction of this Court.

17.     Service can be made on Charanjeev Singh at, upon information and belief, 325 Crooked Stick Drive, Milton, Georgia 30004.

18.     Defendant, Vineet Singh, is on information and belief a resident of DeKalb County, Georgia, and is subject to the jurisdiction of this Court.

3

19.     Service can be made on Vineet Singh at, upon information and belief, 660 Belgrave Lane, Tucker, Georgia 30084.

20.     Defendant, Sahib Arora, is on information and belief a resident of DeKalb County, Georgia, and is subject to the jurisdiction of this Court

21.     Service can be made on Sahib Arora at, upon information and belief, 660 Belgrave Lane, Tucker, Georgia 30084.

22.     Venue is proper in this Court because the property at issue is located in this county and the actions giving rise to this complaint occurred in this county. *See* GA. CONST. 1983, Art. VI, § II, ¶ VI.

23.     All conditions precedent to the bringing of these actions have occurred or otherwise been met or waived.

**GENERAL ALLEGATIONS**

24.     This is an action for declaratory judgment, quiet title, damages, and for the imposition of an equitable lien, brought by the Plaintiff against the above-named Defendants and the Subject Property, defined below.

**Chain of Title to Subject Property**

25.     The real property that is subject to this action is commonly known as 2551 East Pinetree Boulevard, Thomasville, Georgia 31792, and is more fully described by metes and bounds in Exhibit "A" to this Complaint's **Exhibit 1,** below (the "Subject Property").

26.     On or about July 15, 2019, 2551 East Pinetree Boulevard Holdings, LLC, a Maryland limited liability company, conveyed, by Limited Warranty Deed, a 50% interest to Maharaja, and a 50% interest to Borrower in the Subject Property. The deed was recorded in

4

Deed Book 2231, Pages 177-183, Thomas County, Georgia. A true and correct copy is attached hereto as **Exhibit 1**.

27.     On or about August 19, 2019, Charanjeev Singh, as Authorized Signor on behalf of Maharaja conveyed its 50% interest in the Subject Property, by Quitclaim Deed, to Crown Assets (the "Challenged Deed"). The Challenged Deed was recorded in Deed Book 2237, Pages 424-28, Thomas County, Georgia. A true and correct copy of the Challenged Deed is attached hereto as **Exhibit 2**.

28.     Recorded along with the Challenged Deed is a Certified Resolution and Incumbency Certificate of Maharaja Investment LLC (the "Maharaja Resolution") purporting to authorize Charanjeev Singh as an Authorized Signor to carry out the sale of the Subject Property to Crown Assets. A true and correct copy of the Maharaja Resolution is attached hereto as **Exhibit 3**.

29.     The Maharaja Resolution evidences that Vineet Singh had a 100% membership interest and designated Charanjeev Singh as the Authorized Person acting on behalf of Maharaja.

30.     Thereafter, on or about January 16, 2020, Karan Ahuja, as Sole Member on behalf Crown Assets, conveyed by Limited Warranty Deed, all of its interest in the Subject Property to Borrower thereby vesting Borrower with a 100% fee simple interest in the Subject Property. The deed was recorded in Deed Book 2267, Pages 189-194, Thomas County, Georgia. A true and correct copy of the deed is attached hereto as **Exhibit 4**.

<u>**The Challenged Deed**</u>

31.     Sahib Arora ("Dr. Arora") only now disputes the effectiveness of the Challenged Deed by which Maharaja transferred its 50% interest in the Subject Property to Crown Assets that in turn transferred it to the Borrower.

5

32.    Maharaja was formed as a Georgia limited liability company on June 9, 2019.

33.    Vineet Singh organized Maharaja and was designated as its Registered Agent.

34.    On April 30, 2020, Dr. Arora filed an annual registration for Maharaja and changed its registered agent from Vineet Singh to Dr. Arora. The principal and registered addresses remained the same.

35.    At all material times, Dr. Arora was not a member and did not otherwise hold an ownership interest in Maharaja.

36.    Dr. Arora alleges that Maharaja transferred its 50% interest in the Subject Property to Crown Assets via the Challenged Deed for no consideration and without authority of Maharaja.

37.    On information and belief, the members of the defendant entities and the individual defendants are related and this dispute arises from broader business/family disagreements among several entities and individuals.

38.    Between July 12, 2019, and August 13, 2019, all prior to the Challenged Deed, Dr. Arora requested that his attorney prepare documents to effectuate certain transfers and settlements.[1]

39.    For instance, Dr. Arora stated that "50% interest in properties will [sic] transferred to Crown Assets, LLC."

---

[1] Plaintiff does not attach copies of these emails as exhibits to the complaint to avoid any claims of impermissible disclosure of attorney-client communications; though, Plaintiff notes that any privilege claims have been waived by virtue of the inclusion of third parties on the emails and/or the subsequent transmission of the emails to Plaintiff. Therefore, Plaintiff may introduce and rely upon the contents of those emails as evidence in these proceedings.

6

40.     And, on August 13, 2019, a mere six days before the Challenged Deed, Dr. Arora asked his attorney to "prepare quit claim deed for following properties" that included the Subject Property.

41.     Thus, Dr. Arora's dispute appears to be one of compensation between members of a limited liability company or interrelated companies and does not arise from a lack of Charanjeev Singh's technical authority on behalf of Maharaja to execute the Challenged Deed.

42.     On June 5, 2020, Dr. Arora and Vineet Singh recorded affidavits in the public records of Thomas County, Georgia, at Book 2297, Pages 321-324, and Book 2297, Pages 325-328, respectively, directly challenging Borrower's title to the Subject Property and asserting that Plaintiff's Security Deed only pertains to a one-half interest in the Subject Property. True and correct copies of the affidavits are attached hereto as **Composite Exhibit 5.**

### Loan to Borrower

43.     On or about January 16, 2020, Shaneel Lalani as Member on behalf of Borrower executed and delivered a Promissory Note (the "Note") in the principal amount of $1,537,942.00 to TC Federal Bank. A true and correct copy of the Note is attached hereto as **Exhibit 6**.

44.     The loan was further governed by a Business Loan Agreement and a Construction Loan Agreement, true and correct copies of which are attached hereto as **Composite Exhibit 7**.

45.     Also on or about January 16, 2020, and in order to secure the indebtedness evidenced by the Note, Borrower executed and delivered a Security Deed (the "Security Deed") to TC Federal Bank. The Security Deed is recorded in Deed Book 2267, Pages 195-207, Thomas County, Georgia. A true and correct copy of the Security Deed is attached hereto as **Exhibit 8**.

46.     As additional collateral to secure repayment of the Note, Borrower executed and delivered to TC Federal Bank an Assignment of Leases and Rents (the "Assignment"). The

7

Assignment is recorded in Deed Book 2267, Pages 208-216, Thomas County, Georgia. A true and correct copy of the Assignment is attached hereto as **Exhibit 9**.

47.     Plaintiff also perfected a security interest in certain personal property by recording a UCC-1 Financing Statement in Deed Book 2267, Pages 217-222, Thomas County, Georgia. A true and correct copy of the UCC-1 is attached hereto as **Exhibit 10**.

48.     Plaintiff additionally procured commercial loan guaranties from each member of the Borrower, Karan Ahuja, Shaneel Lalani, and Sameer Lalani, in addition to a guaranty from Crown Assets.  True and correct copies of the guaranties are attached hereto as **Composite Exhibit 11**.

49.     The documents delivered to Plaintiff by Borrower and the guarantors in connection with the described loan including, without limitation, the documents attached as exhibits hereto (collectively, the "Loan Documents") arise from a construction loan for the improvement of a strip mall.

50.     The Loan Documents provide for advances as the construction proceeds.

51.     Borrower presently requires additional advances to improve certain tenant space, such tenant and its rents being instrumental to the success of the venture.

52.     Pursuant to the Loan Documents, Plaintiff may refuse additional advances if the Borrower's ownership is called into question.

53.     Plaintiff is presently unable to determine the appropriateness of future advances in the face of challenges to its security for the loan and Plaintiff's interests will be negatively impacted without direction from the Court.

54.     Plaintiff is the current owner and holder of the Loan Documents.

## COUNT I – DECLARATORY JUDGMENT

55.    This is an action for declaratory judgment pursuant to O.C.G.A. § 9-4-2 directed to all parties to this case.

56.    Plaintiff re-alleges and herein incorporates by reference the allegations contained in Paragraphs 1 through 54, above.

57.    This case involves an actual controversy of a justiciable nature between the parties.

58.    There is a bona-fide, actual, present, practical need for a declaration of the parties' rights, obligations, legal status, interest and title to the Subject Property and, by necessity, a declaration of Maharaja's authority to deliver the Challenged Deed.

59.    The ends of justice require that the Court make the requested declarations.

**WHEREFORE**, Plaintiff, TC Federal Bank, requests this Court enter its judgment declaring:

(a) Charanjeev Singh acted within the authority granted to him by Maharaja in executing the Contested Deed;

(b) 2551 East Pinetree was fully vested with fee simple title in the Subject Property at the time it executed the Security Deed and other Loan Documents;

(c) Plaintiff permissibly relied on the title of 2551 East Pinetree in the Subject Property in extending the subject loan and Plaintiff's Security Deed encompasses a 100% interest in the Subject Property;

(d) Sahib Arora's, Vineet Singh's and Maharaja's claims do not impact, void, invalidate, or otherwise call into question the effectiveness of the Security Deed; and

(e) Such other and further relief as the Court may deem just and proper.

9

## COUNT II – QUIET TITLE

60.     This is an action pursuant to Section 23-3-60, O.C.G.A., *et seq.*, to quiet title to the Subject Property in Borrower and Plaintiff to the exclusion of Maharaja.

61.     The Court has jurisdiction over this matter pursuant to Section 23-3-62(a), O.C.G.A.

62.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 54, above.

63.     Plaintiff's verification is incorporated by reference and is included at the end of the pleading prior to the exhibits.

64.     The Subject Property is specifically described by metes as bounds as follows:

**All that tract or parcel of land lying and being in the District of Thomas County, Georgia, and being more particularly described as follows:**

**All that tract of parcel of land situate, lying and being in the City of Thomasville, Thomas County, Georgia, and more particularly described according to a plat of survey prepared for Pinetree Center, L.P., by Frank E Carlton, Georgia Registered Land Surveyor No. 1544, dated December 21, 1992, revised February 15, 1993 and May 17, 1993; and recorded in Plat Cabinet 2, Folio 59-E, among the Deed Records of Thomas County, Georgia, and being more particularly identified as a part of Parcel No. 4, containing an aggregate of 5.296 Acres, reference to which plat of survey is made for a more particular description by metes and bounds and courses and distances as set forth thereon, befog more particularly described as follows:**

**To reach the point of beginning commence at the intersection of the Southeast margin of the right of way of Remington Avenue with the Southwest margin of the right of way of Pinetree Boulevard if such rights of way were extended to intersect at a point and run thence South 60 degrees 35 minutes West along the Southeast margin of the right of way of Remington Avenue a distance of 269.00 feet; run thence South 17 degrees 12 minutes 18 seconds East a distance of 368.11 feet to the point of beginning. From said point of beginning, run thence North 72 degrees 46 minutes 36 seconds East a distance of 234.99 feet; run thence North 60 degrees 21 minutes 34 seconds East a distance of 79.80 feet to the Southwest margin of the right of way of Pine Tree Boulevard; run thence Eastward along the curvature of the Southwest margin of the right of way of Pine Tree Boulevard an arc distance**

of 213.10 feet to a point which point lies along a chord bearing South 27 degrees 00 minutes 29 seconds east a chord distance of 213.09 feet; run thence South 28 degrees 23 minutes 25 seconds East along the Southwest margin of Pine Tree Boulevard a distance of 241.65 feet; run thence South 61 degrees 36 minutes 35 seconds West a distance of 200.00 feet; run thence South 28 degrees 23 minutes 25 seconds East a distance of 257.41 feet; run thence South 45 degrees 35 minute 39 seconds West a distance of 128.88 feet; run thence South 88 degrees 47 minutes 24 seconds West a distance of 141.80 feet; run thence North 17 degrees 12 minutes 18 seconds East a distance of 740.71 feet to the point of beginning and containing 5.296 Acres, more or less.

and

All that tract or parcel of land lying and being in the District of Thomas County, Georgia and being more particularly described as follows:

All that tract or parcel of land situate, lying and being in the City of Thomasville, Thomas County, Georgia, and more particularly described according to a plat of survey prepared for Pinetree Center, L.P., by Frank F. Carlton, Georgia Registered Land Surveyor No. 1544, dated December 21, 1992, revised February 15, 1993, and May 17, 1993, and recorded in Plat Cabinet 2, Folio 59-E, among the Deed Records of Thomas County, Georgia, and being more particularly Identified as Parcel No. 5, containing an aggregate of 5.523 Acres, reference to which Mat of survey is made for a more particular description by metes and bounds and courses and distances as set forth thereon, being more particularly described as follows:

To reach the point of beginning commence at the intersection of the Southeast margin of the right of way of Remington Avenue with the Southwest margin of the right of way of Pinetree Boulevard if such rights of way were extended to intersect at a point and run thence south 60 degrees 35 minutes West along the Southeast margin of the right of way of Remington Avenue a distance of 269.00 feet to the point of beginning. From said point of beginning, run thence South 17 degrees 12 minutes 18 seconds East a distance of 1108.82 feet; run thence South 88 degrees 47 minutes 24 seconds West a distance of 375.35 feet; run thence North 14 degrees 41 minutes 54 seconds West a distance of 533.83 feet; run thence North 60 degrees 35 minutes 00 seconds East a distance of 209.36 feet; run thence along a curve concave to the North (radios 50.00 feet) a chord of North 32 degrees 31 minutes 37 seconds East a distance of 47.03 feet; run thence North 04 degrees 28 minutes 15 seconds East a distance of 130.23 feet; run thence North 17 degrees 12 minutes 18 seconds East a distance of 265.79 feet to the Southeast margin of the right of way of Remington Avenue; ran thence North 60 degrees 35 minutes 00 seconds East along the Southeast margin of the right of way of Remington Avenue a distance of 49.98 feet to the point of beginning and containing 5.523 Acres, more or less.

11

Tax ID: 010 001006

65.    A survey of the Subject Property is attached hereto as **Exhibit 12**.

66.    Plaintiff's estate and interest in the Subject Property is evidenced by the Security Deed and associated Loan Documents.

67.    Dr. Arora, Vineet Singh and Maharaja claim an adverse title interest in the Subject Property that undermines the record estates of Borrower and Plaintiff based on the deeds to Borrower and the Loan Documents.

68.    This alleged adverse interest is evidenced by the recorded affidavits attached hereto as **Composite Exhibit 5**.

69.    The parties to this case are all in one way or another impacted by a determination as to the true state of title in and to the Subject Property, with the cloud on title caused by the recording of **Composite Exhibit 5** directly challenging Borrower's estate, the Plaintiff's estate and the obligations of the Borrower and guarantors.

70.    The names and addresses of those parties are set forth at the outset of this Complaint.

71.    Plaintiff justifiably relied on Borrower's title in extending a loan to the Borrower believing that it held a 100% title interest in the Subject Property.

**WHEREFORE**, Plaintiff, TC Federal Bank, requests this Court enter its judgment quieting title to the Subject Property as against the claims of Dr. Arora, Vineet Singh and Maharaja, declaring:

   (a) Charanjeev Singh acted within the authority granted to him by Maharaja in executing the Contested Deed;

(b) 2551 East Pinetree was fully vested with fee simple title in the Subject Property at the time it executed the Security Deed and other Loan Documents;

(c) Plaintiff permissibly relied on the title of 2551 East Pinetree in the Subject Property in extending the subject loan and Plaintiff's Security Deed encompasses a 100% interest in the Subject Property;

(d) Sahib Arora's, Vineet Singh's and Maharaja's claims do not impact, void, invalidate, or otherwise call into question the effectiveness of the Security Deed; and

(e) Such other and further relief as the Court may deem just and proper.

## COUNT III – EQUITABLE LIEN

72.     This is an action in the alternative to Count I and Count II to establish an equitable lien against the Subject Property to the extent not captured by the Security Deed.

73.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 54, above.

74.     The proceeds from Plaintiff's loan were used in connection with the Subject Property and will act to confer a benefit upon the true owners of the Subject Property, whether the Borrower or the Borrower and Maharaja.

75.     The circumstances are such that it would be inequitable for Maharaja to retain the benefit of the improvements to the Subject Property from the loan proceeds and retain the Subject Property without paying the value thereof.

76.     Plaintiff is entitled to an equitable lien up to the amount of $1,537,942.00 used to make improvements to the Subject Property as against a 100% interest in the Subject Property senior to any other interest in the Subject Property.

13

**WHEREFORE**, Plaintiff, TC Federal Bank, demands judgment establishing an equitable lien on the Subject Property in the amount set forth herein that is senior to the interests of all parties named in this action and all parties making claim since the filing of the lis pendens, plus taxable litigation costs, reasonable attorney fees, and such other and further relief as the Court may deem just and proper.

## COUNT IV – FRAUD AND DECEIT – Charanjeev Singh

77.     This is an action for in the alternative to Count I and Count II, above, for damages against Defendant, Charanjeev Singh, arising from his fraud.

78.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 54, above.

79.     Charanjeev Singh falsely and knowingly represented that he was authorized to execute the Challenged Deed on behalf of Maharaja and then executed the Challanged Deed without authority.

80.     Charanjeev Singh intended that future owners of the Subject Property and lenders to those owners would rely on the Challenged Deed.

81.     Plaintiff justifiably relied on the Challenged Deed in extending a loan to the Borrower believing that it held a 100% title interest in the Subject Property.

82.     Plaintiff has suffered damages as a direct and proximate result of Charanjeev Singh's fraudulent misrepresentations and actions.

**WHEREFORE**, Plaintiff, TC Federal Bank, demands judgment for damages against Charanjeev Singh, plus taxable litigation costs, reasonable attorney fees, and such other and further relief as the Court may deem just and proper.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS –
### Shahib Arora

83.     This is an action in the alternative to Counts III-IV, above, against Defendant, Sahib Arora, for his interference with Plaintiff's contract with 2551 East Pinetree and by extension 2551 East Pinetree's contracts with third parties to this case.

84.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 54, above.

85.     Dr. Arora's dispute arises from distributions to him, or the lack thereof, from certain limited liability companies stemming from the sale of assets and transfers of membership interests in those limited liability companies.

86.     Generally, Dr. Arora alleges that he did not receive the benefit of a bargain between and among himself and other defendants to this case.

87.     Dr. Arora was aware of the Contested Deed but only raised his claims when it appeared that the Borrower's venture may become profitable and provide a source of recovery for his unrelated claims.

88.     Dr. Arora now attacks the Challenged Deed and interrupts Plaintiff's and other's business and contractual relationships, among them those who are third parties to the Contested Deed, to impermissibly address his grievance concerning distribution of certain funds.

89.     Dr. Arora seeks redress of his grievances for distribution of funds through a source to which he has no claim, *i.e.*, the Subject Property.

90.     By email dated April 21, 2020, Dr. Arora stated to Plaintiff that Charanjeev Singh executed the Contested Deed "using a forged resolution" and demanded Plaintiff "not to issue further loan [sic] while investigation is pending and take necessary action."

91.    By letter from his attorney dated April 21,2020, Dr. Arora again alleged fraud in the Borrower's chain of title.

92.    Dr. Arora's allegations presented to Plaintiff were made with the stated intent of preventing future advances on the Borrower's construction loan and disrupting the parties' contractual relationship.

93.    It is clear that Dr. Arora has grievances, but it is also clear that those grievances do not lie against the parties to the Loan Documents or the Borrower's tenants.

94.    It is much less clear, taking Dr. Arora's allegations as true, that he would have standing to assert these claims, particularly as they interfere with rights and obligations of third parties.

95.    All available, executed documents of Maharaja show that Dr. Arora did not have any membership interest in Maharaja at the time of the Contested Deed, further evidence of Dr. Arora's interference with third-party relations in retaliation for an unrelated grievance.

96.    Dr. Arora acted improperly in raising these claims and injecting himself into the Borrower's lending relationship with Plaintiff and the Borrower's relationship with its tenants, including when he filed the affidavit found in **Composite Exhibit 5** in the public records of Thomas County, Georgia.

97.    Dr. Arora did so without any privilege because he is not a party to the Loan Documents or the Borrower's tenant lease contracts.

98.    Dr. Arora acted purposefully, with malice, and with the intent to injure.

99.    Dr. Arora's conduct has induced parties not to continue business relationships with the Borrower.

100.     Plaintiff's obligations to fund the construction loan are governed by the Loan Documents, but the value of its collateral and the ability of the Borrower to pay have been directly and negatively impacted by Dr. Arora's claims.

**WHEREFORE**, Plaintiff, TC Federal Bank, demands judgment for damages against Sahib Arora for his tortious interference with Plaintiff's and the Borrower's contractual relations, plus taxable litigation costs, reasonable attorney fees, and such other and further relief as the Court may deem just and proper.

## COUNT VI - ATTORNEY'S FEES AND EXPENSES OF LITIGATION

101.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 54, above.

102.     Defendants, Sahib Arora, Charanjeev Singh and/or Maharaja Investments, LLC, have acted in bad faith, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense, by, among other things, attempting defraud Plaintiff or interfere with its contractual relationships.

103.     Therefore, pursuant to O.C.G.A. § 13-6-11, Plaintiff is entitled to recover its expenses of litigation, including, without limitation, its reasonable attorney's fees, from said Defendants.

17

Respectfully submitted this 20th day of July, 2020.

CLARK PARTINGTON

*/s/ Ian S. Macdonald*
IAN S. MACDONALD
Georgia Bar No.  799385
imacdonald@clarkpartington.com
CLARK PARTINGTON
106 E. College Ave., Suite 600
Tallahassee, Florida  32301
Phone:   (850) 320-6825
Fax:      (850) 597-7591
*Attorneys for Plaintiff*

18

## IN THE SUPERIOR COURT OF THOMAS COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| TC FEDERAL BANK | ( |
| | ( |
|    Plaintiff, | ( |
| | ( |
| v. | (  Civil Action File No.: _____ |
| | ( |
| 2551 EAST PINETREE BLVD, LLC, a | ( |
| Georgia limited liability company; | ( |
| MAHARAJA INVESTMENTS, LLC, a | ( |
| Georgia limited liability company; | ( |
| CROWN ASSETS, LLC, a Georgia | ( |
| limited liability company; KARAN | ( |
| AHUJA; SHANEEL LALANI; SAMEER | ( |
| LALANI; CHARANJEEV SINGH; | ( |
| VINEET SINGH and SAHIB ARORA | ( |

    Defendants.

### VERIFICATION OF QUIET TITLE COUNT

I, __Greg Eiford_____, am the __President_____

of Plaintiff, am over eighteen years of age and am otherwise competent and qualified to make

this verification on behalf of Plaintiff.   I have reviewed Count II for Quiet Title in the foregoing

Complaint and state that the facts alleged therein are true and correct.

This the 20ᵀᴴ day of July_____, 2020.

_____
for TC FEDERAL BANK

By: Greg Eiford_____

Its: President_____

Sworn to and subscribed before me this 20 day of July_____, 2020.

_____
NOTARY PUBLIC
My commission expires:
(Notary Seal)

19

DOC# 003656
FILED IN OFFICE
7/19/2019  12:11 PM
BK:2231  PG:177-183
RANDA D. WHARTON
CLERK OF SUPERIOR
COURT
THOMAS COUNTY

REAL ESTATE TRANSFER
TAX PAID: $1400.00

After Recording Return To:

Kensington Vanguard National Land Services
39 West 37th Street, 3rd Floor
New York, NY 10018
Attn: Lia Capozzi

PT-61 136-2019-001140

---

## LIMITED WARRANTY DEED

---

**STATE OF GEORGIA** §
§
**COUNTY OF THOMAS** §

**2551 East Pinetree Boulevard Holdings, LLC**, a Maryland limited liability company (**Grantor**), whose mailing address is c/o CWCapital Asset Management LLC, 7501 Wisconsin Avenue, Suite 500 West, Bethesda, Maryland 20814, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged from **Maharaja Investment LLC**, a Georgia limited liability company, as to a 50% interest, and **2551 East Pinetree Blvd LLC**, a Georgia limited liability company, as to a 50% interest (collectively, "**Grantee**"), whose mailing address is 660 Belgrave Lane, Tucker, Georgia 30084, has GRANTED, SOLD AND CONVEYED, and by these presents does GRANT, SELL AND CONVEY, unto Grantee, the following described property:

    (i)    That certain real property in Thomas County, Georgia, which is described on **Exhibit A** attached hereto and incorporated herein by reference (the "Land");

    (ii)    All buildings, structures, utility lines, utility facilities, utility improvements, street and drainage improvements, and other improvements of any kind or nature located in, on, or under the Land (all of the foregoing being referred to herein collectively as the "Improvements"); and

    (iii)    All appurtenances benefiting or pertaining to the Land or the Improvements, including, without limitation, all of Grantor's right, title, and interest in and to all development and utility rights and permits benefiting the Land and all streets, alleys, rights-of-way, or easements adjacent to or benefiting the Land, and all

Certified Copy

SMRH:4837-6541-6347.2                    -1-

RANDA D. WHARTON,
CLERK SUPERIOR COURT
THOMAS COUNTY, GEORGIA
BY

Exhibit "J"

BK:2231   PG:178

strips or pieces of land abutting, bounding, or adjacent to the Land (all of the foregoing being referred to herein collectively as the "Appurtenances").

The Land, Improvements and Appurtenances are collectively referred to herein as the "Property".

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto Grantee, and Grantee's successors or assigns, forever; and, subject to all of the matters set forth or referred to herein, Grantor does hereby bind itself and its successors to WARRANT AND FOREVER DEFEND all and singular the Property unto Grantee, Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof, by, through or under Grantor, but not otherwise; provided, however that this conveyance is made by Grantor and accepted by Grantee subject to: (a) all of the title exceptions revealed in or by the recorded documents and other matters affecting the Property as set forth on **Exhibit B** attached hereto and incorporated herein by reference; and (b) all standby fees, taxes and assessments by any taxing authority for the current and all subsequent years, and all liens securing the payment of any of the foregoing.

GRANTEE ACKNOWLEDGES THAT GRANTOR HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATIONS AS TO THE PHYSICAL CONDITION OF THE PROPERTY, OR ANY OTHER MATTER AFFECTING OR RELATED TO THE PROPERTY. GRANTEE EXPRESSLY AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE PROPERTY IS CONVEYED "AS IS" AND "WITH ALL FAULTS", AND GRANTOR EXPRESSLY DISCLAIMS, AND GRANTEE ACKNOWLEDGES AND ACCEPTS THAT GRANTOR HAS DISCLAIMED, ANY AND ALL REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED (EXCEPT AS TO TITLE AS HEREIN PROVIDED AND LIMITED) CONCERNING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (i) THE VALUE, CONDITION, MERCHANTABILITY, HABITABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE CONSTRUCTION, OF ANY IMPROVEMENTS TO THE PROPERTY; AND (iii) THE MANNER OF REPAIR, QUALITY OF REPAIR, STATE OF REPAIR OR LACK OF REPAIR OF ANY SUCH IMPROVEMENTS. BY GRANTEE'S ACCEPTANCE OF THIS DEED, GRANTEE REPRESENTS THAT GRANTEE HAS MADE (i) ALL INSPECTIONS OF THE PROPERTY TO DETERMINE ITS VALUE AND CONDITION DEEMED NECESSARY OR APPROPRIATE BY GRANTEE, INCLUDING, WITHOUT LIMITATION, INSPECTIONS FOR THE PRESENCE OF ASBESTOS, PESTICIDE RESIDUES, HAZARDOUS WASTE AND OTHER HAZARDOUS MATERIALS AND (ii) INVESTIGATIONS TO DETERMINE WHETHER ANY PORTION OF THE PROPERTY LIES WITHIN ANY FLOOD HAZARD AREA AS DETERMINED BY THE U.S. ARMY CORPS OF ENGINEERS OR OTHER APPLICABLE AUTHORITY.

*[SIGNATURE PAGE FOLLOWS]*

BK:2231   PG:179

**EXECUTED AND DELIVERED,** to be effective as of the 15<u>th</u> day of July, 2019.

GRANTOR:

**2551 East Pinetree Boulevard Holdings, LLC,**
a Maryland limited liability company

By:    U.S. Bank National Association, as Trustee for the
       Registered Holders of CD 2007-CD4 Commercial
       Mortgage Trust, Commercial Mortgage Pass-Through
       Certificates, Series CD 2007-CD4 (the "Trust"), its Sole
       Member/Manager

By:    CWCapital Asset Management LLC, a Delaware limited
       liability company, solely in its capacity as Special
       Servicer for the Trust

By:    _____
Name:
Title:      **Mark Knobloch**
            **Senior Vice President**

Signed, sealed and delivered
In the presence of:

_____
Unofficial Witness

_____
Unofficial Witness

_____
Notary Public, State of Maryland

My commission expires:

[Notarial Seal]

DEANNA L DAWSON
Notary Public-Maryland
Prince George's County
My Commission Expires
October 10, 2021

Prepared by:
Carolyn R. Benson, Esq.
Sheppard Mullin Richter & Hampton LLP
2200 Ross Ave, 24th Floor
Dallas, Texas 75201
(469) 391-7421
File No. 39AV-297589

BK:2231   PG:180

## Exhibit A
## Legal Description

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN THE DISTRICT OF THOMAS COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN THE CITY OF THOMASVILLE, THOMAS COUNTY, GEORGIA, AND MORE PARTICULARLY DESCRIBED ACCORDING TO A PLAT OF SURVEY PREPARED FOR PINETREE CENTER, L.P., BY FRANK E. CARLTON, GEORGIA REGISTERED LAND SURVEYOR NO. 1544, DATED DECEMBER 21, 1992, REVISED FEBRUARY 15, 1993, AND MAY 17, 1993; AND RECORDED IN PLAT CABINET 2, FOLIO 59-E, AMONG THE DEED RECORDS OF THOMAS COUNTY, GEORGIA, AND BEING MORE PARTICULARLY IDENTIFIED AS A PART OF PARCEL NO. 4, CONTAINING AN AGGREGATE OF 5.296 ACRES, REFERENCE TO WHICH PLAT OF SURVEY IS MADE FOR A MORE PARTICULAR DESCRIPTION BY METES AND BOUNDS AND COURSES AND DISTANCES AS SET FORTH THEREON, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO REACH THE POINT OF BEGINNING COMMENCE AT THE INTERSECTION OF THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE WITH THE SOUTHWEST MARGIN OF THE RIGHT OF WAY OF PINETREE BOULEVARD IF SUCH RIGHTS OF WAY WERE EXTENDED TO INTERSECT AT A POINT AND RUN THENCE SOUTH 60 DEGREES 35 MINUTES WEST ALONG THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE A DISTANCE OF 269.00 FEET; RUN THENCE SOUTH 17 DEGREES 12 MINUTES 18 SECONDS EAST A DISTANCE OF 368.11 FEET TO THE POINT OF BEGINNING. FROM SAID POINT OF BEGINNING, RUN THENCE NORTH 72 DEGREES 46 MINUTES 36 SECONDS EAST A DISTANCE OF 234.99 FEET; RUN THENCE NORTH 60 DEGREES 21 MINUTES 34 SECONDS EAST A DISTANCE OF 79.80 FEET TO THE SOUTHWEST MARGIN OF THE RIGHT OF WAY OF PINE TREE BOULEVARD; RUN THENCE ALONG A CURVE CONCAVE TO THE EAST (RADIUS 5714.89 FEET) A CHORD OF SOUTH 60 DEGREES 35 MINUTES EAST ALONG THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE A DISTANCE OF 213.09 FEET; RUN THENCE SOUTH 28 DEGREES 23 MINUTES 25 SECONDS EAST ALONG THE SOUTHWEST MARGIN OF PINE TREE BOULEVARD A DISTANCE OF 241.65 FEET; RUN THENCE SOUTH 61 DEGREES 36 MINUTES 35 SECONDS WEST A DISTANCE OF 200.00 FEET; RUN THENCE SOUTH 28 DEGREES 23 MINUTES 25 SECONDS EAST A DISTANCE OF 257.41 FEET; RUN THENCE SOUTH 45 DEGREES 35 MINUTES 39 SECONDS WEST A DISTANCE OF 128.88 FEET; RUN THENCE NORTH 88 DEGREES 47 MINUTES 24 SECONDS EAST A DISTANCE OF 141.80 FEET; RUN THENCE NORTH 17 DEGREES 12 MINUTES 18 SECONDS EAST A DISTANCE OF 740.71 FEET TO THE POINT OF BEGINNING AND CONTAINING 5.296 ACRES, MORE OR LESS.

AND

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN THE DISTRICT OF THOMAS COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN THE CITY OF THOMASVILLE, THOMAS COUNTY, GEORGIA, AND MORE PARTICULARLY DESCRIBED

BK:2231   PG:181

REVISED FEBRUARY 15, 1993, AND MAY 17, 1993, AND RECORDED IN PLAT CABINET 2, FOLIO 59-E, AMONG THE DEED RECORDS OF THOMAS COUNTY, GEORGIA, AND BEING MORE PARTICULARLY IDENTIFIED AS PARCEL NO. 5, CONTAINING AN AGGREGATE OF 5.523 ACRES, REFERENCE TO WHICH PLAT OF SURVEY IS MADE FOR A MORE PARTICULAR DESCRIPTION BY METES AND BOUNDS AND COURSES AND DISTANCES AS SET FORTH THEREON, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO REACH THE POINT OF BEGINNING COMMENCE AT THE INTERSECTION OF THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE WITH THE SOUTHWEST MARGIN OF THE RIGHT OF WAY OF PINETREE BOULEVARD IF SUCH RIGHTS OF WAY WERE EXTENDED TO INTERSECT AT A POINT AND RUN THENCE SOUTH 60 DEGREES 35 MINUTES WEST ALONG THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE A DISTANCE OF 269.00 FEET TO THE POINT OF BEGINNING. FROM SAID POINT OF BEGINNING, RUN THENCE SOUTH 17 DEGREES 12 MINUTES 18 SECONDS EAST A DISTANCE OF 1108.82 FEET; RUN THENCE SOUTH 88 DEGREES 47 MINUTES 24 SECONDS WEST A DISTANCE OF 375.35 FEET RUN THENCE NORTH 14 DEGREE 41 MINUTES 54 SECONDS WEST A DISTANCE OF 533.83 FEET RUN; THENCE NORTH 60 DEGREES 35 MINUTES 00 SECONDS EAST A DISTANCE OF 209.36 FEET; RUN THENCE ALONG A CURVE CONCAVE TO THE NORTH (RADIUS 50.00 FEET) A CHORD OF NORTH 32 DEGREES 31 MINUTES 37 SECONDS EAST A DISTANCE OF 47.03 FEET; RUN THENCE NORTH 04 DEGREES 28 MINUTES 15 SECONDS EAST A DISTANCE OF 130.23 FEET; RUN THENCE NORTH 17 DEGREES 12 MINUTES 18 SECONDS EAST A DISTANCE OF 265.79 FEET TO THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE; RUN THENCE NORTH 60 DEGREES 35 MINUTES 00 SECONDS EAST ALONG THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE A DISTANCE OF 49.98 FEET TO THE POINT OF BEGINNING AND CONTAINING 5.523 ACRES, MORE OR LESS.

TOGETHER WITH RIGHTS CONTAINED IN CROSS EASEMENT DATED MARCH 20, 1998, BY AND BETWEEN PINETREE CENTER, L.P., A GEORGIA LIMITED PARTNERSHIP, AND THOMASVILLE NATIONAL BANK, A NATIONAL BANKING ASSOCIATION, RECORDED ON MARCH 20, 1998, IN BOOK 622, PAGE 355, AFORESAID RECORDS.

TOGETHER WITH RIGHTS CONTAINED IN CROSS EASEMENT DATED JULY 1, 2003, BY AND BETWEEN PINETREE CENTER, L.P., A GEORGIA LIMITED PARTNERSHIP, AND DANIEL LAND COMPANY, INC., A GEORGIA CORPORATION, RECORDED ON JULY 2, 2003, IN BOOK 1017, PAGE 204, AFORESAID RECORDS.

TOGETHER WITH THE RIGHTS CONTAINED IN DECLARATION OF EASEMENTS, CONDITIONS AND RESTRICTIONS ("DECLARATION") DATED JANUARY 11, 2007, BY PINETREE CENTER INVESTORS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AND PINETREE CENTER LANDS, LLC, A GEORGIA LIMITED LIABILITY COMPANY, RECORDED IN BOOK 1368, PAGE 61, AFORESAID RECORDS.

PARCEL ID: 00100-0001-006-000

BK:2231  PG:182

## Exhibit B
## Permitted Exceptions

1. Terms and conditions of a lease by and between by and between Happy Partners, Inc. ("Landlord") and Publix Super Markets, Inc. ("Tenant"), as disclosed by a Memorandum of Lease recorded April 19, 1993 in Deed Book 380 Page 259, Thomas County, Georgia records. Assignment of Lease, from Happy Partners, Inc. to Pinetree Center, L.P., recorded May 21, 1993 in Deed Book 384 Page 248. Waiver of Restrictive Covenant recorded March 20, 1998 in Deed Book 622 Page 349. Quit-Claim Deed releasing certain property from the lease agreement, recorded July 2, 2003 in Deed Book 1017 Page 190. Subordination, Non-Disturbance and Attornment Agreement, recorded January 18, 2007 in Deed Book 1368 Page 126, aforesaid records.

2. Cross Easement Agreement to Thomasville National Bank, recorded March 20, 1998 in Deed Book 622 Page 355, aforesaid records.

3. Cross Easement Agreement to Daniel Land Company, Inc., recorded July 2, 2003 in Deed Book 1017 Page 204, aforesaid records.

4. Declaration of Easements, Conditions and Restrictions, recorded January 18, 2007 in Deed Book 1368 Page 61, aforesaid records.

5. Terms and conditions of an unrecorded lease to Sally Beauty Supply LLC as evidenced by that certain Subordination, Non-Disturbance and Attornment Agreement, recorded January 18, 2007 in Deed Book 1368 Page 117, aforesaid records.

6. Terms and conditions of an unrecorded lease to Quang Nguyen d/b/a Nail Designs as evidenced by that certain Subordination, Non-Disturbance and Attornment Agreement, recorded January 18, 2007 in Deed Book 1368 Page 134, aforesaid records.

7. Declaration of Covenants & Restrictions, recorded November 5, 2013 in Deed Book 1868 Page 313, aforesaid records.

8. All matters as shown on plat of survey recorded in Plat Book 2 Page 59-E, aforesaid records.

9. Drainage Easement to State Highway Department of Georgia, recorded December 31, 1971 in Deed Book 61 Page 682, aforesaid records.

10. Construction Easement to Department of Transportation, recorded February 28, 1983 in [Deed Book 163 Page 786], aforesaid records.

11. Construction and Maintenance Easement to Department of Transportation recorded February 28, 1983 in Deed Book 163 Page 793, aforesaid records.

12. Construction Easement to Department of Transportation, recorded February 28, 1983 in Deed Book 163 Page 795, aforesaid records.

13. Department of Transportation Construction and Maintenance Easement recorded June 7, 1983 in Deed Book 166 Page 748, aforesaid records.

BK:2231    PG:183

14. Driveway Easement to Department of Transportation, recorded June 7, 1983 in Deed Book 166 Page 754, aforesaid records.

15. Slope/Drainage Easement to City of Thomasville, recorded March 14, 1991 in Deed Book 268 Page 143, aforesaid records.

16. Easement to City of Thomasville, recorded March 14, 1991 in Deed Book 304 Page 43, aforesaid records.

17. Drainage Easement to The City of Thomasville, recorded February 1, 1995 in Deed Book 458 Page 190, aforesaid records.

18. Declaration of Restrictions, recorded July 2, 2003 in Deed Book 1017 Page 195, aforesaid records.

19. Declaration of Restriction, recorded July 2, 3003 in Deed Book 1017 Page 200, aforesaid records.

20. All matters as shown on plat of survey recorded in Plat Book 9 Page O-127, aforesaid records.

21. All matters as shown on plat of survey recorded in Plat Book 1 Page 106-A, aforesaid records.

22. All matters as shown on plat of survey recorded in Plat Book 3 Page 640, aforesaid records.

23. All matters as shown on plat of survey recorded in Plat Book 7 Page 135, aforesaid records.

24. All matters as shown on plat of survey recorded in Plat Book 4 Page 35-C, aforesaid records.

BK:2231   PG:183

14. Driveway Easement to Department of Transportation, recorded June 7, 1983 in Deed Book 166 Page 754, aforesaid records.

15. Slope/Drainage Easement to City of Thomasville, recorded March 14, 1991 in Deed Book 268 Page 143, aforesaid records.

16. Easement to City of Thomasville, recorded March 14, 1991 in Deed Book 304 Page 43, aforesaid records.

17. Drainage Easement to The City of Thomasville, recorded February 1, 1995 in Deed Book 458 Page 190, aforesaid records.

18. Declaration of Restrictions, recorded July 2, 2003 in Deed Book 1017 Page 195, aforesaid records.

19. Declaration of Restriction, recorded July 2, 3003 in Deed Book 1017 Page 200, aforesaid records.

20. All matters as shown on plat of survey recorded in Plat Book 9 Page O-127, aforesaid records.

21. All matters as shown on plat of survey recorded in Plat Book 1 Page 106-A, aforesaid records.

22. All matters as shown on plat of survey recorded in Plat Book 3 Page 640, aforesaid records.

23. All matters as shown on plat of survey recorded in Plat Book 7 Page 135, aforesaid records.

24. All matters as shown on plat of survey recorded in Plat Book 4 Page 35-C, aforesaid records.

## CERTIFIED RESOLUTION AND INCUMBENCY CERTIFICATE
## OF MAHARAJA INVESTMENTS, LLC

I, Vineet Singh hereby certify that: (i) I am the Sole Member of Maharaja Investments LLC, a Georgia limited liability company (the "Company"); (ii) the following is a true and correct copy of a Resolution duly adopted at a special meeting of the Members of the Company (the "Members") held on June 21, 2019 in the membership offices; and (iii) such Resolution has not been repealed, altered or amended and remains in full force and effect as of the date hereof:

WHEREAS, the Members having more than 51% of the membership interest (the "Majority Members") were present at a meeting for the purpose of the approval of the purchase by the Company of their interest in real property with improvement located at 2551 E Pinetree Blvd, Thomasville GA (hereinafter referred to as the "Property")

IT IS HEREBY RESOLVED, that the Majority Members of the Company hereby approve the Purchase of said Property; and

IT IS FURTHER RESOLVED, that CHARANJEEV SINGH, (the "Authorized Person"), is hereby authorized and directed to execute and deliver, on behalf of the Company, such agreements, instruments or documents which he, in his sole and absolute discretion, deem necessary or desirable to facilitate or carry out the Purchase of the Property, including, but not limited to, Settlement Statements, Limited Warranty Deeds, Owners Affidavits, and any and all documents and instruments associated with the Purchase of the Property, and to do such other things as may be required by a national title insurance company in order to issue its owner's and lender's policy of title insurance subject only to the standard exceptions, and that the Company and the Members of the Company shall be bound by all such acts; and

IT IS FURTHER RESOLVED, that the Company hereby ratifies and affirms all of the actions heretofore taken by the Authorized Person and/or the Company in connection with the Purchase of the Property; and

IT IS FURTHER RESOLVED that a national title insurance company shall be entitled to rely on these resolutions until it shall have written notice of the revocation or amendment of these resolutions by its Members.

IT IS FURTHER RESOLVED that the Members ratify action taken to execute such instruments and to do such things as were necessary and proper to enter into a Purchase and Sale Agreement for the sale of the Property; and

IT IS FURTHER RESOLVED, that CHARANJEEV SINGH, as the Authorized Person is authorized to receive on behalf of the Company any and all proceeds disbursed in said transaction, and to endorse checks on behalf of the Company, if applicable;

The undersigned Members further certifies:

Re.SellerResolution.18

Exhibit "K"

1.      that these resolutions and the conduct of the Meeting were in full compliance with and in due observance of the Operating Agreement;

2.      that the Company is a Georgia limited liability company, is in good standing with the Secretary of State's office in the State of Georgia;

3.      that the following is the all of the Majority Members and Managers of the Company and that the signatures set forth opposite the Member or Manager's name is that Member or Managers true and correct signature and their execution shall constitute their consent and adoption to these resolutions:

| Name | Title | Signature |
|------|-------|-----------|
| VINEET SINGH | Sole Member 100% Membership Interest | *vineet singh* Vineet Singh |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Company, effective this 22nd day of June, 2019.

MAHARAJA INVESTMENTS, LLC
**a Georgia limited liability company**

By : *Michelle Morris* (SEAL)
**Vineet Singh, Sole Member**

Re.SellerResolution.18

DEED BOOK 2237 PAGE 424

D2019004218

**BK:2237 PG:424-428**

1049054086
PARTICIPANT ID

FILED IN OFFICE
CLERK OF COURT
08/20/2019 12:47 PM
RANDA D. WHARTON, CLERK
SUPERIOR COURT
THOMAS COUNTY, GA

REAL ESTATE
TRANSFER TAX
PAID: $0.00

PT-61 136-2019-001358

After recording, return
this instrument to:
Brochstein & Bentley, P.C.
3495 Piedmont Road, N.E.
11 Piedmont Center, Suite 330
Atlanta, Georgia 30305
ATTN:

## QUITCLAIM DEED

STATE OF GEORGIA
COUNTY OF FULTON

THIS INDENTURE, made the 19th day of August, in the year two thousand nineteen, between **Maharaja Investment LLC, aka Maharaja Investments LLC**, as party or parties of the first part, hereinafter called Grantor, and **Crown Assets LLC**, as party or parties of the second part, hereinafter called Grantee (the words "Grantor" and "Grantee" to include their respective heirs, successors, and assigns where the context requires or permits).

WITNESSETH that: Grantor, for and in consideration of the sum of One Dollar ($1.00) and other valuable consideration in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, by these presents does hereby remise, convey and forever QUITCLAIM unto the said Grantee, the below described tract or parcel of land more fully and completely described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF BY THIS REFERENCE

TO HAVE AND TO HOLD the said described premises to Grantee, so that neither Grantor nor any person or persons claiming under Grantor shall at any time, by any means or ways, have, claim or demand any right or title to said premises or appurtenances, or any rights thereof.

IN WITNESS WHEREOF, the Grantor has signed and sealed this deed, the day and year above written.

Signed, sealed and delivered in the presence of:

Maharaja Investment LLC
"Grantor"

Witness (Unofficial)

BY: Charanjeev Singh, Authorized Signer    [Seal]

Notary Public

Certified Copy

RANDA D. WHARTON,
CLERK SUPERIOR COURT
THOMAS COUNTY, GEORGIA
BY:

Exhibit "L"

**BK:2237 PG:425**

**Exhibit A**
**Legal Description**

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN THE DISTRICT OF THOMAS COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN THE CITY OF THOMASVILLE, THOMAS COUNTY, GEORGIA, AND MORE PARTICULARLY DESCRIBED ACCORDING TO A PLAT OF SURVEY PREPARED FOR PINETREE CENTER, L.P., BY FRANK E. CARLTON, GEORGIA REGISTERED LAND SURVEYOR NO. 1544, DATED DECEMBER 21, 1992, REVISED FEBRUARY 15, 1993, AND MAY 17, 1993; AND RECORDED IN PLAT CABINET 2, FOLIO 59-E, AMONG THE DEED RECORDS OF THOMAS COUNTY, GEORGIA, AND BEING MORE PARTICULARLY IDENTIFIED AS A PART OF PARCEL NO. 4, CONTAINING AN AGGREGATE OF 5.296 ACRES, REFERENCE TO WHICH PLAT OF SURVEY IS MADE FOR A MORE PARTICULAR DESCRIPTION BY METES AND BOUNDS AND COURSES AND DISTANCES AS SET FORTH THEREON, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO REACH THE POINT OF BEGINNING COMMENCE AT THE INTERSECTION OF THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE WITH THE SOUTHWEST MARGIN OF THE RIGHT OF WAY OF PINETREE BOULEVARD IF SUCH RIGHTS OF WAY WERE EXTENDED TO INTERSECT AT A POINT AND RUN THENCE SOUTH 60 DEGREES 35 MINUTES WEST ALONG THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE A DISTANCE OF 269.00 FEET; RUN THENCE SOUTH 17 DEGREES 12 MINUTES 18 SECONDS EAST A DISTANCE OF 368.11 FEET TO THE POINT OF BEGINNING. FROM SAID POINT OF BEGINNING, RUN THENCE NORTH 72 DEGREES 46 MINUTES 36 SECONDS EAST A DISTANCE OF 234.99 FEET; RUN THENCE NORTH 60 DEGREES 21 MINUTES 34 SECONDS EAST A DISTANCE OF 79.80 FEET TO THE SOUTHWEST MARGIN OF THE RIGHT OF WAY OF PINE TREE BOULEVARD; RUN THENCE ALONG A CURVE CONCAVE TO THE EAST (RADIUS 5714.89 FEET) A CHORD OF SOUTH 60 DEGREES 35 MINUTES EAST ALONG THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE A DISTANCE OF 213.09 FEET; RUN THENCE SOUTH 28 DEGREES 23 MINUTES 25 SECONDS EAST ALONG THE SOUTHWEST MARGIN OF PINE TREE BOULEVARD A DISTANCE OF 241.65 FEET; RUN THENCE SOUTH 61 DEGREES 36 MINUTES 35 SECONDS WEST A DISTANCE OF 200.00 FEET; RUN THENCE SOUTH 28 DEGREES 23 MINUTES 25 SECONDS EAST A DISTANCE OF 257.41 FEET; RUN THENCE SOUTH 45 DEGREES 35 MINUTES 39 SECONDS WEST A DISTANCE OF 128.88 FEET; RUN THENCE NORTH 88 DEGREES 47 MINUTES 24 SECONDS EAST A DISTANCE OF 141.80 FEET; RUN THENCE NORTH 17 DEGREES 12 MINUTES 18 SECONDS EAST A DISTANCE OF 740.71 FEET TO THE POINT OF BEGINNING AND CONTAINING 5.296 ACRES, MORE OR LESS.

AND

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN THE DISTRICT OF THOMAS COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN THE CITY OF THOMASVILLE, THOMAS COUNTY, GEORGIA, AND MORE PARTICULARLY DESCRIBED ACCORDING TO A PLAT OF SURVEY PREPARED FOR PINETREE CENTER, LP., BY FRANK E. CARLTON, GEORGIA REGISTERED LAND SURVEYOR NO. 1544, DATED DECEMBER 21, 1992,

SMRH:4837-6541-6347.2

REVISED FEBRUARY 15, 1993, AND MAY 17, 1993, AND RECORDED IN PLAT CABINET 2, FOLIO 59-E, AMONG THE DEED RECORDS OF THOMAS COUNTY, GEORGIA, AND BEING MORE PARTICULARLY IDENTIFIED AS PARCEL NO. 5, CONTAINING AN AGGREGATE OF 5.523 ACRES, REFERENCE TO WHICH PLAT OF SURVEY IS MADE FOR A MORE PARTICULAR DESCRIPTION BY METES AND BOUNDS AND COURSES AND DISTANCES AS SET FORTH THEREON, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO REACH THE POINT OF BEGINNING COMMENCE AT THE INTERSECTION OF THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE WITH THE SOUTHWEST MARGIN OF THE RIGHT OF WAY OF PINETREE BOULEVARD IF SUCH RIGHTS OF WAY WERE EXTENDED TO INTERSECT AT A POINT AND RUN THENCE SOUTH 60 DEGREES 35 MINUTES WEST ALONG THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE A DISTANCE OF 269.00 FEET TO THE POINT OF BEGINNING. FROM SAID POINT OF BEGINNING, RUN THENCE SOUTH 17 DEGREES 12 MINUTES 18 SECONDS EAST A DISTANCE OF 1108.82 FEET; RUN THENCE SOUTH 88 DEGREES 47 MINUTES 24 SECONDS WEST A DISTANCE OF 375.35 FEET RUN THENCE NORTH 14 DEGREE 41 MINUTES 54 SECONDS WEST A DISTANCE OF 533.83 FEET RUN; THENCE NORTH 60 DEGREES 35 MINUTES 00 SECONDS EAST A DISTANCE OF 209.36 FEET; RUN THENCE ALONG A CURVE CONCAVE TO THE NORTH (RADIUS 50.00 FEET) A CHORD OF NORTH 32 DEGREES 31 MINUTES 37 SECONDS EAST A DISTANCE OF 47.03 FEET; RUN THENCE NORTH 04 DEGREES 28 MINUTES 15 SECONDS EAST A DISTANCE OF 130.23 FEET; RUN THENCE NORTH 17 DEGREES 12 MINUTES 18 SECONDS EAST A DISTANCE OF 265.79 FEET TO THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE; RUN THENCE NORTH 60 DEGREES 35 MINUTES 00 SECONDS EAST ALONG THE SOUTHEAST MARGIN OF THE RIGHT OF WAY OF REMINGTON AVENUE A DISTANCE OF 49.98 FEET TO THE POINT OF BEGINNING AND CONTAINING 5.523 ACRES, MORE OR LESS.

TOGETHER WITH RIGHTS CONTAINED IN CROSS EASEMENT DATED MARCH 20, 1998, BY AND BETWEEN PINETREE CENTER, L.P., A GEORGIA LIMITED PARTNERSHIP, AND THOMASVILLE NATIONAL BANK, A NATIONAL BANKING ASSOCIATION, RECORDED ON MARCH 20, 1998, IN BOOK 622, PAGE 355, AFORESAID RECORDS.

TOGETHER WITH RIGHTS CONTAINED IN CROSS EASEMENT DATED JULY 1, 2003, BY AND BETWEEN PINETREE CENTER, L.P., A GEORGIA LIMITED PARTNERSHIP, AND DANIEL LAND COMPANY, INC., A GEORGIA CORPORATION, RECORDED ON JULY 2, 2003, IN BOOK 1017, PAGE 204, AFORESAID RECORDS.

TOGETHER WITH THE RIGHTS CONTAINED IN DECLARATION OF EASEMENTS, CONDITIONS AND RESTRICTIONS ("DECLARATION") DATED JANUARY 11, 2007, BY PINETREE CENTER INVESTORS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AND PINETREE CENTER LANDS, LLC, A GEORGIA LIMITED LIABILITY COMPANY, RECORDED IN BOOK 1368, PAGE 61, AFORESAID RECORDS.

PARCEL ID: 00100-0001-006-000

BK:2237 PG:427

### CERTIFIED RESOLUTION AND INCUMBENCY CERTIFICATE
### OF MAHARAJA INVESTMENTS, LLC

I, VINEET SINGH hereby certify that: (i) I am the Sole Member of MAHARAJA INVESTMENTS, LLC, a Georgia limited liability company (the "Company"); (ii) the following is a true and correct copy of a Resolution duly adopted at a special meeting of the Members of the Company (the "Members") held on June 21, 2019 in the membership offices; and (iii) such Resolution has not been repealed, altered or amended and remains in full force and effect as of the date hereof:

WHEREAS, the Members having more than 51% of the membership interest (the "Majority Members") were present at a meeting for the purpose of the approval of the sale by the Company of their interest in real property with improvement located at 2551 E Pinetree Blvd, Thomasville, GA 31792 (hereinafter referred to as the "Property"); and

IT IS HEREBY RESOLVED, that the Majority Members of the Company hereby approve the Sale of said Property; and

IT IS FURTHER RESOLVED, that CHARANJEEV SINGH, (the "Authorized Person"), is hereby authorized and directed to execute and deliver, on behalf of the Company, such agreements, instruments or documents which he, in his sole and absolute discretion, deem necessary or desirable to facilitate or carry out the Sale of the Property, including, but not limited to, Settlement Statements, Limited Warranty Deeds, Owners Affidavits, and any and all documents and instruments associated with the Sale of the Property, and to do such other things as may be required by a national title insurance company in order to issue its owner's and lender's policy of title insurance subject only to the standard exceptions, and that the Company and the Members of the Company shall be bound by all such acts; and

IT IS FURTHER RESOLVED, that the Company hereby ratifies and affirms all of the actions heretofore taken by the Authorized Person and/or the Company in connection with the Sale of the Property; and

IT IS FURTHER RESOLVED that a national title insurance company shall be entitled to rely on these resolutions until it shall have written notice of the revocation or amendment of these resolutions by its Members.

IT IS FURTHER RESOLVED that the Members ratify action taken to execute such instruments and to do such things as were necessary and proper to enter into a Purchase and Sale Agreement for the sale of the Property; and

IT IS FURTHER RESOLVED, that CHARANJEEV SINGH, as the Authorized Person is authorized to receive on behalf of the Company any and all proceeds disbursed in said transaction, and to endorse checks on behalf of the Company, if applicable;

VS

Re:SellerResolution.18

## BK:2237 PG:428

1.    that these resolutions and the conduct of the Meeting were in full compliance with and in due observance of the Operating Agreement;

2.    that the Company is a Georgia limited liability company, is in good standing with the Secretary of State's office in the State of Georgia;

3.    that the following is the all of the Majority Members and Managers of the Company and that the signatures set forth opposite the Member or Manager's name is that Member or Managers true and correct signature and their execution shall constitute their consent and adoption to these resolutions:

| Name | Title | Signature |
|------|-------|-----------|
| VINEET SINGH | Sole Member 100% Membership Interest | *Vineet Singh* |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Company, effective this 22nd day of June, 2019.

MAHARAJA INVESTMENTS, LLC
a Georgia limited liability company

By: *Michelle Morris* (SEAL)
Vineet Singh, Sole Member

```
DOC# 000253
FILED IN OFFICE
1/17/2020  05:03 PM
BK:2267  PG:189-194
RANDA D. WHARTON
CLERK OF SUPERIOR
COURT
THOMAS COUNTY
```

*[signature]*

```
REAL ESTATE TRANSFER
TAX PAID: $700.00
```

After recording, return to:
Silvis, Ambrose, Lindquist & Coch, P.C.
P. O. Box 1557
Thomasville, GA 31799-1557

## LIMITED WARRANTY DEED

STATE OF GEORGIA
COUNTY OF THOMAS

**THIS INDENTURE**, made the 16th day of January, in the year of our Lord Two Thousand Twenty (2020) between **CROWN ASSETS, LLC, a Georgia limited liability company**, Party of the First Part, hereinafter referred to as "Grantor", and **2551 EAST PINETREE BLVD, LLC, a Georgia limited liability company**, Party of the Second Part, hereinafter referred to as "Grantee",

### WITNESSETH

**That Grantor**, for and in consideration of the sum of Ten and no/100 ($10.00) Dollars and other good and valuable consideration in hand paid, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the Grantee, its successors and assigns, all of Grantor's 50% undivided interest in and to the following described property to-wit:

All that tract or parcel of land lying and being in the District of Thomas County, Georgia, and being more particularly described as follows:

All that tract of parcel of land situate, lying and being in the City of Thomasville, Thomas County, Georgia, and more particularly described according to a plat of survey prepared for Pinetree Center, L.P., by Frank E Carlton, Georgia Registered Land Surveyor No. 1544, dated December 21, 1992, revised February 15, 1993 and May 17, 1993; and recorded in Plat Cabinet 2, Folio 59-E, among the Deed Records of

Page 1 of 6

Certified Copy

RANDA D. WHARTON.
CLERK SUPERIOR COURT
THOMAS COUNTY GEORGIA
BY: *[signature]*

Exhibit "M"

BK:2267    PG:190

Thomas County, Georgia, and being more particularly identified as a part of Parcel No. 4, containing an aggregate of 5.296 Acres, reference to which plat of survey is made for a more particular description by metes and bounds and courses and distances as set forth thereon, being more particularly described as follows:

To reach the POINT OF BEGINNING commence at the intersection of the southeast margin of the right of way of Remington Avenue with the southwest margin of the right of way of Pinetree Boulevard if such rights of way were extended to intersect at a point and run thence south 60 degrees 35 minutes west along the southeast margin of the right of way of Remington Avenue a distance of 269.00 feet; run thence south 17 degrees 12 minutes 18 seconds east a distance of 368.11 feet to the POINT OF BEGINNING. From said POINT OF BEGINNING, run thence north 72 degrees 46 minutes 36 seconds east a distance of 234.99 feet; run thence north 60 degrees 21 minutes 34 seconds east a distance of 79.80 feet to the southwest margin of the right of way of Pine Tree Boulevard; run thence eastward along the curvature of the southwest margin of the right of way of Pine Tree Boulevard an arc distance of 213.10 feet to a point which point lies along a chord bearing south 27 degrees 00 minutes 29 seconds east a chord distance of 213.09 feet; run thence south 28 degrees 23 minutes 25 seconds east along the southwest margin of Pine Tree Boulevard a distance of 241.65 feet; run thence south 61 degrees 36 minutes 35 seconds west a distance of 200.00 feet; run thence south 28 degrees 23 minutes 25 seconds east a distance of 257.41 feet; run thence south 45 degrees 35 minutes 39 seconds west a distance of 128.88 feet; run thence south 88 degrees 47 minutes 24 seconds west a distance of 141.80 feet; run thence north 17 degrees 12 minutes 18 seconds east a distance of 740.71 feet to the POINT OF BEGINNING and containing 5.296 Acres, more or less.

AND

All that tract or parcel of land lying and being in the District of Thomas County, Georgia and being more particularly described as follows:

All that tract or parcel of land situate, lying and being in the City of Thomasville, Thomas County, Georgia, and more particularly described according to a plat of survey prepared for Pinetree Center, L.P., by Frank E Carlton, Georgia Registered Land Surveyor No. 1544, dated December 21, 1992, revised February 15, 1993, and May 17, 1993, and recorded in Plat Cabinet 2, Folio 59-E, among the Deed Records of Thomas County, Georgia, and being more particularly identified as Parcel No. 5, containing an aggregate of 5.523 Acres, reference to which plat of survey is made for a more particular description by metes and bounds and courses and distances as set forth thereon, being more particularly described as follows:

To reach the POINT OF BEGINNING commence at the intersection of the southeast

margin of the right of way of Remington Avenue with the southwest margin of the right of way of Pinetree Boulevard if such rights of way were extended to intersect at a point and run thence south 60 degrees 35 minutes west along the southeast margin of the right of way of Remington Avenue a distance of 269.00 feet to the POINT OF BEGINNING.  From said POINT OF BEGINNING, run thence south 17 degrees 12 minutes 18 seconds east a distance of 1108.82 feet; run thence south 88 degrees 47 minutes 24 seconds west a distance of 375.35 feet; run thence north 14 degrees 41 minutes 54 seconds west a distance of 533.83 feet; run thence north 60 degrees 35 minutes 00 seconds east a distance of 209.36 feet; run thence along a curve concave to the north (radius 50.00 feet) a chord of north 32 degrees 31 minutes 37 seconds east a distance of 47.03 feet; run thence north 04 degrees 28 minutes 15 seconds east a distance of 130.23 feet; run thence north 17 degrees 12 minutes 18 seconds east a distance of 265.79 feet to the southeast margin of the right of way of Remington Avenue; run thence north 60 degrees 35 minutes 00 seconds east along the southeast margin of the right of way of Remington Avenue a distance of 49.98 feet to the POINT OF BEGINNING and containing 5.523 Acres, more or less.

Together with rights contained in Cross Easement dated March 20, 1998, by and between Pinetree Center, L.P., a Georgia limited partnership, and Thomasville National Bank, a National Banking Association, recorded on March 20, 1998, in Book 622, Page 355, aforesaid Records.

Together with rights contained in Cross Easement dated July 1, 2003, by and between Pinetree Center, L.P., a Georgia limited partnership, and Daniel Land Company, Inc., a Georgia corporation, recorded on July 2, 2003, in Book 1017, Page 204, aforesaid Records.

Together with the rights contained in Declaration of Easements, Conditions and Restrictions ("Declaration") dated January 11, 2007, by Pinetree Center Investors, LLC, a Delaware limited liability company, and Pinetree Center Lands, LLC, a Georgia limited liability company, recorded in Book 1368, Page 61, aforesaid Records.

The above described property is subject to the following:

1.  Cross Easement Agreement to Thomasville National Bank, recorded March 20, 1998 in Deed Book 622 Page 355, aforesaid records.

2.  Cross Easement Agreement to Daniel Land Company, Inc., recorded July 2, 2003 in Deed Book 1017 Page 204, aforesaid records.

3.  Declaration of Easements, Conditions and Restrictions, recorded January 18, 2007 in Deed Book 1368 Page 61, aforesaid records.

BK:2267   PG:192

4.   Terms and conditions of an unrecorded lease to Sally Beauty Supply LLC as evidenced by that certain Subordination, Non-Disturbance and Attornment Agreement, recorded January 18, 2007 in Deed Book 1368 Page 117, aforesaid records.

5.   Declaration of Covenants & Restrictions, recorded November 5, 2013 in Deed Book 1868 Page 313, aforesaid records.

6.   All matters as shown on plat of survey recorded in Plat Book 2 Page 59-E, aforesaid records.

7.   Construction Easement to Department of Transportation, recorded February 28, 1983 in Deed Book 163 Page 786, aforesaid records.

8.   Slope/Drainage Easement to City of Thomasville, recorded March 14, 1991 in Deed Book 268 Page 143, aforesaid records.

9.   Easement to City of Thomasville, recorded March 14, 1991 in Deed Book 304 Page 43, aforesaid records.

10.   Declaration of Restrictions, recorded July 2, 2003 in Deed Book 1017 Page 195, aforesaid records.

11.   Declaration of Restriction, recorded July 2, 2003 in Deed Book 1017 Page 200, aforesaid records.

12.   All matters as shown on plat of survey recorded in Plat Book 9 Page O-127, aforesaid records.

13.   All matters as shown on plat of survey recorded in Plat Book 1 Page 106-A, aforesaid records.

14.   All matters as shown on plat of survey recorded in Plat Book 3 Page 640, aforesaid records.

15.   All matters as shown on plat of survey recorded in Plat Book 7 Page 135, aforesaid records.

16.   All matters as shown on plat of survey recorded in Plat Book 4 Page 35-C, aforesaid records.

BK:2267   PG:193

17. The terms and conditions of an unrecorded lease between 2551 East Pinetree Boulevard Holdings, LLC, and T Owens Companies LLC, Tenant, which Tenant is doing business as Totspot Play Center.

18. The terms and conditions of an unrecorded lease between 2551 East Pinetree Boulevard Holdings, LLC, and Santobe's LLC, Tenant, which Tenant is doing business as Santobes Soul Food Restaurant.

19. The terms and conditions of an unrecorded lease between 2551 East Pinetree Boulevard Holdings, LLC, and Quang Nguyen, Tenant, which Tenant is doing business as Nail Designs.

20. The terms and conditions of an unrecorded lease between Pinetree Center Investors, LLC, and United States of America, acting by and through the USDA Farm Service Agency, Tenant, which lease has been assigned to successor Landlord, 2551 East Pinetree Boulevard Holdings, LLC, pursuant to that Lease Assumption Agreement between Pinetree Center Investors, LLC, Transferor; 2551 East Pinetree Boulevard Holdings, LLC c/o CWCapital Asset Management LLC, Transferee; and the United States of America, acting by and through the Secretary of Agriculture, Government.

21. The terms and conditions of an unrecorded lease between 2551 East Pinetree Blvd, LLC, and Ollie's Bargain Outlet, Inc., Tenant.

Map Parcel No.: 00100-0001-006-000.

Year 2020 City and County taxes shall be the responsibility of the Grantee when due and payable.

**TO HAVE AND TO HOLD** the said above granted and described property, together with all and singular the rights, members and appurtenances thereof, to the same being, belonging or in anywise appertaining to, the only proper use, benefit and behoof of the said Grantee, its successors and assigns, in Fee Simple;

**AND THE SAID GRANTOR** will warrant and forever defend the right and title to the above-described property unto the said Grantee, its successors and assigns, against the lawful claims of all persons whomsoever claiming by, through or under Grantor only and not otherwise.

The remainder of this page intentionally left blank.

BK=2267   PG=194

**IN WITNESS WHEREOF** the said Grantor has hereunto caused these presents to be executed, sealed and delivered by its undersigned officer, the day and year first above written.

CROWN ASSETS, LLC,
a Georgia limited liability company

By: _____
Karan Ahuja, Sole Member

Signed, sealed and delivered by
Crown Assets, LLC, by its duly
authorized officer in the presence of
us in Thomas County, Georgia:

_____
Witness

_____
Notary Public
My Commission Expires:
(NOTARY SEAL AFFIXED)

AARON COCH
NOTARY
EXPIRES
GEORGIA
FEBRUARY 14, 2023
PUBLIC
THOMAS COUNTY

Page 6 of 6

DEED BOOK 2267 PAGE 1
DOC# 000252 185
FILED IN OFFICE
1/17/2020  05:03 PM
BK:2267  PG:185-188
RANDA D. WHARTON
CLERK OF SUPERIOR
COURT
THOMAS COUNTY

After recording, return to:
Silvis, Ambrose, Lindquist & Coch, P.C.
P. O. Box 1557
Thomasville, GA 31799-1557

## AFFIDAVIT OF POSSESSION

**STATE OF GEORGIA**
**COUNTY OF THOMAS**

**PROPERTY DESCRIPTION:**

All that tract or parcel of land lying and being in the District of Thomas County, Georgia, and being more particularly described as follows:

All that tract of parcel of land situate, lying and being in the City of Thomasville, Thomas County, Georgia, and more particularly described according to a plat of survey prepared for Pinetree Center, L.P., by Frank E Carlton, Georgia Registered Land Surveyor No. 1544, dated December 21, 1992, revised February 15, 1993 and May 17, 1993; and recorded in Plat Cabinet 2, Folio 59-E, among the Deed Records of Thomas County, Georgia, and being more particularly identified as a part of Parcel No. 4, containing an aggregate of 5.296 Acres, reference to which plat of survey is made for a more particular description by metes and bounds and courses and distances as set forth thereon, being more particularly described as follows:

To reach the POINT OF BEGINNING commence at the intersection of the southeast margin of the right of way of Remington Avenue with the southwest margin of the right of way of Pinetree Boulevard if such rights of way were extended to intersect at a point and run thence south 60 degrees 35 minutes west along the southeast margin of the right of way of Remington Avenue a distance of 269.00 feet; run thence south 17 degrees 12 minutes 18 seconds east a distance of 368.11 feet to the POINT OF BEGINNING. From said POINT OF BEGINNING, run thence north 72 degrees 46 minutes 36 seconds east a distance of 234.99 feet; run thence north 60 degrees 21 minutes 34 seconds east a distance of 79.80 feet to the southwest margin of the right of way of Pine Tree Boulevard; run thence

Page 1 of 4

Certified Copy

RANDA D. WHARTON,
CLERK SUPERIOR COURT
THOMAS COUNTY GEORGIA
BY:

Exhibit "N"

BK:2267   PG:186

eastward along the curvature of the southwest margin of the right of way of Pine Tree Boulevard an arc distance of 213.10 feet to a point which point lies along a chord bearing south 27 degrees 00 minutes 29 seconds east a chord distance of 213.09 feet; run thence south 28 degrees 23 minutes 25 seconds east along the southwest margin of Pine Tree Boulevard a distance of 241.65 feet; run thence south 61 degrees 36 minutes 35 seconds west a distance of 200.00 feet; run thence south 28 degrees 23 minutes 25 seconds east a distance of 257.41 feet; run thence south 45 degrees 35 minutes 39 seconds west a distance of 128.88 feet; run thence south 88 degrees 47 minutes 24 seconds west a distance of 141.80 feet; run thence north 17 degrees 12 minutes 18 seconds east a distance of 740.71 feet to the POINT OF BEGINNING and containing 5.296 Acres, more or less.

AND

All that tract or parcel of land lying and being in the District of Thomas County, Georgia and being more particularly described as follows:

All that tract or parcel of land situate, lying and being in the City of Thomasville, Thomas County, Georgia, and more particularly described according to a plat of survey prepared for Pinetree Center, L.P., by Frank E Carlton, Georgia Registered Land Surveyor No. 1544, dated December 21, 1992, revised February 15, 1993, and May 17, 1993, and recorded in Plat Cabinet 2, Folio 59-E, among the Deed Records of Thomas County, Georgia, and being more particularly identified as Parcel No. 5, containing an aggregate of 5.523 Acres, reference to which plat of survey is made for a more particular description by metes and bounds and courses and distances as set forth thereon, being more particularly described as follows:

To reach the POINT OF BEGINNING commence at the intersection of the southeast margin of the right of way of Remington Avenue with the southwest margin of the right of way of Pinetree Boulevard if such rights of way were extended to intersect at a point and run thence south 60 degrees 35 minutes west along the southeast margin of the right of way of Remington Avenue a distance of 269.00 feet to the POINT OF BEGINNING. From said POINT OF BEGINNING, run thence south 17 degrees 12 minutes 18 seconds east a distance of 1108.82 feet; run thence south 88 degrees 47 minutes 24 seconds west a distance of 375.35 feet; run thence north 14 degrees 41 minutes 54 seconds west a distance of 533.83 feet; run thence north 60 degrees 35 minutes 00 seconds east a distance of 209.36 feet; run thence along a curve concave to the north (radius 50.00 feet) a chord of north 32 degrees 31 minutes 37 seconds east a distance of 47.03 feet; run thence north 04 degrees 28 minutes 15 seconds east a distance of 130.23 feet; run thence north 17 degrees 12 minutes 18 seconds east a distance of 265.79 feet to the southeast margin of the right of way of Remington Avenue; run thence north 60 degrees 35 minutes 00 seconds east along the southeast margin of the right of way of Remington Avenue a distance of 49.98 feet to the POINT OF BEGINNING and containing 5.523 Acres, more or less.

BK:2267   PG:187

## DEED REFERENCES:

1.  Limited Warranty Deed from 2551 East Pinetree Boulevard Holdings, LLC, a Maryland limited liability company, dated July 15, 2019, and recorded on July 19, 2019, in Deed Book 2231, Pages 177-183, Thomas County, Georgia, conveying a 50% interest in the above-described property to 2551 East Pinetree Blvd LLC, a Georgia limited liability company and a 50% interest in the above-described property to Maharaja Investment LLC, a Georgia limited liability company.

2.  Quitclaim Deed from Maharaja Investment LLC, aka Maharaja Investments LLC, dated August 19, 2019, and recorded on August 20, 2019, in Deed Book 2237, Pages 424-428, Thomas County, Georgia, conveying a 50% interest in the above-described property to Crown Assets, LLC a Georgia limited liability company.

3.  Memorandum of Lease between Happy Partners, Inc. ("Landlord") and Publix Super Markets, Inc. ("Tenant") recorded April 19, 1993 in Deed Book 380, Page 259, Thomas County, Georgia records.  Assignment of Lease, from Happy Partners, Inc. to Pinetree Center, L.P., recorded May 21,1993 in Deed Book 384 Page 248.  Subordination, Non-Disturbance and Attornment Agreement, recorded January 18, 2007 in Deed Book 1368, Page 126, aforesaid records

### AFFIDAVIT

Before the undersigned officer(s) authorized to administer oaths, personally appeared KARAN AHUJA, SAMEER LALANI and SHANEEL LALANI (hereinafter collectively referred to as "Affiants") who, being duly sworn, testified as follows:

1.      KARAN AHUJA, SAMEER LALANI AND SHANEEL LALANI are all the Members of 2551 EAST PINETREE BLVD, LLC, a Georgia limited liability company.

2.      KARAN AHUJA is the Sole Member of CROWN ASSETS, LLC, a Georgia limited liability company.

3.      2551 EAST PINETREE BLVD, LLC, a Georgia limited liability company, received title to a 50% undivided interest in the above-described property on July 15, 2019 by virtue of the deed of conveyance referenced in Item 1, above.

4.      CROWN ASSETS, LLC, a Georgia limited liability company, received title to a 50% undivided interest in the above-described property on August 19, 2019 by virtue of the deed of conveyance referenced in Item 2, above.

5.      Affiants state and testify based on their personal knowledge and inspection of the above-described property that Publix Super Markets, Inc. is not a current tenant in poseession of any portion of the abovedescribed property, that Publix Super Markets, Inc., does not have a present

BK:2267   PG:188

leasehold interest in any portion of the abovedescribed property, and that Publix Super Markets, Inc., has not been in possession of any portion of the abovedescribed property during anytime that the Affiant's respective LLCs, 2551 EAST PINETREE BLVD, LLC and CROWN ASSETS, LLC, have held title to the abovedescribed property.

6.      This affidavit is given to place these facts on record with regard to the above-described property; and Affiants understand that the law firm of SILVIS, AMBROSE, LINDQUIST & COCH, P.C.; Lender TC FEDERAL BANK ISAOA ATIMA; and FIRST AMERICAN TITLE INSURANCE COMPANY; and others interested in the title to the above-described property will rely on the truth of the statements contained herein.

7.      Further Affiants sayeth not.

Witness our hands and seals this 16th day of January 2020.


_____ (SEAL)
KARAN AHUJA


_____ (SEAL)
SAMEER LALANI


_____ (SEAL)
SHANEEL LALANI


Sworn to and subscribed before me
by the above-described affiants.

_____
NOTARY PUBLIC
My Commission Expires:
(Notary Seal Affixed)



Page 4 of 4

DEED BOOK 2267 PAGE

DOC# 000254 195
FILED IN OFFICE
1/17/2020   05:03 PM
BK:2267   PG:195-207
RANDA D. WHARTON
CLERK OF SUPERIOR
COURT
THOMAS COUNTY

GEORGIA INTANGIBLE
TAX PAID: $4614.00

**RECORDATION REQUESTED BY:**

**WHEN RECORDED MAIL TO:**

SALL

## SECURITY DEED

**MAXIMUM LIEN.** The lien of this Security Deed shall not exceed at any one time $3,075,884.00.

**THIS SECURITY DEED** dated January 16, 2020, is made and executed between 2551 East Pinetree Blvd, LLC,m a Georgia Limited Liability Company  , whose address is 1040 Indian Trail Road, Suite B1, Lilburn, GA 30047 (referred to below as "Grantor") and TC FEDERAL BANK, whose address is P O Box 1197, Thomasville, GA 31799 (referred to below as "Lender").

**GRANT OF SECURITY DEED.** FOR AND IN CONSIDERATION of the financial accommodations to Grantor by Lender resulting in the obligation which is hereinafter more particularly described, and in order to secure that obligation, Grantor hereby grants, bargains, conveys, transfers, assigns and sells to Lender, with power of sale, all of Grantor's right, title, and interest in and to the following described real property:  The Real Property is located in  Thomas  County, State of Georgia and is described as follows:

See See Exhibit "A" , which is attached to this Security Deed and made a part of this Security Deed as if fully set forth herein.

TOGETHER WITH ANY AND ALL of the following:  (i) all buildings, structures and improvements now or hereafter located on the real property or on any part or parcel thereof and all fixtures affixed or attached, actually or constructively, thereto; (ii) all and singular the tenements, hereditaments, easements and appurtenances belonging thereunto or in any wise appertaining thereto and the reversion and reversions, remainder or remainders thereof;  (iii) all Rents accruing therefrom, whether now or hereafter due;  (iv) all accounts and contract rights now or hereafter arising in connection with any part or parcel thereof or any buildings, structures or improvements now or hereafter located thereon, including without limitation all accounts and contract rights in and to all leases or undertakings to lease now or hereafter affecting the land or any buildings, structures, or improvements thereon;  (v) all minerals, flowers, crops, trees, timber, shrubbery and other emblements now or hereafter located thereon or thereunder or on or under any part or parcel thereof;  (vi) all estates, rights, title and interest therein, or in any part or parcel thereof;  (vii) all equipment, machinery, apparatus, fittings, fixtures, furniture, furnishings, mobile homes, modular homes and all personal property of every kind or description whatsoever now or hereafter located thereon, or in or on the buildings, structures and improvements thereon, and used in connection with the operation and maintenance thereof, and all additions thereto and replacements thereof; and  (viii) all building materials, supplies, goods and equipment delivered thereto and placed thereon for the purpose of being affixed to or installed or incorporated or otherwise used in the buildings, structures or other improvements now or hereafter located thereon or any part or parcel thereof.

**The Real Property or its address is commonly known as  2551 East Pinetree Blvd, Thomasville , GA  31792. The Real Property tax identification number is 010001006.**

**CROSS-COLLATERALIZATION.**  In addition to the Note, this Security Deed secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.**  In addition to the Note, this Security Deed secures all future advances made by Lender to Grantor whether or not the advances are made pursuant to a commitment.  Specifically, without limitation, this Security Deed secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Grantor, together with all interest thereon.

**THIS SECURITY DEED, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE IN THE ORIGINAL PRINCIPAL AMOUNT OF $1,537,942.00 WHICH HAS THE MATURITY DATE OF JANUARY 16, 2026, THE RELATED DOCUMENTS, AND THIS SECURITY DEED.  THIS CONVEYANCE SHALL BE CONSTRUED AS A DEED PASSING TITLE AND NOT AS A MORTGAGE.  IT IS THE INTENTION OF GRANTOR AND LENDER TO CREATE A PERPETUAL OR INDEFINITE SECURITY INTEREST IN THE REAL PROPERTY DESCRIBED IN THIS SECURITY DEED PURSUANT TO O.C.G.A. 44-14-80 AND TO AGREE**

Certified Copy

RANDA D. WHARTON,
CLERK SUPERIOR COURT
THOMAS COUNTY GEORGIA
BY:

**Exhibit "O"**

BK:2267   PG:196

## SECURITY DEED
## (Continued)

Loan No: 7120339965                                                                    Page 2

THAT TITLE SHALL NOT REVERT TO GRANTOR FOR A PERIOD OF TWENTY (20) YEARS FROM THE DATE OF THIS SECURITY DEED. HOWEVER, NOTHING IN THIS PARAGRAPH WILL IMPAIR LENDER'S RIGHTS TO COLLECTION OF THE INDEBTEDNESS AND FORECLOSURE OF THE SECURITY INTEREST IF THE INDEBTEDNESS IS NOT REPAID WHEN DUE. THIS SECURITY DEED, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS ALSO GIVEN TO SECURE ANY AND ALL OF GRANTOR'S OBLIGATIONS UNDER THAT CERTAIN CONSTRUCTION LOAN AGREEMENT BETWEEN GRANTOR AND LENDER OF EVEN DATE HEREWITH. ANY EVENT OF DEFAULT UNDER THE CONSTRUCTION LOAN AGREEMENT, OR ANY OF THE RELATED DOCUMENTS REFERRED TO THEREIN, SHALL ALSO BE AN EVENT OF DEFAULT UNDER THIS SECURITY DEED. THIS SECURITY DEED IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Security Deed, Grantor shall pay to Lender all amounts secured by this Security Deed as they become due and shall strictly perform all of Grantor's obligations under this Security Deed and the Related Documents.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Security Deed. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Security Deed or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Security Deed, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Security Deed and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Security Deed.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Security Deed upon the sale or transfer, without Lender's prior written consent, of all or any part of the Property, or any interest in the

BK:2267    PG:197

**SECURITY DEED**
**(Continued)**

Loan No: 7120339965                                                                                          Page 3

Property.  A "sale or transfer" means the conveyance of Property or any right, title or interest in the Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Property, or by any other method of conveyance of an interest in the Property.  If any Grantor is a corporation, partnership or limited liability company, transfer also includes any restructuring of the legal entity (whether by merger, division or otherwise) or any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor.  However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Georgia law.

TAXES AND LIENS.  The following provisions relating to the taxes and liens on the Property are part of this Security Deed:

Payment.  Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property.  Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Security Deed, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

Right to Contest.  Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized.  If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien.  In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property.  Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

Evidence of Payment.  Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

Notice of Construction.  Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials.  Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

PROPERTY DAMAGE INSURANCE.  The following provisions relating to insuring the Property are a part of this Security Deed.

Maintenance of Insurance.  Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender.  Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies.  Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require.  Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender.  Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person.  Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain flood insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.  Flood insurance may be purchased under the National Flood Insurance Program, from private insurers providing "private flood insurance" as defined by applicable federal flood insurance statutes and regulations, or from another flood insurance provider that is both acceptable to Lender in its sole discretion and permitted by applicable federal flood insurance statutes and regulations.

Application of Proceeds.  Grantor shall promptly notify Lender of any loss or damage to the Property.  Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty.  Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property.  If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender.  Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Security Deed.  Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Security Deed, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness.  If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

Grantor's Report on Insurance.  Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing:  (1) the name of the insurer;  (2) the risks insured;  (3) the amount of the policy;  (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and  (5) the

**SECURITY DEED**
**(Continued)**

Loan No: 7120339965                                                                                    Page 4

expiration date of the policy.  Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Security Deed or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Security Deed or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.  The Security Deed also will secure payment of these amounts.  Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**WARRANTY; DEFENSE OF TITLE.**  The following provisions relating to ownership of the Property are a part of this Security Deed:

Title.  Grantor warrants that:  (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Security Deed, and  (b) Grantor has the full right, power, and authority to execute and deliver this Security Deed to Lender.

Defense of Title.  Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons.  In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Security Deed, Grantor shall defend the action at Grantor's expense.  Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

Compliance With Laws.  Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

Survival of Representations and Warranties.  All representations, warranties, and agreements made by Grantor in this Security Deed shall survive the execution and delivery of this Security Deed, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**CONDEMNATION.**  The following provisions relating to condemnation proceedings are a part of this Security Deed:

Proceedings.  If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award.  Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

Application of Net Proceeds.  If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property.  The net proceeds of the award shall mean the award after payment of all reasonable attorneys' fees and costs and expenses, including court costs that are incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.**  The following provisions relating to governmental taxes, fees and charges are a part of this Security Deed:

Current Taxes, Fees and Charges.  Upon request by Lender, Grantor shall execute such documents in addition to this Security Deed and take whatever other action is requested by Lender to perfect and continue Lender's security interest on the Property.  Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Security Deed, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Security Deed.

Taxes.  The following shall constitute taxes to which this section applies:  (1)  a specific tax upon this type of Security Deed or upon all or any part of the  Indebtedness secured by this Security Deed;  (2)  a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Security Deed;  (3)  a tax on this type of Security Deed chargeable against the Lender or the holder of the Note; and  (4)  a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

Subsequent Taxes.  If any tax to which this section applies is enacted subsequent to the date of this Security Deed, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either  (1)  pays the tax before it becomes delinquent, or  (2)  contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.**  The following provisions relating to this Security Deed as a security agreement are a part of this Security Deed:

BK:2267    PG:199

**SECURITY DEED**
**(Continued)**

Loan No: 7120339965    Page 5

Security Agreement. This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

Security Interest. Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Security Deed in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Security Deed as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

Addresses. The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Security Deed may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Security Deed.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Security Deed:

Further Assurances. At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Security Deed, and the Related Documents, and (2) the liens and security interests created by this Security Deed as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

Attorney-In-Fact. If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness, including without limitation all future advances, when due, and otherwise performs all the obligations imposed upon Grantor under this Security Deed, Lender shall execute and deliver to Grantor a suitable satisfaction of this Security Deed and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Security Deed:

Payment Default. Grantor fails to make any payment when due under the Indebtedness.

Default on Other Payments. Failure of Grantor within the time required by this Security Deed to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

Environmental Default. Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

Other Defaults. Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Security Deed or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

Default in Favor of Third Parties. Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Security Deed or any of the Related Documents.

False Statements. Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Security Deed or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Defective Collateralization. This Security Deed or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

Death or Insolvency. The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this

BK:2267    PG:200

## SECURITY DEED
### (Continued)

Loan No: 7120339965                                                                        Page 6

Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Security Deed within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S REMEDIES AND POWER OF SALE.** Upon the occurrence of an Event of Default, Lender shall have the following rights, powers, and remedies:

**Accelerate Indebtedness.** Lender, at Lender's option and election and without notice to Grantor, may declare all or any portion of the Indebtedness to be immediately due and payable, whereupon the same shall be and shall become due and payable forthwith without presentment demand, protest or notice of any kind, all of which are expressly waived by Grantor.

**Entry and Possession.** Lender may enter upon the Property, or any part thereof, and take possession of the Property, excluding therefrom Grantor and all agents, employees and representatives of Grantor; employ a manager of the Property or any part thereof; hold, store, use, operate, manage, control, maintain and lease the Property or any part thereof; conduct business thereon; make all necessary and appropriate repairs, renewals, and replacements; keep the Property insured; and carry out or enter into agreements of any kind with respect to the Property.

**Collection of Rents.** Lender may collect and receive all Rents from the Property and apply the same to the Indebtedness, after deducting therefrom all costs, charges, and expenses of taking, holding, managing, and operating the Property, including the fees and expenses of Lender's attorneys, and agents.

**Payments.** Lender may pay any sum or sums deemed necessary or appropriate by Lender to protect the Property or any part of the Property or Lender's interest in the Property.

**Other Remedies.** Lender may exercise all rights and remedies contained in any Related Document, heretofore, concurrently herewith or in the future executed by Grantor in favor of Lender in connection with the transactions resulting in the Indebtedness or any part thereof.

**Appointment of Receiver.** Lender may make application to any court and be entitled to the appointment of a receiver to take charge of the Property or any part thereof without alleging or proving, or having any consideration given to, the insolvency of Grantor, the value of the Property as security for the Indebtedness, or any other matter usually incident to the appointment of a receiver.

**UCC Remedies.** With respect to the Personal Property in which a security interest is herein granted, Lender may exercise any or all of the rights accruing to a secured party under this Security Deed, the Uniform Commercial Code (Sections 11-9-101 et. seq. of the Ga. Code Annotated) and any other applicable law. Grantor shall, if Lender requests, assemble all such Personal Property and make it available to Lender at a place or places to be designated by Lender, which shall be reasonably convenient to Grantor and Lender. Any notice required to be given by Lender of a public or private sale, lease or other disposition of the Personal Property or any other intended action by Lender may be delivered personally to Grantor or may be deposited in the United States mail with postage prepaid duly addressed to Grantor at the address of Grantor last known to Lender at least five (5) business days prior to such proposed action, and shall constitute reasonable and fair notice to Grantor of any such action.

**Power of Sale.** Lender may sell the Property, or any part thereof or any interest therein, separately, at Lender's discretion, with or without taking possession thereof, at public sale before the courthouse door of the county in which the Property, or any part thereof, is located, to the highest bidder for cash, after first giving notice of the time, place and terms of such sale by advertisement, published once a week for four weeks (without regard for the number of days) in a newspaper in which advertisements of sheriff's sales are published in such county. The advertisement so published shall be notice to Grantor, and Grantor hereby waives all other notices. Lender may bid and purchase at any such sale, and Lender may execute and deliver to the purchaser or purchasers at any such sale a sufficient conveyance of the Property, or the part thereof or interest therein sold. Lender's conveyance may contain recitals as to the occurrence of an Event of Default, under this Security Deed, which recitals shall be presumptive evidence that all preliminary acts prerequisite to such sale and conveyance were in all things duly complied with. The recitals made by Lender shall be binding and conclusive upon Grantor, and the sale and conveyance made by Lender shall divest Grantor of all right, title, interest and equity that Grantor may have had in, to and under the Property, or the part thereof or interest therein sold, and shall vest the same in the purchaser or purchasers at such sale. Lender may hold one or more sales hereunder until the Indebtedness has been satisfied in full. Grantor hereby constitutes and appoints Lender as Grantor's agent and attorney-in-fact to make such sale, to execute and deliver such

BK:2267  PG:201

**SECURITY DEED**
**(Continued)**

Loan No: 7120339965                                                                                         Page 7

conveyance and to make such recitals, and Grantor hereby ratifies and confirms all of the acts and doings of Lender as Grantor's agent and attorney-in-fact hereunder. Lender's agency and power as attorney-in-fact hereunder are coupled with an interest, cannot be revoked by insolvency, incompetency, death or otherwise, and shall not be exhausted until the Indebtedness has been satisfied in full. The proceeds of each sale by Lender hereunder shall be applied first to the costs and expenses of the sale and of all proceedings in connection therewith, including attorneys' fees if applicable, then to payment of the Indebtedness, and the remainder, if any, shall be paid to Grantor. If the proceeds of any sale are not sufficient to pay the Indebtedness in full, Lender shall determine, at Lender's option and in Lender's discretion, the portions of the Indebtedness to which the proceeds (after deducting therefrom the costs and expenses of the sale and all proceedings in connection therewith) shall be applied and in what order the proceeds shall be so applied. Grantor covenants and agrees that, in the event of any sale pursuant to the agency and power herein granted, Grantor shall be and become a tenant holding over and shall deliver possession of the Property, or the part thereof or interest therein sold, to the purchaser or purchasers at the sale or be summarily dispossessed in accordance with the provisions of law applicable to tenants holding over.

Cumulative Remedies. All rights and remedies set forth in this Security Deed are cumulative and in addition to any right or remedy provided for by statute, or now or hereafter existing at law or in equity, including without limitation the right of Lender to collect or enforce the Indebtedness with or without taking action with respect to the Property. Lender may, at Lender's election and at Lender's discretion, exercise each and every such right and remedy concurrently or separately. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Security Deed or by any other writing, shall be cumulative and may be exercised singularly or concurrently.

Attorneys' Fees; Expenses. If any part of the Indebtedness is collected by or with any assistance from or consultation with an attorney at law, Grantor shall pay to Lender as Lender's attorneys' fees, fifteen percent (15%) of such amount collected. Whether or not any court action is involved, and to the extent not prohibited by law, all attorneys' fees and all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

NOTICES. Any notice required to be given under this Security Deed, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Security Deed. All copies of notices of foreclosure from the holder of any prior security interest which has priority over this Security Deed shall be sent to Lender's address, as shown near the beginning of this Security Deed. Any party may change its address for notices under this Security Deed by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

CROSS COLLATERALIZATION. All past, present and future loans, obligations and indebtedness of the Grantor to the Lender including, but not limited to, that certain loan heretofore made by Grantor to Lender evidenced herewith shall be cross-collateralized with this loan.

CROSS DEFAULT. This loan shall be cross-defaulted with all current and future loans from Bank to Borrower acting as either a Borrower or Guarantor.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Security Deed:

Amendments. This Security Deed, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Security Deed. No alteration of or amendment to this Security Deed shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Annual Reports. If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

Caption Headings. Caption headings in this Security Deed are for convenience purposes only and are not to be used to interpret or define the provisions of this Security Deed.

Governing Law. This Security Deed will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Georgia without regard to its conflicts of law provisions. This Security Deed has been accepted by Lender in the State of Georgia.

Choice of Venue. If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Thomas County, State of Georgia.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Security Deed unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Security Deed shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Security Deed. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of

BK:2267   PG:202

**SECURITY DEED**
**(Continued)**

Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Security Deed, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Security Deed to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Security Deed. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Security Deed shall not affect the legality, validity or enforceability of any other provision of this Security Deed.

**Merger.** There shall be no merger of the interest or estate created by this Security Deed with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Security Deed on transfer of Grantor's interest, this Security Deed shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Security Deed and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Security Deed or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Security Deed.

**Waiver of Notice and Hearing and Homestead Exemption.** Grantor expressly waives: (1) any right Grantor may have under the Constitution of the State of Georgia or the Constitution of the United States of America to notice or to a judicial hearing prior to the exercise of any right or remedy provided to Lender by this Security Deed and Grantor waives Grantor's rights, if any, to set aside or invalidate any sale under power duly consummated in accordance with the provisions of this Security Deed on the ground (if such be the case) that the sale was consummated without prior notice or judicial hearing or both; and (2) all homestead exemption rights, if any, which Grantor or Grantor's family may have pursuant to the Constitution and laws of the United States, the State of Georgia or any other State of the United States, in and to the Property as against the collection of the Indebtedness, or any part of the Indebtedness. All waivers by Grantor in this provision have been made voluntarily, intelligently and knowingly by Grantor, after Grantor has been afforded an opportunity to be informed by counsel of Grantor's choice as to possible alternative rights. Grantor's execution of this Security Deed shall be conclusive evidence of the making of such waivers and that such waivers have been voluntarily, intelligently and knowingly made.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Security Deed. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Security Deed shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means 2551 East Pinetree Blvd, LLC, a Georgia Limited Liability Company   and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Security Deed in the events of default section of this Security Deed.

**Grantor.** The word "Grantor" means 2551 East Pinetree Blvd, LLC, a Georgia Limited Liability Company .

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Security Deed, together with any amounts expended to preserve and protect the Property and together with interest on such amounts as provided in this Security Deed. Specifically, without limitation, Indebtedness

BK:2267  PG:203

## SECURITY DEED
## (Continued)

Loan No: 7120339965                                                                    Page 9

Includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Security Deed.

**Lender.** The word "Lender" means TC FEDERAL BANK, its successors and assigns.

**Note.** The word "Note" means the promissory note dated January 16, 2020, **in the original principal amount of $1,537,942.00** from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of the Note is January 16, 2026.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, mobile homes, modular homes, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached, affixed to or used in the operation of the Real Property excluding only that property which by operation of law is Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Security Deed less and except the Personal Property.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**Security Deed.** The words "Security Deed" mean this Security Deed between Grantor and Lender, and includes without limitation all assignments and security interest provision relating to the Personal Property and the Rents.

IN WITNESS WHEREOF, THIS SECURITY DEED HAS BEEN SIGNED BY THE UNDERSIGNED, WHO ACKNOWLEDGES A COMPLETED COPY HEREOF. THIS SECURITY DEED IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS SECURITY DEED IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

Signed, Sealed and Delivered in the presence of:

X _____
   Unofficial Witness

_____

Notary Public, _____ County

(NOTARY SEAL)

My Commission expires: _____

GRANTOR:

2551 EAST PINETREE BLVD, LLC, A GEORGIA LIMITED
LIABILITY COMPANY

By: _____ (Seal)
   Shaneel Lalani , Member of 2551 East
   Pinetree Blvd, LLC, a Georgia Limited
   Liability Company

AARON COCH
NOTARY
EXPIRES
FEBRUARY 14, 2023
PUBLIC
THOMAS COUNTY

LaserPro, Ver. 19.4.10.036  Copr. Finastra USA Corporation 1997, 2020.   All Rights Reserved.   - GA  Z:\CFI\LPL\G03.FC  TR-2128

DEED BOOK 2267 PAGE 204

BK:2267  PG:204

Exhibit "A"

Legal Description of
2551 East Pinetree Boulevard, Thomasville, Thomas County, Georgia 31792

All that tract or parcel of land lying and being in the District of Thomas County, Georgia, and being more particularly described as follows:

All that tract of parcel of land situate, lying and being in the City of Thomasville, Thomas County, Georgia, and more particularly described according to a plat of survey prepared for Pinetree Center, L.P., by Frank E Carlton, Georgia Registered Land Surveyor No. 1544, dated December 21, 1992, revised February 15, 1993 and May 17, 1993; and recorded in Plat Cabinet 2, Folio 59-E, among the Deed Records of Thomas County, Georgia, and being more particularly identified as a part of Parcel No. 4, containing an aggregate of 5.296 Acres, reference to which plat of survey is made for a more particular description by metes and bounds and courses and distances as set forth thereon, being more particularly described as follows:

To reach the POINT OF BEGINNING commence at the intersection of the southeast margin of the right of way of Remington Avenue with the southwest margin of the right of way of Pinetree Boulevard if such rights of way were extended to intersect at a point and run thence south 60 degrees 35 minutes west along the southeast margin of the right of way of Remington Avenue a distance of 269.00 feet; run thence south 17 degrees 12 minutes 18 seconds east a distance of 368.11 feet to the POINT OF BEGINNING. From said POINT OF BEGINNING, run thence north 72 degrees 46 minutes 36 seconds east a distance of 234.99 feet; run thence north 60 degrees 21 minutes 34 seconds east a distance of 79.80 feet to the southwest margin of the right of way of Pine Tree Boulevard; run thence eastward along the curvature of the southwest margin of the right of way of Pine Tree Boulevard an arc distance of 213.10 feet to a point which point lies along a chord bearing south 27 degrees 00 minutes 29 seconds east a chord distance of 213.09 feet; run thence south 28 degrees 23 minutes 25 seconds east along the southwest margin of Pine Tree Boulevard a distance of 241.65 feet; run thence south 61 degrees 36 minutes 35 seconds west a distance of 200.00 feet; run thence south 28 degrees 23 minutes 25 seconds east a distance of 257.41 feet; run thence south 45 degrees 35 minutes 39 seconds west a distance of 128.88 feet; run thence south 88 degrees 47 minutes 24 seconds west a distance of 141.80 feet; run thence north 17 degrees 12 minutes 18 seconds east a distance of 740.71 feet to the POINT OF BEGINNING and containing 5.296 Acres, more or less.

AND

All that tract or parcel of land lying and being in the District of Thomas County, Georgia and being more particularly described as follows:

All that tract or parcel of land situate, lying and being in the City of Thomasville, Thomas County, Georgia, and more particularly described according to a plat of survey prepared for Pinetree Center, L.P., by Frank E Carlton, Georgia Registered Land Surveyor No. 1544, dated December 21, 1992, revised February 15, 1993, and May 17, 1993, and recorded in Plat Cabinet 2, Folio 59-E, among the Deed Records of Thomas County, Georgia, and being more particularly identified

Page 1 of 4

DEED BOOK 2267 PAGE
205

BK:2267   PG:205

as Parcel No. 5, containing an aggregate of 5.523 Acres, reference to which plat of survey is made for a more particular description by metes and bounds and courses and distances as set forth thereon, being more particularly described as follows:

To reach the POINT OF BEGINNING commence at the intersection of the southeast margin of the right of way of Remington Avenue with the southwest margin of the right of way of Pinetree Boulevard if such rights of way were extended to intersect at a point and run thence south 60 degrees 35 minutes west along the southeast margin of the right of way of Remington Avenue a distance of 269.00 feet to the POINT OF BEGINNING. From said POINT OF BEGINNING, run thence south 17 degrees 12 minutes 18 seconds east a distance of 1108.82 feet; run thence south 88 degrees 47 minutes 24 seconds west a distance of 375.35 feet; run thence north 14 degrees 41 minutes 54 seconds west a distance of 533.83 feet; run thence north 60 degrees 35 minutes 00 seconds east a distance of 209.36 feet; run thence along a curve concave to the north (radius 50.00 feet) a chord of north 32 degrees 31 minutes 37 seconds east a distance of 47.03 feet; run thence north 04 degrees 28 minutes 15 seconds east a distance of 130.23 feet; run thence north 17 degrees 12 minutes 18 seconds east a distance of 265.79 feet to the southeast margin of the right of way of Remington Avenue; run thence north 60 degrees 35 minutes 00 seconds east along the southeast margin of the right of way of Remington Avenue a distance of 49.98 feet to the POINT OF BEGINNING and containing 5.523 Acres, more or less.

Together with rights contained in Cross Easement dated March 20, 1998, by and between Pinetree Center, L.P., a Georgia limited partnership, and Thomasville National Bank, a National Banking Association, recorded on March 20, 1998, in Book 622, Page 355, aforesaid Records.

Together with rights contained in Cross Easement dated July 1, 2003, by and between Pinetree Center, L.P., a Georgia limited partnership, and Daniel Land Company, Inc., a Georgia corporation, recorded on July 2, 2003, in Book 1017, Page 204, aforesaid Records.

Together with the rights contained in Declaration of Easements, Conditions and Restrictions ("Declaration") dated January 11, 2007, by Pinetree Center Investors, LLC, a Delaware limited liability company, and Pinetree Center Lands, LLC, a Georgia limited liability company, recorded in Book 1368, Page 61, aforesaid Records.

The above described property is subject to the following:

1.    Cross Easement Agreement to Thomasville National Bank, recorded March 20, 1998 in Deed Book 622 Page 355, aforesaid records.

2.    Cross Easement Agreement to Daniel Land Company, Inc., recorded July 2, 2003 in Deed Book 1017 Page 204, aforesaid records.

3.    Declaration of Easements, Conditions and Restrictions, recorded January 18, 2007 in Deed Book 1368 Page 61, aforesaid records.

BK:2267 PG:206

4. Terms and conditions of an unrecorded lease to Sally Beauty Supply LLC as evidenced by that certain Subordination, Non-Disturbance and Attornment Agreement, recorded January 18, 2007 in Deed Book 1368 Page 117, aforesaid records.

5. Declaration of Covenants & Restrictions, recorded November 5, 2013 in Deed Book 1868 Page 313, aforesaid records.

6. All matters as shown on plat of survey recorded in Plat Book 2 Page 59-E, aforesaid records.

7. Construction Easement to Department of Transportation, recorded February 28, 1983 in Deed Book 163 Page 786, aforesaid records.

8. Slope/Drainage Easement to City of Thomasville, recorded March 14, 1991 in Deed Book 268 Page 143, aforesaid records.

9. Easement to City of Thomasville, recorded March 14, 1991 in Deed Book 304 Page 43, aforesaid records.

10. Declaration of Restrictions, recorded July 2, 2003 in Deed Book 1017 Page 195, aforesaid records.

11. Declaration of Restriction, recorded July 2, 2003 in Deed Book 1017 Page 200, aforesaid records.

12. All matters as shown on plat of survey recorded in Plat Book 9 Page O-127, aforesaid records.

13. All matters as shown on plat of survey recorded in Plat Book 1 Page 106-A, aforesaid records.

14. All matters as shown on plat of survey recorded in Plat Book 3 Page 640, aforesaid records.

15. All matters as shown on plat of survey recorded in Plat Book 7 Page 135, aforesaid records.

16. All matters as shown on plat of survey recorded in Plat Book 4 Page 35-C, aforesaid records.

17. The terms and conditions of an unrecorded lease between 2551 East Pinetree Boulevard Holdings, LLC, and T Owens Companies LLC, Tenant, which Tenant is doing business as Totspot Play Center.

18. The terms and conditions of an unrecorded lease between 2551 East Pinetree Boulevard Holdings, LLC, and Santobe's LLC, Tenant, which Tenant is doing business as Santobes Soul Food Restaurant.

DEED BOOK 2267 PAGE
207

BK=2267   PG=207

19.    The terms and conditions of an unrecorded lease between 2551 East Pinetree Boulevard Holdings, LLC, and Quang Nguyen, Tenant, which Tenant is doing business as Nail Designs.

20.    The terms and conditions of an unrecorded lease between Pinetree Center Investors, LLC, and United States of America, acting by and through the USDA Farm Service Agency, Tenant, which lease has been assigned to successor Landlord, 2551 East Pinetree Boulevard Holdings, LLC, pursuant to that Lease Assumption Agreement between Pinetree Center Investors, LLC, Transferor; 2551 East Pinetree Boulevard Holdings, LLC c/o CWCapital Asset Management LLC, Transferee; and the United States of America, acting by and through the Secretary of Agriculture, Government.

21.    The terms and conditions of an unrecorded lease between 2551 East Pinetree Blvd, LLC, and Ollie's Bargain Outlet, Inc., Tenant.

Map Parcel No.: 00100-0001-006-000.

This Exhibit "A" is identified as a part of a Deed to Secure Debt from 2551 EAST PINETREE BLVD, LLC, a Georgia limited liability company, to TC FEDERAL BANK, ISAOA, dated January 16, 2020.

2551 EAST PINETREE BLVD, LLC,
a Georgia limited liability company

By:_____ (L.S.)
Shaneel Lalani, Member

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC<br><br>     Petitioners,<br><br>v.<br><br>CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC<br><br>     Respondents. | § § § § § § § § § § § § § § § § § § § § § § § §<br><br>CIVIL ACTION<br><br>FILE NO. 2020CV339119 |

## VERIFICATION OF SAHIB ARORA

**COMES NOW** Petitioner Sahib Arora and states under oath as follows:

Exhibits "A" – "G" attached hereto are true and correct copies of the documents executed by me on August 14, 2019.

Exhibits "H" attached hereto is a true and correct copy of the document executed by me on November 20, 2019.

This 23 day of August, 2020.

_____
Sahib Arora

Sworn to and subscribed before me

this 23 day of _____August_____, 2020

_____
NOTARY PUBLIC

- 2 -

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC<br><br>Petitioners,<br><br>v.<br><br>CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC<br><br>Respondents. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§     CIVIL ACTION<br><br>    FILE NO. 2020CV339119 |

---

## VERIFICATION OF VINEET SINGH

---

**COMES NOW** Petitioner Vineet Singh and states under oath as follows:

The <u>Certified Resolution and Incumbency Certificate of Maharaja investments, LLC</u> attached hereto as Exhibit "K" is a true and correct copy of the

document that Respondent Charanjeev Singh presented to me for signature and which I executed on June 22, 2019.

This _23_ day of August, 2020.

_____
Vineet Singh

Sworn to and subscribed before me

this _23_ day of ___August___, 2020

_____
NOTARY PUBLIC

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

## FIRST AMENDED AND RESTATED PETITION

**COME NOW** SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

LLC, Petitioners in the above-styled action, and pursuant to O.C.G.A. § 9-11-15(a)

file this, their **First Amended and Restated Petition for Relief under the Georgia**

Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction,
Rescission and Other Equitable Relief, Declaratory Judgment and Damages
("First Amendment") against Respondents CHARANJEEV SINGH, KARAN S.
AHUJA, JARNAIL SINGH, JONIKA ARORA, CROWN ASSETS, LLC, 2551 E
PINETREE BLVD MGMT, LLC, 2551 EAST PINETREE BLVD, LLC, 4319
COVINGTON HWY, LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE
BLVD, LLC; 2505 S MAIN STREET, LLC and KING ASSETS, LLC respectfully
showing as follows:

## AMENDMENTS TO THE PETITION

Petitioners hereby amend the original Petition by adding thereto Count XX
[Breach of Fiduciary Duty (Against Respondent Charanjeev)]; XXI [Breach of
Fiduciary Duty (Against Respondents Charanjeev and Ahuja)]; Count XXII (Claims
under the Brokerage Relationships in Real Estate Transactions Act), and Count
XXIII (Misappropriation of Prospective Business Opportunities), as follows:

## COUNT XX—BREACH OF FIDUCIARY DUTY
### (Against Respondent Charanjeev)

224.

Petitioners re-allege and incorporate herein all allegations of the original
Petition and all other allegations of this First Amendment:

2

225.

A confidential relationship arose as between Petitioner Maharaja Investments, LLC ("Maharaja") and Respondent Charanjeev Singh in regard to the Pinetree Plaza Shopping Center by virtue of Maharaja's entrustment of the closing of its purchase of the property to Charanjeev as evidenced by the <u>Certified Resolution and Incumbency Certificate of Maharaja Investments, LLC</u> he obtained from Petitioner Vineet Singh on June 22, 2019 (the "Authentic Certification"). *Petition at p. 32, ¶¶ 73 - 74; Exhibits to Petition, Ex. "K"*.

226.

Charanjeev breached the fiduciary duty he owed to Maharaja by acquiring an interest in the Pinetree Plaza Shopping Center antagonistic to the interests of Maharaja.

227.

Maharaja is entitled to damages against Charanjeev for the value of all property interests and funds he obtained through the breach of his fiduciary duty including the converted rental income and all other damages that Maharaja has sustained as the result of his breach of fiduciary duty.

3

## COUNT XXI—BREACH OF FIDUCIARY DUTY
### (Against Respondents Charanjeev and Ahuja)

225.

Petitioners re-allege and incorporate herein all allegations of the original Petition and all other allegations of this First Amendment:

228.

Petitioner Sahib Arora and Respondents Charanjeev and Karan S. Ahuja executed the <u>Amended and Restated Operating Agreement of Maharaja Investments, LLC</u> on August 14, 2019 ("Coerced Maharaja Amendment"), which purportedly transferred a 25% Membership Interest in Maharaja to each of them. *Petition at pp. Petition at pp.12-13, 24, ¶¶ 28, 55(b); Exhibits to Petition, Ex. "C".*

229.

Petitioners deny that the Coerced Maharaja Amendment is enforceable and seek rescission of the purported transfer upon the grounds that it was obtained from Petitioners through extortion and fraud. *Petition at pp. 51 - 56, ¶¶ 133 – 153 (Count IV—Rescission on the Ground of Duress; Count V—Rescission on the Ground of Fraudulent Inducement and Count VI—Rescission on Ground of Illegality).*

230.

If and to the extent that the Coerced Maharaja Amendment is determined to be enforceable, a confidential relationship arose as between Maharaja and its members, Petitioners Arora and Vineet and Respondents Charanjeev and Ahuja, in

4

regard to the Pinetree Plaza Shopping Center.

231.

Charanjeev and Ahuja breached their fiduciary duty to Maharaja and the other members of Maharaja, Arora and Vineet, by acquiring interests in the Pinetree Plaza Shopping Center antagonistic to the interests of Maharaja, Arora and Vineet.

232.

Said Petitioners are entitled to damages against Charanjeev and Ahuja for the value of all property interests and funds they obtained through the breach of their fiduciary duty including the converted rental income and all other damages that Petitioners have sustained as the result of their breach of fiduciary duty.

## COUNT XXII—CLAIMS UNDER THE BROKERAGE RELATIONSHIPS IN REAL ESTATE TRANSACTIONS ACT

233.

Petitioners re-allege and incorporate herein all allegations of the original Petition and all other allegations of this First Amendment.

234.

Charanjeev served as buyer's agent in connection with Maharaja's purchase of the Pinetree Plaza Shopping Center.

235.

Charanjeev was prohibited by the Brokerage Relationships in Real Estate Transactions Act, OCGA § 10–6A–1 *et seq*. ("BRRETA") from revealing confidential information belonging to Maharaja to others or using such confidential information for his own enrichment.

236.

Charanjeev breached his duty to Maharaja under BRRETA by using Maharaja's confidential information obtained during the brokerage relationship to acquire an interest in the Pinetree Plaza Shopping Center adverse to the interests of Maharaja.

237.

Charanjeev served as buyer's real estate agent in connection with the purchase by Petitioner King Group MGMT LLC ("King Group") of the properties known as 106 Commerce Street, Fayette County; 3811 Flat Shoals Parkway, DeKalb County; vacant land located on Roosevelt Highway, Fulton County; 5341 Snapfinger Drive, DeKalb County, and 5754 Attucks Boulevard, Morrow, Clayton County.

238.

Charanjeev served as seller's agent in connection with the King Group's properties located at 5341 Snapfinger Drive and 5754 Attucks Boulevard.

239.

Charanjeev breached his duty to King Group under BRRETA by using King Group's confidential information obtained during the brokerage relationship to acquire interests in the properties known as 106 Commerce Street; 3811 Flat Shoals Parkway; vacant land located on Roosevelt Highway; 5341 Snapfinger Drive, and 5754 Attucks Boulevard, adverse to the interests of King Group. *See Exhibits to Petition, Ex. "A" ("Coerced King Group Agreement"); Exs "D" – "G" ("Coerced Deeds").*

240.

Maharaja is entitled to recover all damages sustained by it as the result of Charanjeev's violations of BRRETA including but not limited to the entire value of its title to the Pinetree Plaza Shopping Center and all revenues it would have received but for Charanjeev's breach of his duty to Maharaja under BRRETA.

241.

King Group is entitled to recover all damages sustained by it as the result of Charanjeev's violations of BRRETA including but not limited to the entire value of its title to 106 Commerce Street; 3811 Flat Shoals Parkway; vacant land located on Roosevelt Highway; 5341 Snapfinger Drive, and 5754 Attucks Boulevard and all revenues it would have received but for Charanjeev's breach of his duty to King Group under BRRETA.

7

## COUNT XXIII—MISAPPROPRIATION OF PROSPECTIVE BUSINESS OPPORTUNITES

### 226.

Petitioners re-allege and incorporate herein all allegations of the original Petition and all other allegations of this First Amendment.

### 242.

Respondent Ahuja and/or Crown Assets, LLC ("Crown LLC") and the principals or 2551 East Pinetree, LLC ("Pinetree LLC"), Sameer Lalani and Shaneel Lalani, or other entities controlled by them, are owners of Membership Interests in Respondents 4319 Covington Hwy, LLC ("Covington LLC"); 140 W Dykes Street LLC ("Dykes LLC"); 1604 E Oglethorpe Blvd, LLC ("Oglethorpe LLC"), and 2505 S Main Street, LLC ("Main LLC").  *Petition at pp. 67, ¶ 188*.

### 243.

Respondents Ahuja, Crown LLC, Pinetree LLC and its principals, Sameer Lalani and Shaneel Lalani, used the proceeds of the line of credit from TC Federal Bank ("TC Federal"), which, according to the Security Deed executed by Pinetree LLC to TC Federal, is secured by the entire fee interest in the Pinetree Plaza Shopping Center, to purchase the properties owned by Respondents Covington LLC, Dykes LLC, Oglethorpe LLC and Main LLC, respectively, at 4319 Covington Highway, Unincorporated DeKalb County; 140 W. Dykes Street, City of Cochran, Bleckley County; 1604 E. Oglethorpe Boulevard, City of Albany, Dougherty

8

County, and 2411-2505 S. Main Street, City of Moultrie, Colquitt County. *Petition at pp. 66-67, ¶ 187*; *Exhibits to Petition, Ex. "O"*.

244.

Respondents' said properties located at 4319 Covington Highway, 140 W. Dykes Street, 1604 E. Oglethorpe Boulevard, and 2411-2505 S. Main Street represent prospective business opportunities belonging to Maharaja because they were purchased with funds that Pinetree LLC obtained from its joint ownership interest in Pinetree Plaza as tenant in common with Maharaja, and as to which Pinetree LLC owed Maharaja a fiduciary duty. *Petition at pp. 64-65, ¶¶ 178-182 (Count XI—Breach of Fiduciary Duty)*.

245.

By concealing its acquisition of the said properties from Maharaja and seeking to exclude Maharaja from the acquisitions and from the resulting gains and profits, Pinetree LLC, in collusion with Ahuja, Crown LLC and Charanjeev, misappropriated the prospective business opportunities belonging to Maharaja. *Id.; Petition at pp. 44-45, 49, ¶¶ 116, 119, 129.*

246.

Maharaja is entitled to appropriate remedies due to Respondents' misappropriation of prospective business opportunities belonging to Maharaja including damages, Imposition of an Equitable Lien and Disgorgement. *Id.; Petition*

*at pp. 66-70, ¶¶ 186-199 (Count XIII—Imposition of an Equitable Lien; Count XIV—Imposition of an Constructive Trust and/or Count XV—Disgorgement).*

## AMENDMENT OF REQUESTS FOR RELIEF

Petitioners amend the requests for relief in the <u>Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages</u> by adding thereto the following:

**WHEREFORE** Petitioners respectfully pray:

(r)     For a money judgment against Respondents for Charanjeev's breach of fiduciary duty in an amount to be established at trial, as requested in Count XX

(s)     For a money judgment against Respondents for Charanjeev's and Ahuja's breach of fiduciary duty in an amount to be established at trial, as requested in Count XXI

(t)     For a money judgment against Respondents for Charanjeev's breach of his duties owed to Petitioners Maharaja and King Group under the Brokerage Relationships in Real Estate Transactions Act, OCGA § 10–6A–1 *et seq.* ("BRRETA"), as requested in Count XXII

(u)     For a judgment granting appropriate relief due to Respondents'

10

Misappropriation of Prospective Business  Opportunities belonging to Petitioner Maharaja including damages, Imposition of an Equitable Lien and Disgorgement, as requested in Count XXIII, and

(v)    For such other and further relief as may be just and proper

## CORRECTION OF VERIFICATION

Counsel for Petitioners erroneously attached a copy of the first page of the Petition to the Verification signed by Petitioner Sahib Arora and therefore strikes that erroneous page from the Petition and attaches hereto the true and correct Verification as to the allegations of the Petition signed by Petitioner Sahib Arora.

## RESTATEMENT OF ORIGINAL PETITION

Petitioners restate and re-allege herein all allegations and requests for relief of the Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages as if set forth *verbatim* herein.

This 24th day of August, 2020.

[Signature Continued on Following Page]

*Sahib Arora et al. v. Charanjeev Singh et al.*
Civil Action File No. 2020CV339119
First Amended and Restated Petition
August 24, 2020

_____

Respectfully Submitted,

_____

Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net

# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC | § § § § § | |
| Petitioners, | § § | CIVIL ACTION |
| v. | § § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 EAST PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W. DYKES STREET, LLC; 1604 E. OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S. MAIN STREET, LLC | § § § § § § § § § § § § § | |
| Respondents. | | |

## VERIFICATION

Personally appeared before me, the undersigned officer, duly authorized to administer oaths, **Sahib Arora**, who being duly sworn, upon his oath deposes and says that he has read the foregoing Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and

<u>Other Equitable Relief, Declaratory Judgment and Damages</u> and that the facts stated therein are true and correct.

This 5th day of August, 2020.

_____
Sahib Arora

Sworn to and subscribed before me:

This __5[th]__ day of ___August___, 2020

_____
[NOTARY PUBLIC]

## IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 EAST PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W. DYKES | § | |
| STREET, LLC; 1604 E. | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S. MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

## VERIFICATION

Personally appeared before me, the undersigned officer, duly authorized to administer oaths, **Sahib Arora**, who being duly sworn, upon his oath deposes and says that he has read the foregoing <u>First Amended and Restated Petition</u> and that the facts stated therein are true and correct.

*Sahib Arora et al. v. Charanjeev Singh et al.*
Civil Action File No. 2020CV339119
Petitioner Sahib Arora's Verification of First Amended and Restate Petition

_____

This 23 day of August, 2020.


_____
Sahib Arora


Sworn to and subscribed before me:

This 23 day of ___August___, 2020


_____
[NOTARY PUBLIC]

# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

SAHIB ARORA; VINEET SINGH; §
KING GROUP MGMT LLC; §
MAHARAJA INVESTMENTS, LLC §
and ZILLIONAIRE ASSETS, LLC §
§
     Petitioners, §
§    CIVIL ACTION
v. §
§    FILE NO. 2020CV339119
§
CHARANJEEV SINGH; KARAN S. §
AHUJA; JARNAIL SINGH; JONIKA §
ARORA; CROWN ASSETS, LLC; §
2551 EAST PINETREE BLVD §
MGMT LLC; 2551 EAST PINETREE §
BLVD LLC; 4319 COVINGTON §
HWY, LLC; 140 W. DYKES §
STREET, LLC; 1604 E. §
OGLETHORPE BLVD, LLC; §
KING ASSETS, LLC and §
2505 S. MAIN STREET, LLC §
§
     Respondents.

## VERIFICATION

Personally appeared before me, the undersigned officer, duly authorized to administer oaths, **Vineet Singh**, who being duly sworn, upon his oath deposes and says that he has read the foregoing <u>First Amended and Restated Petition</u> and that the facts stated therein are true and correct.

*Sahib Arora et al. v. Charanjeev Singh et al.*
Civil Action File No. 2020CV339119
Petitioner Vineet Singh's Verification of First Amended and Restated Petition

This _23_ day of August, 2020.

_Vineet Singh_
Vineet Singh

Sworn to and subscribed before me:

This _23_ day of ___August___ , 2020

_____
[NOTARY PUBLIC]

# EXHIBIT B

Debtor Crown Assets, LLC's Notice of Removal
*Sahib Arora et al. v. Charanjeev Singh et al.*
Previously Pending in the Superior Court of Fulton County, Case No. 2020CV339119

Fulton County Superior Court
***EFILED***MH
Date: 8/31/2020 6:27 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | : | |
| KING GROUP MGMT, LLC; | : | |
| MAHARAJA INVESTMENTS, LLC; and | : | |
| ZILLIONAIRE ASSETS, LLC, | : | |
| | : | |
| Petitioners, | : | CIVIL ACTION FILE NO.: |
| | : | 2020CV339119 |
| vs. | : | |
| | : | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | : | |
| JARNAIL SINGH; JONIKA ARORA; | : | |
| CROWN ASSETS, LLC; 2551 E PINETREE | : | |
| BLVD MGMT LLC; 2551 EAST PINETREE | : | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | : | |
| 140 W DYKES STREET LLC; 1604 E | : | |
| OGLETHORPE BLVD LLC; KING ASSETS, | : | |
| LLC; and 2505 S MAIN STREET, LLC, | : | |
| | : | |
| Respondents. | : | |

## RESPONDENTS CHARANJEEV SINGH, KARAN S. AHUJA, CROWN ASSETS, LLC, 4319 COVINGTON HWY LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE BLVD LLC, KING ASSETS, LLC, AND 2505 S MAIN STREET, LLC'S EMERGENCY MOTION TO CANCEL LIS PENDENS[1]

COMES NOW, Respondents Charanjeev Singh, Karan S. Ahuja, Crown Assets, LLC, 4319 Covington Hwy LLC, 140 W Dykes Street LLC, 1604 E Oglethorpe Blvd LLC, King Assets LLC, and 2505 S Main Street, LLC (collectively, the "Moving Respondents"), by and through their undersigned counsel, and file this their Emergency Motion to Cancel Lis Pendens (the "Motion"). The Moving Respondents request that the Court expedite review and place this matter on a calendar for oral argument as soon as possible, as the invalid notices of lis pendens recorded by Petitioners against various properties throughout the State of Georgia, are causing significant harm to the Moving

---

[1] The Moving Respondents file this Motion by special appearance as none of the Respondents in this action have been served with a copy of the summons or the Petition. By filing this Motion, the Moving Respondents specifically do not waive any of their defenses under O.C.G.A. § 9-11-12(b).

Respondents as discussed herein.  In support of this Motion, the Moving Respondents respectfully show the Court as follows.

<u>**STATEMENT OF FACTS**</u>

This lawsuit originates from a familial business dispute.  Petitioners Sahib Arora ("Arora") and Vineet Singh ("Vineet") are brothers.  They are cousins of Respondents Charanjeev Singh ("Charanjeev") and Karan S. Ajuja ("Ahuja").  Respondents Jarnail Singh ("Jarnail") and Jonika Arora ("Jonika") are the parents of Charanjeev and therefore the uncle and aunt of Arora and Vineet, respectively.  Respondents 4319 Covington Hwy LLC ("Covington LLC"), 140 W Dykes Street LLC ("Dykes LLC"), 1604 E Oglethorpe Blvd LLC ("Oglethorpe LLC"), King Assets LLC ("King Assets"), and 2505 S Main Street, LLC ("Main LLC"), and Crown Assets, LLC ("Crown") (collectively, the "Moving Respondents' LLCs") are all operated by Ahuja in which Ahuja is one of the members of each LLC.  King Assets is owned and operated by Charanjeev.  The Moving Respondents' LLCs own various parcels of real property throughout Georgia, only one of which is located in Fulton County.

Petitioners allege in their 223 paragraph Petition, which originally contained zero exhibits[2], that Respondents engaged in a scheme to defraud them of money and real property assets.  The overarching basis for their claims against Respondents hinges on a fanciful story that Respondents planned to release "false and defamatory" information about Arora and Vineet's sister (and cousin to Charanjeev and Ahuja, and niece to Jarnail and Jonika) to her fiancé's family prior to their wedding day in India, and that through this alleged duress and extortion, Arora and Vineet executed various documents in August 2019 transferring and conveying money and property interests among the two

---

[2] Petitioners filed a First Amended and Restated Petition (the "FARP"), along with 15 exhibits, on August 24, 2020.

sides of the family.  Indeed, Petitioners boldly allege in their Complaint that "[t]hese were the 'acts of racketeering activity' that kicked off Respondents' racketeering scheme."  (Petition ¶ 25.)

Petitioners allege that "[r]espondents used some or all of the proceeds that they have obtained from Petitioners" to purchase the following properties: 325 Crooked Stick Drive in Milton, Georgia ("325 Crooked Stick"); 4319 Covington Highway in Decatur, Georgia ("4319 Covington"); 140 W. Dykes Street in Cochran, Georgia ("140 W Dykes"); 1604 E. Oglethorpe Boulevard in Albany, Georgia ("1604 E. Oglethorpe"), 2411-2505 S. Main Street in Moultrie ("2411-2505 S. Main"); 7530 St. Marlo Country Club Parkway ("7530 St. Marlo"); and 90 Hunters Chase in McDonough, Georgia ("90 Hunters").  (Petition ¶ 187.)  Another property claimed to have been acquired through "duress" and "extortion" is located at 2551 E. Pinetree Boulevard, Thomasville, Georgia ("2551 Pinetree") (collectively, 325 Crooked Stick, 4319 Covington, 140 W Dykes, 1604 E. Oglethorpe, 2441-2505 S. Main, 7530 St. Marlo, 90 Hunters, and 2551 Pinetree may be referred to as the "Affected Properties")..  All of the Affected Properties, except 7530 St. Marlo and 2551 Pinetree are owned, by one of the Moving Respondents' LLCs.  (*Id.*).  Dykes LLC, Oglethorpe LLC, Main LLC, and 2551 East Pinetree Blvd LLC ('Pinetree LLC") are jointly owned with Sameer Lalani ("Lalani"), who is not a named Respondent in this action.  Petitioners, in a bid to completely place Respondents' business and livelihood on hold through litigation, have recorded notices of lis pendens against the Affected Properties, except 2551 Pinetree, copies of which are attached collectively hereto as Exhibit "A" and are incorporated herein by reference (collectively, the "Invalid Notices of Lis Pendens").

Petitioners request the imposition of an equitable lien (Count XIII) allegedly against the Affected Properties as the sole basis for their filing of the Invalid Notices of Lis Pendens.[3]  However,

---

[3] In the FARP, Petitioners request an imposition of an equitable lien due to "Respondents' misappropriation of prospective business opportunities belonging to Maharaja." (FARP ¶ 246.).  This count then refers to Count XIII in the original Petition.  (*See id.*).

as discussed herein, while Petitioners attempt to couch those claims as affecting the real property (i.e., the Affected Properties), in reality and as a matter of law they do not. Accordingly, the Invalid Notices of Lis Pendens are improper and constitute slander of title (to be asserted as a counterclaim in this lawsuit), and the Court should enter an Order requiring Petitioners to cancel them immediately.

## ARGUMENT AND CITATION TO AUTHORITY

### 1. Good cause exists for the Court to expedite review of this Motion.

A motion to cancel lis pendens is the proper vehicle for challenging the wrongful filing of such notice and, when warranted, such a motion may be reviewed on an expedited basis. *See Hill v. L/A Management Corp.,* 234 Ga. 341, 342-43 (1976). In *Hill*, the Georgia Supreme Court affirmed the cancellation of a notice of lis pendens on an emergency basis, reasoning

> With the evidence presented at the hearing that the project would be endangered if the lis pendens were continued and the bank draw refused, it was clearly neigh inequitable nor an abuse of discretion for the judge to set the hearing less than three days after the motion to cancel lis pendens was filed.

In this case, the recording of the Invalid Notices of Lis Pendens against the Affected Properties threatens to cause the Moving Respondents serious irreparable harm. First, because of the Invalid Notices of Lis Pendens, the Moving Respondents, who rely solely on their real estate holdings for income, are unable to refinance their high interest loans and unable to sell some of the Affected Properties. (Affidavit of Karan Ahuja, Exhibit B, ¶¶ 6-14, 18; Affidavit of Charanjeev Singh, Exhibit C, ¶ 6.) Second, it is clear through Arora's actions prior to this lawsuit that he seeks to inflict business losses on the Moving Respondents as he has communicated defamatory and slanderous information to the Moving Respondents' lenders and other third parties. (*See infra,* n. 5.) Third, many of the Affected Properties are securing loans. (Ahuja Aff. ¶¶ 6, 9, 10, 11, 12, 14.) Those lenders are not part of this lawsuit, even though their interests are being affected. Fourth, there are other parties involved in the ownership – Lalani – on some of the Affected Properties. Lalani is not a party to this

4

lawsuit and his interests are being affected by Petitioners' wrongful filing of the Invalid Notices of Lis Pendens.[4]

The Invalid Notices of Lis Pendens are deficient and wrongful (as explained below), are made for the sole purpose of harming and damaging the Moving Respondents, and unless they are canceled will cause the Moving Respondents serious irreparable harm.[5]  Therefore, under the reasoning in *Hill* and Uniform Superior Court Rule 6.7, the Moving Respondents respectfully request that the Court expedite review and decision on this Motion.

**2.**  **The Invalid Notices of Lis Pendens are improper, and the Court should order that Petitioners immediately cancel them of record.**

A lis pendens is valid only if (i) the property must be of a character to be subject to the rule, (ii) the court must have jurisdiction both of the person and the subject-matter, and (iii) the property involved must be sufficiently described in the pleadings.  *Boca Petroco, Inc. v. Petroleum Realty II, LLC*, 292 Ga.App. 833, 837 (2008) (citations omitted).  Further, the pleadings in the pending suit must seek some relief "respecting that particular property."  *Hutson v. Young*, 255 Ga. App. 169 (2002).  Real property is "involved" in litigation within the meaning of the lis pendens statute "only [if it is] actually and directly brought into litigation by the pleadings in a pending suit and as to which some relief is sought respecting that particular property."  *Hill*, 234 Ga. at 342-43.

If the alleged interest cannot be enforced in law or equity, then the lis pendens is not authorized.  *Evans v. Fulton Nat. Mortgage Corp.,* 168 Ga.App. 600, 601 (1983).  Furthermore, "if the

---

[4] The Moving Respondents, through these arguments, are not consenting to these third parties being added as party-defendants to this lawsuit.

[5] In one situation, Arora sent a defamatory and slanderous e-mail to the Moving Respondents' lender on the Pinetree Plaza property, claiming that the Federal Bureau of Investigation was investigating the Moving Respondents, when the same was wholly untrue and made for the purpose of harming the Moving Respondents' standing with their lender.  (*See* Arora Aff. ¶ 13, Exhibit 2.)  Arora's pattern for the last several months has been to make defamatory and slanderous statements about the Moving Respondents to any person that he can find associated with the Moving Respondents.

pleadings or evidence before the trial court hearing the motion to cancel shows on its face that the plaintiff is not entitled to a remedy involving the real property, then the lis pendens is unauthorized." *South River Farms v. Bearden,* 210 Ga.App. 156, 158 (1993). As discussed below, there are several reasons why the Invalid Notices of Lis Pendens are improper and should be immediately canceled.

> **a. The claims in the Petition concerning the Affected Properties do not "involve real property" and therefore the Invalid Notices of Lis Pendens are improper under O.C.G.A. § 44-14-610 and should be canceled of record.**

At best, the claims in the Petition involve only personal property interests – not interests in real property – and therefore the Invalid Notices of Lis Pendens are improper and should be canceled of record. It is well established that real property is only "involved" in litigation and within the meaning of the lis pendens statue "[if it is] actually and directly brought into litigation by the pleadings in a pending suit and […] some relief is sough respecting that particular property." *Meadow Springs, LLC v. IH Riverdale, LLC,* 286 Ga. 701, 703 (2010) (quoting *Hill,* 234 Ga. at 342-343). The purpose of a lis pendens is to notify prospective purchasers and third parties that a particular property is the subject of pending litigation over "title or an interest, i.e., a lien, an equitable interest, … or other similar interest, which seeks some relief respecting such alleged interest in such realty." *Hutson v. Young,* 255 Ga.App. 169, 170 (2002). A complaint which in reality only seeks a money judgment is insufficient. Importantly, as well, "[a] limited liability company interest is personal property. A member has no interest in specific limited liability company property." *Meadow Springs,* 286 Ga. 701, 704(1) (2010).

There is only one claim that Petitioners will argue entitles them to record notices of lis pendens against the Affected Properties – the count for an equitable lien (count XIII). On their claim for an equitable lien, Petitioners allege that "[r]espondents used some or all of the proceeds that they have obtained from Petitioners through the unlawful acts set forth in this Petition to purchase interests in …." the Affected Properties. (Petition ¶ 187). But in reality, after looking at the 78-page, originally

exhibit-less Petition, it is clear that Petitioners are only seeking relief against personal property interests – namely the membership interests in certain companies – and for a monetary judgment against Respondents.  The entire transaction completed in August 2019 concerned the transfer of membership interests in various companies and the transfer of real property interests. (Petition ¶ 28).  Arora later entered into another agreement whereby he transferred membership interests in a company – Zillionaire Investments, LLC ("Zillionaire") – in November 2019.  (Petition ¶ 46).  Further, there was another agreement that Arora entered into in December 2019 – between King Group Mgmt, LLC ("King Group") and Crown Assets, LLC ("Crown").  (Petition ¶ 47).

This case is similar to several Georgia appellate court holdings in which a lis pendens was found to be improper.  For example, in *Hill*, the plaintiff entered into a contract as an employee where he would receive an "equity interest" in certain developments or projects of the defendants.  In a subsequent lawsuit, the defendants filed a motion to cancel lis pendens that the plaintiff had recorded on a property owned by the defendants.  The plaintiff then amended his complaint wherein he alleged that the agreement was "arbitrary, unreasonable, and unconscionable."  *Id.* at 341-342.  The Court of Appeals agreed with the trial court and concluded that if plaintiff ultimately prevailed in the litigation, he would receive damages and a potential limited partnership interest in an entity of the defendants.  *Id.* at 343.  The court further held that "[a]n interest in a limited partnership – even a partnership that deals solely in real estate – is personalty, not realty."  *Id.*

In *Meadow Springs*, the plaintiff generally asserted that one defendant and a co-member in a development committed a host of grievances related to both phases of a particular development, *inter alia*, fraud, breach of fiduciary duty, and breach of an operating agreement.  Essentially, the plaintiff alleged that two of the defendants were alter egos and that monies had been shifted from phase I to phase II of a development – effectively an embezzlement-type scenario, even though this specific term is not referenced in the court's opinion.  The plaintiff's allegations concerned its right to invest in the

7

development of real estate, as defined in the parties' operating agreement, rather than it having a right to ownership of any real property. *Id.* at 704 (citations omitted). While the plaintiff, if it prevailed in the litigation, could have imposed a constructive trust on the profits of the development, such relief would not constitute relief against the land on which phase II was located. *Id.* (citations omitted).

In *Quill*, the plaintiff sought not only to rescind a contract of sale on one property he had purchased from the defendant, but also sought to enjoin the defendant from selling a separate property. The plaintiff alleged that he wanted to prevent the defendant from hiding any sale proceeds. 238 Ga. App. at 184, 186. The Court of Appeals found that the fraud claims did not involve the property; but rather, the plaintiff would have to pursue the proceeds of any sale of that property to satisfy his claim. *Id.* at 190(2)(a).

Petitioners' claims do not "actually and directly" bring into question the Affected Properties. Instead, Petitioners are attempting to use the guise of a count for "equitable lien" in order to provide a basis for them to record the Invalid Notices of Lis Pendens. Respondents own real property – they are real estate investors – and Petitioners know that the recording of Invalid Notices of Lis Pendens will cause Respondents significant harm. This case is nothing more than a familial business dispute, which involved the transfer of money, membership interests, and real property – it does not "actually and directly" bring into question the Affected Properties.

### b. Petitioners' claims in the Petition will fail since all of their claims are predicated on duress and extortion which are unavailable to them as they are sophisticated in business matters and had the opportunity to obtain advice of counsel prior to consummating the transactions in question.

Petitioners claims are cemented in an allegation that Arora and Vineet were under duress when certain agreements were signed in August 2019 and later in November and December 2019. Such claims are baseless and fail as a matter of law. It is well-established that "when the signer of an agreement is sophisticated in business matters and has access to and in fact obtains advice of counsel, the defense of duress is not available to void the contract." *Compris Technologies v. Techwerks, inc.,* 274

Ga.App. 673, 682 (2005) (quoting *Cooperative Resource Center v. Southeast Rural Assistance Project,* 256 Ga.App. 719, 720-721 (2002)).

On the first element, it is clear that Arora and Vineet are sophisticated in business matters. Indeed, Arora attended medical school in India.  (Petition ¶ 14).  Instead of practicing medicine, Arora started investing in real estate in 2013 or 2014 upon returning to the United States.  (Petition ¶ 14). Arora brought other family members into the real estate investment industry and was "moderately successful."  (Petition ¶ 16).  Then in later years he became "much more successful in his real estate investment endeavors, acquiring a handsome portfolio of income producing commercial properties located throughout the State of Georgia."  (Petition ¶ 17).  Arora and Vineet worked together on their real estate investments, allegedly placing $700,000 of their own savings into the Thomasville property. (Petition ¶ 40).

On the second element, Petitioners intentionally did not attach exhibits to the original Petition so the Court would not be aware that Arora and Vineet **used an attorney to consummate all of the transactions allegedly entered into under duress**.  While this Court is constrained to looking at the pleadings, if a document is referenced in a plaintiff's complaint and attached to a pleading, it may be considered by the Court.  *See Lapolla Indus., Inc. v. Hess,*  325 Ga.App. 256 (2013).  With the filing of the FARP, Petitioner's attached copies of various "coerced" documents.  It is clear from the face of these documents that Arora and Vineet utilized the services of an attorney – Joel Haber in Conyers, Georgia – to effectuate the transactions that they now complaint were consummated under duress and extortion.  For example, Exhibits D through G are Limited Warranty Deeds from King Group to Crown.  They are prepared by Mr. Haber and Mr. Haber notarized Arora's signature.  (*See also* Ahuja Aff. ¶ 16, Exhibits 1, 4.)

Because Arora and Vineet are by their own description, sophisticated business-persons, and used an attorney to consummate all of the transactions complained of in the Petition, their claims in

this Petition will fail as a matter of law.[6]   And because their claims will fail, Petitioners the Invalid

Notices of Lis Pendens are improper and should immediately be cancelled of record.

### c. Petitioners' equitable claims will fail as a matter of law as Petitioners have adequate remedies at law.

As stated above, if the pleadings establish that a plaintiff would not be entitled to relief against

real property, a notice of lis pendens is improper and may be canceled.   *Bearden,* 210 Ga.App. at 158.

It is well established precedent that "[e]quity will grant relief only where there is available no adequate

and complete remedy at law."   *Stewart v. Walton,* 254 Ga. 81, 83 (citing *Cantrell v. Henry County,* 250 Ga.

822 (1983)); *see also* O.C.G.A. § 23-1-4 ("equity will not take cognizance of a plain legal right where an

adequate and complete remedy is provided by law.")   An action that could produce a monetary

judgment is an adequate remedy at law.   *Id.* (affirming trial court's denial of injunction to enjoin

defendants from transferring, selling, and moving assets where the plaintiff sought monetary

damages).

Admittedly, Petitioners seek the imposition of an equitable lien on grounds that "[a]n equitable

lien on specific property may be decreed whenever under the rules of equity, the circumstances require

this remedy."   (Petition ¶ 189).   However, in many of the counts of the Petition, Petitioners seek

monetary judgment against Respondents.   (*See* Petition ¶¶ 159, 166, 167, 176, 215, 219; FARP ¶¶ 227,

232, 241).   Plainly stated, Petitioners do have an adequate remedy at law and actively seek one in their

Petition and the FARP – monetary judgments against Respondents.   Because they do have adequate

remedies at law, Petitioners' equitable claims will fail as a matter of law.

---

[6] As discussed *supra* § 1, the Petition is further subject to a motion to dismiss under O.C.G.A. § 9-11-12(b)(7) for failure to join indispensable parties under O.C.G.A. § 9-11-19.

### d. The Court does not have subject matter jurisdiction over the Affected Properties which are located outside of Fulton County.

The Supreme Court in *Boca Petroco* held that another pre-requisite for a proper notice of lis pendens is that the court must have jurisdiction of the subject-matter. 285 Ga. at 489. This means that the court "must be the court before which the underlying litigation was filed." *Id.* at 490 (citations omitted). Justice Hunstein, in her dissent stated that "[t]he majority's holding, however, not only bars out-of-state litigants from filing a valid lis pendens in Georgia, it also adversely affects Georgia litigants whose causes of action involve real property located in more than one Georgia county." *Id.* at 492 (Hunstein, J., dissenting).

In this case, only one of the Affected Properties is located in Fulton County. All of the other properties are located in different counties throughout Georgia. As such, under *Boca Petoco,* in particular the reasoning found in Justice Hunstein's dissent, the Invalid Notices of Lis Pendens recorded against the Affected Properties not located in Fulton County should be canceled of record as the Court does not have subject-matter jurisdiction over those properties.

### e. The Court at this juncture does not have personal jurisdiction over the Moving Respondents as Plaintiff have not served the Respondents with the summons and the Petition, nor have they filed any proof of service with the Court.

As discussed above, one of the requirements for a lis pendens to be valid against real property is that the Court have personal jurisdiction over the record title owner of the property. O.C.G.A. § 9-11-12(b) requires defenses thereunder, including defenses for service and lack of personal jurisdiction to be asserted at the time of filing a responsive pleading. In *Riggio*, the defendant filed an answer asserting lack of personal jurisdiction as an affirmative defense. The defendant also filed a compulsory counterclaim against the plaintiff. In holding that the filing of a compulsory counterclaim did not result in a waiver of the defendant's personal jurisdiction defense, the Georgia Court of Appeals found that "[t]o hold otherwise would be to subject litigants in [the defendant's] situation to a 'Catch 22,' because it would require them to choose either to waive a legitimate compulsory

counterclaim in order to test the trial court's jurisdiction over their person or waive the right to contest the issue of lack of personal jurisdiction to avoid the risk of not properly and timely asserting a compulsory counterclaim." *Id.* The Court further rejected the plaintiff's claim that because the defendant had participated in discovery that such actions constituted a waiver of the personal jurisdiction defense. *Id.* (citing *Williams v. Willis*, 204 Ga.App. 328 (1992)).

In this case, on August 7, 2020, almost a year after the alleged duress and extortion resulted in the transfer of money and property, Petitioners filed their Petition alleging various "emergencies." Petitioners even sought a temporary restraining order hearing almost two weeks ago but were directed by the Court to file a motion. No such motion has been filed to date. Further, Petitioners have made have not served all Respondents. As the Court does not have personal jurisdiction over the Moving Respondents due to Petitioners' lack of service and lack of filing a proof of service with the Court, Petitioners cannot prevail at this time against Respondents.[7] As such, the Invalid Notices of Lis Pendens recorded against the Affected Properties are improper and the Court should order that Petitioners immediately cancel them of record.

## CONCLUSION

The Moving Respondents respectfully request that the Court expedite review of this Motion and schedule a hearing. The Moving Respondents then respectfully request that the Court enter an Order requiring Petitioners to immediately cancel the Invalid Notices of Lis Pendens of record. The Moving Respondents further respectfully request that the Court award them attorney's fees and costs for having to file this Motion against Petitioners pursuant to O.C.G.A. § 9-15-14(a) and (b).

[Signature of counsel on following page]

---

[7] For purposes of full disclosure, Petitioners' counsel recently requested that the Moving Respondents' counsel acknowledge service on behalf of the Moving Respondents. However, other Respondents in this case have not been served with the summons and the Petition or the FARP.

Respectfully submitted, this 31st day of August, 2020.

**ROUNTREE LEITMAN & KLEIN, LLC**

/s/ David S. Klein
David S. Klein
Georgia Bar No. 183389
Alexandra M. Dishun
Georgia Bar No. 184502
Counsel for Respondents Charanjeev Singh, Karan S.
Ahuja, Jarnail Singh, Jonika Arora, Crown Assets
LLC, 4319 Covington Hwy LLC, 140 W Dykes Street
LLC, 1604 E Oglethorpe Blvd LLC, King Assets,
LLC and 2505 S Main Street, LLC

Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, Georgia 30329
(404) 584-1238
dklein@rlklawfirm.com
adishun@rlklawfirm.com

# EXHIBIT A

BK:1564 PG:298-299
Filed and Recorded
Aug-12-2020 04:51 AM
DOC# 2020 - 011664
BARBARA A. HARRISON
CLERK OF SUPERIOR COURT
HENRY COUNTY, GA
Participant ID: 9460511647

CROSS REFERENCE:

Book 17094 Page 318

Tax Parcel ID No. 095-01013002

RETURN RECORDED DOCUMENT TO:

Michael A. Dominy

The Dominy Law Firm, LLC

729 Piedmont Ave. NE

Atlanta, GA  30308

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

_____

### NOTICE OF LIS PENDENS

_____

BK:1564 PG:299

NOTICE is hereby given of the filing of the above-styled <u>Petition for Relief under the</u> <u>Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission</u> <u>and Other Equitable Relief, Declaratory Judgment and Damages</u> against the named Respondents. Petitioner seeks among other things to secure the recovery of funds obtained from Petitioners through unlawful means through the **Imposition of an Equitable Lien** upon the property owned by Respondent **Crown Assets, LLC** known as **90 Hunters Chase**, City of McDonough, Henry County, Georgia, having Tax Parcel ID No. 095-01013002 and being more particularly described in the Warranty Deed of record at Deed Book 17094 Page 318, Henry County real property records, the legal description being referred to and incorporated herein by reference.

This 11th day of August, 2020.

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners


The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

eFiled & eRecorded
DATE: 8/12/2020
TIME: 8:30 AM
DEED BOOK: 00445
PAGE: 00176 – 00177
RECORDING FEES: $25.00
PARTICIPANT ID: 9460511647,7067927936
CLERK: Carol Evans
Bleckley County, GA

CROSS REFERENCE:                              RETURN RECORDED DOCUMENT TO:
Book 443, Page 128                                      Michael A. Dominy
                                                  The Dominy Law Firm, LLC
                                                     729 Piedmont Ave. NE
                                                     Atlanta, GA  30308

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC | § § § § § | |
| Petitioners, | § § | |
| v. | § § § | CIVIL ACTION FILE NO. 2020CV339119 |
| CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC | § § § § § § § § § § § | |
| Respondents. | | |

**NOTICE OF LIS PENDENS**

eFiled & eRecorded
DATE: 8/12/2020
TIME: 8:30 AM
DEED BOOK: 00445
PAGE: 00177

**NOTICE** is hereby given of the filing of the above-styled <u>Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages</u> against the named Respondents. Petitioner seeks among other things to secure the recovery of funds obtained from Petitioners through unlawful means through the **Imposition of an Equitable Lien** upon the property owned by Respondent **140 W Dykes Street LLC** known as **140 W Dykes Street**, City of Cochran, Bleckley County, Georgia, having Tax Parcel ID No. A14 008, and being more particularly described in the Trustee's Deed of record at Deed Book 443 Page 128, Bleckley County real property records, the legal description being referred to and incorporated herein by reference.

This 11th day of August, 2020.

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

Lien Book 4899 Page 78
Filed and Recorded 08/12/2020 4:46:00 AM
2020-0257677
Cathelene Robinson
Clerk of Superior Court
Fulton County, GA
Participant IDs: 4879476286
7067927936

CROSS REFERENCE:                                RETURN RECORDED DOCUMENT TO:
Book 61402, Page 498                                    Michael A. Dominy
                                                   The Dominy Law Firm, LLC
                                                       729 Piedmont Ave. NE
Tax Parcel ID No. 22-3811-0807-012-7                   Atlanta, GA 30308

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

## NOTICE OF LIS PENDENS

Lien Book 4899 Page 79
Cathelene Robinson
Clerk of Superior Court

**NOTICE** is hereby given of the filing of the above-styled <u>Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages</u> against the named Respondents. Petitioner seeks among other things to secure the recovery of funds obtained from Petitioners through unlawful means through the **Imposition of an Equitable Lien** upon the property owned by Respondent **Crown Assets, LLC** known as **325 Crooked Stick Drive**, City of Alpharetta, Fulton County, Georgia, having Tax Parcel ID No. 22-3811-0807-012-7 and being more particularly described in the Warranty Deed of record at Book 61402 Page 498, Fulton County real property records, the legal description being referred to and incorporated herein by reference.

This 11th day of August, 2020.

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

<u>michael@dominylaw.net</u>

9460511647
7067927936
PARTICIPANT ID

CROSS REFERENCE:
Book 4709, Page 346

RETURN RECORDED DOCUMENT TO:
Michael A. Dominy
The Dominy Law Firm, LLC
729 Piedmont Ave. NE
Atlanta, GA 30308

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

SAHIB ARORA; VINEET SINGH;
KING GROUP MGMT LLC;
MAHARAJA INVESTMENTS, LLC
and ZILLIONAIRE ASSETS, LLC

    Petitioners,

v.

CHARANJEEV SINGH; KARAN S.
AHUJA; JARNAIL SINGH; JONIKA
ARORA; CROWN ASSETS, LLC;
2551 E PINETREE BLVD
MGMT LLC; 2551 EAST PINETREE
BLVD LLC; 4319 COVINGTON
HWY, LLC; 140 W DYKES
STREET LLC; 1604 E
OGLETHORPE BLVD, LLC;
KING ASSETS, LLC and
2505 S MAIN STREET, LLC

    Respondents.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION

FILE NO. 2020CV339119

**L2020007236**
**BK:528 PG:354-355**
FILED IN OFFICE
CLERK OF COURT
08/12/2020 08:01 AM
EVONNE S. MULL, CLERK
SUPERIOR COURT
DOUGHERTY COUNTY, GA

## NOTICE OF LIS PENDENS

BK:528 PG:355

NOTICE is hereby given of the filing of the above-styled <u>Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages</u> against the named Respondents. Petitioner seeks among other things to secure the recovery of funds obtained from Petitioners through unlawful means through the **Imposition of an Equitable Lien** upon the property owned by Respondent **1604 E Oglethorpe Blvd, LLC** known as **1604 E Oglethorpe Blvd**, City of Albany, Dougherty County, Georgia, having Tax Parcel ID No. 000II/00035/010 and, and being more particularly described in the Limited Warranty Deed of record at Deed Book 4709 Page 346, Dougherty County real property records, the legal description being referred to and incorporated herein by reference.

This 11th day of August, 2020.

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

eFiled & eRecorded
DATE: 8/12/2020
TIME: 5:34 PM
LIEN BOOK: 00082
PAGE: 00381 - 00382
RECORDING FEES: $25.00
PARTICIPANT ID: 9460511647
CLERK: Lynn G. Purvis
Colquitt County, GA
Cross-References: Deed Book 1411 Page 33

CROSS REFERENCE:                                   RETURN RECORDED DOCUMENT TO:
Book 1411, Page 33                                         Michael A. Dominy
                                                      The Dominy Law Firm, LLC
                                                       729 Piedmont Ave. NE
                                                        Atlanta, GA  30308

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | § | |

## NOTICE OF LIS PENDENS

eFiled & eRecorded
DATE: 8/12/2020
TIME: 5:34 PM
LIEN BOOK: 00082
PAGE: 00382

**NOTICE** is hereby given of the filing of the above-styled <u>Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages</u> against the named Respondents. Petitioner seeks among other things to secure the recovery of funds obtained from Petitioners through unlawful means through the **Imposition of an Equitable Lien** upon the property owned by Respondent **2505 S Main Street, LLC** known as **2505 S Main Street**, City of Moultrie, Colquitt County, Georgia, having Tax Parcel ID No. M041 001, and being more particularly described in the Trustee's Deed of record at Deed Book 1411 Page 33, Colquitt County real property records, the legal description being referred to and incorporated herein by reference.

This 11th day of August, 2020.

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

20115933  LIEN BOOK 2325 Pg 189
Filed and Recorded: 8/12/2020 3:41:00 AM
Recording Fee: $25.00
Prepared By:
9460511647
7067927936

CROSS REFERENCE:                                    RETURN RECORDED DOCUMENT TO:
Book 28197, Page 476                                        Michael A. Dominy
                                                        The Dominy Law Firm, LLC
                                                          729 Piedmont Ave. NE
    Tax Parcel ID No. 15 196 03 021                        Atlanta, GA  30308

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

## NOTICE OF LIS PENDENS

2020115933  LIEN BOOK 2325 Pg 190
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

**NOTICE** is hereby given of the filing of the above-styled <u>Petition for Relief under the</u> <u>Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission</u> <u>and Other Equitable Relief, Declaratory Judgment and Damages</u> against the named Respondents. Petitioner seeks among other things to secure the recovery of funds obtained from Petitioners through unlawful means through the **Imposition of an Equitable Lien** upon the property owned by Respondent **4319 Covington Hwy, LLC** known as **4319 Covington Highway**, Unincorporated DeKalb County, Georgia, having Tax Parcel ID No. 15 196 03 021, and being more particularly described in the Limited Warranty Deed of record at Deed Book 28197 Page 476, DeKalb County real property records, the legal description being referred to and incorporated herein by reference.

This 11th day of August, 2020.

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

Type:  GEORGIA STANDARD LIENS
Recorded: 8/12/2020 4:54:00 AM
Fee Amt:  $25.00  Page 1 of 2
Forsyth County, GA
Greg G. Allen Clerk Superior Ct

Participant ID: 9460511647File#

BK 431  PG 761 - 762

CROSS REFERENCE:
Book 9035 Page 607

RETURN RECORDED DOCUMENT TO:
Michael A. Dominy
The Dominy Law Firm, LLC
729 Piedmont Ave. NE
Atlanta, GA  30308

Tax Parcel ID No. 162 020

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

SAHIB ARORA; VINEET SINGH; §
KING GROUP MGMT LLC; §
MAHARAJA INVESTMENTS, LLC §
and ZILLIONAIRE ASSETS, LLC §
§
    Petitioners, §
§            CIVIL ACTION
§
v. §
§            FILE NO. 2020CV339119
§
CHARANJEEV SINGH; KARAN S. §
AHUJA; JARNAIL SINGH; JONIKA §
ARORA; CROWN ASSETS, LLC; §
2551 E PINETREE BLVD §
MGMT LLC; 2551 EAST PINETREE §
BLVD LLC; 4319 COVINGTON §
HWY, LLC; 140 W DYKES §
STREET LLC; 1604 E §
OGLETHORPE BLVD, LLC; §
KING ASSETS, LLC and §
2505 S MAIN STREET, LLC §
§
    Respondents. §
_____

## NOTICE OF LIS PENDENS

_____

**NOTICE** is hereby given of the filing of the above-styled <u>Petition for Relief under the</u> <u>Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission</u> <u>and Other Equitable Relief, Declaratory Judgment and Damages</u> against the named Respondents. Petitioner seeks among other things to secure the recovery of funds obtained from Petitioners through unlawful means through the **Imposition of an Equitable Lien** upon the property owned by Respondent **King Assets, LLC** known as **7530 St. Marlo Country Club Pkwy**, City of Duluth, Forsyth County, Georgia, having Tax Parcel ID No. 162 020 and being more particularly described in the Warranty Deed of record at Book 9035 Page 607, Forsyth County real property records, the legal description being referred to and incorporated herein by reference.

This 11th day of August, 2020.

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

# EXHIBIT B

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | : | |
| KING GROUP MGMT, LLC; | : | |
| MAHARAJA INVESTMENTS, LLC; and | : | |
| ZILLIONAIRE ASSETS, LLC, | : | |
| | : | |
| Petitioners, | : | CIVIL ACTION FILE NO.: |
| | : | 2020CV339119 |
| vs. | : | |
| | : | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | : | |
| JARNAIL SINGH; JONIKA ARORA; | : | |
| CROWN ASSETS, LLC; 2551 E PINETREE | : | |
| BLVD MGMT LLC; 2551 EAST PINETREE | : | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | : | |
| 140 W DYKES STREET LLC; 1604 E | : | |
| OGLETHORPE BLVD LLC; KING ASSETS, | : | |
| LLC; and 2505 S MAIN STREET, LLC, | : | |
| | : | |
| Respondents. | : | |

## AFFIDAVIT OF KARAN AHUJA

STATE OF GEORGIA
COUNTY OF FULTON

Personally appeared before the undersigned attesting officer authorized to administer oaths, Karan Ahuja who after being duly sworn, on oath deposes and says:

1.    My name is Karan Ahuja; I am above the age of eighteen years, and am competent in all respects to give this Affidavit based upon my own personal knowledge.

2.    I am one of the named Respondents in the above-captioned matter and am making this Affidavit for purposes of the Emergency Motion to Cancel Lis Pendens (the "Motion") being filed with the Court.

3.    Arora and Vineet, who are Petitioners in this lawsuit, are members of our family. Arora's biological parents and Vineet's Parents are Meharban Arora and Neeta Arora and my

Page 1

biological parents and Charanjeev Singh's parents are Jarnail Singh Arora and Jonika Arora. Meharban Arora and Jarnail Singh Arora are brothers and are and have been equal partners in all their businesses for over 30 years and both the families shared the same residence in India at 38 Green Avenue, Amritsar Punjab 143001 and in United States at 660 Belgrave Lane, Tucker GA 30084 till 2019. Neeta Arora and Jonika Arora are cousins.

4.      I am a member in each of the Moving Respondents' LLCs, as that term is defined in the Motion, except King Assets.  I have personal knowledge about the operations and dealings of each of the Moving Respondents' LLCs.

5.      The Moving Respondents' LLCs, except for King Assets, were formed for the purpose of holding single real estate assets and thus they are named after the property location and address.

6.      The real property owned Dykes LLC, Oglethorpe LLC, and Main LLC was pledged to ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

7.      Prior to the filing of this lawsuit and discovery of the notices of lis pendens recorded by Respondents, ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

8.      We were also in the process of selling the real property owned by Dykes LLC – 140 W. Dykes Street in Cochran, Georgia, the sale of which ██████████████████████████

████████████████████████████████████████████

9.      Crown owns the property at 325 Crooked Stick Drive in Milton, Georgia.  Prior to

the filing of this lawsuit and discovery of the notices of lis pendens recorded by Respondents,

Crown was in the process of re-financing the loan currently on the property.  A re-financing would

████████████████████████████████████████████

10.      Covington LLC owns the property at 4319 Covington Highway in Decatur, Georgia.

Prior to the filing of this lawsuit and discovery of the notices of lis pendens recorded by

Respondents, Covington LLC was in the process of ████████████████████

████████████████████████████████████████████

11.      Charanjeev Singh owns the property at 7530 St Marlo Country Club Parkway in

Duluth, Georgia.  Prior to the filing of this lawsuit and discovery of the notices of lis pendens

recorded by Respondents, we had the property listed for sale (and it is still listed for sale).  The loan

████████████████████████████████████████████

Page 3

████████████████████████████████████

12.    Zillionaire owns the property at 90 Hunters Chase in McDonough, Georgia. There is ███████████████████████████████ the property. Arora sent an e-mail to Zillionaire's lender on this property in May 2020. A copy of that e-mail is attached hereto as Exhibit 1.

13.    Regarding the Pinetree Plaza property in Thomasville, Georgia, Arora has been sending multiple false statements to the lender on that property since at least May 2020. Copies of those e-mails are attached hereto collectively as Exhibit 2.

14.    The Petition incorrectly states that the loan on the Pinetree Plaza property is $3,075,884.00. The loan amount is actually ████████ The full amount of the loan has not yet been disbursed because there is continuing construction for repairs and improvements taking place at the property. A copy of the construction proposal and budget is attached hereto as Exhibit 3.

15.    We have also taken on significant debt from various sources in order to make payments on these loans. ████████████████████████

16.    While it is not stated in the Petition, the transactions that occurred in August 2019,, which are the primary focus point for Petitioners' allegations, were all handled by an attorney in Conyers, Georgia – Joel Haber. Mr. Haber served as Arora's attorney and prepared all of the conveyance deeds, operating agreements, and other documents associated with the transactions.

Attached hereto as <u>Exhibit 4</u> is a copy of an e-mail sent from Arora to Mr. Haber asking him to prepare these documents. Arora also copied Mr. Haber on the e-mail referred to in Exhibit 1.

17.    The allegations that Arora and Vineet were under duress and being extorted by Respondents are blatanly false. There was never any "false and defamatory" information about Arora and Vineet's sister that Respondents threatened to release.

18.    Respondents rely on the refinancing of real estate and sale of real estate as their primary source of income. Neither I nor any of the other Respondents have a regular source of income and as stated above the monthly debt service on these properties is very high. If we are unable to service the debt on these properties, it will result in immediate and long term harm to all of us. The notices of lis pendens filed by Petitioners, which we only recently discovered because they were not attached to the Petition, are inhibiting our ability to complete the transactions discussed herein and run our businesses.

[End of Affidavit]

_____
Karan Ahuja

Sworn to and subscribed before me
This **28** day of August, 2020.

_____
Print Name: Jamie W. Keeling
Notary Public, State of Georgia
My commission expires: 06/21/

# EXHIBIT 1



## FW: GA Claim (Gelt Financial LLC to Crown Assets, LLC / Our Ref: GR-407-A)

1 message

<mab@2blaw.com>                                                      Mon, Jul 6, 2020 at 2:14 PM
To: Charanjeev Singh <charan@kw.com>

Charan, what is going on here?

**MICHAEL A. BROCHSTEIN**| Attorney at Law

404-869-1160 *phone*
404-869-0350 *fax*
www.2blaw.com
mab@2blaw.com

Brochstein & Bantley, P.C.

3495 Piedmont Road, N.E.
Eleven Piedmont Center, Suite 330

Atlanta, Georgia 30305

**CONFIDENTIALITY NOTICE:** This e-mail and any attachments contain information from the law firm of Brochstein & Bantley, P.C., and are intended solely for the use of the named recipient or recipients. This e-mail may contain privileged attorney/client communications or work product. Any dissemination of this e-mail by anyone other than an intended recipient is strictly prohibited. If you are not a named recipient, you are prohibited from any further viewing of the e-mail or any attachments or from making any use of the e-mail or attachments. If you believe you have received this e-mail in error, notify the sender immediately and permanently delete the e-mail, any attachments, and all copies thereof from any drives or storage media and destroy any printouts of the e-mail or attachments. If you are not a client of the firm receipt of this communication may not be construed as the creation of an attorney client relationship.

**From:** Amar Agrawal <aagrawal@egalawfirm.com>
**Sent:** Monday, July 6, 2020 2:05 PM
**To:** GAclaims@oldrepublictitle.com
**Cc:** mab@2blaw.com; jackmiller@geltfinancial.com; Marcy Berger <mberger@geltfinancial.com>; Elizabeth Warrington <ewarrington@egalawfirm.com>
**Subject:** GA Claim (Gelt Financial LLC to Crown Assets, LLC / Our Ref: GR-407-A)
**Importance:** High

Dear Sir/Madam,

Attached please find correspondence from our office along with attachments for a title claim. Kindly please acknowledge your receipt of same.

Thank you.



Amar A. Agrawal, Esquire

**Eisenberg, Gold & Agrawal, P.C.**

1040 Kings Highway North, Suite 200

Cherry Hill, New Jersey 08034

**T:** (856) 330-6200 Ext. 102

**F:** (856) 330-6207

**E:** aagrawal@egalawfirm.com

**W:** www.egalawfirm.com

**L:** www.linkedin.com/in/amaragrawal

Notice: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S federal tax advice contained in this e-mail, including attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service.

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

--------- Forwarded message ---------
From: Jack Miller <jackmiller@geltfinancial.biz>
To: Amar Agrawal <aagrawal@egalawfirm.com>, Marcy Berger <mberger@geltfinancial.com>
Cc:
Bcc:
Date: Fri, 29 May 2020 14:58:48 -0400
Subject: Fwd: Loan documents Zillionaire Assets LLC - GELT FINANCIALS
See below.

Jack

**Jack Miller**

5300 West Atlantic Ave, Suite 205    (561) 221-0000 ext. 2586789

Delray Beach, Fl 33484    Skype: JackMiller613

Follow us on: cid:image001.png@01D1275F.D6CB9E60 cid:image002.png@01D1275F.D6CB9E60

Gelt Financial Corporation www.Geltfinancial.com

DIP Lending, LLC  www.DIPLending.com

Quote "Success has 1000 Battles" Source unknown

Emails sent or received shall neither constitute an acceptance of conducting transactions via electronic means nor create a binding contract until and unless a written contract is signed by the parties. The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is neither the intended recipient nor an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by replying to this message and deleting it from your computer.  Note that we are not a legal or accounting firm and we do not provide legal or accounting advice.

---------- Forwarded message ---------
From: **Dr Arora** <sahib3@gmail.com>
Date: Fri, May 29, 2020 at 11:46 AM
Subject: Loan documents Zillionaire Assets LLC - GELT FINANCIALS
To: Jack Miller <jackmiller@geltfinancial.biz>, Joel Haber <Joel@joelhaber.com>

Dear Mr Miller,

My entity is listed on security deed for - **90 Hunters Chase, McDonough, GA 30253**. King Group MGMT LLC being a 50% managing member of Zillionaire Assets LLC did not sign any resolution authorizing approval of Loan.

Also, deed to secure debt says Assignment of rents - Zillionaire assets did not sign any lease with any prospective tenant for this property. To my knowledge, this property is vacant.

Attached is Operating Agreement for Zillionaire Assets LLC. You may confirm this operating agreement with Joel Haber. Originally, King Group Mgmt LLC was 100% member of Zillionaire assets LLC and Crown Assets LLC was added 50% member in November 2019. https://link.zixcentral.com/u/c3b6995c/hiugud6h6hGaZXZOPI9hPQ?u=https%3A%2F%2Fwww.joelhaber.com%2F

**Kindly let me know how did my entity become a borrower/guarantor to a loan from GELT Financials LLC without my signatures ?**

Also, I want to inform that my previous partner - Karan Ahuja and past agent Charanjeev Singh - Both are siblings - have pending investigation for fraudulent transfers of deeds using fake resolution and fraudulent loan from bank. I am providing case under investigation with Thomas county Police Department - Case# 2020-24888  - Where 50% of our interest ($700,000) was transferred (stolen) in 2551 E Pinetree Blvd, Thomasville,

GA 31792 using fake resolution/quit claim deed and new loan from TU federal bank was taken out. If you look in to quit claim deed - transfer tax is $0 on first transfer. HOW DID MY ENTITY TRANSFER A SHOPPING CENTER FOR FREE ? I believe that loan has been frozen by lender as of now and possibly being called due. This matter has been referred to FBI by Thomasville police department.

Sincerely,
Dr. Arora
4046734282
President, King Group MGMT LLC

**Links contained in this email have been replaced by ZixProtect Link Protection. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.**

# EXHIBIT 2



## FW: Fraudulent Deed transfer - 2551 E Pinetree Blvd Thomasville, GA 31792

1 message

**Kevin Vick** <Kevin.Vick@tcfederal.com>                                    Mon, Apr 27, 2020 at 1:20 PM
To: karansingh12121@gmail.com <karansingh12121@gmail.com>, Sameer Lalani <sameer.lalani10@gmail.com>,
Shaneel Lalani <shaneel@billionairesfundinggroup.com>
Cc: Greg Eiford <Greg.Eiford@tcfederal.com>, Noel Ellis <Noel.Ellis@tcfederal.com>

Karan, Sameer, and Shaneel,


On April 21st, we received the email below (and attached information) regarding a possible fraudulent
deed transfer on the 2551 E Pinetree Blvd property in Thomasville.


We are obviously concerned about the nature of the allegations made and would like to ask for an
immediate explanation regarding these allegations.


Thanks,


**Kevin Vick**
*VP, Commercial Banker  |  TC Federal Bank*

**Kevin.Vick@TCFederal.com**

131 S. Dawson St.  |  PO Box 1197
Thomasville, GA  31799

**main:** 229.226.3221  **direct:** 229.584.1035

**mobile:** 229-221-6117  **fax:**  229.226.3415


**www.TCFederal.com**

---

**From:** Dr Arora <sahib3@gmail.com>
**Sent:** Tuesday, April 21, 2020 1:31 PM
**To:** Greg Eiford <Greg.Eiford@tcfederal.com>; Kevin Vick <Kevin.Vick@tcfederal.com>; aaron@silvis-ambrose.com; lawhammond <lawhammond@bellsouth.net>; Toby Knifer <tknifer@thomasville.org>
**Subject:** Fraudulent Deed transfer - 2551 E Pinetree Blvd Thomasville, GA 31792


**\*\*\*This message was NOT sent from a TC Federal Bank email account. Please use caution when clicking on
links or opening attachments.\*\*\***

Dear Mr Eiford,

I want to inform my previous agent Charanjeev Singh executed fraudulent quit claim deed from Maharaja Investments LLC to Crown Assets LLC on **August 19,2019** using a forged resolution (Attached).

Then, Karan Ahuja/Crown Assets again transferred the property on **January 16,2020** to take out new loan from TC Federal Bank (Attached).

Maharaja Investments LLC purchased 50% interest in this property on **07/15/2019 -** Warranty deed and settlement statement attached along with copy of wire transfer to Kensington Vanguard National/Jennifer Maxwell Closing escrow. You may confirm with closing attorney in regards to this purchase.

Original resolution was provided For Purchase of property and this was edited by agent to make it For Sale with fake initials on both pages. In the place where the officer or authorized signatory should sign, the notary signed. The place where Vineet "signed" is actually just the table attesting to his ownership of 100 percent of stock at that time. As such, the document is not even properly signed as a resolution. I have original in my possession (attached). There was no money received from any of the transfers. Also, Forged Resolution for Sale by Charanjeev is dated June 22,2019 and we had not closed on this property until July 15,2019. Quite surprising how Maharaja investments LLC decided to sell a property which it had not purchased until a later date for no money to Crown Assets LLC (which was not formed till August 11,2019).

Currently both Charanjeev Singh And Karan Singh Ahuja reside at 325 Crooked Stick Dr, Milton, GA 30004 (Fulton County) I have filed a complaint with Thomas county sheriff department (Case number 2020-24888) which is under investigation with Lieutenant Toby Knifer, Criminal Investigations Division, City of Thomasville Police.

It's a request to bank not to issue further loan while investigation is pending and take necessary action.

Sincerely,

Dr. Arora

4046734282

# EXHIBIT 3

**Ollie's Bargain Outlet**
*2603 East Pinetree Boulevard*
Thomasville, GA 31792

**Prepared For:**
Align Design Associates

# PROPOSAL SUMMARY

| Line Item | Amount | Comments |
|---|---|---|
| [redacted] | | |



**Ollie's Bargain Outlet**
*2603 East Pinetree Boulevard*
Thomasville, GA 31792

**Prepared For:**
Align Design Associates

## CLARIFICATIONS & QUALIFICATIONS

1 [redacted]
2 [redacted]
3 [redacted]
4 [redacted]
5 [redacted]
6 [redacted]
7 [redacted]
8 [redacted]
9 [redacted]
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]
26 [redacted]
27 [redacted]
28 [redacted]
29 [redacted]
30 [redacted]
31 [redacted]
32 [redacted]

Asa Carlton INCORPORATED





# EXHIBIT 4

Charanjeev Singh <charan@kw.com>

## Re: Liquidation Agreement King Group MGMT LLC

5 messages

**Dr Arora** <sahib3@gmail.com>                                                    Tue, Aug 13, 2019 at 12:03 PM
To: Joel Haber <Joel@joelhaber.com>, Vineet Singh <vineetmaharaja@gmail.com>, Charanjeev Singh
<charan@kw.com>

Dear Mr Haber,

Please prepare quit claim deed for following properties and I will come this week for signatures. Charan will provide
you LLC name.

Address of Properties -
1. 106 Commerce St, Fayetteville, GA 30214 - quit claim 50% interest
2. 2723 Roosevelt Hwy, Atlanta, GA 30337  - quit claim 50% interest
3. 3811 Flat Shoals Pkwy, Decatur, GA 30034  - quit claim 50% interest
4. 5341 Snapfinger Park Dr, Decatur, GA 30035 - quit claim 50% interest
5. 2551 E Pinetree Blvd, Thomasville, GA 31792 (Update operating agreement with 4 partners under Maharaja
Investments LLC having 25% interest each - Sahib Arora, Vineet Singh, Charanjeev Singh,Karan Singh Ahuja )

Sincerely,
Dr. Arora
4046734282

On Fri, Jul 12, 2019 at 2:12 PM Dr Arora <sahib3@gmail.com> wrote:
  Dear Mr Haber,

  Profits will be distributed 25% to each at closing for each property.

  Dr Sahib Arora
  Vineet Singh
  Charanjeev Singh
  Karan Singh Ahuja

  In exchange of execution, Sahib Arora will be given $950,000 of Cost of properties under King Group MGMT LLC
  with profits at closing.

  Address of Properties -
  1. 106 Commerce St, Fayetteville, GA 30214
  2. 2995 Roosevelt Hwy, Atlanta, GA 30337
  3. 2723 Roosevelt Hwy, Atlanta, GA 30337
  4. 5754 Attucks Blvd, Morrow, GA 30260
  5. 3811 Flat Shoals Pkwy, Decatur, GA 30034
  6. 5341 Snapfinger Park Dr, Decatur, GA 30035
  7. 2318 Old Cornelia Hwy, Gainesville, GA 30507 (56% King Group)
  8. 2485 N. Columbia St. Milledgeville, GA 31061 (50% King Group)
  9. 2551 E Pinetree Blvd, Thomasville, GA 31792  (50% Maharaja investments LLC).Each member will be receiving
  25% of profit under Maharaja Investments LLC.

  Sincerely,
  Dr. Arora
  4046734282

  --
  Sincerely,
  Dr. Arora

**Charanjeev Singh** <charan@kw.com>                                              Tue, Aug 13, 2019 at 12:40 PM
To: Dr Arora <sahib3@gmail.com>

Dear Mr. Haber,
The LLC name is Crown Assets LLC

Charanjeev Singh
Keller Williams First Atlanta
200 Glenridge Point Pkwy
Cell # 4044821118 Office - +14045315700

Emails sent or received shall neither constitute acceptance of conducting transactions via electronic means nor create a binding Agreement until and unless a written contract is signed by all parties
[Quoted text hidden]

---

**sahib3@gmail.com** <sahib3@gmail.com>                                    Tue, Aug 13, 2019 at 1:27 PM
To: Charanjeev Singh <charan@kw.com>
Cc: Joel Haber <joel@joelhaber.com>, Vineet Singh <vineetmaharaja@gmail.com>

Also, make a bill of sale from Karan Ahuja to Sahib Arora - conveying 11% remaining partnership to Sahib Arora. I believe McKinzie did bill of sales for us last time.

Thankfully,
Dr Arora
[Quoted text hidden]

---

**Joel Haber** <joel@joelhaber.com>                                        Tue, Aug 13, 2019 at 2:49 PM
To: "sahib3@gmail.com" <sahib3@gmail.com>, Charanjeev Singh <charan@kw.com>
Cc: Vineet Singh <vineetmaharaja@gmail.com>

Is this for King Group MGMT

Joel M. Haber

Attorney at Law

Law Office of Joel M. Haber

2365 Wall Street

Suite 120

Conyers, GA 30013

Ph: (770) 922-9080

Fax: (770)922-4647

NOTICE:  This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee.  If you are not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.  If you have received this message in error, please notify the sender immediately by telephone (770) 922-9080 or by e-mail (Reply to Sender), and delete this message and all copies and backups thereof.  Thank you.  Law Office of Joel M. Haber.

**\*\*WARNING\*\* - Beware of Fraudulent Wire Instructions:**

Email hacking and fraud are occurring with greater frequency on real estate transactions. If you are involved in a real estate transaction as a buyer, seller, lender or real estate agent/broker or in any other capacity, you must immediately call the escrow agent or closing attorney to whom you will be sending money to or receiving money from via a wire transfer. Please contact the escrow agent or closing attorney using contact

wiring/funding instructions received from a different source, including your attorney. I am not responsible for any wires sent by you to an incorrect bank account.

[Quoted text hidden]

---

**Dr Arora** <sahib3@gmail.com>                                          Tue, Aug 13, 2019 at 4:01 PM
To: Joel Haber <joel@joelhaber.com>
Cc: Charanjeev Singh <charan@kw.com>, Vineet Singh <vineetmaharaja@gmail.com>

Yes, that is correct. 50% interest in properties will transferred to Crown Assets LLC.
Sincerely,
Dr Arora
[Quoted text hidden]

--
Sincerely,
Dr. Arora

# EXHIBIT C

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | : | |
| KING GROUP MGMT, LLC; | : | |
| MAHARAJA INVESTMENTS, LLC; and | : | |
| ZILLIONAIRE ASSETS, LLC, | : | |
| | : | |
| Petitioners, | : | CIVIL ACTION FILE NO.: |
| | : | 2020CV339119 |
| vs. | : | |
| | : | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | : | |
| JARNAIL SINGH; JONIKA ARORA; | : | |
| CROWN ASSETS, LLC; 2551 E PINETREE | : | |
| BLVD MGMT LLC; 2551 EAST PINETREE | : | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | : | |
| 140 W DYKES STREET LLC; 1604 E | : | |
| OGLETHORPE BLVD LLC; KING ASSETS, | : | |
| LLC; and 2505 S MAIN STREET, LLC, | : | |
| | : | |
| Respondents. | : | |

## AFFIDAVIT OF CHARANJEEV SINGH

STATE OF GEORGIA
COUNTY OF FULTON

Personally appeared before the undersigned attesting officer authorized to administer oaths, Charanjeev Singh who after being duly sworn, on oath deposes and says:

1.  My name is Charanjeev Singh; I am above the age of eighteen years, and am competent in all respects to give this Affidavit based upon my own personal knowledge.

2.  I am one of the named Respondents in the above-captioned matter and am making this Affidavit for purposes of the Emergency Motion to Cancel Lis Pendens (the "Motion") being filed with the Court.

3.  Arora and Vineet, who are Petitioners in this lawsuit, are members of our family.

Page 1

4.      I have personal knowledge about the operations and dealings of each of the Moving Respondents' LLCs.

5.      The Moving Respondents' LLCs, except for King Assets, were formed for the purpose of holding single real estate assets and thus they are named after the property location and address.

6.      I have reviewed the Affidavit being submitted by Karan Ahuja and affirm all of the statements made therein and the documents attached thereto.  I incorporate those statements and the documents attached into my affidavit.

7.      The allegations that Arora and Vineet were under duress and being extorted by Respondents are blatantly false.  There was never any "false and defamatory" information about Arora and Vineet's sister that Respondents threatened to release.

8.      Respondents rely on the refinancing of real estate and sale of real estate as their primary source of income.  Neither I nor any of the other Respondents have a regular source of income and as stated above the monthly debt service on these properties is very high.  If we are unable to service the debt on these properties, it will result in immediate and long term harm to all of us.  The notices of lis pendens filed by Petitioners, which we only recently discovered because they were not attached to the Petition, are inhibiting our ability to complete the transactions discussed herein and run our businesses.

[End of Affidavit]

Charanjeev Singh

Sworn to and subscribed before me
This 21st day of August, 2020.

Print Name: Megan Klein Winokur
Notary Public, State of Georgia
My commission expires: 6|10|2023

Page 2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2020, I electronically filed the foregoing **RESPONDENTS CHARANJEEV SINGH, KARAN S. AHUJA, CROWN ASSETS, LLC, 4319 COVINGTON HWY LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE BLVD LLC, KING ASSETS, LLC, AND 2505 S MAIN STREET, LLC'S EMERGENCY MOTION TO CANCEL LIS PENDENS** with the Clerk of Court using the Odyssey E-Filing System, which will automatically send e-mail notification of such filing and a copy of same to all attorneys of record.

/s/ David S. Klein
David S. Klein
Georgia Bar No. 183389

# EXHIBIT C

Debtor Crown Assets, LLC's Notice of Removal
*Sahib Arora et al. v. Charanjeev Singh et al.*
Previously Pending in the Superior Court of Fulton County, Case No. 2020CV339119

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC | § § § § § | |
| Petitioners, | § § | |
| | § | **CIVIL ACTION** |
| v. | § § | **FILE NO. 2020CV339119** |
| | § | |
| CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC | § § § § § § § § § § § § § | |
| Respondents. | | |

---

## PETITIONERS' RESPONSE IN OPPOSITION TO RESPONDENTS' EMERGENCY MOTION TO CANCEL LIS PENDENS

---

**COME NOW** Petitioners SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

LLC and file their **Response in Opposition to Respondents' Emergency Motion

to Cancel Lis Pendens,** respectfully showing that the said Motion should be denied

upon the grounds set forth below.

## I.    ARGUMENT AND CITATION OF AUTHORITY

### A. <u>There Is No Emergency</u>

Respondents filed their "<u>Emergency" Motion to Cancel Lis Pendens</u> on August 31, 2020 and although it was accompanied by two Affidavits,[1] neither of them contains any evidence as to what the "emergency" is, nor is it otherwise evident from the motion. Respondent Karan Ahuja states that "[p]rior to the filing of this lawsuit…" Respondents "…were in the process of re-financing [a] hard money loan [on the "real property owned by Dykes LLC, Oglethorpe LLC and Main LLC"] to a permanent long-term loan…" [*Affidavit of Karan Ahuja ("Ahuja Aff."), ¶¶ 6-7*] and that Respondents "…were also in the process of selling the real property owned by Dykes LLC—140 Dykes Street in Cochran, Georgia…". *Id., ¶ 8.*

He also states that "Charanjeev Singh[2] owns the property at 7530 St. Marlo County Club Parkway…" and that "[p]rior to the filing of this lawsuit…" Respondents "…had the property listed for sale (and it is still listed for sale). The loan secured by the property had a monthly payment of $2,700…Inability to sell the property would cause us a serious and large loss." Paragraph 11 ends with the sentence, "Further, if

---

[1] The Affidavit of Karan Ahuja and Affidavit of Charanjeev Singh.

[2] The record owner is actually King Group, LLC

payments are not maintained, the lender may foreclose the property." *Id., ¶ 11.*  None of these statements indicates the existence of any "emergency."

And if it were the case that one or more of Petitioners' Notices of Lis Pendens stood in the way of Respondents' conveyance of good title, either in a re-finance or sale, it is disingenuous to assume that Petitioners would not cooperate with Respondents and the other parties involved in the transaction in whatever way they could so as to *preserve* the properties or to facilitate the sale, providing they have the opportunity to assess the legitimacy of the transaction and assure that it is a *bona fide* arm's-length transaction.  If it is, Petitioners would be perfectly willing to subordinate their interest to that of a lender or to agree to transfer their lien rights to the proceeds of a sale.   Petitioners have no interest in making things difficult for Respondents in regard to their maintenance and preservation of the subject properties—quite the opposite.  Petitioners want to see to it that the properties are preserved during the pendency of the litigation so as to preserve their right to recover title or enforce their lien rights.  They requested just such relief in their <u>Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages</u> (Count III—Injunctive Relief) and in their <u>Motion for Interlocutory Injunctive Relief</u>.

Whether the statements in Ahuja's Affidavit are true or not, there is no "emergency."  And at least one of those statements may be *untrue*.

3

Regarding the property at 7530 St. Marlo Country Club Parkway, Ahuja states that the loan on the property "has a monthly payment of $2,700" and that "the lender may foreclose." *Ahuja Aff., ¶ 11.*

Petitioners' counsel took a look at the on-line GSCCCA deed records, and they indicate that Respondent King Assets, LLC ("King Assets") purchased this property on September 11, 2019—exactly one year ago—for a purchase price of $460,000.[3] Recorded after the vesting deed is a Deed to Secure Debt evidencing that Charanjeev obtained a purchase money loan in the amount of $375,000.[4]

That loan has been paid in full as indicated by the Cancellation of Security Deed dated August 6, 2020.[5] See Ex. "A" attached hereto.

The deed records of Forsyth County do not reflect a new security deed that would indicate a re-fi or any further conveyances in the chain of title to at 7530 St. Marlo Country Club Parkway.  Therefore, it would appear that, not only is 7530 St. Marlo Country Club Parkway *not* heading for foreclosure, it is owned free and clear. Moreover, it is listed for sale at $845,000—almost twice the price King Assets paid for

---

[3]   Limited Warranty Deed dated September 11, 2019 from William E. Whitaker, County Administrator, to King Assets LLC, recorded at Deed Book 9035 Page 607, Forsyth County real property records.

[4]   Deed Book 9035 Page 608

[5]   Deed Book 9543 Page 594

it.  Charanjeev is the listing agent.[6]  Far from being in dire straits, Respondents actually

seem to be faring quite well.  They do not appear to be facing any "emergencies" at

all.

### B.  <u>"Irreparable Harm" Is Irrelevant to Respondents'</u> <u>Motion  and  to  Their  Request  for  an  Expedited</u> <u>Hearing.</u>

Although Respondents cite U.S.C.R. 6.7[7] in support of their request for an

expedited consideration of their <u>Motion to Cancel Lis Pendens</u> (at p. 5), their motion

fails to "state in detail the necessity for such expedited procedure," as shown above,

nor have they shown good cause as required by the Rule.  Respondents attempt to

bolster their request for an emergency hearing by citing a case, *Hill v. L/A Management*

*Corp*., 234 Ga. 341, 216 S.E.2d 97 (1975).  However, the *Hill* case has nothing to say

about the Uniform Rules of the Superior Courts, as they did not become effective

until July 1, 1985.  *Hill* is otherwise inapplicable to the present case as it is factually

distinguishable.  The lis pendens in *Hill* was improper based on the court's finding

that  the  plaintiff's  lawsuit  involved  a  dispute  over  partnership  interests  and

compensation, not real property.  Petitioners' Notices of Lis Pendens, on the other

---

[6] Petitioners' counsel states these facts in his place, based upon internet research.

[7] "Upon written notice and good cause shown, the assigned judge may shorten or waive the time requirement applicable to emergency motions, except motions for summary judgment, or grant an immediate hearing on any matter requiring such expedited procedure. The motion shall set forth in detail the necessity for such expedited procedure."

hand, are entirely proper based on the claims and allegations in their pleadings, which clearly involve real property, as discussed *infra*.

Also in the context of their request for an expedited hearing, Respondents assert that Petitioners' Notices of Lis Pendens "…threatens (*sic*) to cause…Respondents serious irreparable harm." Motion at p. 4-5. Respondents do not develop an argument based on "irreparable harm" nor do they cite any authority showing why that principal might be applicable to their motion nor do they even try. They just throw it in. The principal of "irreparable harm" is completely irrelevant to Respondents' motion.

"Irreparable harm" is one of the four requirements for the granting of injunctive relief under Georgia law. See e.g., *Bishop v. Patton*, 288 Ga. 600, 604, 706 S.E.2d 634 (2011). It generally refers to the inadequacy of a remedy at law. "Equity intervenes by grant of an interlocutory injunction to prevent **irreparable damage** to one of the parties and to maintain the status quo until a final determination is made. [Cits.] In short, there must be some vital necessity for the injunction so that one of the parties will not be **damaged and left without adequate remedy**." *Kennedy v. W. M. Sheppard Lumber Co., Inc.,* 261 Ga. 145, 146, 401 S.E.2d 515 (1991) (emphasis supplied).

The right to record a Notice of Lis Pendens is a right provided *by law*. O.C.G.A. § 44-14-610. The only issue before the court on a motion to cancel a lis

6

pendens is whether the claims alleged in the underlying pleadings "involve" the subject real property as that term is defined in this area of the law, as discussed *infra*. It is a *statutory* right, and the equitable concept of "irreparable harm" has nothing to do with it.  Equity cannot interfere with a legal right.  "[T]he first maxim of equity is that equity follows the law. ... Where rights are defined and established by existing legal principles, they may not be changed or unsettled in equity." *Emson Investment Properties, LLC v. JHJ Jodeco 65, LLC*, 349 Ga. App. 644, 824 S.E.2d 113, 118 (2019) (citation omitted).  Whether Respondents are suffering any "irreparable harm" from Petitioners' Notices of Lis Pendens is not an issue because it is not grounds to cancel them.

## II.    ARGUMENT AND CITATION OF AUTHORITIES

### A. <u>Petitioners' Claims "Involve" Real Property as Contemplated in O.C.G.A. § 44-14-610</u>.

#### 1.  The Applicable Law

"In Georgia, there is no specific statutory authorization for the filing of a motion to cancel a notice of lis pendens." *Jay Jenkins Co. v. Financial Planning Dynamics, Inc.*, 256 Ga. 39, 41, 343 S.E.2d 487 (1986).  "Although…there is no such statutory provision in Georgia, motions to cancel notices of lis pendens have been entertained."  *Jay Jenkins Co.*, 256 Ga. 39 at 41.

The statute that provides for the filing of notices of lis pendens is O.C.G.A. § 44-14-610, which states as follows:

> No action, whether seeking legal or equitable relief or both, as to real property in this state shall operate as a lis pendens **as to any such real property involved** therein until there shall have been filed in the office of the clerk of the superior court of the county where the real property is located and shall have been recorded by the clerk in a book to be kept by him for the purpose a notice of the institution of the action containing the names of the parties, the time of the institution of the action, the name of the court in which it is pending, a description of the real property involved, and a statement of the relief sought regarding the property
>
> (emphasis supplied).

"Georgia continues to require a showing of the common law elements of lis pendens." *Meljon v. Sonsino*, 325 Ga. App. 719, 753 S.E.2d 456 (2014). Those elements are stated as follows:

> To the existence of a valid and effective lis pendens it is essential that three elements be present; that is, three material facts must concur: the property must be of a character to be subject to the rule; the court must have jurisdiction both of the person and the subject matter; and the property involved must be sufficiently described in the pleadings.
>
> *Walker v. Houston*, 176 Ga. 878, 880, 169 S.E. 107 (1933)

A pending lawsuit "involves" the subject real property as contemplated by O.C.G.A. § 44-14-610 when:

8

'… the real property…is 'actually and directly brought into litigation **by the pleadings** in a pending suit and **as to which some relief is sought respecting that particular property**.'

*Scroggins v. Edmondson*, 250 Ga. 430, 433, 297 S.E.2d 469 (1982) [quoting *Kenner v. Fields*, 217 Ga. at 745, 747, 125 S.E.2d 44 (1962)] (emphasis supplied).

However, "'[i]t is not essential ... that a plaintiff assert a direct interest in the real property for a lis pendens to be valid, **so long as the real property would be directly affected by the relief sought**.'" *Meljon v. Sonsino*, 325 Ga. App. 719, 753 S.E.2d 456 (2014) [quoting *Meadow Springs, LLC v. IH Riverdale, LLC*, 286 Ga. 701, 703, 690 S.E.2d 842 (2010)] (emphasis supplied).

The analysis to determine whether an action "involves" particular property is further explored in *Meljon v. Sonsino, supra*. The plaintiff filed a lis pendens on property in Dunwoody, Georgia, alleging that the defendant had fraudulently conveyed it to his sister for no consideration to avoid payment of his damages claims arising out of breached contract concerning a property in Marietta. The court upheld the lis pendens, noting that the plaintiff "…seeks not only to enjoin transfer of the Dunwoody property, but also to reverse a fraudulent conveyance." *Meljon v. Sonsino, supra,* 753 S.E.2d 456 at 458. The lawsuit "involved" the Dunwoody property because if the plaintiff prevailed, the property would be conveyed from the sister back to the defendant.

9

> Such a transfer falls squarely within the *raison d'etre* for a lis pendens**:** to inform prospective purchasers "that the real property in question is directly involved in a pending suit over title or an interest, i.e., **a lien, an equitable interest, fraudulent conveyance**, contract right, **or other similar interest**, which seeks some relief respecting such alleged interest in such realty." to inform prospective purchasers 'that the real property in question is directly involved in a pending suit over title or an interest, i.e., a lien, an equitable interest, fraudulent conveyance, contract right, or other similar interest, which seeks some relief respecting such alleged interest in such realty.'
>
> *Meljon v. Sonsino, supra,* 753 S.E.2d 456 at 458 [quoting *Hutson v. Young*, 255 Ga. App. 169, 170, 564 S.E.2d 780 (2002)] (emphasis supplied).

Examined in the light of these principles of law, the claims and allegations contained in the Petition and the First Amended and Restated Petition ("Amended Petition") show plainly that this action is one "involving" the subject parcels of real property and that Petitioners have the statutory right to a lis pendens notice under O.C.G.A. § 44-14-610.

## 2. Respondents' Arguments

Respondents do not contend that the subject parcels are not subject to the common law lis pendens rule, nor do they raise any issue as to the descriptions of the properties in the pleadings. Apart from some rather preposterous objections to jurisdiction, both subject matter and personal (*infra* at pp. 21-24), they mainly concern themselves with the question of whether this action "involves" the subject

10

properties as contemplated in the lis pendens statute. It clearly does, and Respondents' effort to show otherwise is a task with which they never should have troubled themselves. Or anyone else.

Respondents' Motion is filled with false and inaccurate representations of the **facts** of Petitioners' claims and allegations, including the following: "There is only one claim that Petitioners will argue entitles them to record notices of lis pendens against the Affected Properties – the count for an equitable lien." Motion at p. 6. **Not so.** In addition to fraudulent conveyance and equitable lien, Petitioners claim title to the properties at 140 W. Dykes Street, City of Cochran, Bleckley County, 1604 E. Oglethorpe Boulevard, City of Albany, Dougherty County and 2411-2505 S. Main Street, City of Moultrie, Colquitt County under a theory of Disgorgement arising from a Breach of Fiduciary Duty and Misappropriation of Business Opportunities. *Petition (Count XI—Breach of Fiduciary Duty) at pp. 64-65, ¶¶ 178-182; (Count XV—Disgorgement) at pp. 69-70, ¶¶ 197-199; Amended Petition (Count XXIII— Misappropriation of Business Opportunities) at pp. 8-10, ¶¶ 242-246.*

"Another property claimed to have been acquired through 'duress' and 'extortion' is located at 2551 E. Pinetree Boulevard, Thomasville, Georgia ("2551 Pinetree"). Motion at p. 3. **Not so.** Petitioners do not contend that Pinetree Plaza was acquired through 'duress' and 'extortion' but through a series of fraudulent

conveyances, as plainly set forth in their Petition. *Petition (Count II—Quiet Title) at pp. 31-43, ¶¶ 68-110.*

A further mischaracterization of Petitioners' claims is the following: "At best, the claims in the Petition involve only personal property interests—not interests in real property…" Motion at p. 6. **Not so.** Petitioners seek rescission of the Amended and Restated Operating Agreement of Maharaja Investments, LLC, based on Respondents' extortion and fraud and recovery of the Membership Interests transferred to Ahuja and Charanjeev, which is personal property (Counts IV -VI), but also separately seek the Imposition of an Equitable Lien (Count XIII) against all of the subject parcels of real property  on the grounds that "Respondents used some or all of the proceeds that they have obtained from Petitioners through the unlawful acts set forth in this Petition to purchase interests in [the subject properties]," as Respondents specifically acknowledge.  Motion at pp. 6-7.  Petitioners also seek recovery of title to 140 W. Dykes Street, 1604 E. Oglethorpe Boulevard, and 2411-2505 S. Main Street, under a theory of Disgorgement arising from a Breach of Fiduciary Duty and Misappropriation of Business Opportunities, as discussed *supra.*

Ignoring Petitioners' actual allegations and their actual requests for relief as actually stated in their Petition, Respondents insist that "[p]etitioners' claims do not 'actually and directly' bring into question the [subject properties]".  Motion at p. 8. Respondents seem to be in a state of denial.  They argue, weirdly, that "…*in reality,*

12

after looking at the 78-page…Petition, it is clear that Petitioners are only seeking

relief against personal property interests– namely the membership interests in certain

companies – and for a monetary judgment against Respondents." Motion at p. 7.

(emphasis supplied).  It is not clear what "reality" Respondents are referring to but

it is clearly not the reality of what Petitioners actually claim.

### 3.  Petitioners' Actual Claims

By reading the Petition and acknowledging its actual contents, one sees that

Petitioners' claims "actually and directly" involve interests in real property and do

so clearly and unambiguously, as shown by the following:

> "**Petitioners file this action** for relief under the general
> civil law of the State of Georgia and the Georgia Racketeer
> Influenced and Corrupt Organizations Act (O.C.G.A. §
> 16-14-1 et seq.; hereinafter the "Georgia RICO Act") **to
> recover the interests in real property and the
> Membership Interests in Petitioners Maharaja and
> Zillionaire**, and other property and money**,** which
> Respondents…obtained from them through a pattern of
> racketeering activity…" *Petition at pp. 2-3, ¶ 1.*

> "**Respondents have acquired** and maintain interests in
> and control of **real property**, personal and intangible
> property **belonging to Petitioners** through a pattern of
> racketeering activity or proceeds derived therefrom…"
> *Petition at p. 29, ¶ 63.*

> **The <u>First Fraudulent Deed</u> is an iniquitous instrument
> and cloud upon Maharaja's title, and Petitioners are
> entitled to an equitable order setting it aside and
> cancelling it in equity** pursuant to O.C.G.A. § 23-3-40 *et
> seq. Petition at pp. 37-38, ¶ 93.*

13

The **Second Fraudulent Deed is an iniquitous instrument and cloud upon Maharaja's title, and Petitioners are entitled to an equitable order setting it aside and cancelling it in equity** pursuant to O.C.G.A. § 23-3-40 *et seq. Petition at p. 39, ¶ 101.*

"[Petitioners] are entitled a Temporary Restraining Order and Interlocutory Inunction as **this case involves title to real property**, tenants in common, complicated and intricate accounts and dissipation of assets." *Petition at p. 47, ¶ 124.*

**Petitioners** have no adequate remedy at law.   They **can be made whole only through the** recovery of Pinetree Plaza and the establishment of an **Imposition of an Equitable Lien on all properties that Respondents purchased with funds obtained from them through racketeering**, including the properties or interests in the properties located at 325 Crooked Stick Drive, 4319 Covington Highway, 140 W. Dykes Street, 1604 E. Oglethorpe Boulevard, and 2411-2505 S. Main Street… *Petition at p. 47, ¶ 125.*

**Respondents used** some or all of the **proceeds** that they have **obtained from Petitioners through the unlawful acts** forth in this Petition **to purchase interests in** the following properties: **325 Crooked Stick Drive**, City of Milton…**4319 Covington** Highway, City of Decatur, DeKalb County…**140 W. Dykes** Street, City of Cochran, Bleckley County…**1604 E. Oglethorpe Boulevard**, City of Albany, Dougherty County…**2411-2505 S. Main Street**, City of Moultrie, Colquitt County…**7530 St. Marlo Country Club Parkway**, City of Duluth, Forsyth County…and **90 Hunters Chase**, City of McDonough.... *Petition at p. 66-67, ¶ 187.*

An **equitable lien on specific property** may be decreed whenever under the rules of equity, the circumstances require this remedy… *Petition at p. 67, ¶ 189*

> **Petitioners seek and are entitled to the imposition of an equitable lien upon Respondents' interests** in 325 Crooked Stick Drive; 4319 Covington Highway; 140 W. Dykes Street; 1604 E. Oglethorpe Avenue; 2411-2505 S. Main Street; 7530 St. Marlo Country Club Parkway and 90 Hunters Chase… *Petition at p. 67, ¶ 191*

> "**Maharaja is entitled recover title to the said properties**, or the gross or net profits received by therefrom, **as the result of the said Respondents' misappropriation of its business opportunities**." *Amended Petition*, at pp. 6-7, ¶ 240

Having ignored the allegations in Petitioners' pleadings that negate the premise of their Motion or having falsely characterized them as claims for money damages and recovery of personal property only, Respondents then proceed to their misguided legal conclusions. "[W]hile Petitioners attempt to couch [their request for Imposition of an Equitable Lien] as affecting the real property…in *reality* and as a matter of law they do not." Motion at pp. 3-4 (emphasis supplied). Again, whatever the "reality" is that Respondents keep referring to, it is not the reality of what is in Petitioners' pleadings. Respondents' "arguments" are nothing more than vague suggestions that in some unexplained, mysterious way, Petitioners' pleadings are just not what they appear to be. They have no substance at all, as one can readily discern by reading the Petition and Amended Petition and gaining clarity as to their actual contents. In *reality*, Petitioners assert claims to set aside fraudulent conveyances, recover title to property under a disgorgement theory and recover funds obtained by Respondents through unlawful means from the properties that

15

bought or improved with such funds through the Imposition of an Equitable Lien, as allowed by well-settled principles. *Petition at pp. 66-68, ¶¶ 192-196.*

> Whenever one person fraudulently takes money from another and invests that money in real estate, the person defrauded may follow that money to the real property and impress a trust on the property for his or her benefit.
>
> *Meadow Springs, LLC v. IH Riverdale, LLC*, *supra*, 286 Ga. 701 at 704.

It is therefore plainly evident that Petitioners' claims do "involve" the parcels of real property in issue as contemplated in O.C.G.A. § 44-14-610 and that Respondents' attempts to argue otherwise are completely meritless.

### B. The Court Cannot Consider Respondents' Argument that Petitioners' Claims of Duress Will "Fail as a Matter of Law".

Respondents argue that Petitioners' Notices of Lis Pendens should be canceled because their claims of duress "will fail as a matter of law." Motion at pp. 8-10. As a threshold matter, the Court cannot consider this argument as it is a back-handed attempt to obtain a ruling on the *merits* of Petitioners' claim. The Court would reject the argument even if it were properly brought, as it is a *straw man* that operates by mischaracterizing Petitioners' duress claims as "economic duress," whereas Petitioners actually allege duress from *extortion*,[8] then proceeds to a

---

[8] Petition at pp. 3, 14, 16-17, 27-28, ¶¶ 1, 30, 34, 39, 60

refutation of the *straw man* claim that Petitioners do not assert, which they can refute, while ignoring the actual claim that Petitioners do assert, which they cannot refute.

### 1. Impermissible as a Request for a Ruling on the Merits of Petitioners' Claims

In *Moore v. Bank of Fitzgerald*, 266 Ga. 190, 465 S.E.2d 445 (1996), the court reversed the trial court's grant of a motion to cancel a lis pendens, which the Bank of Fitzgerald had brought on the theory that the plaintiffs were *estopped* from filing the lis pendens, ruling that "…the Bank's estoppel theory relates to **the merits of appellants' claim,** an issue which **has no relevancy to** the Bank's **motion to cancel appellants' notices of lis pendens**. "'[I]nquiries of that sort are reserved for a motion for summary judgment, a remedy [the Bank] remains free to pursue.'" *Moore, supra,* 266 Ga. 190 at 191 (quoting *Scroggins, supra*, 250 Ga. 430 at 433) (emphasis supplied). "It was error to grant the Bank's motion to cancel appellants' notices of lis pendens, since, 'at this stage in the litigation, it cannot be said that the [realty conveyed by the Bank's deeds under power is] not 'involved' in [this] litigation.'" *Moore, supra,* 266 Ga. 190 at 191 [quoting *Jay Jenkins Co. v. Financial Planning Dynamics, Inc.*, 256 Ga. 39, 43, 343 S.E.2d 487 (1986)].

In *Jay Jenkins Co. v. Financial Planning Dynamics, Inc.*, *supra*, the court was called upon to "…determine whether the grant of the motion to cancel the notice of lis pendens constituted an unauthorized and premature decision of the underlying

17

case on its merits" under facts similar to those in the present case. *Jay Jenkins Co.,*
256 Ga. 39 at 39. The court noted that "'…**a motion to cancel a notice of lis**
**pendens does not raise any issue concerning the merits of a claim**.'" *Jay Jenkins*
*Co.,* 256 Ga. 39 at 42 (quoting *Scroggins, supra*, 250 Ga. 430 at 433) (emphasis
supplied). The plaintiffs in *Jay Jenkins Co.* alleged they had conveyed certain
property to the defendant in trust to obtain financing, whereas the defendant
contended it was a conveyance outright. The court upheld the plaintiffs' lis pendens,
ruling that "…it cannot be said that, **as a matter of law**, [the plaintiffs] would not
be entitled to have trusts impressed on these properties." *Jay Jenkins Co. supra,* 256
Ga. 39 at 42 (emphasis supplied).

The court in *Scroggins* upheld the lis pendens under facts similar to the case
*sub judice*. The plaintiff was the trustee of a corporation in bankruptcy who alleged
that the defendant, a corporate officer, had used corporate assets to pay off a
mortgage on property owned by her personally, knowing that the company was
insolvent. The trustee had filed a lis pendens on the subject property in connection
with a suit to recover the converted funds. The court rejected the defendant's
argument that her property was not "involved" in the suit "…since **if appellant**
**ultimately prevails** in the part of his suit under consideration, **a trust or lien will**
**be imposed on the property** specifically described in his complaint." *Scroggins v.*
*Edmondson*, *supra*, 250 Ga. 430 at 433. "Although [the defendant] also argues the

18

merits of appellant's claim, this argument is misplaced. [A] motion to cancel a notice of lis pendens does not raise any issue concerning the merits of a claim." *Id.*

As the *Meljon* court noted, "...**a court may not cancel a lis pendens notice on the ground that the underlying case ... lacks merit**." *Meljon v. Sonsino, supra,* 753 S.E.2d 456 at 459 (emphasis supplied). "Thus, if the pleadings or evidence before the trial court hearing the motion to cancel **shows on its face** that the plaintiff is not entitled to a remedy involving the real property, the lis pendens is unauthorized." *Hutson v. Young*, 255 Ga. App. 169, 171,564 S.E.2d 780 (2002) (emphasis supplied).

### 2. Respondents' "Duress" Argument

Respondents assert that Petitioners' claims of *duress* "are baseless and fail as a matter of law." Motion at p. 8. They argue that Petitioners have no duress claims because they are "sophisticated business persons" and that under the case of *Compris Technologies, Inc., v. Techwerks*, 274 Ga. App. 673, 682, 618 S.E.2d 664 (2005), "...when the signer of an agreement is sophisticated in business matters and has access to and in fact obtains advice of counsel, the defense of duress is not available to void the contract." Respondents Motion at pp. 8-9. However, the *Techwerks* case has no application to the present case because it involves "business compulsion" also known as "economic duress."

> 'Business compulsion' or 'economic duress' involves the
> taking of undue or unjust advantage of a person's

economic necessity or distress to coerce him into making a contract and is recognized as a contractual defense. **A duress claim must be based on acts or conduct of the opposing party which are wrongful or unlawful.** Georgia courts are reluctant to void contracts, and we have found no Georgia decision voiding a contract on the theory of economic duress

*Compris Technologies, Inc., v. Techwerks*, *supra*, 274 Ga. App. 673 at 682 (emphasis supplied).

Petitioners do not allege "economic duress" but duress caused by "acts or conduct of the opposing party which are wrongful or unlawful," being Respondents' acts of criminal *extortion*, specifically, extortion as defined in O.C.G.A. 16-8-16(3), that is, threats to "disseminate any information tending to subject any person to hatred, contempt, or ridicule…" *Petition at pp. 2-3, 14, 27-28, ¶¶ 1, 30, 60.* Thus the straw man falls.

## C. <u>The Court Cannot Consider Respondents' Argument that Petitioners' Equitable Claims Will "Fail as a Matter of Law".</u>

Respondents argue that Petitioners' Notices of Lis Pendens should be canceled because Petitioners will not be able show that they have no adequate remedy at law, as a "matter of law". Motion at p. 10. The Court cannot consider this argument for the same reason it cannot consider Respondents' "duress" argument: it is a back-handed attempt to obtain a ruling on the merits of Petitioners' claim. The Court will decide whether Petitioners have shown that they have no adequate remedy at law at the hearing on their Motion for Interlocutory Injunctive

20

Relief or perhaps the Court will rule that they are not required to show "irreparable harm"—the absence of an adequate remedy at law—in this case under Georgia Racketeer Influenced and Corrupt Organizations Act (O.C.G.A. § 16-14-1 et seq.; the "Georgia RICO Act"), which dispenses with the requirement of "irreparable harm." O.C.G.A. § 16-14-6(c).

In any case, as discussed *supra*, "irreparable harm" is one of the requirements of injunctive relief (except in the present case where Petitioners seek an injunction under the Georgia RICO Act) and is irrelevant to the question of whether Petitioners' Notices of Lis Pendens are proper.

### D. <u>The Court Must Reject Respondents' Argument Based on Lack of Subject Matter Jurisdiction.</u>

Respondents make a further attempt to support their Motion to Cancel Lis Pendens, this one the argument that this Court has no subject matter jurisdiction over properties outside of Fulton County. Motion at p. 11. If this argument were correct, Petitioners would be required to maintain the present suit relative to one of the "Affected Properties," 325 Crooked Stick Drive, City of Alpharetta, Fulton County, and file six (6) additional lawsuits—in DeKalb, Forsyth, Colquitt, Henry, Dougherty and Bleckley Counties—a separate lawsuit in each county in which the additional six (6) properties involved in this action are located.

A requirement that Petitioners file seven (7) separate lawsuits in seven (7) different counties scattered throughout the State of Georgia would impose an odious

burden upon them and fly in the face of the basic policies of the Civil Practice Act, which "…shall be construed to secure the just, speedy, and inexpensive determination of every action." O.C.G.A. § 9-11-1.  From this oppressive result, one might suspect that Respondents' argument is wrongheaded, and one would be correct.  It is complete nonsense.

But one does not have to go far to determine the source of Respondents' error. It is apparent within the pages of their Brief, in the case they cite as supporting authority, *Boca Petroco v. Petroleum Realty II, LLC*, 285 Ga. 487, 678 S.E.2d 330 (2009), a case involving a lis pendens filed in Georgia by a *Florida* litigant. Respondents actually cite one of the two *dissenting* opinions—the dissent of Justice Hunstein.

Undoubtedly, Justice Hunstein would be *shocked* to know that an attorney was actually citing her opinion in *support* of a request to require the opposing party to file seven (7) separate lawsuits throughout the State of Georgia against the same parties on the same claims involving the same facts and issues.  She did not champion such a result.  She thought the majority opinion required it and wrote her dissent to express her dismay.  She believed it "adversely affects Georgia litigants..." *Boca Petroco v. Petroleum Realty II, LLC*, 678 S.E.2d 330 at 335.  The majority did not believe its opinion required such a result, nor did Justice Carley, who wrote a separate dissenting opinion.  It is certainly not the law of this State.  Probably the

22

only people in the world who like the idea are Respondents and their counsel. But they like it for the wrong reasons. Lawyers should not seek out ways to cast unfair burdens upon their opponents.

### E. <u>The Court Must Reject Respondents' Argument Based on Lack of Personal Jurisdiction.</u>

Respondents make one final attempt at supporting their Motion to Cancel Lis Pendens with legal argument, and this argument is the most interesting of all. Pointing out that Petitioners had not perfected service by the time they filed their Motion to Cancel Lis Pendens on Monday, August 31, 2020, Respondents contend that "Petitioners cannot prevail at this time against Respondents." Motion at p. 12. Based on Petitioners' failure to serve Respondents with process by August 31, 2020, Respondents argue that "...the Notices of Lis Pendens recorded against the Affected Properties are improper and the Court should order that Petitioner immediately cancel them of record." *Id.*

Had Petitioners' counsel known that Respondents' counsel, rather than this Court, could establish a cut-off date for serving process without even giving advance notice, he would have handled things differently in the week before Respondents filed their Motion from how he did handle them, as shown by the emails exchanged between him and Respondents' counsel and the proposed Acknowledgment of Services that he prepared as a courtesy to Respondents' counsel. See Ex. "B" – "E" attached hereto.

Setting aside the concerns that the emails might raise as to fairness and good faith in counsels' dealings with each other and turning to the substance of Respondents' argument, one sees that, not only is there no requirement of personal service prior to consideration of a motion such as Respondents', "[t]here is no requirement of personal service prior to the issuance of an interlocutory injunction. Notice to the adverse party is all that is required..." *Consortium Management Co. v. Mutual America Corp*., 246 Ga. 346, 348, 271 S.E.2d 488 (1980).

**WHEREFORE** Petitioners respectfully pray that Respondents' Motion to Cancel Lis Pendens be DENIED.

This 15th day of September, 2020.

Respectfully Submitted,

_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

24

Type:  STATE LAND RECORDS
Recorded: 8/18/2020 10:17:00 AM
Fee Amt:  $25.00  Page 1 of 1
Forsyth County, GA
Greg G. Allen Clerk Superior Ct

Participant ID(s): 9562359654,
  7067927936

## BK 9543  PG 594

**GEORGIA**

Parcel No. **162 020**



County of **FORSYTH**
Loan No.: **50003035**
When Recorded Mail To: King Llc Glenridge Point Pkwy Ste 100 Atlanta, GA 30342

# CANCELLATION OF SECURITY DEED

THE indebtedness referred to in that certain Deed to Secure Debt described below, having been paid in full, and the undersigned, **BLACKSTONE RESIDENTIAL OPERATING PARTNERSHIP LP**, located at **1601 LBJ FREEWAY SUITE 150, FARMERS BRANCH, TX 75234**, the Grantee of that certain Security Deed described below, the Clerk of such Superior Court is authorized and directed to cancel, that deed of record as provided in Code Section 44-14-4 O.C.G.A. for other mortgage cancellations.

Said Security Deed dated **SEPTEMBER 11, 2019** and executed by **KING ASSETS LLC**, Grantor, to **COMMERCIAL LENDER LLC**, Original Grantee, and recorded in the office of the Clerk of the Superior Court of **FORSYTH** County, State of **GEORGIA** on **SEPTEMBER 18, 2019** in Book **9035** at Page **608**.

**AS DESCRIBED IN SAID SECURITY DEED**

IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed this **AUGUST 06, 2020**.

**BLACKSTONE RESIDENTIAL OPERATING PARTNERSHIP LP, BY FAY SERVICING, LLC ITS ATTORNEY IN FACT**

**CHRISTY BROWN, ASSISTANT SECRETARY**

STATE OF **IDAHO**          COUNTY OF **BONNEVILLE**    ) ss.

SIGNED, SEALED, AND DELIVERED in the presence of the below named Notary Public, as an official witness and below named unofficial witness, on **AUGUST 06, 2020**, by **CHRISTY BROWN, ASSISTANT SECRETARY**, of **FAY SERVICING, LLC AS ATTORNEY-IN-FACT FOR BLACKSTONE RESIDENTIAL OPERATING PARTNERSHIP LP**:

Notary Public/Official Witness:

**ASHLEY RYDALCH (COMMISSION EXP. 03/29/2025)**
NOTARY PUBLIC

Unofficial Witness:

ASHLEY RYDALCH
Notary Public - State of Idaho
Commission Number 20190781
My Commission Expires Mar 29, 2025

**RIKA UPCHURCH**, Witness

POD: 20200529
FY8101218IM - LR - GA

Page 1 of 1

# Exhibit "A"

**From:** Michael Dominy
**To:** David Klein
**Cc:** Alexandra Dishun; Assistant
**Subject:** RE: Sahib Arora et a. v. Charanjeev Singh et al., CAFN 2020CV339119
**Date:** Tuesday, August 25, 2020 9:43:00 AM
**Attachments:** image001.png
image002.png
image003.png
image004.png
image005.png
image006.png
image007.png
image008.png
image009.png

That sounds good.

Thank you.

**MICHAEL A. DOMINY**
— ATTORNEY AT LAW —

729 Piedmont Ave NE
Atlanta, GA 30308
(404) 900-9570
michael@dominylaw.net

THE DOMINY LAW FIRM, LLC

This email, and any attachments, is intended only for use by the addressee(s) named and may contain legally privileged or confidential information, or both. If you are not the intended recipient of this email, you are notified that any dissemination, distribution or copying of this email, and any attachments, is prohibited. The unauthorized disclosure or interception of email is a federal crime. See 18 U.S.C. Section 2511. If you have received this email in error, please immediately notify me at (404) 900-9570 or at michael@dominylaw.net and permanently delete the original and any copy of any email and any printout. If this is regarding a debt, please be aware that this is an attempt to collect a debt, and any information obtained will be used for that purpose.

**From:** David Klein <dklein@rklawfirm.com>
**Sent:** Tuesday, August 25, 2020 1:30 AM
**To:** Michael Dominy <Michael@dominylaw.net>
**Cc:** Alexandra Dishun <adishun@rklawfirm.com>
**Subject:** RE: Sahib Arora et a. v. Charanjeev Singh et al., CAFN 2020CV339119

Michael – I can probably acknowledge service, let me just double check with clients. I have a MSJ bankruptcy court hearing in the morning, so I will get back to you in the afternoon.

Thanks,
David



**David S. Klein**
Partner
Rountree Leitman & Klein, LLC

_____

☎ (404) 856-0540 | (404) 310-3371
✉ dklein@rklawfirm.com
⚹ www.rklawfirm.com
⊙ Century Plaza I, 2987 Clairmont Road, Suite 175, Atlanta, GA 30329

CONFIDENTIALITY NOTICE: This email and any attachments are intended solely for the recipients identified in the "To," "Cc," and "Bcc" lines of this email. Additionally, this email and any attachments are confidential and may contain privileged information. Rountree Leitman & Klein, LLC reserves and asserts all rights to confidentiality and privileges that may apply to this email and any attachments. If you are not an intended recipient, then your receipt of this email and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Furthermore, no attorney-client relationship exists without a signed agreement. In accordance with those rights and privileges, you are instructed to delete and destroy immediately all copies of the email and its attachments in any form and immediately notify Rountree Leitman & Klein, LLC. You are not permitted in any way to review, copy, or rely on the contents of this email and any attachments. Rountree Leitman & Klein, LLC expressly reserves all rights and remedies for violations of confidentiality and privilege. This email and any attachments are covered by the Electronic Communications Privacy Act, 18 USC § 2510 et seq.
FDCPA NOTICE: Please be advised that this Firm may be acting as a debt collector and that this communication may constitute an attempt to collect a debt, and any information obtained will be used for that purpose. If the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect the debt.

**From:** Michael Dominy <Michael@dominylaw.net>
**Sent:** Monday, August 24, 2020 8:56 PM
**To:** David Klein <dklein@rklawfirm.com>
**Cc:** Alexandra Dishun <adishun@rklawfirm.com>
**Subject:** Sahib Arora et a. v. Charanjeev Singh et al., CAFN 2020CV339119

David,

Attached are courtesy copies of the **Exhibits to the Petition** and **First Amended and Restated Petition**, which I submitted for e-filing this evening.

I did not attach Certificates of Service because I intend for these pleadings to be personally served upon the Respondents along with the Original Petition and Summons.

In that regard, I would like to know if you are authorized or could obtain authorization to acknowledge service. I have taken the liberty of preparing an Acknowledgement of Service for your review. Please let me know if it is in acceptable form. If you would rather use a form of your choosing, that would be fine too. If I am going have to serve your people, please let me know and I will get that done.

Thank you.

**MICHAEL A. DOMINY**
— ATTORNEY AT LAW —

729 Piedmont Ave NE
Atlanta, GA 30308
(404) 900-9570
michael@dominylaw.net

THE DOMINY LAW FIRM, LLC

# Exhibit "B"

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

SAHIB ARORA; VINEET SINGH;   §
KING GROUP MGMT LLC;   §
MAHARAJA INVESTMENTS, LLC   §
and ZILLIONAIRE ASSETS, LLC   §
   §
    Petitioners,   §
   §   CIVIL ACTION
v.   §
   §   FILE NO. 2020CV339119
   §
CHARANJEEV SINGH; KARAN S.   §
AHUJA; JARNAIL SINGH; JONIKA   §
ARORA; CROWN ASSETS, LLC;   §
2551 E PINETREE BLVD   §
MGMT LLC; 2551 EAST PINETREE   §
BLVD LLC; 4319 COVINGTON   §
HWY, LLC; 140 W DYKES   §
STREET LLC; 1604 E   §
OGLETHORPE BLVD, LLC;   §
KING ASSETS, LLC and   §
2505 S MAIN STREET, LLC   §
   §
    Respondents.

_____

## ACKNOWLEDGMENT OF SERVICE OF PROCESS
_____

The undersigned, Counsel of Record for Respondents Charanjeev Singh,

Karan S. Ahuja, Jarnail Singh, Jonika Arora, Crown Assets, LLC, 4319 Covington

Hwy, LLC, 140 W Dykes Street LLC, 1604 W. Oglethorpe Blvd, LLC, 2505 S. Main

Street LLC and King Assets, LLC, for and on behalf of each of the said Respondents,

hereby acknowledges service of the following process and other papers in the above-styled civil action:

(a) Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages

(b) Summons

(c) Exhibits to the Petition, and

(d) First Amended and Restated Petition.

All additional service and issuance of process is hereby waived.

This ____ day of August, 2020.

_____
David S. Klein
State Bar No. 183389
Counsel for Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh, Jonika Arora, Crown Assets, LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street LLC, 1604 W. Oglethorpe Blvd, LLC, 2505 S. Main Street LLC and King Assets, LLC

Rountree Leitman & Klein, LLC
Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, Georgia 30329
(404) 584-1238
dklein@rlkawfirm.com

Sworn to and subscribed before me this ____ day of _____, 2020.

_____
[NOTARY PUBLIC]

**Exhibit "C"**

**From:** Michael Dominy
**To:** David Klein
**Cc:** Alexandra Dishun; Assistant
**Subject:** RE: Sahib Arora et al., v. Charanjeev Singh et al., CAFN 2020CV339119
**Date:** Wednesday, August 26, 2020 11:00:00 AM
**Attachments:** image006.png
image007.png
image008.png
image009.png
image010.png
image011.png
image012.png

Thank you.

**MICHAEL A. DOMINY**
— ATTORNEY AT LAW —

729 Piedmont Ave NE
Atlanta, GA 30308
(404)900-9570

THE DOMINY LAW FIRM, LLC
michael@dominylaw.net

This email, and any attachments, is intended only for use by the addressee(s) named and may contain legally privileged or confidential information, or both. If you are not the intended recipient of this email, you are notified that any dissemination, distribution or copying of this email, and any attachments, is prohibited. The unauthorized disclosure or interception of email is a federal crime. See 18 U.S.C. Section 2511. If you have received this email in error, please immediately notify me at (404) 900-9570 or at michael@dominylaw.net and permanently delete the original and any copy of any email and any printout. If this is regarding a debt, please be aware that this is an attempt to collect a debt, and any information obtained will be used for that purpose.

---

**From:** David Klein <dklein@rlklawfirm.com>
**Sent:** Wednesday, August 26, 2020 10:56 AM
**To:** Michael Dominy <Michael@dominylaw.net>
**Cc:** Alexandra Dishun <adishun@rlklawfirm.com>; Assistant <assistant@dominylaw.net>
**Subject:** Re: Sahib Arora et a. v. Charanjeev Singh et al., CAFN 2020CV339119

Michael:

Thanks. I've reached out again to my folks to confirm I am authorized to accept service on their behalf. Should let you know something here shortly.

Best,
David



**David S. Klein**
Partner, Rountree Leitman & Klein, LLC
(404) 856-0540 | (404) 310-3371 | dklein@rlklawfirm.com
www.rlklawfirm.com
Century Plaza I, 2987 Clairmont Rd., Ste. 175, Atlanta, Georgia 30329

CONFIDENTIALITY NOTICE: This email and any attachments are intended solely for the recipients identified in the "To," "Cc," and "Bcc" lines of this email. Additionally, this email and any attachments may contain privileged information. Rountree Leitman & Klein, LLC reserves and asserts all rights to confidentiality and privileges that may apply to this email and any attachments. If you are not an intended recipient, then your receipt of this email and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Furthermore, no attorney-client relationship exists without a signed agreement. In accordance with those rights and privileges, you are instructed to delete and destroy immediately all copies of this email and its attachments in any form and immediately notify Rountree Leitman & Klein, LLC. You are not permitted in any way to review, copy, or rely on the contents of this email and any attachments. Rountree Leitman & Klein, LLC expressly reserves all rights and remedies for violations of confidentiality and privilege. This email and any attachments are covered by the Electronic Communications Privacy Act, 18 USC § 2510 et seq.

---

**From:** Michael Dominy <Michael@dominylaw.net>
**Date:** Wednesday, August 26, 2020 at 10:54 AM
**To:** David Klein <dklein@rlklawfirm.com>
**Cc:** Alexandra Dishun <adishun@rlklawfirm.com>, Assistant <assistant@dominylaw.net>
**Subject:** RE: Sahib Arora et a. v. Charanjeev Singh et al., CAFN 2020CV339119

David,

Attached is a copy of the Notice of Filing Exhibits which was accepted for filing today following the Clerk's rejection of the "Exhibits to Petition" that I tried to file on Monday. The Clerk required the caption to include "Notice of Filing…" The substance of the document is the same

I have revised the proposed Acknowledgment of Service that I sent you on Monday to reflect the change in the caption of that document. A copy is attached. Also, I have attached a copy of the Summons. I wasn't sure whether you have a copy.

Do you know yet whether you will be acknowledging service?

Thank you.

**MICHAEL A. DOMINY**
— ATTORNEY AT LAW —

729 Piedmont Ave NE
Atlanta, GA 30308
(404)900-9570

THE DOMINY LAW FIRM, LLC
michael@dominylaw.net

This email, and any attachments, is intended only for use by the addressee(s) named and may contain legally privileged or confidential information, or both. If you are not the intended recipient of this email, you are notified that any dissemination, distribution or copying of this email, and any attachments, is prohibited. The unauthorized disclosure or interception of email is a federal crime. See 18 U.S.C. Section 2511. If you have received this email in error, please immediately notify me at (404) 900-9570 or at michael@dominylaw.net and permanently delete the original and any copy of any email and any printout. If this is regarding a debt, please be aware that this is an attempt to collect a debt, and any information obtained will be used for that purpose.

# Exhibit "D"

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

_____

## ACKNOWLEDGMENT OF SERVICE OF PROCESS
_____

The undersigned, Counsel of Record for Respondents Charanjeev Singh,

Karan S. Ahuja, Jarnail Singh, Jonika Arora, Crown Assets, LLC, 4319 Covington

Hwy, LLC, 140 W Dykes Street LLC, 1604 W. Oglethorpe Blvd, LLC, 2505 S. Main

Street LLC and King Assets, LLC, for and on behalf of each of the said Respondents,

**Exhibit "E"**

hereby acknowledges service of the following process and other papers in the above-styled civil action:

(a) Petition for Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages

(b) Summons

(c) Notice of Filing Exhibits, and

(d) First Amended and Restated Petition.

All additional service and issuance of process is hereby waived.

This ____ day of August, 2020.

_____
David S. Klein
State Bar No. 183389
Counsel for Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh, Jonika Arora, Crown Assets, LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street LLC, 1604 W. Oglethorpe Blvd, LLC, 2505 S. Main Street LLC and King Assets, LLC

Rountree Leitman & Klein, LLC
Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, Georgia 30329
(404) 584-1238
dklein@rlkawfirm.com

Sworn to and subscribed before me this ____ day of _____, 2020.


_____
[NOTARY PUBLIC]

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

_____

## CERTIFICATE OF SERVICE
_____

THIS IS TO CERTIFY that I have this day served a copy of the foregoing

**Petitioners' Response in Opposition to Respondents' Emergency Motion to**

**Cancel Lis Pendens** by email marked STATUTORY ELECTRONIC SERVICE

upon counsel for Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh,

Jonika Arora, Crown Assets, LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street

LLC, 1604 W. Oglethorpe Blvd, LLC, 2505 S. Main Street LLC and King Assets,

LLC, as follows:

David S. Klein, Esq. at dklein@rlklawfirm.com and

Alexandra M. Dishun, Esq., at adishun@rlklawfirm.com

By Priority Mail: Upon Respondent 2551 East Pinetree Blvd, LLC c/o Sameer

Lalani, 1040 Indian Trail Rd., Suite Bl, Lilburn, GA 30047

This 21st day of September, 2020.


_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners


The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net

# EXHIBIT D

Debtor Crown Assets, LLC's Notice of Removal
*Sahib Arora et al. v. Charanjeev Singh et al.*
Previously Pending in the Superior Court of Fulton County, Case No. 2020CV339119

Fulton County Superior Court
***EFILED***TB
Date: 9/22/2020 11:50 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

|  |  |  |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

## PETITIONERS' MOTION FOR ATTORNEY'S FEES
## PURSUANT TO O.C.G.A. § 9-15-14

**COME NOW** Petitioners SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

LLC, and file this, their **Motion for Attorney's Fees Pursuant to O.C.G.A. § 9-**

**15-14** as follows:

## I.    INTRODUCTION

This Motion pertains to Respondents' <u>Emergency Motion to Cancel Lis Pendens</u>, which was filed on August 31, 2020.[1]  The motion is set for hearing at 12:30 pm on September 23, 2020.   Petitioners file this <u>Motion for Attorney's Fees,</u> pointing out that pursuant to O.C.G.A. § 9-15-14(a), the various positions asserted by Respondents are not only meritless, "…there existed such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim…" and that the Court *is required to* award "reasonable and necessary attorney's fees and expenses of litigation" to Petitioners in having to respond to the motion and attend the Rule Nisi hearing.  Alternatively, Petitioners show that Respondents' arguments "lack substantial justification," meaning that they are "substantially frivolous, substantially groundless or substantially vexatious" and that the Court *should* award "reasonable and necessary attorney's fees and expenses of litigation" incurred by Petitioners pursuant to O.C.G.A. § 9-15-14(b).

A  review  of  certain  of  Respondents'  arguments,  especially  their "jurisdictional" arguments, requires the conclusion that those claims were

---

[1]  Petitioners submitted their <u>Response in Opposition to Respondents' Emergency Motion to Cancel Lis Pendens</u> ("Response Brief") for e-filing on September 15, 2020.  However, the filing was returned due to a missing signature.  Petitioners have re-submitted their Response Brief.

"interposed for delay or harassment," in addition to being devoid of any factual or legal basis. *Id*. Finally, viewing Respondents' <u>Emergency Motion to Cancel Lis Pendens</u> as a whole, it becomes clear that Respondents have used the Motion as a vehicle to assert a collection of frivolous and abusive claims and that the Motion in its entirety is devoid of legal merit and was filed for improper purposes.

Before launching into those matters, however, it may be helpful to clarify the *scope* of Respondents' <u>Emergency Motion to Cancel Lis Pendens</u>. As stated in their <u>Memorandum of Law in Support of Motion for Interlocutory Injunctive Relief</u> at pp. 13-16, Petitioners intend to proceed with their claims against Respondents concerning **1604 E. Oglethorpe Boulevard**, Albany, Dougherty County, **140 W. Dykes Street**, Cochran, Bleckley County, and **2505 S. Main Street**, Moultrie, Colquitt County, in the pending Civil Action File No. SUCV202000035 in the Superior Court of Thomas County, Georgia (the "Thomas County Action"). Therefore, Petitioners intend to record Notices of Lis Pendens relative to those claims, when they are filed in the Thomas County Action, along with dismissals as appropriate of claims pertaining to these properties in the present action.

Accordingly, Respondents' Motion should only concern Petitioners' <u>Notices of Lis Pendens</u> as to four (4) properties, those located at **90 Hunters Chase**, Unincorporated Henry County (TPID No. 095-01013002), **4319 Covington Highway**, City of Decatur, DeKalb County, (TPID No. 15 196 03 021), **325**

3

**Crooked Stick Drive**, City of Milton, Fulton County (TPID No. 22 381108070127)

and **7530 St. Marlo Country Club Parkway**, Unincorporated Forsyth County

(TPID No. 162 020).

Petitioners assert claims against each of these properties for Imposition of an

Equitable Lien and/or Constructive Trust based upon the allegations that they were

purchased or improved with funds that Respondents obtained from Petitioners

through unlawful means. *See* Response Brief at pp. 13-15. It is beyond cavil that

Petitioners' claims "involve" the properties and that their <u>Notices of Lis Pendens</u> are

authorized by O.C.G.A. § 44-14-610, and Respondents could not have reasonably

believed that the Court would order their cancellation.

## II.    ARGUMENT AND CITATION OF AUTHORITIES

### A. <u>Respondents' Argument that Petitioners' Claims Do Not Involve Real Property Is Frivolous.</u>

In their <u>Emergency Motion to Cancel Lis Pendens</u>, Respondents argue that

Petitioners' <u>Notices of Lis Pendens</u> as to 90 Hunters Chase, 4319 Covington

Highway, 325 Crooked Stick Drive and 7530 St. Marlo Country Club Parkway are

improper because the claims stated in the <u>Petition</u> and <u>First Amended and Restated</u>

<u>Petition</u> do not "involve" real property as contemplated in O.C.G.A. § 44-14-610.

*See* Motion at pp. 5-9. Petitioners have exposed this argument as completely

meritless by citing to the pages and Paragraphs of their Petition in which the

4

Imposition of an Equitable Lien among other claims including Imposition of a Constructive Trust is clearly and unambiguously alleged and claimed as to each of these specific parcels. *See* Response Brief at pp. 14-15.

No additional showing is necessary to conclude that "…there existed such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim." It may be helpful, however to frame the issue in terms O.C.G.A. § 9-15-14(a) and perhaps accentuate a few points.

First, Respondents' <u>Motion to Cancel Lis Pendens</u> raises no justiciable issue of *fact* as to what the black print of Petitioners' pleadings states—and that is the only issue before a Georgia court on a motion to cancel a recorded Notice of Lis Pendens. *See* Response Brief at pp. 18-19.[2] Nor does Respondents' <u>Motion</u> raise any justiciable issue of *law* as to how the black print of Petitioners' pleadings must be *construed*.

The Court's only inquiry—its only concern—is the *contents* of the pleadings, and the reason that Respondents are *not* entitled to cancellation of Petitioners' <u>Notices of Lis Pendens</u> is because the Petition does *not* show on its face that

---

[2] "Thus, if the pleadings or evidence before the trial court hearing the motion to cancel **shows on its face** that the plaintiff is not entitled to a remedy involving the real property, the lis pendens is unauthorized."  *Hutson v. Young,* 255 Ga. App. 169, 171,564 S.E.2d 780 (2002) (emphasis supplied).

Petitioners are *not* entitled to a remedy involving real property. *Id.*

Respondents' legal position is that Petitioners' claims do not "involve" real property although they obviously do.   Respondents suggest, however, that Petitioners are somehow attempting to "*couch*" their claims as affecting real property (Motion at pp. 3-4) and are using "the *guise*[3] of a count for 'equitable lien' in order to…" achieve certain nefarious ends *Id*. at p. 8.  This idea that, irrespective of what the pleadings actually state, Petitioners' claims and allegations are "in reality" something else, is the core idea of Respondents' <u>Motion</u>.  Their "arguments" are nothing more than vague suggestions that in some unexplained, mysterious way, Petitioners' pleadings are just not what they appear to be.  They might be described as "Gaslighting" with a *veneer* of legal argument.  They are enigmatic yet entirely bogus, as one can readily discern by reading the Petition and Amended Petition and gaining clarity as to their actual contents.

The falsity of Respondents' legal position is perhaps best exposed by noting what is missing from it.   There is not even the slightest effort to explain *why* the Petitioners' claims should be construed as if they are "cover" for some other, unstated set of claims, which do not "involve" real property, rather than according to the plain and unambiguous allegations of the Petition that set forth the facts and

---

[3]  guise/gīz/ "An external form, appearance, or manner of presentation, typically concealing the true nature of something."

circumstances supporting Petitioners' Equitable Lien and Constructive Trust claims as to the subject parcels, which obviously *do* "involve" real property. "All pleadings shall be so construed as to do substantial justice." O.C.G.A. § 9-11-8(f). Respondents' bizarre construction of Petitioners' pleadings is as far away from that ideal as east is from west. To accept it would require the Court to disregard the plain language of the Petition, and no one could have believed that the Court would do that.

## B. Respondents' Arguments of "Irreparable Harm" Are Irrelevant and Frivolous.

Throughout their Emergency Motion to Cancel Lis Pendens, Respondents complain of the hardships they are supposedly suffering as the result of Petitioners' Notices of Lis Pendens. They repeatedly assert that Petitioners harbor improper or malicious motives in recording the Notices of Lis Pendens and that their business as "real estate investors" is being harmed by them. None of these assertions have *any* bearing whatsoever on Petitioners' statutory right to record Notices of Lis Pendens. They are completely irrelevant, and Respondents' inclusion of them has served to cloud and confuse the issues and considerably expand the proceedings.

Such statements include the following: "[T]he notices of lis pendens recorded by Petitioners against various properties throughout the State of Georgia, **are causing significant harm** to [Respondents]" Motion at p. 1 (emphasis supplied). "Petitioners, in a bid to completely place Respondents' business and livelihood on

hold through litigation, have recorded notices of lis pendens…"  Motion at p. 3.
"[T]he recording of the …Notices of Lis Pendens against the Affected Properties
**threatens to cause the Moving Respondents serious irreparable harm**." Motion
at p. 4 (emphasis supplied).   "[B]ecause of the…Notices of Lis Pendens,
…Respondents, who rely solely on their real estate holdings for income, are unable
to refinance their high interest loans and unable to sell some of the Affected
Properties." Motion at p. 4.  "The…Notices of Lis Pendens are made for the sole
purpose of harming and damaging the Moving Respondents, and **unless they are**
**canceled will cause the Moving Respondents serious irreparable harm**." Motion
at p. 5 (emphasis supplied).  "Respondents own real property – they are real estate
investors – and Petitioners know that the recording of …Notices of Lis Pendens **will**
**cause Respondents significant harm**." Motion at p. 8 (emphasis supplied).

Respondents' Emergency Motion to Cancel Lis Pendens is really one big mis-
direction play.  Respondents are approaching it—and want the Court to approach
it—as if it involved *equitable* issues, hence the repeated use of the totally
inapplicable concept of "irreparable harm."  Respondents' Motion does *not* present
any equitable issues.  The right to record a Notice of Lis Pendens is a right provided
*by law* (O.C.G.A. § 44-14-610) and equity cannot interfere with it.  Their allegations
of harm to their business is part of the mis-direction play.  Petitioners are not seeking
to restrain Respondents from conducting whatever business they want to conduct—

8

only to prevent the dissipation of specific assets.  Respondents' interjection of these various extraneous and irrelevant issues has greatly and unnecessarily increased the time, effort and expense incurred by Petitioners in responding to their <u>Emergency Motion to Cancel Lis Pendens</u>.

### C. <u>Respondents' Arguments Attacking the Merits of Petitioners' Claims Are Frivolous.</u>

Respondents have attempted to use their <u>Motion to Cancel Lis Pendens</u> to bring a number of issues before the Court for decision that have no relevance at all to Petitioners' <u>Notices of Lis Pendens</u> or Respondents' efforts to remove them, including two separate requests for decisions in their favor and against Petitioners *on the merits of Petitioners' claims*.

Respondents argue that Petitioners' <u>Notices of Lis Pendens</u> should be canceled because Petitioners' claims of duress "fail as a matter of law" (Motion at pp. 8-10) and because Petitioners' equitable claims "will fail as a matter of law." Motion at p.10.    These arguments are frivolous because they are completely irrelevant to the subject matter of Respondents' Motion.[4]  *See* Response Brief at pp. 17-19.  There is no dispute about that point.  Georgia law does not allow such back-handed attempts to obtain a ruling on the opposing party's claims. Respondents

---

[4] "…the merits of appellants' claim…has no relevancy to the Bank's motion to cancel appellants' notices of lis pendens." *Moore v. Bank of Fitzgerald*, 266 Ga. 190, 191, 465 S.E.2d 445 (1996); *Jay Jenkins Co. v. Financial Planning Dynamics, Inc.*, 256 Ga. 39, 43, 343 S.E.2d 487 (1986)

either did not research the issue or having done the research, ignored the results. Respondents' assertion of these claims has "unnecessarily expanded the proceedings," in the language of O.C.G.A. § 9-15-14(b).

What of the merits of Respondents' attacks on the merits of Petitioners' claims? They are without merit. Respondents blatantly misrepresent the nature of Petitioners' claims relating to duress, falsely referring to them as relating to *economic duress*, whereas they are in fact based on *extortion*, and proceeding to misguided legal conclusions based on their own mischaracterizations. *See* Response Brief at pp. 19-20. Respondents' effort to use their <u>Motion to Cancel Lis Pendens</u> to obtain a back-handed ruling on Petitioners' equitable claims is another attempt to gain an unfair advantage over Petitioners—by pre-empting their right to establish a claim to equitable relief as requested in their pending Motion for Interlocutory Injunctive Relief. *See* Response Brief at pp. 20-21. The law does not allow it; Respondents should have known the law, and that knowledge should have counselled against the assertion of these frivolous claims.

But Respondents were obviously *motivated* to try to use their <u>Motion to Cancel Lis Pendens</u> as a vehicle to attack the merits of Petitioners' claims. It is a surprise attack—especially effective on an "emergency" basis. However, any attorney with experience in civil litigation would know, instinctively, that generally speaking, a litigant cannot be subjected to an adverse decision on the merits of his

claim under such circumstances.  Such an attorney, perhaps being somewhat fair-minded, would know that seeking judgment on an opponent's claims "as a matter of law" *on an emergency basis* is not a procedure that the Civil Practice Act allows. But Respondents did not know.  Or did not care.  Whatever the case, it should have been obvious to them that seeking judgment "as a matter of law" is properly brought on a motion for summary judgment, with its protections and procedures, not an "Emergency" Motion to Cancel Lis Pendens.  Most probably, Respondents asserted such claims to try to gain an unfair and unconscionable advantage over Petitioners, in view of their other attempts at using their <u>Emergency Motion to Cancel Lis Pendens</u> for such purposes, as discussed *infra*.

All of Respondents' efforts, these misuses of their <u>Motion to Cancel Lis Pendens</u>, will fail—but not before they have cost Petitioners a substantial amount of time, trouble and expense.  O.C.G.A. § 9-15-14(a) provides the Court with the means to allocate those costs, and that allocation should be based on a determination of whether Respondents could have had any reasonable belief that they would *not* fail. The lack of any evident basis for such a belief will undoubtedly factor in to the Court's decision.

### D. <u>Respondents' Jurisdictional Arguments Are Frivolous and Made in Bad Faith.</u>

Respondents' frivolous and bad faith litigation tactics reach their apex with the "subject matter jurisdiction" argument (Motion at p. 11) and the "personal

jurisdiction" argument. *Id*. at p. 11-12. With regard to the former, Respondents argue that this Court lacks subject matter jurisdiction over those parcels of real property in issue in this case that are not located in Fulton County. If Respondents' argument is correct, Petitioners will be forced to file a separate lawsuit in each county in which the parcels are located—seven lawsuits in all.

Is that *really* the law? No. It is not the law. Respondents base their argument on the *dissent* written by Justice Huntstein in *Boca Petroco v. Petroleum Realty II, LLC*, 285 Ga. 487, 678 S.E.2d 330 (2009). Did Respondents accurately state the legal principle discussed in Justice Huntstein's dissent? No.

> The majority claims its holding will have no effect on [Georgia litigants whose causes of action involve real property located in more than one Georgia county], relying on *Walker v. Houston*, 176 Ga. 878, 169 S.E. 107 (1933), which held that **"[c]ommon law doctrine permits lis pendens to give notice of a lawsuit brought in a county within the state other than the county in which the real property at issue is located**." Majority Opinion, p. 490, n. 6.
>
> (emphasis supplied).

Thus, Justice Huntstein acknowledges that the *majority* did not believe that its opinion required a litigant to file a separate lawsuit in every county in which property that is the subject of the litigation is located, and she was certainly not promoting or advocating the principle. She believed that the majority's reasoning required it, and she thought it was *terrible*. Anyway, *Boca Petroco* involved a lis pendens filed in

12

Georgia giving notice of a *Florida* lawsuit. It did not even involve Georgia litigants and the issue of lis pendens in more than one county.

But Respondents' argument does not reveal any of those facts. Based on their characterization of the law, one would think that the reasoning of Justice Huntstein's dissent had carried the day somehow, that it pronounced a legal principle that this Court should follow— and that **Petitioners should be required to file a separate lawsuit in every county in which the subject property is located—seven in all**.

> No attorney or party shall be assessed attorney's fees as to any claim or defense which the court determines was asserted by said attorney or party **in** a **good faith** attempt to establish a new theory of law in Georgia if such new theory of law is based on some recognized precedential or persuasive authority.

> O.C.G.A. § 9-15-14(c) (emphasis supplied).

Are Respondents attempting in good faith to establish a new theory of law? Absolutely not. Respondents' "subject matter jurisdiction" argument can only be seen for what it is—a grossly misleading statement of the law. Moreover, it is one with dire consequences to Petitioners, if the Court were to accept it. Respondents' obvious purpose in making the argument was to cast an unconscionable and unfair burden upon Petitioners. That is bad faith.

The same intent is evidenced by Respondents' "personal jurisdiction" argument, which evidences an even *worse* degree of bad faith and mendacity. Based on the fact that Petitioners had not served Respondents with process by August 31,

13

2020, Respondents argue that "…the Notices of Lis Pendens recorded against the Affected Properties are improper and the Court should order that Petitioner immediately cancel them of record." *Id*.  To dig down deeper into Respondents' thought process, it seems to go like this:   A court does not obtain personal jurisdiction over a defendant until and unless he is properly served with process. Fair enough.  Respondents even cite a case to support that proposition, and then they note that the Court did not have personal jurisdiction over them when they filed their Emergency Motion to Cancel Lis Pendens.  Then comes their conclusion:

> As the Court does not have personal jurisdiction over [Respondents]…Petitioners cannot prevail at this time against Respondents.  As such [Petitioners' Notices of Lis Pendens] are improper and the Court should order that Petitioners immediately cancel them of record.

> Motion at p. 12.

One struggles to follow this argument.  It starts out OK; one can understand that a defendant who has not been served is not subject to the personal jurisdiction of the Court.   But then…if that defendant who is not subject to the personal jurisdiction of the Court files an Emergency Motion to Cancel Lis Pendens, the plaintiff must lose…because the Court does not have personal jurisdiction over the defendant to grant the plaintiff any relief.  Right.  As is the case with all of the other legal positions that Respondents assert in their Emergency Motion to Cancel Lis Pendens, their "personal jurisdiction" argument is not even intelligible.  It is not even

14

argument.  It is just nonsense but with a bad intent.

Making matters much worse, however, are the facts that Respondents *did not* disclose to the Court in connection with this particular argument.  In a footnote, they state: "For purposes of full disclosure, Petitioners' counsel recently requested that the Moving Respondents' counsel acknowledge service on behalf of the Moving Respondents."  Motion at p. 12 n7.  That footnote is not even close to "full disclosure."  *See* Exs. "B" – "E" to Petitioners' Response Brief, which are emails exchanged by the parties' counsel during the week prior to the filing of Respondents' Motion, showing that Respondents' counsel repeatedly indicated to the undersigned that he would be acknowledging service, and the Acknowledgment of Service forms that the undersigned drafted for Respondents' counsel as a courtesy.  As the result of Respondents' refusal to acknowledge service, Petitioners have been put to the trouble and expense of serving them personally, and it is now appears that Respondents are avoiding service.  It is not fair play to refuse to cooperate in furthering the orderly progress of the litigation and then attempt to use the consequences of that same lack of cooperation against the opposing party.

### E. <u>Taken as a Whole, Respondents' "Emergency" Motion to Cancel Lis Pendens Is Substantially Frivolous, Substantially Groundless, and Substantially Vexatious.</u>

To summarize the points raised in this Motion showing Respondents'

Emergency Motion to Cancel Lis Pendens to be one big collection of frivolous actions:  First, the only legitimate issue to be decided on such a motion is very narrow:  Does the complaint show on its face that the plaintiff's claims do not involve real property?  If yes, motion granted.  If no, motion denied.

Based on this simple but very accurate analysis of the issues on a motion to cancel lis pendens, Respondents' Motion should never have been brought, and Respondents knew it.  They had to.  No one could have believed that the Court would accept the empty-headed claims piled into it.  Their inscrutable but highly bogus arguments purporting to disclose the hidden meaning behind the plain and unambiguous language of the Petition are paradigmatic of the substantially frivolous, as their efforts to use a motion to cancel lis pendens as a way to get a back-door ruling on the merits of Petitioners' claims are of the substantially groundless, and their virtually unintelligible arguments based on "jurisdiction" are of the substantially vexatious.  The whole undertaking was misguided, in bad faith, and filed for an improper purpose—to gain unfair advantage in the litigation by confusing issues, misstating the facts and misrepresenting the law.

### F.  Petitioners' Attorney's Fees and Expenses.

Petitioners' counsel expended approximately twenty hours in drafting Petitioners' Response in Opposition to Respondents' Emergency Motion to Cancel Lis Pendens and eight hours in drafting the instant Motion for Attorney's Fees

<u>Pursuant to O.C.G.A. § 9-15-14</u>, at the hourly rate of $300.00.  Costs are estimated at $39.00 (e-filing).  Additional fees and costs will be incurred in attending the Rule Nisi hearing and possibly in drafting a Motion to Strike Affidavits.

**WHEREFORE** Petitioners respectfully pray that the Court consider this Motion and enter an Order awarding Petitioners their reasonable and necessary attorney's fees and expenses of litigation incurred due to <u>Respondents' Emergency Motion to Cancel Lis Pendens</u> as set forth herein

This 22nd day of September, 2020.

Respectfully Submitted,

_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

17

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH;<br>KING GROUP MGMT LLC;<br>MAHARAJA INVESTMENTS, LLC<br>and ZILLIONAIRE ASSETS, LLC | §<br>§<br>§<br>§<br>§ | |
| Petitioners, | §<br>§ | |
| | § | CIVIL ACTION |
| v. | §<br>§ | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S.<br>AHUJA; JARNAIL SINGH; JONIKA<br>ARORA; CROWN ASSETS, LLC;<br>2551 E PINETREE BLVD<br>MGMT LLC; 2551 EAST PINETREE<br>BLVD LLC; 4319 COVINGTON<br>HWY, LLC; 140 W DYKES<br>STREET LLC; 1604 E<br>OGLETHORPE BLVD, LLC;<br>KING ASSETS, LLC and<br>2505 S MAIN STREET, LLC | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Respondents. | § | |

---

## CERTIFICATE OF SERVICE
_____

THIS IS TO CERTIFY that I have this day served a copy of the foregoing

**Petitioners' Motion for Attorney's Fees Pursuant to O.C.G.A. § 9-15-14** by

email marked STATUTORY ELECTRONIC SERVICE upon counsel for

Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh, Jonika Arora, Crown

Assets, LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street LLC, 1604 W.

Oglethorpe Blvd, LLC, 2505 S. Main Street LLC and King Assets, LLC, as follows:

David S. Klein, Esq. at dklein@rlklawfirm.com and

Alexandra M. Dishun, Esq., at adishun@rlklawfirm.com

This 22nd day of September, 2020.

 

 

_____

Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net

# EXHIBIT E

Debtor Crown Assets, LLC's Notice of Removal
*Sahib Arora et al. v. Charanjeev Singh et al.*
Previously Pending in the Superior Court of Fulton County, Case No. 2020CV339119

Fulton County Superior Court
***EFILED***DG
Date: 9/23/2020 7:27 AM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC | § § § § § | |
| Petitioners, | § § | |
| | § | CIVIL ACTION |
| v. | § § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC | § § § § § § § § § § § § § | |
| Respondents. | § | |

## PETITIONERS' MOTION TO STRIKE THE AFFIDAVITS OF
## CHARANJEEV SINGH AND KARAN AHUJA

**COME NOW** Petitioners SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

LLC, and file this, their **Motion to Strike Affidavits of Charanjeev Singh and**

**Karan Ahuja** as follows:

## I.    INTRODUCTION

On August 31, 2020, Respondents filed their Emergency Motion to Cancel Lis Pendens.  Attached to the Motion are two supporting Affidavits, the Affidavit of Respondent Charanjeev Singh dated August 27, 2020 ("Charanjeev Affidavit") and the Affidavit of Karan Ahuja dated August 28, 2020 ("Ahuja Affidavit").  Both Affidavits recite that they were made "…for purposes of the Emergency Motion to Cancel Lis Pendens (the 'Motion') being filed with the Court."  Charanjeev Aff., ¶ 2; Ahuja Aff., ¶ 2.

Petitioners file this Motion to Strike both Affidavits in their entirety in advance of the Rule Nisi hearing set for September 23, 2020, upon the grounds that the evidence they contain is completely irrelevant to the limited issues to be decided by the Court on Respondents' Motion and that the Ahuja Affidavit contains material that is not only irrelevant but scurrilous and prejudicial.

To briefly summarize the contents of the Affidavits, both Charanjeev and Ahuja deny that Petitioners Sahib Arora and Vineet Singh "were under duress and being extorted." Charanjeev Aff., ¶ 7; Ahuja Aff., ¶ 17.  These statements are irrelevant to any issue that the Court may consider in connection with Respondents' Motion and should be stricken.  Both Charanjeev and Ahuja complain that Petitioners' Notices of Lis Pendens "…are inhibiting [their] ability to complete the transactions discussed herein and run [their] business."  Charanjeev Aff., ¶ 8; Ahuja

2

Aff., ¶ 18.  These statements are likewise irrelevant to any issue that the Court may consider in connection with Respondents' <u>Motion</u> and should be stricken.   In his Affidavit, Ahuja provides certain information of a financial nature concerning on-going loan transactions, debt service and prospective sales of certain of the subject properties as well as certain financial information concerning some of the individual Respondents, which are also completely irrelevant to the <u>Emergency Motion to Cancel Lis Pendens</u> and should likewise be stricken.  Ahuja Aff., ¶¶ 6-12, 15.  Ahuja also makes certain extraneous and self-serving statements concerning the Pinetree Plaza Shopping Center, which is the subject of litigation in Thomas County, and the involvement of Dr. Arora's attorney, Joel M. Haber, Esq., in the transactions that were coerced from Petitioners on August 14, 2019, which are completely irrelevant to the issues before the Court and should be stricken.  Ahuja Aff., ¶¶ 14, 16.  Finally, Ahuja attaches certain communications involving Dr. Arora, including privileged communications between him and his attorney, and makes certain comments and statements regarding them which are self-serving, false, defamatory and obviously intended to prejudice the Court against Petitioners, and these statements should be stricken upon such grounds and also upon the grounds that—like all the other statements in both Affidavits—they are completely irrelevant to Respondents' <u>Motion to Cancel Lis Pendens</u>. Ahuja Aff., ¶¶ 12-13, Exs. 1-2, 4.

Respondents' <u>Motion</u> is heavy laden with all manner of irrelevant, frivolous

and vexatious claims and arguments,[1] and a full explication of all these groundless

claims is expected at the Rule Nisi hearing.  The Court will decide the parameters of

oral argument.  To assist it in doing so, Petitioners have filed the instant <u>Motion to

Strike</u>, alerting the Court to the irrelevant and scurrilous matter in Respondents'

Affidavits and specifically requesting that the Court not consider them upon the

grounds set forth below.


## II.    ARGUMENT AND CITATION OF AUTHORITIES

### A. <u>The Statements in Respondents' Affidavits Alleging "Harm" Due to the Notices of Lis Pendens Are Irrelevant and Should Be Stricken.</u>

Respondents will certainly try to tell their sob stories about the difficulties

they are encountering in making money off the properties they stole from Petitioners

because of the <u>Notices of Lis Pendens</u>, and the Court should not allow it.  As they

state in their <u>Motion</u>: "[T]he notices of lis pendens recorded by Petitioners against

various properties throughout the State of Georgia, **are causing significant harm** to

[Respondents]" Motion at p. 1 (emphasis supplied). "Petitioners, in a bid to

completely place Respondents' business and livelihood on hold through litigation,

have recorded notices of lis pendens…" Motion at p. 3.    "[T]he recording of the

---

[1] See Petitioners' Motion for Attorney's Fees Pursuant to O.C.G.A. § 9-15-14 at pp. 15-16.

…Notices of Lis Pendens against the Affected Properties **threatens to cause the Moving Respondents serious irreparable harm**." Motion at p. 4 (emphasis supplied*). Et Cetera*.

These assertions, whether true or not, are **completely irrelevant** to the sole question that the Court must decide, which is:  Do Petitioners' claims "involve" the subject parcels of real property as contemplated in O.C.G.A. § 44-14-610? Answering this question does **not** involve the exercise of the Court's equitable powers.  The right to record a Notice of Lis Pendens is a right provided *by law* (O.C.G.A. § 44-14-610) and equity cannot interfere with it. "[T]he first maxim of equity is that equity follows the law. ... Where rights are defined and established by existing legal principles, they may not be changed or unsettled in equity." *Emson Investment Properties, LLC v. JHJ Jodeco 65, LLC*, 824 S.E.2d 113, 118 (2019) (Citation omitted).  The statements in Respondents' Affidavits attempting to show hardship or "irreparable harm" due to Petitioners' <u>Notices of Lis Pendens</u> are irrelevant and should be stricken.

### B. <u>The Statements in Respondents' Affidavits Pertaining to the Merits of Petitioners' Claims Are Irrelevant and Should Be Stricken.</u>

Respondents are obviously anxious to deny their involvement in the extortion scheme perpetrated by them and their family members and of which they were the primary beneficiaries.  However, an inquiry as to the merits of Petitioners' claims is

impermissible in the context of Respondents' Motion to Cancel Lis Pendens. The statements in Respondents' Affidavits pertaining to the merits of this case are irrelevant to the subject matter of Respondents' Motion[2] and should be stricken.

**WHEREFORE** Petitioners respectfully pray that the Court consider this Motion and enter an Order awarding Petitioners their reasonable and necessary attorney's fees and expenses of litigation incurred due to Respondents' Emergency Motion to Cancel Lis Pendens as set forth herein

This 23rd day of September, 2020.

Respectfully Submitted,

_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

---

[2] "…the merits of appellants' claim…has no relevancy to the Bank's motion to cancel appellants' notices of lis pendens." *Moore v. Bank of Fitzgerald*, 266 Ga. 190, 191, 465 S.E.2d 445 (1996); *Jay Jenkins Co. v. Financial Planning Dynamics, Inc.*, 256 Ga. 39, 43, 343 S.E.2d 487 (1986)

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

_____

## CERTIFICATE OF SERVICE
_____

THIS IS TO CERTIFY that I have this day served a copy of the foregoing

**Petitioners' Motion to Strike the Affidavits of Charanjeev Singh and Karan**

**Ahuja** by email marked STATUTORY ELECTRONIC SERVICE upon counsel for

Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh, Jonika Arora, Crown

Assets, LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street LLC, 1604 W.

Oglethorpe Blvd, LLC, 2505 S. Main Street LLC and King Assets, LLC, as follows:

David S. Klein, Esq. at dklein@rlklawfirm.com and

Alexandra M. Dishun, Esq., at adishun@rlklawfirm.com

This 23rd day of September, 2020.

_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net

2

Fulton County Superior Court
***EFILED***TB
Date: 9/23/2020 11:06 AM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

SAHIB ARORA; VINEET SINGH;   §
KING GROUP MGMT LLC;   §
MAHARAJA INVESTMENTS, LLC   §
and ZILLIONAIRE ASSETS, LLC   §
  §
    Petitioners,   §
  §    CIVIL ACTION
v.   §
  §    FILE NO. 2020CV339119
  §
CHARANJEEV SINGH; KARAN S.   §
AHUJA; JARNAIL SINGH; JONIKA   §
ARORA; CROWN ASSETS, LLC;   §
2551 E PINETREE BLVD   §
MGMT LLC; 2551 EAST PINETREE   §
BLVD LLC; 4319 COVINGTON   §
HWY, LLC; 140 W DYKES   §
STREET LLC; 1604 E   §
OGLETHORPE BLVD, LLC;   §
KING ASSETS, LLC and   §
2505 S MAIN STREET, LLC   §
  §
    Respondents.   

---

## AMENDMENT TO
## PETITIONERS' MOTION TO STRIKE THE AFFIDAVITS OF
## CHARANJEEV SINGH AND KARAN AHUJA

---

**COME NOW** Petitioners SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

LLC, and file this, their **Amendment to Motion to Strike Affidavits of Charanjeev**

**Singh and Karan Ahuja** to correct an error in the *Request for Relief*, as follows:

**WHEREFORE** Petitioners respectfully pray that the Court strike the Affidavits of Charanjeev Singh and Karan Ahuja in their entirety.

This 23rd day of September, 2020.

Respectfully Submitted,

Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

2

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

SAHIB ARORA; VINEET SINGH;  §
KING GROUP MGMT LLC;  §
MAHARAJA INVESTMENTS, LLC  §
and ZILLIONAIRE ASSETS, LLC  §
　  §
　　Petitioners,  §
　  §　CIVIL ACTION
v.  §
　  §　FILE NO. 2020CV339119
　  §
CHARANJEEV SINGH; KARAN S.  §
AHUJA; JARNAIL SINGH; JONIKA  §
ARORA; CROWN ASSETS, LLC;  §
2551 E PINETREE BLVD  §
MGMT LLC; 2551 EAST PINETREE  §
BLVD LLC; 4319 COVINGTON  §
HWY, LLC; 140 W DYKES  §
STREET LLC; 1604 E  §
OGLETHORPE BLVD, LLC;  §
KING ASSETS, LLC and  §
2505 S MAIN STREET, LLC  §
　  §
　　Respondents.

_____

## CERTIFICATE OF SERVICE
_____

THIS IS TO CERTIFY that I have this day served a copy of the foregoing

**Amendment to Petitioners' Motion to Strike the Affidavits of Charanjeev Singh**

**and Karan Ahuja** by email marked STATUTORY ELECTRONIC SERVICE upon

counsel for Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh, Jonika

Arora, Crown Assets, LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street LLC,

1604 W. Oglethorpe Blvd, LLC, 2505 S. Main Street LLC and King Assets, LLC,

as follows:

David S. Klein, Esq. at dklein@rlklawfirm.com and

Alexandra M. Dishun, Esq., at adishun@rlklawfirm.com

This 23rd day of September, 2020.

_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net

# EXHIBIT F

Debtor Crown Assets, LLC's Notice of Removal
*Sahib Arora et al. v. Charanjeev Singh et al.*
Previously Pending in the Superior Court of Fulton County, Case No. 2020CV339119

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1        THE COURT:  Good afternoon, gentlemen.  This is the

2   matter of Arora, et al. versus -- is it pronounced

3   Ahuja -- Ahuja?

4        MR. KLEIN:  Yes, Your Honor.

5        THE COURT:  All right.  Before the Court is the

6   defendant's motion to cancel the lis pendens.

7        Who is representing the plaintiff in this matter?

8        MR. DOMINY:  Michael Dominy, Your Honor.

9        THE COURT:  Thank you, Mr. Dominy.

10       And on behalf of -- there's several defendants  but

11   on behalf of the defendants?

12       MR. KLEIN:  Your Honor, David Klein.  I represent

13   all of the defendants except for the 2551' entities and

14   also my cocounsel, Matt Thiery, who entered an appearance

15   this morning, is on the line.  He won't be arguing today.

16       THE COURT:  And who's representing the 2551'

17   entities?  Do you know?

18       MR. KLEIN:  So they have just retained counsel but

19   they haven't -- I don't believe they have been served and

20   they are not a part of this motion.

21       MR. DOMINY:  They have been served, Judge, just

22   recently.

23       THE COURT:  So you concur, Mr. Dominy, that there

24   is -- that they don't have a dog in this fight and we can

25   proceed?

*** UNCERTIFIED DRAFT ***

1          MR. DOMINY:  That's correct.

2          THE COURT:  All right.  Then you may proceed,

3     Mr. Klein.

4          MR. KLEIN:  Thank you, Your Honor.

5          Again, David Klein for the moving respondent in this

6     case.  My cocounsel Matt Thiery is on the line as well.

7     We appreciate the Court's attention to this matter in

8     scheduling this hearing today.

9          As discussed in the affidavits filed with the motion

10     my clients are continuing to suffer harm as a result of

11     the notices of lis pendens that have been filed by the

12     petitioners in this case.  That includes high interest

13     rates, the ability to refinance properties and problems

14     being created with their tenants and lenders as a result

15     of these notices of lis pendens.

16          We contend that the petitioners' strategy here in

17     filing this lawsuit and filing notices of lis pendens is

18     to simply lock down the assets of my clients in order to

19     gain an advantage in this litigation.  Their attempt to

20     file these notices of lis pendens is nothing more than an

21     attempt to effectuate what's essentially a prejudgment

22     attachment which is not permitted considering the

23     circumstances of this case nor is it supported by Georgia

24     law.

25          I would like to provide the Court with a little bit

2

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1    of background in terms of what's alleged in the
2    proceedings.  This lawsuit arises from a familial
3    business dispute.  All the clients here are originally
4    from India.  And the petitioners, Mr. Arora and
5    Mr. Singh -- Vineet Singh are brothers.
6        My clients, Charanjeev Singh and Mr. Ahuja, are
7    cousins of the petitioners.
8        The other respondents, Jarnail and Jonika, are the
9    aunt and uncle of the petitioners in this case.
10       All of the LLCs that are the respondents in this
11   case, except for King Assets, are owned and operated by
12   Mr. Ahuja.  And King Assets is operated by my client
13   Charanjeev Singh.  The moving respondents rely on the
14   management of the real estate and the construction of
15   real estate and the sale of real estate as their -- as
16   their primary source of income.
17       So going back to 2014, the various family members
18   formed an entity called King Group Management -- MGMT,
19   LLC.  So there are multiple members of this company.  And
20   the purpose of this company was to invest in real estate
21   here in the United States, primarily in Georgia.
22       And over the course of several years this seemed to
23   be working okay.  And at times in 2019 there was
24   essentially a falling out amongst the family members.
25   And in August of 2019 there was essentially a settlement

3

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1   reached between each side of the family.  And Mr. Arora,
2   one of the petitioners, as part of that settlement,
3   directed his attorney Joel Haber, who is an attorney in
4   Conyers to draft up a number of documents to effectuate
5   the settlement agreement.
6        Many of these documents are actually in the
7   pleadings.  They're attached to the first amended
8   petition that was filed by the petitioners in this case.
9   They're attached as Exhibits A through N and they consist
10  of operating agreements and warranty deeds and things
11  like that.  That were all prepared by Mr. Haber's office.
12  And Mr. Haber's office is actually indicated as being the
13  preparer of these documents directly on the face of the
14  documents.
15       The documents, again, consisted of the transfer of
16  certain membership interest in companies like King Group
17  and another company called Maharaja, which is another
18  petitioner in this case, and the transfer of assets and
19  liabilities amongst the parties respective limited
20  liability companies.  So essentially this was supposed to
21  be a split of the two sides of the family to be
22  effectuated through all these agreements that were
23  signed.
24       In November of 2019, after the majority of the
25  documents were signed in August of 2019, there were

4

*** UNCERTIFIED DRAFT ***

1    additional membership interest transferred.  The
2    transferrer's name -- namely in a company called
3    Zillionaire Assets, LLC.  That again is another one of
4    the petitioners.  That additional membership interest
5    transfer's reflected on Exhibit A that the petitioners
6    attached to the first amended petition.
7         Of the real property interest that were transferred
8    in connection with August 2019 settlement, the
9    petitioners actually retained interest in these
10   properties.  There were usually 50 percent of the
11   property interest being transferred to my client's
12   company, while the petitioner's company retained interest
13   in those properties.  It's my understanding that those
14   properties have since been sold and the proceeds have
15   been distributed amongst the petitioners and my clients.
16   So that all occurred after the 2019 settlement documents.
17        This lawsuit was filed, Your Honor, by the
18   petitioners on August 7, 2020.  This was almost a year
19   after the August 2019 settlement transaction.  And at the
20   time that the petition was filed my clients' lender on a
21   property down in Thomasville, Georgia, which is owned
22   partially by my clients' company Crown Assets, LLC, that
23   lender had actually already filed a lawsuit due to
24   various affidavits and statements that were being made to
25   the lender by petitioners.  Some of those statements are

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1        reflected in the pleadings in this case.  So there's
2        actually a suit that's pending currently in Thomas County
3        Superior Court.  Some of the respondents have filed
4        answers in that case.
5             In late 2000 -- excuse me -- in late August 2020,
6        the last month, my clients discovered that the
7        petitioners had filed notices of lis pendens in relation
8        to this case against various properties in different
9        counties that my clients owned. It's basically their
10       entire real estate portfolio that these lis pendens have
11       been filed against.  We spell out the effected properties
12       that I refer to them as in the motion.  That is all
13       spelled out and the property addresses are spelled in
14       page 3 of the motion that I filed with the Court.  And
15       all of the notices of lis pendens are attached as Exhibit
16       A to the motion.
17            Importantly, each notice of lis pendens states
18       specifically the grounds that their -- the petitioners
19       are alleging they are permitted to file the notices of
20       lis pendens.  And it's all based upon petitioners' claim
21       in their petition for imposition of an "equitable lien"
22       as they call it.
23            So moving on to the argument, Your Honor, a lis
24       pendens provides notice to third parties of a dispute
25       that request relief to a particular property.  On

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1    notices -- a notice of lis pendens is only appropriate if

2    the real property is actually and directly brought into

3    the litigation by the pleadings in a pending lawsuit and

4    as to which some relief is sought respective to that

5    particular property.

6        So if an alleged interest cannot be enforced in law

7    or in equity, then a notice of lis pendens is not

8    authorized and it should be canceled by the Court.  And

9    my clients and I rely on three primary reasons for moving

10    to cancel these lis pendens and why they should be

11    canceled by the Court.

12        The first reason is that the claims in the

13    petition and the first amended petition that formed the

14    basis for these notices of lis pendens filed against the

15    effected properties do not actually involve real

16    property.  And we rely on the case that we cite to in our

17    brief Meadow Springs, LLC vs. IH Riverdale, LLC, 286

18    Georgia 701, 2010, Supreme Court case, which held a

19    limited liability company interest is personal property.

20    A member has no interest in specific limited liability

21    company property.

22        And so basically, the take away from that case is

23    that if a claim involves personal property interest such

24    as a membership interest in an LLC, then the real

25    property is not really involved.  It's not directly being

7

*** UNCERTIFIED DRAFT ***

1        effected by the litigation.
2              Your Honor, in this case we have a familial dispute.
3        We have a business-familial dispute that arose out of a
4        settlement transaction occurring over a year ago in
5        August of 2019.  There are also concerns, like I said,
6        the transfer of membership interests in a company called
7        Zillionaire Assets that occurred in November of 2019 of
8        last year.
9              So based on the pleadings there are various personal
10       property interests that were transferred in connection
11       with the settlement transactions to essentially
12       effectuate a split of the family.  And while interest in
13       real estate were transferred, those properties have since
14       been sold by the parties and proceeds have gone,
15       admittedly in pleadings, to both my clients and to the
16       petitioners.  So they have received proceeds from the
17       sale of real estate that has occurred after this
18       purported transaction that purportedly occurred under
19       duress in August of 2019.
20             The properties that the petitioners have filed lis
21       pendens against in this case were not part of that
22       original transaction.  Instead they were simply part of
23       my clients' real estate portfolio.  They went out and
24       filed notices of lis pendens essentially against all the
25       properties that my clients own as part of the real estate

*** UNCERTIFIED DRAFT ***

1          portfolio and they derive income from.

2          And since the August 2019 and the related

3     November 2019 transactions in reality involving the

4     transfer of personal property interest, they are not

5     permitted to file lis pendens under the reasoning in the

6     Meadow Springs case.

7          Secondly, petitioners' claims allegedly supporting

8     the placement of these lis pendens against my clients'

9     property are going to fail as a matter of law.  That is

10    directly derived from what is in the pleadings in this

11    case.

12         Every single one of the petitioners' claims in this

13    case hinge on an allegation that my clients used the

14    threat of releasing what they call false and defamatory

15    information about Mr. Arora and Mr. Vineet Singh's

16    sister.  And they, you know, allegedly were going to

17    release this false and defamatory information to the

18    groom-to-be's family members because there was a wedding

19    taking place in India at some point in 2019.  And so

20    their entire argument in this case is that they were

21    under duress and they were being extorted by my clients

22    who were allegedly going to release false and defamatory

23    information to effectively mess up a wedding that was

24    going to occur in India in 2019.  That is the sole basis

25    for their claims in this case.

*** UNCERTIFIED DRAFT ***

1          And Your Honor, it is well established and we cite
2     to the Techwerks case, 274 Georgia App. 673.  It's a 2005
3     George Court of Appeals decision.  That case said when a
4     signer of agreement is sophisticated in business matters
5     and has access and in fact obtains the advice of counsel,
6     the defense -- the contractual defense of duress is not
7     available to void a contract or an agreement.
8          So the petition itself -- the pleadings itself
9     establish that Mr. Arora and Vineet Singh are
10    sophisticated in business matters.  They talk about how
11    they've invested all of this money in real estate over
12    the last several years, that they have bought properties
13    all over the state, all over the country.  These are very
14    sophisticated individuals.
15         Then you go on and look at the petition.  And in
16    particular, the first amended petition that was filed in
17    this case, especially the exhibits that were attached to
18    the first amended petition.
19         THE COURT:  Mr. Klein, I don't want to cut you off,
20    Counsel.  But I do want to remind you that I only set
21    aside 15 minutes per side in connection with oral
22    argument, unless a request is made for additional time.
23    And you did not make such a request.
24         THE STAFF ATTORNEY:  Judge?
25         THE COURT:  Yes.

10

*** UNCERTIFIED DRAFT ***

1          THE STAFF ATTORNEY:  Judge, it was my error.
2     Additional time was requested --
3          THE COURT:  When was that?
4          THE CASE MANAGER:  -- of 30 minutes.  It was -- it
5     was timely requested.  I just timely didn't provide  it
6     to the Court.  So that is my error.
7          Moving respondent requested 30 minutes and
8     petitioner requested 10 minutes.
9          THE COURT:  All right.  I still think, Mr. Klein, we
10    need to move along.
11         MR. KLEIN:  I just have two more --
12         THE COURT:  So I just ask you wrap up.
13         MR. KLEIN:  Understood, Your Honor.  I just have two
14    more points if I have 10 minutes, maybe five minutes, I
15    should be able to wrap up.
16         Again, we cite to the Techwerks case.  You have --
17    you can't -- you can't sustain a claim for duress if
18    somebody's sophisticated in business matters and then
19    they use that term.  In all the documents they've
20    attached to their first amended petition, it's clear they
21    used an attorney to effectuate this 2019 settlement.  And
22    in response to the petitioner's claim -- in their
23    response brief they claim, without any citation to
24    anything, that the Techwerks case is an opposite because
25    it's not an economic duress situation.  I'm not aware of

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1   any case law distinguishing between duress addressed in
2   Techwerks and the alleged duress and extortion in this
3   case.  So I think the Techwerks case still applies.
4        So because their claims are essentially based on
5   this duress argument, they're going to fail and under the
6   Techwerks standard.  And these notices of lis pendens
7   never should have been filed by the petitioners.
8        And finally, Your Honor, the third point is that the
9   sole basis for the notices of lis pendens that's evident
10  on the face of the lis pendens -- it actually says
11  this -- is that it's a claim for equitable lien.  And
12  again, that's in the petition, the first amended
13  petition, and on the face of notices of lis pendens.
14       And we cite to the Stewart case, which is 254
15  Georgia 81, a 1983 case and just the statute, O.C.G.A.
16  23-1-4.  It's well established that a party can't obtain
17  equitable relief if there's an adequate remedy at law.
18  And the adequate remedy at law here is a monetary
19  judgment and they actually ask for it throughout the
20  petition against my clients.
21       So they're not going to be able to get an equitable
22  lien because equity shouldn't come into play here.  What
23  they should be seeking and what they have sought is a
24  monetary judgment against my clients.
25       Your Honor, there's also been a number -- just very

*** UNCERTIFIED DRAFT ***

1     briefly, there's been a number of motions filed in the
2     last 24 hours.  For instance, petitioners filed like a
3     20-page motion for attorney's fees.  We would obviously
4     ask for the Court to deny that request.  But in any
5     event, it's not ripe for the Court's consideration.  If
6     the Court's not going to decline it today, then we would
7     request time to respond.  Also --
8         THE COURT:  The only thing we are hearing today,
9     Mr. Klein, is your motion.  So if there are other matters
10    that were filed within the last 24 hours, they are not on
11    the calendar.
12        Anything else?
13        MR. KLEIN:  No, Your Honor.  Just, you know, I would
14    ask to reserve just a brief minute or two of rebuttal
15    time if I need to address anything that Mr. Dominy brings
16    up in his oral argument.
17        Thank you, Your Honor.
18        THE COURT:  Mr. Dominy?
19        MR. DOMINY:  Thank you, Judge.
20        The issue before the Court for a decision on this
21    motion is very narrow.  And that issue is does
22    petitioners' claims involve real property?  That's all.
23        Now, we are at the very first stage of the case and
24    all the Court can do in response to decide a motion such
25    as this at this stage is to look at the pleadings and

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1   make a determination of whether the claims,
2   quote/unquote, involve real property as contemplated by
3   the lis pendens statute.  And that's it.
4        As Mr. Klein pointed out, petitioners' claims
5   involving the property, petitioners' claims against the
6   property are based in equitable lien or constructive
7   trust.  And that is a very well recognized cause of
8   action in Georgia law in which you're following the
9   money.  Someone steals money from you or gets money
10  through some unlawful means and buys real estate with it.
11  It is well settled in Georgia law that the plaintiff can
12  follow that money and recover that money from the
13  property, hence imposition of an equitable lien.
14       Our complaint clearly and unambiguously sets forth
15  all the facts showing that petitioners had a good claim
16  for equitable lien.  We have alleged and if -- we have
17  the tightest case you could possibly imagine from an
18  evidentiary point of view for following the money because
19  the source of the stolen money or extorted money was
20  sales proceeds from property.  We know for a fact that
21  the respondents used that money that they got to buy
22  other investment properties under a 1031 exchange, which
23  Your Honor is familiar with.
24       Basically you roll that money over into another
25  investment property.  And it was several hundred thousand

14

*** UNCERTIFIED DRAFT ***

1    dollars.  We have it to the penny.  And we know exactly
2    what properties they invested -- they purchased with that
3    investment money and those are the properties in issue.
4        So Mr. Klein's argument that our claims do not
5    involve real property is nonsensical.  The plain language
6    of the claims, the allegations and the language of the
7    petition show that, yes, they involve real property.  We
8    are seeking the imposition of a lien on these particular
9    properties.  And under the lis pendens statute we have a
10   statutory right, a right provided by law, to file notices
11   of lis pendens.  And those notices of lis pendens are
12   entirely proper.
13       Mr. Klein's argument seems to be along the lines --
14   it's not really intelligible.  The complaint says what it
15   says.  And Mr. Klein comes back around and tries to say,
16   no, it says something else.  Really what this is about is
17   money damages.  Well, right.  We could be satisfied with
18   money damages but that doesn't mean we don't have a right
19   to impose an equitable lien to recover that money.
20   That's the whole point of it.
21       Mr. Klein raises the issue of certain personal
22   property.  And what he's referring to are the limited
23   liability company interests.  Yes, that's part of the
24   case but those are separate parts of the case.
25       Mr. Klein in his argument and in his brief

*** UNCERTIFIED DRAFT ***

1    repeatedly states that, well, in reality the claims are
2    not what they look to be.  That we are from couching our
3    claims in terms of equitable line or we are using the
4    guise of an equitable lien and that is totally
5    groundless.  As I said, we have firm, factual, support
6    for our causes and claims and there is no relief
7    available for canceling the lis pendens under these
8    circumstances.
9        By the way, Mr. Klein has gotten into a lot of
10   issues here and, you know, I didn't want to interrupt of
11   course.  But these issues are irrelevant.  Mr. Klein is
12   trying to get a backdoor determination on the merits.
13       And I've cited the case law in my brief, Judge.
14   You're not looking at the merits on a motion to cancel
15   lis pendens.  We have not done any discovery.  Mr. Klein
16   comes to court arguing that our claims fail as a matter
17   of law.  No.  That has nothing to do with it.  And what
18   the case law says, and I cite it in my brief -- the issue
19   before you, Judge, is very narrow.  And basically, it
20   could be approached like this:  Does the complaint show
21   on its face that petitioners' claims do not involve real
22   property?
23       Well, clearly they do.  And Mr. Klein's alternative
24   construction of the petition is just totally groundless.
25   It makes no sense at all.

16

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1        The issue of duress is not properly before the

2    Court.  The Court is not here on the merits.  The issue

3    of equitable relief, that's not before the Court.  The

4    only issue before the Court is do -- do these allegations

5    quote/unquote involve real property?

6        And what that means to get a little more detail in

7    this specific context is, if we were to prevail, would

8    that effect -- would that directly effect these

9    properties?  Well, of course, it would.  Because what it

10   would do would be to result in the imposition of a lien.

11   It's hard to think of any clearer case of any property

12   being impacted by a claim.

13       So the respondent, to summarize -- that's all I

14   have.  To summarize, though, the allegations regarding

15   the merits are not properly before the Court.  That's

16   improper.  The respondents' argument that petitioners'

17   claims do not involve real property are just total

18   nonsense.  They're totally groundless.  And the notices

19   of lis pendens being firmly supported and petitioners'

20   having a statutory right to record them, the Court --

21   there are no grounds for canceling them.

22       Judge, I did file a motion to strike these

23   affidavits but on the grounds it was simply irrelevant.

24   And the main purpose of my filing that motion was to

25   basically alert the Court to the approach that the

*** UNCERTIFIED DRAFT ***

1      respondents are taking, which is, they're trying to make
2      out like this is some equitable claim, that they're being
3      harmed by the notices of lis pendens, irreparable harmed,
4      and so they need to be canceled.  Well, that has nothing
5      to do with it.
6           This is not an equitable issue.  We have a statutory
7      right to record the lis pendens and if that is preventing
8      them from undertaking certain transactions, well, that's
9      the whole purpose of a notice of lis pendens.
10          I mean, if parties are entitled and have grounds to
11     come into court complaining that a notice of lis pendens
12     is preventing them from conveying title, well, that
13     completely eviscerates the statute and renders it
14     meaningless.  And their arguments are meaningless.
15          I would simply say, Judge.  The issue is very
16     narrow.  Do our claims involve real property?  Well, of
17     course they do.  Therefore, this motion has to be denied.
18          That's all I have.  Thank you.
19          THE COURT:  Thank you, Mr. Dominy.
20          Last word, Mr. Klein.
21          MR. KLEIN:  Thank you, Your Honor.
22          First, I think that's the first time I've been
23     called unintelligible.  But I respectfully disagree that
24     my arguments are unintelligible.
25          But essentially, the petitioners in this case --

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1   their argument is you can claim duress to try to get out
2   of a contractual agreement.  Then you could file lis
3   pendens no matter what.  It doesn't matter what the case
4   law says in terms of the pleadings related to your duress
5   allegations.  Then you can tie up real property for the
6   duration of the lawsuit.  That's just not what the law
7   is.
8          Number two, I'm not looking at the merits of this
9   case.  I didn't file, you know, some ridiculously long
10  affidavit or anything like that.  The only reason the
11  affidavits were filed was to get a basis for emergency
12  hearing before the Court.
13         I specifically cite to the petitioners' own petition
14  in the first amended petition in the motion.  So these
15  are allegations coming directly out of their own petition
16  that we support our motion on.
17         And then, finally, I believe Mr. Dominy's statement
18  we would be satisfied with monetary damages.  That
19  completely defeats their claim for an equitable lien
20  because there is an alternative adequate remedy at law
21  here, Your Honor.
22         What, again, they're trying to do here is get a
23  judgment lien against these properties before they ever
24  have a judgment.  That's their remedy here, Your Honor.
25         Thank you.

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1        THE COURT:  All right.  Thank you, Counsel, for your
2    arguments.
3        I think Mr. Dominy, actually, Mr. Klein, focused in
4    or honed in on the analysis in which the Court is
5    required to engage based on the motion that you filed.
6    You contend that the petitioner is not entitled to a lis
7    pendens because he is not entitled to equitable relief
8    and that he is seeking monetary damages.  I don't know
9    that that is the standard for the Court to consider.
10       Filing a notice of lis pendens is a right that's
11   provided by law as you know.  The issue before the Court
12   on a motion to cancel is simply whether the claims
13   alleged in the underlying pleading involve the property
14   at issue.
15       I find based on the arguments that have been made by
16   counsel that in fact does.  As such, I believe that
17   Mr. Dominy in this instance has properly asserted his
18   legal right and that there is no basis upon which the
19   Court would be authorized to cancel the notice at this
20   time.
21       So for all of those reasons, your motion is denied.
22       MR. DOMINY:  Shall I prepare an order?
23       THE COURT:  That's fine.  If you will submit it
24   electronically in Word to Ms. Sanders.
25       I wanted to move forward with the case management

*** UNCERTIFIED DRAFT ***

1        hearing, counsel.  But since we have another lawyer who
2        was recently retained, at least according to both
3        parties, to represent the remaining defendants the 255'
4        entities -- I will accept your characterization of that,
5        Mr. Klein -- we are not able to proceed today.
6              However, I have instructed my staff attorney to
7        ensure that this case is placed on the next available
8        case management conference calendar so that we can set
9        appropriate deadlines, provide some guidance for counsel
10       and begin moving this case forward.
11             The lawsuit was filed on August 8th.  So it has not
12       been pending very long.  But however, in light of the
13       fact that all of the parties have now been served,
14       there's no reason for us to delay the setting of a case
15       management conference in the Court's opinion.  And I
16       would like to move forward with such a conference in
17       October.
18             Any objection to that, Mr. Dominy?
19             MR. DOMINY:  Absolutely not.
20             THE COURT:  Mr. Klein?
21             MR. KLEIN:  No, Your Honor.
22             I'm happy to reach out to the other attorney and
23       tell him about that.
24             THE COURT:  All right.
25             MR. KLEIN:  His name is Ramsey Knowles.

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1          THE COURT:  Okay.  Hopefully he's entered an

2     appearance and Ms. Sanders is able to provide notice.

3     The date of that calendar, I believe, is October 28th.

4          Is that correct, Ms. Sanders?  I'm presiding as

5     well.

6          THE CASE MANAGER:  Yes, Judge.

7          THE COURT:  I can tell you the date, the specific

8     time for the case management conference would be some

9     time in the afternoon and that information will be

10    provided upon publication of the calendar.

11         Anything else that the Court needs to take up on

12    your behalf, Mr. Klein?

13         MR. KLEIN:  No, Your Honor.  Thank you for your

14    time.

15         THE COURT:  All right.  Mr. Dominy?

16         MR. DOMINY:  That's all we have.  Thank you, Judge.

17         THE COURT:  When shall we expect the prosposed

18    order, sir?

19         MR. DOMINY:  Today.

20         THE COURT:  Thank you, gentlemen.  Have a good

21    afternoon.

22         MR. DOMINY:  Thank you.

23         MR. KLEIN:  You too.  Thank you.

24

25

# EXHIBIT G

Debtor Crown Assets, LLC's Notice of Removal
*Sahib Arora et al. v. Charanjeev Singh et al.*
Previously Pending in the Superior Court of Fulton County, Case No. 2020CV339119

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC | § § § § § | |
| Petitioners, | § § | CIVIL ACTION |
| v. | § § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC | § § § § § § § § § § § § § § | |
| Respondents. | | |

## PETITIONERS' MOTION FOR INTERLOCUTORY INJUNCTIVE RELIEF

**COME NOW** Petitioners SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

LLC, and pursuant to O.C.G.A. §§ 9-5-1 *et seq*., 16-14-6 and 23-3-3, file this, their

**Motion for Interlocutory Injunctive Relief** against Respondents CHARANJEEV

SINGH, KARAN S. AHUJA, JARNAIL SINGH, JONIKA ARORA, CROWN

ASSETS, LLC, 2551 E PINETREE BLVD MGMT, LLC, 2551 EAST PINETREE

BLVD, LLC, 4319 COVINGTON HWY, LLC, 140 W DYKES STREET LLC,

1604 E OGLETHORPE BLVD, LLC; 2505 S MAIN STREET, LLC and KING

ASSETS, LLC, respectfully requesting the entry of an Interlocutory Injunction to

preserve the *status quo* pending the conclusion of the case.

Petitioners file herewith the following evidence in support of this Motion:

1.     Affidavit of Sahib Arora

2.     Affidavit of Vineet Singh

3.     Affidavit of Meharban Arora

4.     Affidavit of Harsimran Arora

5.     Affidavit of Joel M. Haber, Esq.

6.     Affidavit of Reeta Rani

7.     Second Affidavit of Sahib Arora

8.     Second Affidavit of Vineet Singh

9.     Second Affidavit of Harsimran Arora, and

10.    Memorandum of Law.

**WHEREFORE** Petitioners respectfully pray:

(a)    For an Order granting injunctive relief under the Georgia

       RICO Act, and/or

(b)   For an Order granting injunctive relief under general civil

law of the State of Georgia, and

(c)   For such other and further relief as the Court may deem just

and proper under the circumstances.

This 14th day of September, 2020.

Respectfully Submitted,

_____

Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

3

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; KING GROUP MGMT LLC; MAHARAJA INVESTMENTS, LLC and ZILLIONAIRE ASSETS, LLC | § § § § § | |
| Petitioners, | § § | CIVIL ACTION |
| v. | § § § | FILE NO. 2020CV339119 |
| CHARANJEEV SINGH; KARAN S. AHUJA; JARNAIL SINGH; JONIKA ARORA; CROWN ASSETS, LLC; 2551 E PINETREE BLVD MGMT LLC; 2551 EAST PINETREE BLVD LLC; 4319 COVINGTON HWY, LLC; 140 W DYKES STREET LLC; 1604 E OGLETHORPE BLVD, LLC; KING ASSETS, LLC and 2505 S MAIN STREET, LLC | § § § § § § § § § § § § § § | |
| Respondents. | | |

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that I have this day served a copy of the foregoing **Petitioners' Motion for Interlocutory Injunctive Relief** by email marked STATUTORY ELECTRONIC SERVICE upon counsel for Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh, Jonika Arora, Crown Assets, LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street LLC, 1604 W. Oglethorpe Blvd,

LLC, 2505 S. Main Street LLC and King Assets, LLC, as follows:

David S. Klein, Esq. at dklein@rlklawfirm.com and

Alexandra M. Dishun, Esq., at adishun@rlklawfirm.com

By Priority Mail: Upon Respondent 2551 East Pinetree Blvd, LLC c/o Sameer

Lalani, 1040 Indian Trail Rd., Suite Bl, Lilburn, GA 30047

This 14th day of September, 2020.

_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net

2

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | § | |
| KING GROUP MGMT LLC; | § | |
| MAHARAJA INVESTMENTS, LLC | § | |
| and ZILLIONAIRE ASSETS, LLC | § | |
| | § | |
| Petitioners, | § | |
| | § | CIVIL ACTION |
| v. | § | |
| | § | FILE NO. 2020CV339119 |
| | § | |
| CHARANJEEV SINGH; KARAN S. | § | |
| AHUJA; JARNAIL SINGH; JONIKA | § | |
| ARORA; CROWN ASSETS, LLC; | § | |
| 2551 E PINETREE BLVD | § | |
| MGMT LLC; 2551 EAST PINETREE | § | |
| BLVD LLC; 4319 COVINGTON | § | |
| HWY, LLC; 140 W DYKES | § | |
| STREET LLC; 1604 E | § | |
| OGLETHORPE BLVD, LLC; | § | |
| KING ASSETS, LLC and | § | |
| 2505 S MAIN STREET, LLC | § | |
| | § | |
| Respondents. | | |

---

## PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR INTERLOCUTORY INJUNCTIVE RELIEF

---

**COME NOW** Petitioners SAHIB ARORA, VINEET SINGH, MAHARAJA

INVESTMENTS, LLC, KING GROUP MGMT LLC and ZILLIONAIRE ASSETS,

LLC, and file this, their **Memorandum of Law in Support of Motion for**

**Interlocutory Injunctive Relief** against Respondents CHARANJEEV SINGH,

KARAN S. AHUJA, JARNAIL SINGH, JONIKA ARORA, CROWN ASSETS, LLC, 2551 E PINETREE BLVD MGMT, LLC, 2551 EAST PINETREE BLVD, LLC, 4319 COVINGTON HWY, LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE BLVD, LLC; 2505 S MAIN STREET, LLC and KING ASSETS, LLC respectfully showing as follows:

## I. INTRODUCTION

### 1.   **Overview**

Respondents Crown Assets, LLC ("Crown LLC"), King Assets, LLC (King Assets") and 4319 Covington Hwy, LLC ("Covington LLC") claim to own interests in twelve (12) parcels of real property or interests in real property, which Respondents either (**1**) fraudulently conveyed from Petitioners to themselves, (**2**) obtained by through extortion and other acts of fraud and racketeering activity, or (**3**) acquired with funds obtained from Petitioners through such unlawful activity. Petitioners seek to recover title to the properties in the first and second categories and impose Equitable Liens or Constructive Trusts upon those in the third category to recover funds that Respondents obtained from them through their racketeering scheme.

### 2.   **Procedural Issues**

On July 21, 2020 TC Federal Bank ("TC Federal") filed Civil Action File No. SUCV202000035 in the Superior Court of Thomas County, Georgia, against

Petitioners Maharaja Investments, LLC" ("Maharaja"), Dr. Arora and Vineet and Respondents Charanjeev, Ahuja, Crown LLC, Pinetree LLC and others (the "Thomas County Action").[1]   The Thomas County Action centers on the **Pinetree Plaza Shopping Center** [2]   which is the only property in the first category above (fraudulently conveyed from Petitioners to Respondents).  It is the most significant single property involved in this controversy.   TC Federal holds a <u>Security Deed</u>[3] on Pinetree Plaza from Respondent 2551 Pinetree Blvd, LLC ("Pinetree LLC"), which claimed title to the entire fee interest in the property based on two previous fraudulent conveyances[4] of the 50% undivided interest in the property owned by Maharaja.[5]   TC Federal seeks a Declaratory Judgment and/or Quiet Title order establishing the *bona fides* of its <u>Security Deed</u>, among other things.  To prevail, TC Federal must establish the *bona fides* of the two fraudulent conveyances of Maharaja's 50% interest, issues that are of importance to the present case as well. Petitioners Maharaja, Sahib Arora and Vineet Singh were served with process on August 3, 2019 and have filed responsive pleadings and counterclaims.  Respondents

[1] Notice of Filing Exhibits, Ex. "T" (Complaint).

[2] 2551 E. Pinetree Boulevard, City of Thomasville, Thomas County (TPID No.

[3] Notice of Filing Exhibits, Ex. "O" (Security Deed).

[4] Notice of Filing Exhibits, Ex. "L" (Quitclaim Deed) and Ex. "M" (Limited Warranty Deed)

[5] Notice of Filing Exhibits, Ex. "J" (Limited Warranty Deed)

Charanjeev, Ahuja, Crown LLC and Pinetree LLC have also been served with process.

The Thomas County Action, which was filed a few days before the present case, probably results in the *abatement* of any issues in this case that directly involve the Pinetree Plaza Shopping Center.  Since TC Federal is unwilling to transfer the Thomas County Action to Fulton County where it could be consolidated with this case, it is unavoidable that this controversy will be litigated in the two separate cases.

So that they may proceed without difficulty on a parallel track, Petitioners have sought to separate those claims initially made in this case that are *directly* related to Pinetree Plaza as well as those that are *indirectly* related and most logically decided as part of the Thomas County Action, from those that are most logically decided as a part of this case—hence the division of the twelve properties in issue between the two cases as set forth *infra*.

### 3.  <u>Summary of Injunctive Relief Sought</u>

Petitioners seek an Interlocutory Injunction requiring Respondents to maintain and to not transfer, interfere with or dispose of any of the parcels of real property involved in this lawsuit or the income being generated by them, pending final resolution of the case.  To preserve the income, Petitioners request that Respondents be enjoined from disbursing funds received from the properties to themselves or to any person except in the ordinary course of business to pay regularly recurring business

expenses. Petitioners also seek other, related relief to promote the goal of preserving the *status quo* including an injunction against altering, removing or destroying records and against transferring any Membership Interests in the Respondent limited liability companies. *Petition at pp. 43-51, ¶¶ 111-132 (Count III—Injunctive Relief)*. Petitioners' request for Injunctive Relief is made to preserve the *status quo* by preventing the dissipation of assets during the pendency of the case and is well within the established parameters in Georgia law. *Atlanta Area Broadcasting, Inc. v. James Brown Enterprises, Inc.*, 263 Ga. App. 388, 587 S.E.2d 853 (2003); *Patel v. State Handy Check v. State Dudhwala v. State Patel v. State Mehta v. State*, 289 Ga. 479, 713 S.E.2d 381 (2011); S*RB Investment Services, LLLP v. Branch Banking and Trust Company*, 289 Ga. 1, 709 S.E.2d 267 (2011); *Total Supply, Inc. v. Pridgen*, 267 Ga. App. 125, 598 S.E.2d 805 (2004). Petitioners bring their Motion for Interlocutory Injunctive Relief under the Georgia Racketeer Influenced and Corrupt Organizations Act (O.C.G.A. § 16-14-1 *et seq*.; the "Georgia RICO Act"), which dispenses with the requirement of "irreparable harm" [O.C.G.A. § 16-14-6(c)], as well as "…the principles that govern the granting of injunctive relief from threatened loss or damage in other civil cases." *Id*.

## II.   FACTS

### A.   Claims and Issues in The Present Action

Petitioners intend to proceed in the present case with their claims concerning

eight of the twelve properties in issue: **106 Commerce Street**, Unincorporated Fayette County (TPID No. 130501002), Vacant land on Roosevelt Highway (a/k/a **2723 Roosevelt Hwy**.), City of College Park, Fulton County (TPID No. 13 003500060352), **3811 Flat Shoals Road**, Unincorporated DeKalb County (TPID No. 15 089 01 003), **2318 SE Old Cornelia Highway**, City of Gainesville, Hall County (TPID No. 130501002), **90 Hunters Chase**, Unincorporated Henry County (TPID No. 095-01013002), **4319 Covington Highway**, City of Decatur, DeKalb County, (TPID No. 15 196 03 021), **325 Crooked Stick Drive**, City of Milton, Fulton County (TPID No. 22 381108070127) and **7530 St. Marlo Country Club Parkway**, Unincorporated Forsyth County (TPID No. 162 020).

Respondent Crown Assets, LLC ("Crown LLC") is record title holder of a 50% undivided interest in 106 Commerce Street, 2723 Roosevelt Hwy, and 3811 Flat Shoals Road. Petitioner King Group MGMT LLC ("King Group") is record owner of the other 50% interest in these properties. [6]  Crown LLC claims a 50% undivided interest in the 56% undivided interest owned by King Group in 2318 SE Old Cornelia Highway (28% of the fee) under the Agreement dated August 14, 2019.[7]

---

[6] Notice of Filing Exhibits, Exs "D" – "F" (<u>Limited Warranty Deeds</u> dated August 14, 2019)

[7] Notice of Filing Exhibits, Ex. "A" (Agreement)

Crown LLC is the record title owner of a 50% undivided interest in 4319 Covington Highway as tenant in common with 50% record owner, Respondent 4319 Covington Hwy, LLC ("Covington LLC), a company owned by the principals of Respondent 2551 Pinetree Blvd, LLC ("Pinetree LLC"), Sameer Lalani and Shaneel Lalani.  Crown LLC is the sole record owner of 325 Crooked Stick and Respondent King Assets, LLC ("King Assets") the sole record owner of 7530 St. Marlo Country Club Pkwy.

90 Hunters Chase is still titled in the name of Petitioner Zillionaire Assets, LLC ("Zillionaire"), in which Crown LLC and King Group LLC each own a 50% Membership Interest.[8]   Crown LLC is 100% owned by Respondent Karan S. Ahuja,[9] and King Assets is believed to be owned by Respondents Ahuja and Charanjeev Singh.

1.   **106 Commerce St., 2723 Roosevelt Highway, 3811 Flat Shoals Parkway and 2318 Old Cornelia Highway**

These four properties, which fall in the second category above (*properties obtained from Petitioners through extortion and other acts of fraud and racketeering activity*), were 100% owned by Petitioner King Group prior to August 14, 2019.

---

[8] Notice of Filing Exhibits, Ex. "H" (Amended and Restated Operating Agreement of Zillionaire Assets, LLC)

[9] Notice of Filing Exhibits, Ex. "N" (Affidavit of Possession at p. 3 "Affidavit," ¶ 1)

King Group executed Limited Warranty Deeds transferring a 50% undivided interest in 106 Commerce Street, 2723 Roosevelt Highway and 3811 Flat Shoals Parkway[10] and an Agreement transferring a 50% undivided interest in King Group's 56% undivided interest in Old Cornelia Highway (28% of the fee) to Crown LLC on August 14, 2019.[11]   These transactions were among the "Coerced Transactions" that took place on that day, which Petitioners seek to set aside on the grounds of duress, illegality and fraudulent inducement. *Petition at pp. 12-15, 25-26 ¶¶ 27-31, 55(i) – 55(j).*   Petitioners entered into the Coerced Transactions under the duress caused by Respondents' threats to ruin the pending marriage of Petitioner's sister, Harsimran Arora, by slandering and defaming her to her fiancé's family and to inflict violence upon her fiancé's family, which constitute the crime of extortion under the Georgia Criminal Code. *See* Code. O.C.G.A. § 16-8-16; *Affidavit of Sahib Arora ("Arora Aff."), ¶¶ 19-24, 27-29, 31, 36-37; Affidavit of Vineet Singh ("Vineet Aff."), ¶¶ 25-29, 31, 37; Affidavit of Meharban Arora ("Meharban Aff.), ¶¶ 10-16; Affidavit of Harsimran Arora ("Harsimran Aff."), ¶¶ 4, 8-11, 14.*   Additionally, Petitioners were fraudulently induced to enter into the Coerced Transactions by Respondents' false promises to back off from their threats to harm their sister and to accept the

---

[10]  Notice of Filing Exhibits, Exs. "A", "D" – "F"

[11]   King Group also conveyed 50% interests in two other properties on August 14, 2019, 5754 Attucks Boulevard and 5341 Snapfinger Drive, which were subsequently sold, as discussed *infra*.

August 14th conveyances as full settlement of any grievances they felt they had against Petitioners.  Instead, just five days later, they recorded a fraudulent deed to Maharaja's 50% interest in the Pinetree Plaza Shopping Center,[12] and they persisted in their threats against Harsimran, thus revealing that they never had any intention of settling anything with Petitioners but rather, were intent on stealing everything they could from them.  *Arora Aff., ¶¶ 36, 51-53; Vineet Aff., ¶¶ 31-32; Meharban Aff., ¶¶ 19-22; Harsimran Aff., ¶¶ 5-7, 9-12.*

### 2. <u>90 Hunters Chase, 325 Crooked Stick Drive and 4319 Covington Highway</u>

These three properties fall into the third category above (*properties acquired with funds obtained from Petitioners through unlawful activity*).  The "dirty money" with which Crown LLC acquired them was the proceeds it received from the sales of **5754 Attucks Boulevard**, City of Morrow, Clayton County, and **5341 Snapfinger Drive**, Decatur, DeKalb County (*See* n. 11 *supra*).  King Group had conveyed an undivided 50% interest in these properties to Crown LLC under duress on August 14, 2019. [13]   Attucks Boulevard was sold on November 27, 2019, and Crown LLC received half of the net sale proceeds disbursed at the closing in the sum of **$341,408.22**.  5341 Snapfinger Drive was sold on February 25, 2020, and Crown

---

[12] Notice of Filing Exhibits, Ex. "L" (Quitclaim Deed dated August 19, 2019)

[13] Notice of Filing Exhibits, Ex A" (Agreement) and Ex. "G" (Limited Warranty Deed)

LLC received half of the net proceeds in the sum of **$541,756.27**.

Crown LLC reinvested the proceeds from the 5754 Attucks Boulevard sale in 90 Hunter Chase and reinvested part of the 5341 Snapfinger Drive proceeds in 325 Crooked Stick Drive and part in 4319 Covington Highway, pursuant to Section 1031 of the U. S. Internal Revenue Code. *Arora Aff., ¶¶ 38-40, 42-46; Second Affidavit of Sahib Arora ("Second Arora Aff."), ¶¶ 3-17, Exs. "A" – "B"; Petition at pp. 19-21, ¶¶ 43-48; Petition at pp. 25-26, ¶¶ 55(i) – 55(j).*

Petitioner King Group seeks to recover the sales proceeds that were paid to Respondent Crown LLC through the Imposition of an Equitable Lien and/or Constructive Trust against 90 Hunters Chase, 325 Crooked Stick Drive and 4319 Covington Highway. *Petition at pp. 47-48, 66-68, ¶¶ 125-126, 187-191 (Count XIII).*

3.    **7530 St. Marlo Country Club Parkway**

The final property[14] also falls in the third category above.  It is a parcel that Respondent King Assets acquired or improved with funds converted by Ahuja and Charanjeev by means of forged checks on the business checking accounts of King Group and Maharaja and from Vineet's personal checking account in the sum of **$30,300.00** plus other sums to be determined, and with funds stolen by Charanjeev

---

[14] 7530 St. Marlo Country Club Parkway, Unincorporated Forsyth County

and Ahuja from Petitioners' sister (their own first cousin), Harsimran Arora, through identity theft and credit card fraud, including the fraudulent charges on her credit cards totaling **$32,843.19**, a number of which were obviously charged by Charanjeev and/or Ahuja in connection with their purchase of 7530 St. Marlo country Club Parkway on September 11, 2019, including large cash advances and balance transfers, home inspection fees, appraisal fees, utility charges, and Home Depot charges. *Petition at pp. 47-48, 66-68, ¶¶ 125-126, 187-191 (Count XIII—Imposition of Equitable Lien); Second Affidavit of Vineet Singh ("Second Vineet Aff."), ¶¶ 3-10, Exs. "A" – "E"; Second Affidavit of Harsimran Arora ("Second Harsimran Aff."), ¶¶ 2-11, Exs. "A" – "G"*. Harsimran assigned her claims against Ahuja and Charanjeev for collection of the converted funds to Petitioner Zillionaire Assets, LLC ("Zillionaire"), which had paid the debts for her in the sum of $29,514.54. Petitioners King Group, Maharaja, Vineet and Zillionaire seek the Imposition of an Equitable Lien to recover the stolen funds used in the purchase of the property or improvement of the property. *Petition at pp. 58-63 ¶¶ 161-177, Count IX—Conversion of Bank Funds; Count X—Conversion through Identity and Financial Transaction Card Theft*.

Among other possible remedies available to Petitioners to recover title to the properties or the stolen funds used to purchase them are Disgorgement [*Petition at pp. 69-73, ¶¶ 201-216 (Count XV)*] and Divestment under the Georgia RICO Act.

*Petition at pp. 27-31,* ¶¶ *59-67 (Count I—Claims under the Georgia RICO Act).*
Petitioners' claims for Imposition of an Equitable Lien and/or Constructive Trust
include attorney's fees, treble damages and punitive damages if awarded by the jury.
*See* O.C.G.A. § 16-14-6(c). Petitioners assert their claims against Respondents'
equity in the subject properties and all also income generated by them.

### B. Claims and Issues in the Thomas County Action

1. **The Pinetree Plaza Shopping Center**

Petitioner Maharaja Investments, LLC ("Maharaja") purchased a 50%
undivided interest in the **Pinetree Plaza Shopping Center** for $700,000 on July 15,
2019. [15] Thirty-five days later, on August 19, 2019, Respondent Charanjeev Singh
signed and recorded a fraudulent <u>Quitclaim Deed</u> [16] in which he falsely represented
himself as an "Authorized Signer" for Maharaja and purported to convey Maharaja's
50% ownership interest in Pinetree Plaza for no consideration to Respondent Crown
Assets, LLC ("Crown LLC"), which is 100% owned by Respondent Karan S. Ahuja,
Charanjeev' s brother. Crown LLC subsequently issued a fraudulent <u>Limited</u>
<u>Warranty Deed</u> [17] to Respondent 2551 East Pinetree Blvd, LLC ("Pinetree LLC"),

---

[15] Notice of Filing Exhibits, Ex. "J" (the "Vesting Deed")

[16] Notice of Filing Exhibits, Ex. "L" (the "First Fraudulent Deed")

[17] Notice of Filing Exhibits, Ex. "M" (the "Second Fraudulent Deed")

which issued a fraudulent <u>Security Deed</u> [18] to TC Federal Bank ("TC Federal") as security for a $3,075,884.00 line of credit. *Petition at pp. 31-43, ¶¶ 69-110.* Maharaja has asserted Counterclaims against TC Federal in the Thomas County Action for Quiet Title and Declaratory Judgment and will assert Cross-Claims against Charanjeev, Ahuja, Crown LLC and Pinetree LLC as appropriate after they have filed pleadings in the case, or before as necessary.

2. **1604 E. Oglethorpe Boulevard, 140 W. Dykes Street and 2411-2505 S. Main Street**

Respondent Ahuja and the principals of Respondent Pinetree LLC, Sameer Lalani and Shaneel Lalani, joined themselves together in acquiring these three properties, as they joined together in defrauding Maharaja of its 50% interest in the Pinetree Plaza Shopping Center. The record owners of these parcels, Respondents 1604 E Oglethorpe Blvd, LLC ("Oglethorpe LLC"), 140 W Dykes Street LLC ("Dykes LLC") and 2505 S Main Street, LLC ("Main LLC"), are all joint ventures of Ahuja, Sameer Lalani and Shaneel Lalani, and the properties they purchased all part of their ill-gotten gains in that they acquired them with the converted rental income and/or loan proceeds they received—and continue to receive—from Pinetree Plaza, and their acquisitions were otherwise facilitated by the huge increase in the value and equity in the shopping center that accrued in the few short months during which their

---

[18] Notice of Filing Exhibits, Ex. "O"

fraudulent scheme developed, culminating in the fraudulent Security Deed to TC Federal and $3,075,884.00 line of credit. Its claims relating to these properties being so closely related to those arising out of Pinetree Plaza Shopping Center, Maharaja will assert them in the Thomas County Action.

Public deed records show that, having procured the line of credit from TC Federal by means of the fraudulent Security Deed, Respondent Ahuja, in league with Sameer Lalani and Shaneel Lalani, went on a veritable "buying spree".

On May 15, 2020, Sameer Lalani and Shaneel Lalani formed Respondent Oglethorpe LLC, and on June 2, 2020, Oglethorpe LLC purchased the property located at **1604 E Oglethorpe Blvd, City of Albany, Dougherty County** for $1,170,000 as evidenced by the Limited Warranty Deed at Deed Book 4709 Page 346, Dougherty County real property records, securing a loan in the amount of $2,325,000 as evidenced by the Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement and Fixture Filing at Deed Book 4710 Page 1, Dougherty County real property records. That instrument refers to "Loan Obligations" evidenced by a Real Estate Note dated May 27, 2020 made by Billionaire's Funding Group, LLC, a company owned and operated by Sameer Lalani and Shaneel Lalani, and Respondents Crown LLC, Oglethorpe LLC, Main LLC and Dykes LLC.

On May 19, 2020, Sameer Lalani and Shaneel Lalani formed Respondent Dykes LLC, and on May 27, 2020, Dykes LLC purchased the property located at **140 W**

**Dykes Street, City of Cochran, Bleckley County** for $971,300 as evidenced by the Trustee's Deed at Deed Book 443 Page 128, Bleckley County real property records. This property secures the same $2,325,000 loan, as evidenced by the Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement and Fixture Filing at Deed Book 443 Page 133, Bleckley County real property records, which refers to the same Real Estate Note dated May 27, 2020 made by Billionaire's Funding Group, LLC, and Respondents Crown LLC, Oglethorpe LLC, Main LLC and Dykes LLC.

On May 19, 2020, Sameer Lalani and Shaneel Lalani formed Respondent Main LLC, and on May 27, 2020, Main LLC purchased the property located at **2505 S. Main Street, City of Moultrie, Colquitt County** for $1,123,500 as evidenced by the Trustee's Deed at Deed Book 1411 Page 33, Colquitt County real property records, This property also secures the same $2,325,000 loan evidenced by the same Real Estate Note dated May 27, 2020 as recited in the Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement and Fixture Filing at Deed Book 1411 Page 37, Colquitt County real property records.

Pinetree LLC's participation in the fraudulent transfers of Maharaja's 50% interest in Pinetree Plaza, in addition to fraud, was a breach of the confidential relationship that existed between it and Maharaja as tenants in common. Charanjeev also breached a fiduciary duty to Maharaja under the facts of this case. *Arora Aff., ¶¶ 15-16; Vineet Aff., ¶¶ 11-13.* Ahuja also breached a confidential relationship that

existed between it and Maharaja if the <u>Amended and Restated Operating Agreement</u> <u>of Maharaja Investments, LLC</u> (the "Coerced Maharaja Amendment"),[19] which resulted in the transfer of a 25% Membership Interest in Maharaja each to Charanjeev and Ahuja, is ruled to be enforceable.[20]

Maharaja will assert claims in the Thomas County Action to recover title to these properties based on Breach of Fiduciary Duty, Misappropriation of Potential Business Opportunities and Disgorgement.  Alternatively, or in addition to such relief, Petitioners will assert claims for recovery of the rental income and/or loan proceeds used to purchase or improve the properties, through the Imposition of an Equitable Lien and/or Constructive Trust.

## III. ARGUMENT AND CITATION OF AUTHORITY

### A. The Injunctive Relief Available to Petitioners

#### 1. <u>The Evidence</u>

Petitioners have submitted evidence herewith in the form of verified pleadings, affidavits, certified copies and authenticated documents in support of their request for Injunctive Relief and also request the opportunity to present live witness testimony in Court as necessary for the Court's full consideration of this matter.

---

[19] Notice of Filing Exhibits, Ex. "C".

[20]  As one of the "Coerced Transactions,"  Petitioners contend it is *not* enforceable.  See pp. 8-9 *supra*

> A court confronted with a request for an interlocutory injunction often will not have available all the evidence needed to fully and finally adjudicate the parties' claims and defenses. In some instances, as in this case, the request for an interlocutory injunction comes before formal discovery has even begun.

*Bishop v. Patton*, 288 Ga. 600, 604, 706 S.E.2d 634 (2011)

> [T]he power to grant [an interlocutory injunction] must be 'prudently and cautiously exercised.'"' [Cits.] However, to be effective, the decision…must often be made under time constraints that do not allow for the careful deliberation and reflection that accompany a full trial on the merits. [Cits.] Thus, the trial court must make a judgment call regarding the equities presented, and the court is vested with broad discretion in making that decision.

> *Id.*

Petitioners respectfully suggest that the most important evidence before the Court upon which to base its "judgment call" is the evidence demonstrating: (**1**) The *criminal* nature of Respondents' conduct; (**2**) Petitioners' *superior equities* in the subject properties, and (**3**) the *certainty* that Respondents will dispose of assets and remove the funds representing the profits of their predations beyond the reach of the Court, if an injunction is not granted, as discussed *infra*.    In considering the evidence, the Court will be informed by O.C.G.A. § 23-2-57: "Fraud may not be presumed but, being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence".    On a continuum of sufficiency from "slight" to "overwhelming," however, Petitioners believe that the evidence of Respondents'

fraud will tend strongly toward the "overwhelming" end.

## 2.   **The Law**

"Any person may, in any civil action, claim equitable relief by appropriate and sufficient pleadings and obtain the equitable relief proper in the case." OCGA § 23-3-2. "A person who asserts a claim for equitable relief may at any time, by proper pleading and proof, also apply for and obtain any of the extraordinary remedies available from the court in its exercise of equitable powers." OCGA § 23-3-3. "The granting and continuing of injunctions shall always rest in the sound discretion of the judge, according to the circumstances of each case. This power shall be prudently and cautiously exercised and, except in clear and urgent cases, should not be resorted to." OCGA § 9-5-8. "Any superior court may, after making due provisions for the rights of innocent persons, **enjoin violations** of Code Section 16-14-4 **by** issuing **appropriate orders and judgments**…" O.C.G.A. § 16-14-6(a) (emphasis supplied).

Each of the four requirements in Georgia law for the issuance of an interlocutory injunction is satisfied in this case: (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of its claims at trial; and (4) granting

the interlocutory injunction will not disserve the public interest. *Bishop v. Patton, supra,* 288 Ga. 600 at 604.   "The moving party, however, is not required to prove all four factors." *Nissan North American, Inc. v. Walker-Jones Nissan*, 345 Ga. App. 447, 812 S.E.2d 130, 132 (2018).

### 3.    **Irreparable Harm.**

Irreparable harm is *not* a required element of Petitioners' request for Injunctive Relief under the Georgia RICO Act.

> Any aggrieved person or the state may institute a civil action under subsection (a) of this Code section. In such civil action, relief shall be granted in conformity with the principles that govern the granting of injunctive relief from threatened loss or damage in other civil cases, provided that **no showing of special or irreparable damage to the person shall have to be made**.

O.C.G.A. § 16-14-6(c) (emphasis supplied).

The verified allegations of the Petition and evidence submitted with this Motion provide ample factual support for Petitioners' RICO claims.   *Petition at p. 27-28, ¶ 60.*

> A person commits the offense of **Theft by Extortion** when he unlawfully obtains property of or from another person by threatening to [d]isseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute."

O.C.G.A. § 16-8-16(a)(3)

Respondents committed the crime of Theft by Extortion and multiple acts of

-19-

racketeering activity by threatening to slander and defame Petitioners' sister and to inflict violence on her fiancé's family to force Dr. Arora to convey the subject properties as they demanded. *Affidavit of Sahib Arora, ¶¶ 19-24, 27-29, 31, 36-37; Affidavit of Vineet Singh, ¶¶ 25-29, 31, 37; Affidavit of Meharban Arora, ¶¶ 10-16; Affidavit of Harsimran Arora, ¶¶ 4, 8-11, 14; Petition, ¶¶ 24-28, 30, 33-39, 134-138.*

> A person commits the offense of **Theft by Deception** when he…obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property. A person deceives if he intentionally [s]ells or otherwise transfers or encumbers property intentionally failing to disclose a substantial and valid known lien, adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not a matter of official record.

> O.C.G.A. § 16-8-3(b)(4)

Respondents committed the crime of Theft by Deception and three acts of racketeering activity by creating falsified documents and recording fraudulent conveyances of Maharaja's 50% ownership interest in the Pinetree Plaza Shopping Center.[21] *Vineet Aff., ¶¶ 11-13, 20, 31-36; Meharban Aff., ¶ 19; Harsimran Aff., ¶¶ 12-13, 16-18; Affidavit of Reeta Rani, ¶¶ 2-9.; Petition, ¶¶ 72-110.*

> A person commits the offense of **Theft by Conversion** "…when, having lawfully obtained funds or other property of another…, he knowingly converts the funds or property

---

[21] Notice of Filing Exhibits, Exs. "L" – "O" (Quitclaim Deed dated August 19, 2019) "First Fraudulent Deed)", Limited Warranty Deed dated January 16, 2020 ("Second Fraudulent Deed") and Security Deed dated January 16, 2020.

to his own use in violation of the agreement or legal obligation.

O.C.G.A. § 16-8-4(a)

Respondents have committed and continue to commit the crime of Theft by Conversion on an on-going basis and multiple on-going acts of racketeering activity by withholding the rental income from the Pinetree Plaza Shopping Center that rightfully belongs to Maharaja as 50% owner of the property. *Arora Aff., ¶ 51.*

> A person commits the offense of **Forgery in the First Degree** when he or she knowingly makes, alters, or possesses any writing, other than a check, in a fictitious name or in such manner that the writing as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority and utters or delivers such writing.

O.C.G.A. § 16-9-1(b)

Respondents Charanjeev and Ahuja committed the crime of Forgery in the First Degree and an act of racketeering activity by altering the <u>Certified Resolution and Incumbency Certification of Maharaja Investments, LLC</u> signed by Vineet on June 22, 2019[22] to change the intent of the document from authorization for Charanjeev to act for Maharaja in the *purchase* of Pinetree Plaza to authorization for him to act in the *sale* of the property and using the falsified document to falsely claim authority to sign

---

[22] Notice of Filing Exhibits, Ex. "K" ("Authentic Certification")

the Quitclaim Deed dated August 19, 2019 on Maharaja's behalf conveying its 50% in

the Pinetree Plaza property to his brother Ahuja's company Crown LLC for no

consideration.[23] *Vineet Aff., ¶¶ 12-13, 32-36; Petition, ¶¶ 84-89.*

> A person commits the offense of **Forgery in the Third Degree** when with the intent to defraud he or she knowingly…[m]akes, alters, possesses, utters, or delivers any check written in the amount of $1,500.00 or more in a fictitious name or in such manner that the check as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority.

> O.C.G.A. § 16-9-1(d)(1)

Respondent Charanjeev committed the crime of Forgery in the Third Degree

and two acts of racketeering activity by forging Vineet's signature on two checks

written on the business checking account of Maharaja and negotiating the checks, one

dated July 30, 2019 payable to Charanjeev's company King Property Advisors, LLC,

in the amount of $15,000 and the other dated August 3, 2019 payable to Respondent

King Assets in the amount of $10,000 (*Second Vineet Aff., ¶¶ 3-4, 8-9, Exs. "A" –

"C"*), and Respondent Ahuja committed the crime of Forgery in the Third Degree and

an act of racketeering activity by forging Vineet's signature on a check written on his

personal checking account dated August 12, 2019 payable to himself in the amount of

---

[23] Notice of Filing Exhibits, Ex. "L", [Quitclaim Deed and Certified Resolution and Incumbency Certification of Maharaja Investments, LLC ("Fraudulent Certification") recorded with it]

$5,300 and negotiating the check. *Second Vineet Aff., ¶ 10, 8-9, Exs. "D" – "E";*

*Petition, ¶¶ 162-168.*

> A person to whom a lawful oath or affirmation has been administered or who executes a document knowing that it purports to be an acknowledgment of a lawful oath or affirmation commits the offense of **False Swearing** when, in any matter or thing other than a judicial proceeding, he knowingly and willfully makes a false statement.
>
> O.C.G.A. § 16-9-1(d)(1)

Respondent Ahuja committed the crime of False Swearing and an act of racketeering activity by signing his name to the <u>Affidavit of Possession</u> dated January 16, 2020 and recorded in the real property records of Thomas County, Georgia,[24] in connection with Respondent Crown LLC's fraudulent Limited Warranty Deed to Respondent Pinetree LLC, which contains the false statement that: "CROWN ASSETS, LLC, a Georgia limited liability company, received title to a 50% undivided interest in the above-described property on August 19, 2019 by virtue of the deed of conveyance referenced in Item 2, above [the First Fraudulent Deed]" [25] *Petition, ¶¶ 104-110.*

> A person commits the offense of **Financial Transaction Card Fraud** when, with intent to defraud the issuer; a person or organization providing money, goods, services, or anything else of value; or any other person; or cardholder,

---

[24] Notice of Filing Exhibits, Ex. "N" (Affidavit of Possession)

[25] *Id*. at. p. 3, "Affidavit", ¶ 4

such person [u]ses for the purpose of obtaining money, goods, services, or anything else of value: [a] financial transaction card obtained or retained or which was received with knowledge that it was obtained or retained in violation of Code Section 16-9-31 or 16-9-32.

O.C.G.A. § 16-9-33(a)(1)

Respondents Charanjeev and Ahuja committed the crime of **Financial Transaction Card Fraud** and multiple acts of racketeering activity by fraudulently transferring unpaid credit card balances to Harsimran's credit card accounts and charging goods and services to her accounts without authorization. *Vineet Aff., ¶¶ 41-43; Harsimran Aff., ¶ 7; Second Harsimran Aff., ¶¶ 2-11, Exs. "A", "B" – "G"; Petition, ¶¶ 170-172.*

"Enterprise" means any…group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises …as well as other entities." O.C.G.A. § 16-14-3(3).  "A '[p]attern of racketeering activity' means: Engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." O.C.G.A. § 16-14-3(4).  "It shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."  O.C.G.A. § 16-

-24-

14-3(4)(a).  The evidence presented by Petitioners in support of their Motion for Interlocutory Injunction establishes a solid factual basis for their RICO claims against Respondents, and the Court should grant Petitioners' Motion based upon preliminary findings of fact in accordance with that evidence.

Petitioners' case for interlocutory injunctive relief is as equally compelling under the general principles governing the granting of injunctive relief from threatened loss or damage in other civil cases.

> **Equity, by a writ of injunction, may restrain** proceedings in another or the same court, **a threatened or existing tort**, or **any other act** of a private individual or corporation which is **illegal or contrary to equity and good conscience** and for which no adequate remedy is provided at law.

> OCGA § 9-5-1 (Emphasis supplied).

"**Equity may enjoin the defendant as to transactions involving fraud**, trust, or contracts beyond the limits of this state." O.C.G.A. § 9-5-11 (emphasis supplied); See e.g., *Bryant Realty Corp. v. Lorberbaum*, 221 Ga. 820, 823,147 S.E.2d 420 (1966).  The present case is particularly suited for the entry of injunctive relief under the general civil law as it involves on-going tortious conduct, specific threats of harm, acts illegal or contrary to equity and good conscience (See O.C.G.A. § 9-5-1), extortion, fraud (See O.C.G.A. § 9-5-11), fraudulent conveyance, theft and other wrongdoing as detailed above.  *Grossi Consulting, LLC v. Sterling Currency Group, LLC*, 290 Ga. 386, 388, 722 S.E.2d 44 (2012); *Owens v. Ink Wizard Tattoos*, 272

Ga. 728, 533 S.E.2d 722 (2000). There can be no "adequate remedy at law" under these conditions. No court in Georgia will allow a party before it to be victimized by fraud and criminality or allow the perpetrator to walk away with his ill-gotten gains, if there is a way to stop it.

Petitioners *will* suffer irreparable harm in the absence of injunctive relief. "[T]he ultimate availability of a judgment for money damages has never precluded an interlocutory injunction when fraudulent transfers are at issue." *Branch Banking and Trust Company*, 289 Ga. 1 at 5-6. Also, "[i]t is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity." *Owens v. Ink Wizard Tattoos*, 272 Ga. 728, 533 S.E.2d 722 (2000). "Equity intervenes by grant of an interlocutory injunction to prevent irreparable damage to one of the parties and to maintain the status quo until a final determination is made. [Cits.] In short, there must be some vital necessity for the injunction so that one of the parties will not be damaged and left without adequate remedy." *Kennedy v. W.M. Sheppard Lumber Co., Inc.*, 261 Ga. 145, 146, 401 S.E.2d 515 (1991). Petitioners *will* be damaged and left without a remedy unless the Court grants their Motion for Interlocutory Injunctive Relief because the only assets that Respondents own are the parcels of real property in issue in this lawsuit and the income being produced by them, and it is *certain* that Respondents will dispose of those assets to prevent Petitioners from recovering them

unless they are prevented from doing so.

Respondent Charanjeev came to the United States in February of 2018 with no automobile, no job and no financial resources of his own except support from his father, Jarnail.  He resided with Dr. Arora, who assisted him by paying his expenses to obtain a Georgia Real Estate Salesperson License and by permitting him to work as a trainee at King Group for a time—his only source of income at the time, although he probably does earn some modest income now as an affiliated licensee at Keller-Williams.  *Arora Aff., ¶¶ 4-5; Second Arora Aff., ¶¶ 21-23*.  His father, Respondent Jarnail, came to the United States later in 2018 under similar circumstances, with no permanent residence here and no job.  All of his financial resources originate from his business dealings in India.  He has minimal financial resources, personal or business income or assets in this country.  *Arora Aff., ¶ 7; Second Arora Aff., ¶ 24*.  Ahuja came to this country in June of last year, and he also took up residence at Dr. Arora's home, having no permanent residence here, no automobile, no job and no financial resources of his own.  *Arora Aff., ¶ 8; Second Arora Aff., ¶¶ 25-27*.  None of the Respondents has any appreciable income or personal or business assets except the properties which they have obtained from Petitioners through extortion, fraud and theft and the additional properties they have been able to acquire with the money and property obtained from Petitioners through such unlawful means. *Second Arora Aff., ¶¶ 23-23, 27*.  Of all the Respondents, only Ahuja is a U. S. citizen.  Respondents Charanjeev,

Jarnail and Jonika are all citizens of the Republic of India.  All the Respondents travel frequently between the United States and India, own homes and other properties in India, have business interests in India, and have friends, family, business and financial contacts in India.  They all have the capability to transfer liquid assets from the United States to India easily and as a matter of course.  *Second Arora Aff., ¶ 28.*

Injunctive relief is proper to prevent the dissipation of assets.  *Ebon Foundation v. Oatman*, 269 Ga. 340, 498 S.E.2d 728 (1998). "Under the circumstances of this case, where [the defendants] controlled the assets that are a subject of the litigation, raising the possibility that they could be dissipated before the litigation is resolved, the trial court did not abuse its discretion in enjoining [the defendants] from disposing of any of the documents or assets of the business. *Pittman v. State*, 288 Ga. 589, 593, 706 S.E.2d 398 (2011) (grant of injunctive relief in RICO case). The same distinct possibility is raised in the present case, and Petitioners are entitled to the same remedy.

"Fraudulent transfer cases are especially amenable to interlocutory injunctive relief." *Bishop v. Patton, supra,* 288 Ga. 600 at 605.  The present case is not a "fraudulent transfer" case in the sense of a *preferential transfer*—a transfer of assets intended "…to hinder, delay, or defraud any creditor…" OCGA § 18–2–74(a); *See* Georgia Uniform Voidable Transfers Act ("Georgia UVTA"); OCGA § 18–2–70 *et seq*.  Here, we are dealing with Respondents' fraudulent conveyances of *property*

-28-

*belong to Petitioners to themselves*, not conveyances of *Respondents' property to third parties*. Although the Georgia UVTA is not applicable to the case *sub judice*, the injunctive relief so liberally available to restrain conveyances of property to defraud creditors is equally available under the facts of this case. The case of *Mitchell v. Hayden, Stone, Inc.*, 225 Ga. 711, 171 S.E.2d 280 (1969) is directly on point. The defendant stole a stock certificate and managed to have it canceled and replacement stock certificates issued in his name, which he sold. The trial court's issuance of an interlocutory injunction restraining the defendant from disposing of any of his assets or from transferring or concealing or removing them from the jurisdiction of the court was upheld on appeal. The court noted that creditors *without a lien* cannot generally restrain their debtors from disposing of property. "An exception to the general rule is…**where property is obtained by fraudulent representations**." *Mitchell v. Hayden, Stone, Inc.*, supra, 225 Ga. 711 at 714. Petitioners have a stronger case for interlocutory relief than did the plaintiff in Mitchell because Petitioners *do* have a lien, as discussed *infra*. The court in *Mitchell* upheld the trial court's grant of injunctive relief based upon the defendant's fraud and the fact that he could not pay a judgment in the amount of the plaintiff's losses. "[I]t has long been the law that an interlocutory injunction may be granted to prevent a defendant from fraudulently transferring his assets and thereby putting them beyond the trial court's jurisdiction before the plaintiff's claim has been reduced to an enforceable judgment." *Bishop v. Patton*, 288 Ga. 600

-29-

at 605.  "When a money judgment is likely to be uncollectible because a debtor has fraudulently moved its assets in an attempt to dissipate or conceal them from a creditor, Georgia law, *both before and under* the Georgia UVTA, gives the creditor the right to seek interlocutory relief by freezing the assets where they are." S*RB Investment Services, LLLP v.  Branch Banking and Trust Company, supra*, 289 Ga. 1 at 6 (emphasis supplied).

That Respondents intend to upset the *status quo* in the absence of an injunction is conclusively shown by their Emergency Motion to Cancel Lis Pendens and the accompanying affidavits. [26] Respondents are "…in the process of selling the real property owned by Dykes LLC—140 Dykes Street in Cochran, Georgia…"  *Affidavit of Karan Ahuja ("Ahuja Aff."), ¶ 8.*  Ahuja also states that 7530 St. Marlo Country Club Parkway is listed for sale. *Ahuja Aff. at ¶ 8.*  Petitioners' counsel discovered while drafting this Memorandum of Law that on August 6, 2020—one day before this lawsuit was filed—King Assets paid the $375,000 purchase money Security Deed on 7530 St. Marlo Country Club Parkway in full, meaning that all the proceeds of the sale of that property will be received by King Assets in cash at closing.  Unless an injunction is entered, that money will never be seen again.

Finally,  the  damages  that  Petitioners  have  suffered  and  will  continue  to

---

[26] Petitioners' counsel does not have an unredacted copy of the Affidavit of Karan Ahuja dated August 28, 2020.

suffer in the absence of injunctive relief will be increasingly difficult to measure with the passage of time.  Petitioners' claims for Breach of Fiduciary Duty and Misappropriation of Potential Business Opportunities entitle them to the remedy of Disgorgement (*Petition, Counts XI, XV; Amended Petition, Counts XX-XXI, XXIII*), and the measure of damages is the gross revenues or net revenues received by Respondents as a result of their wrongful conduct.[27]  *McMillian v. McMillian*, 310 Ga. App. 735, 713 S.E.2d 920 (2011).  Respondents Charanjeev and Ahuja state that the primary source of their income is "the refinancing of real estate and the sale of real estate."  *Ahuja Aff., ¶ 18; Affidavit of Charanjeev Singh ("Charanjeev Aff."), ¶ 8.*  The complexity of calculating gross and net receipts from the purchases and sales of numerous parcels of real property involving multiple ownership interests would increase exponentially over time, as would the potential sources of disputes and contentions.  Unless Respondents are enjoined from engaging in further transactions in the subject parcels, Petitioners will be denied an adequate remedy as a practical matter. *Clear-Vu Cable, Inc. v. Town of Trion*, 244 Ga. 790, 262 S.E.2d 73 (1979).

"The granting and continuing of injunctions shall always rest in the sound discretion of the judge, according to the circumstances of each case. This power shall be prudently and cautiously exercised and, except in clear and urgent cases, should not

---

[27] Alternatively, or in addition to such relief, Petitioners claim they can recover title to the properties acquired by unlawful means.

be resorted to." OCGA § 9-5-8.  The Georgia RICO Act similarly provides, "Upon…a showing of immediate danger of significant loss or damage…a preliminary injunction may be issued in any such action before a final determination on the merits." OCGA § 16-4-6(b).  Petitioners have supported their request for an injunction under the Georgia RICO Act with substantial, corroborated and credible evidence as to Respondents' "pattern of racketeering." *See* pp. 19-25 *supra*.  Petitioners have further demonstrated that they are entitled to an injunction under the general civil law based on that same evidence, which is evidence of Respondents' fraud  and other "acts illegal or contrary to equity and good conscience" (OCGA §§ 9-5-1, 9-5-11; see pp. 25-26 *supra*) and they have shown they *will be* irreparably harmed in the absence of injunctive relief to prevent the dissipation of the assets in Respondents' hands that are the object of their claims because Respondents intend to dispose of those assets as they have expressly indicated, and they are the only assets Respondents have that are sufficient to satisfy Petitioners' claims.  Petitioners have shown that they are entitled to an injunction to preserve the *status quo* and the remedies available to them now that will later be lost without such relief. See pp. 26-31 *supra*.

### 4.   **Balancing the Parties' Equities.**

"In determining whether to issue an interlocutory injunction, the trial court must balance the conveniences of the parties pending final adjudication. [Cits.] An interlocutory injunction may be issued to maintain the status quo if, after balancing

the relative equities of the parties, it appears the equities favor the party seeking the injunction." *Bernocchi v. Forcucci*, 279 Ga. 460, 461, 614 S.E.2d 775 (2005). The burden is on the movant to demonstrate entitlement to interlocutory injunctive relief, and the parties against whom relief is sought may present evidence showing the inequity in imposing such relief.

> '(A)n interlocutory hearing is designed to balance the conveniences of the parties pending a final outcome of the case. Stated another way, it has been held that the real consideration should be as to whether the greater harm would result by the granting or the refusal of the interlocutory relief. In other words, if the danger to one party is great, while the probable harm to the other is minimal, then relief ought to be granted or refused in line with such probabilities.'
>
> *Metropolitan Atlanta Rapid Transit Authority v. Wallace*, 43 Ga. 491, 494-495, 254 S.E.2d 822 (1979) [quoting 15 EGL 285, Injunctions, § 16 (1969)]

The trial court must balance the parties' equities based upon the evidence presented. *Bernocchi v. Forcucci, supra*, 279 Ga. 460 at 461. Failure to do so is grounds for reversal. *Hampton Island Founders v. Liberty Capital*, 283 Ga. 289, 294, 658 S.E.2d 619 (2008). In balancing the parties' equities, the Court must consider the nature of the parties' respective property interests to determine which is superior. *Cantrell v. Henry County, Georgia, by Henry County Water and Sewerage Authority*, 250 Ga. 822, 826, 301 S.E.2d 870 (1983); *Jimerson v. Republic Land & Investment Company, Inc.*, 234 Ga. App. 417, 419-420, 506 S.E.2d 920 (1998). "Where equities

are equal, the law shall prevail.  If equities are unequal, the superior equity shall prevail.
Superior diligence as to time will create such inequality." OCGA § 23-1-11.

Petitioners' evidence shows that the four (4) <u>Limited Warranty Deeds</u> and the
"<u>Agreement</u>" evidencing the conveyance of a 50% undivided interest in the properties
at106 Commerce Street, 2723 Roosevelt Highway, 3811 Flat Shoals Parkway, 5754
Attucks Boulevard and 5341 Snapfinger Road and a 28% undivided interest in 2318
SE Old Cornelia Highway from King Group to Crown LLC, and the <u>Amended and
Restated Operating Agreement of Maharaja Investments, LLC</u> evidencing the
transfer of a 50% Membership Interest in Maharaja to Charanjeev and Ahuja (25%
each) which were signed on August 14, 2019 (the "Coerced Transactions"), were
signed by Dr. Arora **under duress** as the result of Respondents' threats to interfere
with Harsimran's wedding by slandering and defaming her to her fiancé's family and
to inflict violence upon her fiancé's family and that they were procured by fraud as
evidenced by the fraudulent Quitclaim Deed[28] dated just five days later, signed by
Charanjeev purportedly conveying Maharaja's 50% interest in Pinetree Plaza to Crown
LLC for nothing. *See* pp. 8-9, *supra*; *Arora Aff., ¶¶ 23-24, 31; Second Arora Aff., ¶¶
5,12.*

"[A] deed executed under compulsion or duress is not binding upon the maker."

---

[28] Notice of Filing Exhibits, Ex. "L".

*Gilmore et Ux v. Hunt*, 137 Ga. 272, 73 S.E. 364, 365 (1911) (threats of criminal prosecution against property owner's husband constituted duress). "[A]n action is always maintainable to cancel a deed procured by fraud or duress, where the legal remedy is not as efficacious as that afforded by a court of equity." *Id*. "Respondents had the knowledge, information, means, opportunity and amoral character needed to carry out their threats against Harsimran, which made them entirely credible." *Petition, ¶ 26.* A threat to throw the plaintiff into a river if she did not sign a deed were made under circumstances "…sufficient to show an apparent intent and ability and, hence, sufficient to overcome the mind and will of a person of ordinary firmness. They were therefore sufficient to constitute duress and, hence, sufficient to void the deed which was delivered as a result thereof." *Calhoun v. Dowdy*, 207 Ga. 584, 587-588, 63 S.E.2d 373 (1951).

The various documents evidencing the Coerced Transactions of August 14, 2019 were prepared by Joel M. Haber, Esq., Dr. Arora's attorney, and signed at his office. *Affidavit of Joel M. Haber, ¶¶ 7-8.* The deed coerced from the plaintiff in the *Calhoun* case was also drafted by an attorney and signed in the attorney's office. According to the court in *Calhoun*, the plaintiff could not rely on any threats or intimidation *made in the presence of the attorney* because she could have sought protection from the attorney. However, threats made elsewhere when the defendants could have carried out the threats were sufficient to constitute duress.

> Although the threats to throw the petitioner into the river, at a time when she was alone with the defendant's agents and approaching the river, if she refused to promise to execute the deed, were sufficient to constitute duress in that at the time there was an apparent intention and ability to carry out such threats, the repetition of the threat and other acts of intimidation alleged to have occurred in the presence of [the attorney], in the absence of allegations showing that the petitioner was unable to secure protection from [the attorney], would not have been sufficient to show the signing of the deed to be the result of such duress as would avoid it."

*Calhoun v. Dowdy, supra,* 207 Ga. 584 at 587.

Respondents apparently believe that the preparation of the documents evidencing the August 14th Coerced Transactions by Dr. Arora's attorney and the parties' execution of the documents at his office is somehow significant although they do not clearly articulate the reason. Anyway, Petitioners have never contended that Charanjeev or Ahuja repeated any threats of harm against Harsimran or her fiancé's family in Mr. Haber's presence, nor could Mr. Haber have offered any protection. The actual threats of harm were made far away in India, where they could have and clearly would have been carried that very day had not Dr. Arora signed the documents as Respondents demanded. *Vineet Aff,. ¶ 29.*

To briefly summarize the facts as to the Pinetree Plaza Shopping Center, which will be litigated in the Thomas County Action: Maharaja purchased a 50% undivided

interest in the property for $700,000 on July 15, 2019,[29] and thirty-five days later, on August 19, 2019, Respondent Charanjeev Singh signed and recorded a fraudulent Quitclaim Deed,[30] falsely representing *himself* as an "Authorized Signer" for Maharaja and purporting to convey Maharaja's 50% interest in Pinetree Plaza to his brother Ahuja's company Crown Assets, LLC **for nothing**. Crown LLC subsequently issued a fraudulent Limited Warranty Deed [31] to Respondent 2551 East Pinetree Blvd, LLC ("Pinetree LLC"), which issued a fraudulent Security Deed [32] to TC Federal Bank ("TC Federal") as security for a $3,075,884.00 line of credit. *See* pp. 12-13 *supra*.

Obviously, Charanjeev was not an "Authorized Signer" for Maharaja and obviously. He was not authorized to give away the property for which Maharaja had just paid $700,000 to his brother's company for nothing. Rather, he executed the First Fraudulent Deed without Vineet's or Dr. Arora's knowledge or consent, and it is a complete fraud. *Vineet Aff., ¶¶ 34-36*; *Arora Aff, ¶ 36*.

Appended to the First Fraudulent Deed and recorded with it is a document

---

[29] Notice of Filing Exhibits, Ex. "J" (the "Vesting Deed")

[30] Notice of Filing Exhibits, Ex. "L" (the "First Fraudulent Deed")

[31] Notice of Filing Exhibits, Ex. "M" (the "Second Fraudulent Deed")

[32] Notice of Filing Exhibits, Ex. "O"

captioned "Certified Resolution and Incumbency Certificate of Maharaja Investments, LLC," which purports to evidence Charanjeev's authority to act on Maharaja's behalf in signing the deed (the "Fraudulent Certification").[33] Vineet did not sign this document nor had he ever seen it before obtaining a copy of the recorded First Fraudulent Deed to which it was attached. The Fraudulent Certification is a falsified document that Charanjeev created from an Authentic Certification[34] that Charanjeev prepared and presented to Vineet on June 22, 2019 before Vineet left for an extended trip to India, to evidence Charanjeev's authority to act on behalf of Maharaja at the closing of Maharaja's *purchase* of Pinetree Plaza. *Vineet Aff., ¶ 12, Ex. "C"*. Vineet signed and dated the document June 22, 2019 and left the original with Charanjeev for use in the closing. After it was completed and signed, Charanjeev altered the Authentic Certification by removing the first page of the two-page document and substituting an *altered* first page in which the word "*sale*" was substituted for the word "*purchase*" in several places, and attaching it to the *original* second page of the document, changing the document from a Resolution authorizing Charanjeev to act on behalf of Maharaja in its *purchase* of Pinetree Plaza as originally intended, to one authorizing him to act for the company in its *sale* of the property.

---

[33] Notice of Filing Exhibits, Ex. "L"

[34] Notice of Filing Exhibits, Ex. "K"

These facts are easily proven by simply comparing copies of the two documents side-by-side. *Vineet Aff., ¶ 36, Exs. "C", "E".*  The fraud is plainly evident.

The equities of Petitioner Maharaja in the Pinetree Plaza Shopping Center are unassailable.  Maharaja paid $700,000 for its half interest in the property, having won the bid to purchase the property and having funded the bid and procured its title.  *Vineet Aff., ¶¶ 4, 8-9, 15-16, Exs. "A"-"C", "D".*  As is the case in all of Petitioners' acquisitions, Maharaja's purchase of Pinetree Plaza was a legitimate, arms' length transaction involving a disinterested third-party seller in which the purchase price was established by a bidding process and paid in full, all in the ordinary course of Petitioners' business.  *Id*. King Group's equities in the properties at 106 Commerce Street, 2723 Roosevelt Hwy., 3811 Flat Shoals Road, and 2318 SE Old Cornelia Highway are equally clear, each representing a legitimate, arms' length transaction in the ordinary course of Petitioners' business, as in the case of Pinetree Plaza.

Dr. Arora was forced to sell 5754 Attucks Boulevard and 5341 Snapfinger Road under duress even though Harsimran's wedding had taken already place, due to Respondents' continuing threats to retain their fraudulent title to Maharaja's 50% undivided interest in Pinetree Plaza if he refused. *Arora Aff., ¶ 38; Second Arora Aff., ¶¶ 9,17; Findley v. Hulsey,* 79 Ga. 670, 671-672, 4 S. E. 902 (1887) (threat to oust property owners based on void sheriff's deed stated good grounds to set aside deed for fraud and duress). King Group sustained damages of **$266,298.42** on the sale of 5754

Attucks Boulevard and **$422,669.90** on the sale of 5341 Snapfinger Road, being the sums disbursed to Crown LLC as the record owner of a 50% interest in the two properties —interests it had obtained through extortion and fraud. *See* p. 8 n. 11, pp. 33-36, *supra.*

Crown LLC "swapped" the sales proceeds from  5754 Attucks Boulevard and 5341 Snapfinger Road for 90 Hunters Chase, 4319 Covington Highway and 325 Crooked Stick Drive, pursuant to 1031 Exchanges.  Based on these facts, King Group has a damages claim against Crown LLC—and all the Respondents under the Georgia RICO Act and Civil Conspiracy (*Petition, Count XVII*)—in the sum of **$688,968.32** and the clear legal right to pursue collection of such damages through the assertion of an Equitable Lien and/or Constructive Trust against the properties purchased with them.

> Whenever one person fraudulently takes money from another and invests that money in real estate, the person defrauded may **follow that money to the real property and impress a trust on the property** for his or her benefit.
>
> *Meadow Springs, LLC v. IH Riverdale, LLC*, 286 Ga. 701, 704, 690 S. E. 2d 842 (2010).
>
> 'A constructive trust is a trust `implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity.' 'Where the constructive trustee has invested such funds or has purchased other property, **the real owner can follow it**

**wherever it can be traced**.'

*Total Supply, Inc. v. Pridgen*, 267 Ga. App. 125, 126, 598
S.E.2d 805 (2004) (citations omitted). See also *First
National Bank of Cartersville v. Hill*, 412 F. Supp. 422, 425
(N.D. Ga. 1976) (emphasis supplied)

A more solid evidentiary case for "following the money" than a 1031 Exchange can hardly be imagined, in view of the exacting documentation required by Section 1031 of the Internal Revenue Code. Petitioners' legal claim for collection of the sales proceeds paid to Crown LLC from the properties purchased with them (90 Hunters Chase, 4319 Covington Highway and 325 Crooked Stick Drive and) through the establishment of an Equitable Lien or Constructive Trust is equally solid. Petitioners possess liens rights in specific amounts in specific parcels of real property that are entitled to protection by a court of equity in accordance with long-standing principles of Georgia law. *Meadow Springs, LLC v. IH Riverdale, LLC, supra,* 286 Ga. 701 at 704; *First National Bank of Cartersville v. Hill*, 412 F. Supp. 422 at 425.

The full extent of Petitioners' equities in 7530 St. Marlo Country Club Parkway cannot be fully established at this juncture because discovery has not commenced. However, the evidence that Petitioners do possess shows without any doubt that Respondents stole funds from Petitioners and used the stolen money to purchase or improve the property. See p. 11 *supra*.   These facts are evident from the fraudulent charges that Charanjeev made on Harsimran's credit card accounts as indicated on her monthly account statements, which show on their face that certain of the charges

pertained to the purchase of 7530 St. Marlo Country Club Parkway. *Id*. Petitioners' claims for Equitable Lien and/or Constructive Trust against the property to recover the stolen funds is absolutely clear, although, as stated above, Petitioners cannot establish the full amount of stolen funds used in the purchase or improvement of the property (and therefore exact the amount of their Equitable Lien) without discovery. Their request for an injunction is justified to preserve the asset until such discovery can be completed.

Petitioners come into this Court seeking the vindication of legally recognized property rights that are entitled to the protection of a court of equity, and they have demonstrated the injuries they will suffer in the absence of an injunction. The threatened injuries to Petitioners far outweigh any threatened harm to Respondents from an injunction because Respondents have no property interests that the law will recognize. Neither Charanjeev nor Ahuja nor Crown LLC paid *any* consideration for the valuable property interests they wrested from Petitioners. *Arora Aff., ¶¶ 27-29; Second Arora Aff., ¶¶ 3-4, 10-11*. They have no more rights than an embezzler, which is none.

> It is a general rule of common law that **no title is acquired by an embezzler**, but that **such title remains in the victim**, who is the beneficial owner of a constructive trust which is imposed on such monies or on property purchased with such money.
>
> *First National Bank of Cartersville v. Hill*, *supra*, 412 F. Supp. 422 at 425 (N.D. Ga. 1976) (emphasis supplied).

The same principles applied in the *Hill* case apply to the wrongdoing of Respondents and the property they have acquired from Dr. Arora through their predations. All one need do is substitute the word "extortionist" for "embezzler" to fit the facts of the case *sub judice* perfectly. "[T]he conduct of each of the parties is highly relevant in determining where the equities lie." *Rice v. Lost Mountain Homeowners Assoc.*, 269 Ga. App. 351  604 S.E.2d 215 (2004). Petitioners are the innocent victims of Respondents' criminal predations. They come into Court with clean hands. *See* O.C.G.A. § 23-1-10.  There could be no sharper contrast than that between the legitimate property interests that Petitioners acquired by years of hard work and the scheme of extortion and fraud by which Respondents have sought to appropriate that property for themselves without working for it, without risking anything for it and without offering to give anything in return, in utter disregard of Petitioners' rights. *Affidavit of Sahib Arora, ¶¶ 19-24, 27-29, 31, 36-37; Affidavit of Vineet Singh, ¶¶ 25-29, 31, 37; Affidavit of Meharban Arora, ¶¶ 10-16; Affidavit of Harsimran Arora, ¶¶ 4, 8-11, 14*.  In balancing the parties' equities in this case, the scales of justice will weigh heavily Petitioners' favor.

Respondents claim that they "…rely on the refinancing of real estate and sale of real estate as their primary source of income." *Ahuja Aff., ¶ 18*; *Charanjeev Aff., ¶ 8*.  They state that "[n]either [they] nor any of the other Respondents have a regular source of income…" *Id*.  Petitioners are not requesting that Respondents be enjoined

from dealing in real estate, only that they be enjoined from disposing of the parcels of real estate involved in this litigation, which they obtained from Petitioners through extortion and fraud as shown by the evidence. The injunction requested by Petitioners does not restrict Respondents' business activities in any way. Nor do Petitioners seek to prevent Respondents from servicing the monthly debt on the properties. Petitioners are invested in the preservation of the properties. The injunction they are seeking specifically allows Respondents to continue to deal with the properties on an on-going basis, to receive income from them and make disbursals for recurring expenses in the ordinary course of business. Petitioners request only that the injunction be issued enjoining any disposition of the properties or disbursal of income to Respondents during the pendency of the case. The parties should be able to handle any issues that arise requiring communication and cooperation among them. "A trial court's findings and legal rulings at the interlocutory injunction stage are not final, and an interlocutory injunction may be dissolved or modified as the case develops." *Bishop v. Patton, supra,* 288 Ga. 600 at 604 at 611. If not, they can seek assistance from the Court.

### 5.  <u>Substantial Likelihood that Petitioners Will Prevail on the Merits of Their Claims at Trial.</u>

"[A] trial court is not required to find that a movant is likely to succeed on the merits before granting an interlocutory injunction, under certain circumstances

where other equitable factors counsel in favor of the grant." T*oberman v. Larose Ltd.*, 281 Ga. App. 775, 778, 637 S.E.2d 158 (2006); *Bijou Salon & Spa, LLC v. Kensington Enterprises, Inc.*, 283 Ga. App. 857, 860, 643 S.E.2d 531 (2007) (although not controlling, trial court may consider merits of the case in balancing the equities in favor of temporary injunctive relief). "In determining whether the equities favor one party or the other, a trial court *may* look to the final hearing and contemplate the results." *Lee v. Environmental Pest and Termite Control, Inc*. 271 Ga. 371, 373, 516 S.E.2d 76 (1999) (citations omitted) (emphasis supplied).  "If the trial court determines that the law and facts are so adverse to a plaintiff's position that a final order in his favor is unlikely, it may be justified in denying the temporary injunction because of the inconvenience and harm to the defendant if the injunction were granted." *Id*.  Petitioners welcome a consideration of the likelihood of their success at trial, though the other factors militate so strongly in favor of their request for injunctive relief, it is probably not necessary.  From Petitioners' perspective, there are no facts present in this case that are worrisome nor legal precedent that will cause undue trouble.  Indeed, this case is one in which the facts and the law appear to be heavily in favor of Petitioners' cause.

### 6.    Granting the Interlocutory Injunction Will Not Disserve the Public Interest.

The injunctive relief sought by Petitioners would not appear to run afoul of any public policy or interest.

## IV.  CONCLUSION

Considering the above arguments and authorities cited in support thereof, Petitioners respectfully request that their Motion for Interlocutory Injunctive Relief be GRANTED.

This 14th day of September, 2020.

Respectfully submitted,

_____
Michael A. Dominy
Georgia Bar No. 225335
Attorney for Petitioners

The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia 30308
(404) 900-9570

michael@dominylaw.net

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

SAHIB ARORA; VINEET SINGH;   §
KING GROUP MGMT LLC;   §
MAHARAJA INVESTMENTS, LLC   §
and ZILLIONAIRE ASSETS, LLC   §
  §
    Petitioners,   §
  §   CIVIL ACTION
v.   §
  §   FILE NO. 2020CV339119
  §
CHARANJEEV SINGH; KARAN S.   §
AHUJA; JARNAIL SINGH; JONIKA   §
ARORA; CROWN ASSETS, LLC;   §
2551 E PINETREE BLVD   §
MGMT LLC; 2551 EAST PINETREE   §
BLVD LLC; 4319 COVINGTON   §
HWY, LLC; 140 W DYKES   §
STREET LLC; 1604 E   §
OGLETHORPE BLVD, LLC;   §
KING ASSETS, LLC and   §
2505 S MAIN STREET, LLC   §
  §
    Respondents.   §

_____

## CERTIFICATE OF SERVICE
_____

THIS IS TO CERTIFY that I have this day served a copy of the foregoing

**Petitioners' Memorandum of Law in Support of Motion for Interlocutory**

**Injunctive Relief** by email marked STATUTORY ELECTRONIC SERVICE upon

counsel for Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh, Jonika

Arora, Crown Assets, LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street LLC,

1604 W. Oglethorpe Blvd, LLC, 2505 S. Main Street LLC and King Assets, LLC,

as follows:

David S. Klein, Esq. at dklein@rlklawfirm.com and

Alexandra M. Dishun, Esq., at adishun@rlklawfirm.com

By Priority Mail: Upon Respondent 2551 East Pinetree Blvd, LLC c/o Sameer

Lalani, 1040 Indian Trail Rd., Suite Bl, Lilburn, GA 30047

This 14th day of September, 2020.


_____
Michael A. Dominy
State Bar No. 225335
Attorney for Petitioners


The Dominy Law Firm, LLC
729 Piedmont Avenue NE
Atlanta, Georgia  30308
(404) 900-9570

michael@dominylaw.net

# EXHIBIT H

Debtor Crown Assets, LLC's Notice of Removal
*Sahib Arora et al. v. Charanjeev Singh et al.*
Previously Pending in the Superior Court of Fulton County, Case No. 2020CV339119

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| SAHIB ARORA; VINEET SINGH; | : | |
| KING GROUP MGMT, LLC; | : | |
| MAHARAJA INVESTMENTS, LLC; and | : | |
| ZILLIONAIRE ASSETS, LLC, | : | |
| | : | |
| Petitioners, | : | CIVIL ACTION FILE NO.: |
| | : | 2020CV339119 |
| vs. | : | |
| | : | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | : | |
| JARNAIL SINGH; JONIKA ARORA; | : | |
| CROWN ASSETS, LLC; 2551 E PINETREE | : | |
| BLVD MGMT LLC; 2551 EAST PINETREE | : | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | : | |
| 140 W DYKES STREET LLC; 1604 E | : | |
| OGLETHORPE BLVD LLC; KING ASSETS, | : | |
| LLC; and 2505 S MAIN STREET, LLC, | : | |
| | : | |
| Respondents. | : | |

**RESPONDENTS CHARANJEEV SINGH, KARAN S. AHUJA, CROWN ASSETS, LLC,
4319 COVINGTON HWY LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE
BLVD LLC, KING ASSETS, LLC, AND 2505 S MAIN STREET, LLC'S RESPONSE TO
PETITIONERS' MOTION FOR INTERLOCUTORY INJUNCTIVE RELIEF**

COMES NOW, Respondents Charanjeev Singh, Karan S. Ahuja, Crown Assets, LLC, 4319
Covington Hwy LLC, 140 W Dykes Street LLC, 1604 E Oglethorpe Blvd LLC, King Assets LLC,
and 2505 S Main Street, LLC (collectively, the "**Crown Respondents**"), by and through their
undersigned counsel, and file this their Response to Petitioners' Motion for Interlocutory Injunctive
Relief (the "**Motion**"), respectfully showing the Court as follows.

STATEMENT OF FACTS

1. **Background of King Group and the Family Businesses.**

This lawsuit originates from a familial business dispute. Petitioners Sahib Arora ("**Arora**")
and Vineet Singh ("**Vineet**") are brothers. They are cousins of Respondents Charanjeev Singh
("**Charanjeev**") and Karan S. Ahuja ("**Ahuja**"). Respondents Jarnail Singh ("**Jarnail**") and Jonika

Arora ("**Jonika**") are the parents of Charanjeev and therefore the uncle and aunt of Arora and Vineet, respectively. Meharban Arora ("**Meharban**") and Neeta Arora ("**Neeta**") are the parents of Arora, Singh and Harsimran Arora ("**Harsimran**"). Meharban and Jarnail are brothers and Neeta and Jonika are cousins and sisters-in-law. The families lived together in the same residence in India for almost thirty (30) years. Arora, Vineet, Charanjeev, and Ahuja all grew up together in India. Jarnail and Meharban have operated and continue to operate a business in India called Maharaja Farms ("**Maharaja Farms**"). Maharaja Farms performs event management services.

In 2014, all of the members of each side of the respective families organized a company called King Group Mgmt, LLC ("**King Group**"). King Group initially consisted of nine (9) family members owning eleven percent (11%) each of the company's membership interests. Each side of the family made capital contributions to King Group upon its creation, totaling approximately $200,000.00. King Group was and is in the business of purchasing, managing, and selling real property throughout the United States, with a primary focus on real property located in Georgia. The company served as an investment vehicle for the family members.

On January 6, 2017, the nine (9) family members decided to transfer their respective membership interests in King Group to two (2) family members – Ahuja and Arora – with them holding forty-nine percent (49%) and fifty-one percent (51%), respectively, of the membership interests in the company. At this time, Ahuja was completing medical school in India and Arora was in the United States. Since Arora was located in the United States, he was given a majority membership interest in King Group in order to more easily effectuate real estate and other transactions on behalf of the company. The transfer of these membership interests was evidenced by an Amended and Restated Operating Agreement (the "**King Group Amended and Restated Operating Agreement**"). As part of their ordinary course of business dealings for the last several decades, including here in the United States and in India, the parties would share e-mail accounts,

2

bank accounts, and credit cards. There were also various "side agreements" and payments of debt on behalf of other individuals, as is customary in their culture and in the ordinary course of the parties' business dealings.

In May or June of 2019, Ahuja discovered that Arora had forged the King Group Amended and Restated Operating Agreement to change the membership interests from forty-nine percent (49%) and fifty-one percent (51%) to eleven percent (11%) and eighty-nine percent (89%) for Ahuja and Arora, respectively. At this point in time, Arora had complete and total control over the assets and the bank accounts of King Group. Ahuja demanded that Arora fix the King Group Amended and Restated Operating Agreement to state the correct membership interest percentages. It was later discovered that Arora went as far as to file fraudulent federal tax returns with incorrect membership interests listed.

In July 2019, Arora started making threats and outrageous demands against Ahuja and members of his side of the family, including but not limited to demanding that they pay him $900,000 to "revert-back" the membership interests in King Group. Ahuja and other members of his side of the family demanded that the properties, assets, and liabilities be distributed equally amongst each side of the family. Multiple discussions and meetings were held between each side of the family in July and August 2019 with the goal of complete separation.

2. **The August 2019 Settlement.**

In early August 2019, a resolution was reached between the two sides of the family. On August 13, 2019, Arora sent a comprehensive e-mail to his attorney – Joel Haber in Conyers, Georgia – directing him to prepare documents to effectuate the settlement. Mr. Haber prepared several operating agreements and deeds to effectuate the agreed upon transfers of membership interests in companies and real property. Arora executed these documents at Mr. Haber's office. One such document included a bill of sale of eleven percent (11%) of Ahuja's membership interest

in King Group.[1] The remaining thirty-eight percent (38%) of Ahuja's membership interest in King Group was to be transferred after the whole familial debt was paid in full by Arora which included balances owed from the real estate Arora kept in King Group, 1031 exchange proceeds from the sale of a property at 2995 Roosevelt Hwy in Atlanta, Georgia ("**2995 Roosevelt**"), fifty percent (50%) of the equity of the residence located at 660 Belgrave Lane in Tucker, Georgia, payment of Jonika and Jarnail's credit cards, amounting to approximately $198,000.00, fifty percent (50%) of the value of vehicles owned by Crown Royal Cars LLC ("**Crown Cars**"), fifty percent (50%) of a loan promissory note to Charles and Linda Grier upon maturity, as well as various other expenses that Charanjeev and others fronted in connection with the properties owned or previously owned by King Group.

In addition, on August 17, 2019, Vineet called Charanjeev from India and asked him to use a previously prepared corporate resolution for Maharaja to transfer Maharaja's fifty percent (50%) interest in the real property at 2551 E. Pinetree Boulevard in Thomasville, Georgia ("**Pinetree Plaza**") to Crown in order to reduce the amount of money owed by Arora and Vineet's side of the family. Vineet and Meharban at that time also asked to Jarnail to also keep their credit card and life insurance payments current, which Jarnail began paying from his account at Associated Credit Union ("**ACU**") and continued paying through February 2020, the total amount being in the range of $25,000.00. Vineet and Meharban were worried about asking Arora to keep these payments current, so they would not lose their share or interest in King Group. The transfer of the Pinetree Plaza Property occurred on August 19, 2019. On the same day, Vineet called the Crown Respondents on at least two occasions about the status of the transfer of Maharaja's interest in the Pinetree Plaza Property. Vineet apologized to Jarnail for the way that Arora had acted over the past

---

[1] Ahuja actually owned forty-nine percent (49%) of the membership interests of King Group, but Arora had forged the King Group Amended and Restated Operating Agreement, as discussed *supra*.

several months. Charanjeev also called Vineet and Meharban and talked to Vineet on Meharban's phone that evening after the transfer in order to confirm that it had been completed.

### 3. **Events After the August 2019 Settlement.**

   a.   The Pinetree Plaza Property.

In mid-August, under threat of eviction, the Crown Respondents were forced by Petitioners to leave the property the parties resided at in Tucker, Georgia.[2]   In September 2019, Vineet forwarded several e-mails to Charanjeev concerning the Pinetree Plaza Property. In October 2019, Arora and Vineet approached Shaneel Lalani ("**Shaneel**"), Arora and Vineet's partner on two other properties and a partner on the Pinetree Plaza property, and told him that no funds from a property located at 2485 N Columbia St. in Milledgeville, Georgia (the "Milledgeville Property") should be used for the Pinetree Plaza Property, because they had taken over the interest in the Milledgeville Property and transferred all of their interest in the Pinetree Plaza Property to Charanjeev and Ahuja. Arora and Vineet further told Shaneel that they did not want to use such funds because the Milledgeville Property was cash flow positive and the Pinetree Plaza Property was cash flow negative, and that they were no longer involved in the ownership or management of the Pinetree Plaza Property. In addition, through January and February 2020, Vineet received e-mails from the U.S. Department of Agriculture requesting an update on ownership of the Pinetree Plaza property, to which he never responded. In late February or early March 2020, Arora, Vineet and Meharban visited Shaneel and asked him whether it would be beneficial or not to obtain their interest back in the Pinetree Plaza Property. Arora then started sending e-mails and other communications to the Crown Respondents' lenders in an attempt to cause a default under their respective loans.

---

[2] This property – 660 Belgrave Lane in Tucker, Georgia – had been paid for with proceeds from King Group and therefore all family members had used their money to purchase this property.

b. <u>5754 Attucks and 5341 Snapfinger.</u>

As a result of the August 2019 settlement, Zillionaire Investments, LLC ("**Zillionaire**") owned the property at 5754 Attucks Blvd in Morrow, Georgia ("**5754 Attucks**"), while King Group and Crown each owned a fifty percent (50%) interest in the property at 5341 Snapfinger Park Dr in Decatur, Georgia ("**5341 Snapfinger**"). Charanjeev continued managing these properties for Zillionaire and King Group and Crown, respectively, paying for repairs on both properties, including the installation of three HVAC units at 5754 Attucks and completion of the buildout for the tenant at 5341 Snapfinger.

On November 20, 2019, Arora signed an Amended Operating Agreement for one of his companies – Zillionaire – which added Crown as a member ("**Zillionaire Amended Operating Agreement**"). On November 27, 2019, Zillionaire sold 5754 Attucks for $1.85 million. Charanjeev acted as the real estate agent for Zillionaire in connection with the sale of 5754 Attucks and charged only a flat $500 commission in order to save the parties' commission costs, which would ordinarily be in excess of $100,000 for a transaction of this size. Arora attended the closing on 5754 Attucks, flying in from India, and indicated that he was excited because they already had lined up their share of proceeds to purchase an interest in 3180 Atlanta Hwy, Athens, Georgia ("**3180 Atlanta**"). On December 21, 2019, King Group, Crown, and Zillionaire entered into an agreement (the "**Zillionaire Internal Agreement**") in order to effectuate a 1031 exchange. The Zillionaire Internal Agreement acknowledged and affirmed that King and Crown each held a fifty percent (50%) membership interest in Zillionaire. The Zillionaire Internal Agreement further acknowledged and affirmed that King and Crown were each entitled to $341,408.22 of the proceeds from the sale of 5754 Attucks. On December 23, 2019, Zillionaire used the proceeds from the sale of 5754 Attucks to purchase a sixty-six and 67/10ths interest in the property at 3180 Atlanta and the signature of Ahuja, on behalf of Crown, was obtained to effectuate the purchase. On December 28, 2019, Arora

sent an e-mail to Mr. Haber indicating that Zillionaire had completed a 1031 exchange in connection

with the sale of 5754 Attucks and the purchase of 3180 Atlanta. In that e-mail Arora stated, "Crown

assets LLC may purchase any property for its 50% ($341,408.22) proceeds remaining in escrow with

1031 intermediary or receive a 1099 if they decide to withdraw."

On February 25, 2020, King and Crown sold 5341 Snapfinger for $1.155 million. Arora and

Ahuja both signed the warranty deed conveying the property. Charanjeev also acted as the real estate

agent for King and Crown in connection with the sale of 5754 Attucks and charged only a flat $500

commission in order to save the parties' commission costs, which would ordinarily be in excess of

$100,000 for a transaction of this size. Arora, Vineet, and Meharban all attended the closing on 5341

Snapfinger. They all spoke to Ahuja and Charanjeev for about an hour after closing in the parking

lot of the closing attorney's office discussing various things, such as their current financial situation

and the sale of a property at 118 S Grant Street in Fitzgerald, Georgia.

In January 2020, Arora executed a Certified Resolution and Incumbency Certificate for

Zillionaire, which provided Ahuja with the authority to purchase the property at 90 Hunters Chase

in McDonough, Georgia ("90 Hunters") for $785,000 and execute all documents in connection

therewith. On April 2, 2020, Crown and Zillionaire purchased 90 Hunters for $785,000, using the

funds Crown received from the sale of 5754 Attucks. In connection with the purchase of 90

Hunters, Crown and Zillionaire obtained a loan from Gelt Financial LLC.

c.   The Attempt at an April 2020 Settlement.

On April 4, 2020, Charanjeev, Jarnail, Meharban, and Reeta met once again about settling

money owed to Ahuja and Charanjeev's side of the family. While an initial deal was worked out, it

fell through once Arora filed a police report the very next day and started again sending e-mails and

other communications to the Crown Respondents' respective lenders. In June 2020, Arora and

Vineet, through the assistance of their counsel, filed affidavits against the Pinetree Plaza property.

The filing of these affidavits led to the Crown Respondents' lender – TC Federal Bank – filing an action to quiet title and for declaratory judgment in Thomas County Superior Court against some of the Petitioners and some of the Crown Respondents.

### 4. Other Events Concerning the Alleged "Duress" and "Extortion".

None of the Crown Respondents ever threatened to release "false and defamatory" information about Harsimran to her groom's family, nor did they ever threaten violence against any members of Petitioners' side of the family. All expenses for the children were paid from the income of Maharaja Farms. Even the wedding of Harsimran was paid for from the income of Maharaja Farms. On September 21, 2019, Jonika was forced out of the home she lived in with Neeta in India. In fact, she was assaulted and sustained a fracture. All of her jewelry and other items were seized be Neeta. After several days of medical leave, she came to be with her family in the United States. From September 22, 2019 through November 27, 2019, the last date, which is a month after Harsimran's wedding date, Harsimran continued texting and talking to Jonika. On the day of her wedding, Harsimran stated to me "You are my mother […] I miss you everyday I swear […] But I had restrictions […] Now I'm free." Harsimran also continued asking Jonika not to tell anyone that she was speaking to her and that "[n]o one [could] stop [her]" from talking to Jonika in the future. A few weeks later, Harsimran stated that it was a lie that a function was called off because everyone was scared of Jonika. On November 9, 2019, Harsimran stated to Jonika "I would suggest you not be affected much ..even if you get less money settle for a peaceful life. Money just comes and goes." Then, once Harsimran came to the United States in February 2020, she and her husband visited the Crown Respondents in their residence at the time at 7530 St. Marlo Country Club Parkway in Duluth, Georgia ("**7530 St. Marlo**"). Harsimran apologized for what Arora and her side of the

family had done. Meharban and Neeta also visited the residence and made the same apologies during this time period.[3]

<div align="center">**ARGUMENT AND CITATION TO AUTHORITY**</div>

1. **Legal Standard.**

The purpose of an interlocutory injunction is to maintain the status quo during the pendency of the litigation, and in determining whether to maintain the status quo, the Court must consider the harms an injunction would cause to the parties. *Univ. Health Servs., Inc. v. Long,* 274 Ga. 829, 829 (2002). An interlocutory injunction is an "extraordinary remedy" and the power to grant such relief "must be prudently and cautiously exercised." *SRB Investment Svcs., LLLP v. Branch Banking and Trust Co.,* 289 Ga. 1, 5 (3) (2011). There must be some vital necessity for the injunction so that one of the parties will not be damaged and left without an adequate remedy. *Bishop v. Batton,* 288 Ga. 600, 604 (2011); *Bernocchi v. Forcucci,* 279 Ga. 460, 461 (2005) (citing *Chambers v. Peach County,* 268 Ga. 672 (1997)).

An interlocutory injunction should not be granted unless the moving party shows there will be irreparable injury, the threatened injury to the moving party outweighs the harm to the non-movant, there is a substantial likelihood the movant will prevail on the merits, and an injunction will not disserve the public interest. *Bishop v. Batton,* 288 Ga. 600, 604 (2011). The burden is on the party seeking injunctive relief to demonstrate entitlement to the requested relief. *Treadwell v. Inv. Franchises,* 273 Ga. 517 (2001). Courts should not grant an injunction based on a mere threat of injury or an anticipation of similar wrongs based on past conduct. *Thomas v. Mayor of Savannah,* 209 Ga. 866 (1953). And the Court has broad discretion to deny injunctive relief. *Parker v. Clary Lakes Recreation*

---

[3] The Crown Respondents reserve the right to present testimonial or documentary support for the facts contained in this Motion, as well as additional evidence at any hearing on this Motion. Further, the Crown Respondents respectfully state that they may serve opposing affidavits not later than one day before the hearing. O.C.G.A. § 9-11-6(d).

*Ass'n, Inc.,* 272 Ga. 44, 44 (2000). A hearing on a request for interlocutory injunction is required. *Paine v. Lowndes County Bd. of Tax Assessors,* 124 Ga. App. 233 (1971), overruled on other grounds, *Chancey v. Hancock,* 233 Ga. 734 (1975); O.C.G.A. § 9-11-65(a).

As discussed below, Petitioners have failed to meet their burden in establishing any of the elements required for an interlocutory injunction and their Motion should be denied.

**2.** **Petitioners are not entitled to injunctive relief as they have an adequate remedy at law.**

At the hearing on the Crown Respondents' Emergency Motion to Cancel Lis Pendens, Petitioners' counsel clearly and plainly stated that Petitioners would be satisfied with a monetary judgment against the Crown Respondents. A monetary judgment is an adequate remedy at law. *See, e.g., Kirkley v. Jones,* 250 Ga.App. 113, 117 (2001) (plaintiff had "an adequate remedy at law in the form of a monetary judgment [and] the trial court did not err in refusing to grant specific performance"). It is well established that extraordinary remedies – such as injunctive relief – do not lie in favor of one who has an adequate remedy at law. *Bishop,* 288 Ga. at 606; *Ledbetter v. Callaway,* 211 Ga. 607, 610 (1955). Since the Petitioners have admitted through their counsel and their pleadings that they have an adequate remedy at law, injunctive relief may not be granted, and their Motion should be denied.

**3.** **Petitioners have not met the elements for an interlocutory injunction.**

a.  Element 1: There is not a likelihood of success on the merits of their claims.

i.  The claims, which are based exclusively on duress and extortion, will not succeed.

All of Petitioners' claims in this lawsuit are predicated on duress and extortion, which are unavailable remedies since Petitioners are sophisticated in business matters and had the opportunity to obtain (**and did obtain**) advice of counsel prior to consummating the transactions in question. While the Court indicated it would not consider matters outside of the pleadings in connection with

the Emergency Motion to Cancel Lis Pendens, in connection with a request for interlocutory injunction, the Court must consider evidence presented to it. *See Turner v. Trust Co.,* 214 Ga. 339 (1958) (discussing evidence of material issues of fact at a hearing on a request for interlocutory injunctive relief). The overarching basis for Petitioners' claims against Respondents hinges on a fanciful and fabricated story that Respondents planned to release "false and defamatory" information about Arora and Vineet's sister (and cousin to Charanjeev and Ahuja, and niece to Jarnail and Jonika) to her fiancé's family prior to their wedding day in India, and that through this alleged duress and extortion, Arora and Vineet executed various documents in August 2019 transferring and conveying money and property interests among the two sides of the family.[4]

As discussed in the Crown Respondents' Emergency Motion to Cancel Lis Pendens, it is well-established that "when the signer of an agreement is sophisticated in business matters and has access to and in fact obtains advice of counsel, the defense of duress is not available to void the contract." *Compris Technologies v. Techwerks, Inc..,* 274 Ga.App. 673, 682 (2005) (quoting *Cooperative Resource Center v. Southeast Rural Assistance Project,* 256 Ga.App. 719, 720-721 (2002)). Ultimately, Petitioners' claims will fail. First, it is undisputed that Petitioners are sophisticated in business matters. Second, it is clear through Arora's own e-mails to his attorney that Petitioners had access to and in fact obtained advice of counsel in connection with the 2019 transactions. On August 13, 2019, Arora sent a comprehensive e-mail to his counsel – Joel Haber – directing him to prepare documents to effectuate the parties' settlement. In turn, Mr. Haber prepared several operating agreements and deeds to effectuate the settlement. Arora executed these documents at Mr. Haber's

---

[4] Not until the Crown Respondents filed their Emergency Motion to Cancel Lis Pendens did Petitioners begin to make allegations (through affidavits submitted to this Court) that the Crown Respondents threatened physical violence against them. (*See* Affidavit of Meharban Arora (August 17, 2020) ¶ 14 ("stating they would send 'a hundred' thugs to wreck their house and commit acts of violence against their person, if they did not call the wedding off."). Meharban's own statements are not set forth anywhere in the Petition or the First Amended Petition, nor is any threat of physical violence.

office. Mr. Haber's own affidavit, submitted by Petitioners in connection with their Motion, affirms

that he provided legal advice to Arora. (Affidavit of Joel Haber (Aug. 26, 2020) ¶¶ 7, 8.) Under the

reasoning set forth in *Techwerks,* Petitioners' claims will fail against Respondents.

ii.  There was no duress or extortion.

The merits of the evidence in this case will establish there never was any duress or extortion

and that this is a fanciful story concocted by Petitioners and their counsel. For example, Harsimran,

who testified in an affidavit presented to this Court that her father – Meharban – told her the

wedding had to be moved because of the Crown Respondents' threats continued **speaking and**

**texting with Jonika for over a month after the wedding date**. Harsimran said things like she was

"free" from her family now that she was married, that Jonika was like a mother to her, and that

maybe Jonika should just take less money to settle for a peaceful life. Harsimran, Meharban and

Neeta even visited the Crown Respondents at their residence at 7530 St. Marlo as recently as

February 2020 to apologize for the conduct of Arora and their side of the family. Further, Vineet

and Arora **continued working with the Crown Respondents after the wedding date and**

**receiving the benefits of that cooperation**, including using Charanjeev as a real estate agent at a

significantly discounted commission rate, allowing Charanjeev to manage and repair properties

jointly owned, and engaging in a 1031 exchange with some of the Crown Respondents.

iii.  The Petitioners ratified the 2019 transactions through subsequent conduct.

Even if Petitioners were under duress or being extorted by the Crown Respondents (which

they were not), Petitioners' subsequent conduct shows that they ratified such transactions. If the

execution of a contract is procured by duress, the person executing it may, after removal of the

duress, waive the duress and ratify the contract. *Staley v. S. Guar. Inv.,* 184 Ga. App. 212, 213 (1987)

(quoting *Charter Medical & Co. v. Ware Manor,* 159 Ga. App. 378, 382(3) (1981)). In *Staley,* the person

that executed a contract – claimed to be executed under duress – subdivided the real property at

issue and sold it. *Id.* at 213. Such action amounted to a waiver of the alleged duress or extortion. *Id.* (citing *Augusta Motor Sales Co. v. King,* 36 Ga. App. 541 (1926)).

In this case, much more than just a sale of real estate has occurred. Instead, Petitioners have kept the assets that they received in connection with the 2019 transactions **and have benefitted from such assets, including keeping several hundred thousand dollars and purchasing real estate with those proceeds.** Further, in connection with the property 3180 Atlanta, which is owned by Zillionaire – governed by a membership interest agreement procured under alleged duress – Petitioners' own counsel has asked that Ahuja execute a document to effectuate a refinance of the property, which would in turn benefit Petitioners. Such ratification of the transactions complained of constitutes a waiver of any alleged duress or extortion.

      b.  <u>Element 2: There is no threat of irreparable harm to Petitioners.</u>

          i.  Petitioners cannot rely on the Georgia RICO Act to avoid showing irreparable harm.

Likely because Petitioners cannot show irreparable harm (as discussed *infra*), they instead argue that the Georgia RICO Act does not require a showing of irreparable harm for an injunction to issue. (Motion at 18.) This statement is incorrect. First, Petitioners and their counsel did not quote the entirety of O.C.G.A. § 16-14-6(b)[5], in particular the third sentence of that subparagraph which reads: "Upon the execution of proper bond against damages for an injunction improvidently granted and a showing of immediate danger of significant loss or damage, a temporary restraining order and a preliminary injunction may be issued in any such action before a final determination on the merits." Petitioners have made no effort to execute such a bond and their reliance on this section of the Georgia RICO Act should be dismissed. Second, as discussed *infra*, Petitioners have not shown any "immediate danger of significant loss or damage" as required by O.C.G.A. § 16-14-6(b).

---

[5] Petitioners cite to O.C.G.A. § 16-14-6(c), but should have cited to subparagraph (b).

ii.  There is no threat of irreparable harm.

Petitioners seem to have specifically limited their request for injunctive relief to a request that the Crown Respondents "be enjoined from disbursing funds received from the properties to themselves or to any person except in the ordinary course of business to pay regularly recurring business expenses" and "from disposing of the parcels of real estate involved in this litigation." (Motion at 4, 44.). Those two requests are addressed as follows.

First, it is unclear how disbursement of funds received from the properties to the Crown Respondents would harm Petitioners who do not yet have a judgment. Petitioners make the bald statement that there is "*certainty* that Respondents will dispose of assets and remove the funds representing the profits" and then claim that the individual Crown Respondents came to the United States without an automobile, job, or any financial resources. (Motion at 17, 27-28) (emphasis included). These unsupported statements are lies and Petitioners know it. The Crown Respondents had interests in King Group and another company Crown Cars. They also had bank accounts and Jarnail owned a Toyota Camry financed in his name through ACU. Harsimran actually used this vehicle in 2016 when she visited the United States. Further, there is no evidence that the Crown Respondents are disposing of assets or money received from the properties. The Crown Respondents are in the business of purchasing, managing, and selling real estate and real estate is their "inventory or product" to be leveraged with loans or sold for profits. Money, which is income for them, is then reinvested in other real estate. The properties owned by the Crown Respondents also serve as collateral for lenders. If they were fraudulently transferring assets and money, this would provide a cause of action for their lenders. Obviously, they are not doing this, and Petitioners' unsupported allegations are just that – unsupported by any actual evidence. Finally, Petitioners had the ability to file a motion for temporary restraining order with the Court, which they never did.

14

Second, there is no threat of harm that the Crown Respondents will dispose of the real estate involved in this litigation. Petitioners and their counsel have already admitted in communications with and filings in the Court that purpose of the notices of lis pendens filed against various properties owned by the Crown Respondents was so that the Crown Respondents could not transfer these properties. The Court has already denied the Crown Respondents' request to cancel the notices of lis pendens. It is well established that a notice of lis pendens provides notice to all the world of a particular claim and that one who takes title to such property would be affected by any subsequent orders or decrees entered by the Court. *Wilson v. Blake Perry Realty Co.,* 219 Ga. 57, 58-59 (1963). A notice of lis pendens "protect[s] against conveyance of the property" and denial of an injunction to accomplish the same goal is appropriate. *Id.* at 59 (citing *Brooks v. Carter,* 216 Ga. 836, 837(1) (1961). There is no threat that the Crown Respondents will transfer the real property which Petitioners contend is part of this litigation.

       iii.   Petitioners and their counsel are disrupting the status quo in order to gain a litigation advantage.

Furthermore, even though Petitioners are seeking to "preserve the status quo" it is Petitioners and their counsel who are **disrupting the status quo** through various actions undertaken by them and their counsel. First, prior to initiating this litigation, Petitioners consistently sent communications to the Crown Respondents' lenders in an attempt to cause them to default on their loan obligations. They and their counsel also filed false affidavits in the real estate records in Thomas County, Georgia. Petitioners' counsel is engaging in the same conduct and as recently as the week of filing this motion, he contacted the broker involved on the Pinetree Plaza property for some unknown reason. One such communication from Petitioners caused the Crown Respondents' lender – TC Federal Bank – to file a lawsuit in Thomas County, Georgia. Second, after filing the Petition, the Petitioners sent copies of the Petition to the Crown Respondents' lenders without any explanation. They have not named any of the Crown Respondents' lenders as parties to this lawsuit.

Third, Petitioners have filed at least one (1) false police report against the Crown Respondents during the pendency of this lawsuit. Fourth, Petitioners have hacked into the e-mail accounts of some of the Crown Respondents. Finally, during the pendency of this lawsuit, Petitioners were able to cause a credit card company to reverse around $38,000 of balance transfers made in connection with the 2019 settlement(s), thereby causing the debt to be reinstituted on the Crown Respondents' credit card(s). Over a year after the transactions took place, Petitioners claimed fraud and unfortunately the credit card company complied with this false and fraudulent request. Unlike Petitioners' efforts to upset the status quo, there is no evidence that the Crown Respondents have done anything to upset the status quo.

   c. Element 3: The balance of harms weighs significantly in favor of the Crown Respondents.

It is not even a close call that if injunctive relief were granted that the Crown Respondents would be significantly harmed. Petitioners are essentially asking the Court to require the Crown Respondents to shut down or severely limit their business – which much like the Petitioners is the livelihood of and sole source of income of the Crown Respondents. Such injunctive relief is not permitted under Georgia law. *See, e.g., Green v. Waddleton,* 288 Ga.App. 369 (2007) (trial court's enjoining of the operation of a business forcing closure of such business did not serve to maintain the status quo). This is because injunctions "should be refused where its grant would operate oppressively on the defendant's rights, especially in such a case that the denial of the temporary injunction would not work 'irreparable injury' to the plaintiff or leave the plaintiff 'practically remediless' [….]" *Garden Hills Civic Ass'n v. Metro Atlanta Rta,* 273 Ga. 280, 281-282 (2000) (citing *McKinnon v. Neugent,* 226 a. 331, 332 (1970)).

As discussed above and within the affidavits submitted with this response, it is clear that the relief requested by Petitioners would operate oppressively on the defendant's rights – namely to service their properties and debt obligations and to generate income. In addition, there is no

"irreparable injury" or a concern that Petitioners would be left "practically remediless." Petitioners'
counsel has already admitted that a money judgment would make his clients whole. And further,
there is no evidence that the properties owned by the Crown Respondents are being transferred or
will be transferred, nor is there any evidence that other assets or money are being transferred or will
be transferred by the Crown Respondents out of the reach of Petitioners if they were able to obtain
a judgment.

> d.  <u>Element 4: The equities and public interest do not favor injunctive relief.</u>

There are equitable and public interest considerations that do not favor Petitioners' request
for injunctive relief. Petitioners literally devote a single sentence in "support" of this fourth element
stating "[t]he injunctive relief sought by Petitioners would not appear to run afoul of any public
policy or interest." (Motion at 45.) There are at least two reasons why an injunction would disserve
the public interest. First, in Georgia there is a strong policy that permits parties to contract with one
another on whatever terms they wish. *Hardin v. Macon Mall,* 169 Ga. App. 793, 794 (1) (1984).
Second, as discussed *supra*, at the bare minimum, the facts in this case are in dispute. If an injunction
were to issue in this case, the effect on business would be significant. A party not liking the outcome
of a particular contract could wait a year, continue accepting the benefits of that contract, and then
claim through an intricate story that they were under duress or being extorted. That party, like the
Petitioners in this case, could simply make these baseless allegations in order to obtain an injunction
against a competitor or a person in a similar situation to that of the Crown Respondents. Public
interest considerations weigh strongly against the grant of injunctive relief to Petitioners.

Then there are also the equitable considerations of Petitioners' conduct. O.C.G.A. § 23-1-10
states that "[h]e who would have equity must do equity and must give effect to all equitable rights of
the other party respecting the subject matter of the action." This epitomizes the "unclean hands"
doctrine. A showing of "unclean hands" is a basis to deny an injunction. *See, e.g., Bishop Eddie Long*

*Ministries, Inc. v. Dillard,* 272 Ga. App. 894, 901 (2) (2005) (where plaintiffs did not have easement rights authorizing them to plug up a dam or harvest trees, trial court had good reason to deny an injunction based on its finding that plaintiffs' wrongful conduct in plugging up the dam and harvesting trees constituted unclean hands). There is ample evidence that Petitioners have unclean hands, as discussed *supra*. As such, principles of equity do not support injunctive relief for Petitioners.

<h2 style="text-align:center">C<small>ONCLUSION</small></h2>

The Crown Respondents respectfully state that an interlocutory injunction request requires a hearing as discussed *supra*. Further, the Crown Respondents respectfully request that the Court deny Petitioners' Motion for Interlocutory Injunctive Relief.

[Signature of counsel on following page]

Respectfully submitted, this 19th day of October, 2020.

**ROUNTREE LEITMAN & KLEIN, LLC**

/s/ David S. Klein
David S. Klein
Georgia Bar No. 183389
Alexandra M. Dishun
Georgia Bar No. 184502
Counsel for Respondents Charanjeev Singh, Karan S.
Ahuja, Jarnail Singh, Jonika Arora, Crown Assets
LLC, 4319 Covington Hwy LLC, 140 W Dykes Street
LLC, 1604 E Oglethorpe Blvd LLC, King Assets,
LLC and 2505 S Main Street, LLC

Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, Georgia 30329
(404) 584-1238
dklein@rlklawfirm.com
adishun@rlklawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2020, I electronically filed the foregoing **RESPONDENTS CHARANJEEV SINGH, KARAN S. AHUJA, CROWN ASSETS, LLC, 4319 COVINGTON HWY LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE BLVD LLC, KING ASSETS, LLC, AND 2505 S MAIN STREET, LLC'S RESPONSE TO PETITIONERS' MOTION FOR INTERLOCUTORY INJUNCTIVE RELIEF** with the Clerk of Court using the Odyssey E-Filing System, which will automatically send e-mail notification of such filing and a copy of same to all attorneys of record.

/s/ David S. Klein
David S. Klein
Georgia Bar No. 183389

20